Benjamin D. Brown (SBN 202545)
Daniel A. Small (*pro hac vice pending*)
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave., N.W., Suite 500, East Tower
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
bbrown@cohenmilstein.com
dsmall@cohenmilstein.com

Matthew W. Ruan (SBN 264409)
COHEN MILSTEIN SELLERS & TOLL, PLLC
88 Pine St., Ste 1400
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
mruan@cohenmilstein.com

Christopher C. Wheeler (SBN 224872)
FARELLA BRAUN + MARTEL LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480
cwheeler@fbm.com

*Attorneys for Plaintiff Pacific Steel Group*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC STEEL GROUP,<br><br>        Plaintiff,<br><br>v.<br><br>COMMERCIAL METALS COMPANY, C M C STEEL FABRICATORS, INC., CMC STEEL US, LLC, DANIELI CORPORATION, and GERDAU REINFORCING STEEL,<br><br>        Defendants. | Case No. _____<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

Page

INTRODUCTION...................................................................................................................1

JURISDICTION AND VENUE..............................................................................................4

INTRADISTRICT ASSIGNMENT........................................................................................4

INTERSTATE TRADE & COMMERCE ..............................................................................4

PARTIES.................................................................................................................................5

AGENTS AND CO-CONSPIRATORS..................................................................................6

FACTUAL ALLEGATIONS..................................................................................................7

I.      Industry Background ..................................................................................................7

        A.      The Upstream Market: Manufacturing Steel Reinforcing Bar................7

        B.      The Downstream Market: Rebar Furnish-and-Install Services................9

II.     The Evolution from Integrated Mills to Mini Mills to Micro Mills.......................11

III.    PSG's Entry Into the Rebar Furnish-and-Install Markets and CMC's Response ...............15

IV.     Market Consolidation and CMC's Gerdau Acquisition ........................................17

V.      CMC's Opposition to PSG's Efforts to Import Steel Rebar From Turkey .........................18

VI.     PSG's Attempt to Vertically Integrate and CMC's Response ..............................20

RELEVANT MARKETS.......................................................................................................27

I.      The Relevant Rebar Manufacturing Market..........................................................27

        A.      The Product Market...............................................................................27

        B.      The Geographic Market .........................................................................28

        C.      CMC Market Power ...............................................................................28

        D.      Harm to Competition..............................................................................29

II.     The Rebar Furnish-and-Install Market..................................................................29

        A.      The Relevant Product Market ................................................................29

        B.      The Relevant Geographic Markets.........................................................30

        C.      CMC Market Power ...............................................................................31

        D.      Harm to Competition..............................................................................31

INJURY TO PACIFIC STEEL GROUP ...................................................................................32

CAUSES OF ACTION .......................................................................................................32

Count One: Conspiracy in Restraint of Trade ...................................................................32

Count Two: Monopolization .............................................................................................33

Count Three: Attempted Monopolization (In the Alternative) ..........................................34

Count Four: Conspiracy to Monopolize ............................................................................35

Count Five: Below Cost Sales ..........................................................................................37

Count Six: Loss Leader Sales ...........................................................................................37

Count Seven: Unlawful & Unfair Business Practices ........................................................38

Count Eight: Interference with Prospective Economic Advantage .....................................39

PRAYER FOR RELIEF .....................................................................................................39

JURY DEMAND ...............................................................................................................42

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1   Plaintiff Pacific Steel Group ("PSG" or "plaintiff") brings this action for permanent

2   injunctive relief and damages or restitution against defendants Commercial Metals Company

3   ("CMC") and its subsidiaries, C M C Steel Fabricators, Inc. d/b/a CMC Rebar ("CMC Rebar"),

4   CMC Steel US, LLC ("CMC Steel US"), and Gerdau Reinforcing Steel ("GRS") (collectively, the

5   "CMC Defendants") and defendant Danieli Corporation ("Danieli") for violations of Sections 1

6   and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), California antitrust and unfair competition statutes,

7   and California common law, and alleges as follows:

8   **INTRODUCTION**

9   1.   This case is brought to remedy injuries to competition and PSG caused by the

10   unconscionable and illegal conduct of a multi-billion-dollar, multi-national steel conglomerate,

11   defendant CMC, that conspired with defendant Danieli, the world's only experienced

12   manufacturer of continuous feed reinforcing steel rebar micro mills, to exclude PSG from the

13   relevant market for steel reinforcing bar ("rebar") manufacturing and to deny PSG the ability to

14   supply itself and the rest of the relevant rebar fabrication and installation ("Furnish-and-Install")

15   markets with lower-cost rebar.  In addition, defendant CMC Rebar, through both its own conduct

16   and that of GRS (whose equity CMC purchased through CMC's subsidiaries CMC Rebar and

17   CMC Steel US), has for years priced its Furnish-and-Install services below cost in an effort to

18   minimize PSG's growth, profitability, effectiveness, and efficiency.  The result of defendants'

19   unlawful conduct has been and/or will be the exclusion of a substantial, lower-cost competitor

20   from the relevant rebar manufacturing market (covering, at most, the majority of California and

21   parts of Arizona, Nevada, and Utah) for over five years, the loss of an additional, lower-priced

22   supply of rebar in the relevant Furnish-and-Install markets (covering, at most, California and small

23   parts of Arizona, Nevada, and Utah) for over five years, and the loss of lower prices from PSG in

24   the same Furnish-and-Install markets beginning over five years ago.

25   2.   PSG is a San Diego-based fabricator and installer of rebar founded in late 2014.  In

26   response to PSG's entry, CMC Rebar and GRS began frequently offering their rebar Furnish-and-

27   Install services below cost in order to stifle PSG's growth and profitability and to prevent PSG

28   from achieving economies of scale, further investing in more efficient and effective operations,

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF                                            1

and becoming an even stronger competitor.

3. Although this below-cost bidding caused PSG to lose projects and profits, PSG's superior efficiency and skill nonetheless enabled it to win enough bids to grow, albeit more slowly, and, by 2019, PSG was poised to take the next step in becoming an even more efficient company: building California's first state-of-the-art, environmentally friendly rebar micro mill. Vertical integration would not only have enabled PSG to better compete with CMC Rebar and others, and led to lower prices in the relevant rebar Furnish-and-Install markets, it would have increased capacity and output and reduced prices in the relevant rebar manufacturing market.

4. PSG's plan was to build a micro mill in Southern California, specifically in the high desert area near the greater Los Angeles basin. This posed a multi-faceted threat to CMC because it would (a) create a new competitor in the rebar manufacturing market, (b) deprive CMC of rebar sales to PSG, which instead would supply itself, and (c) create a more efficient and effective competitor in the rebar Furnish-and-Install markets.

5. The only commercially viable way for PSG to enter the relevant rebar manufacturing market was to construct a micro mill, as opposed to a mini mill that requires a significantly greater capital investment and employs older, less efficient technology. The only company in the world to have built a reinforcing steel micro mill is Danieli. CMC had previously built two such micro mills using Danieli's MI.DA technology. Shortly after learning of PSG's plans to vertically integrate, CMC embarked on plans to meet this competitive threat by building a third micro mill and by reaching an agreement with Danieli that prevented Danieli from selling a MI.DA mill to any other company within a 500-mile radius of Rancho Cucamonga, California for 69 months. The 500-mile radius prevents PSG from building its planned micro mill, and there is no other mill type or micro mill manufacturer, or location beyond the 500-mile radius, that would even come close to providing the benefits to PSG, and to competition, of the MI.DA mill in the planned Southern California location.

6. A 500-mile exclusivity zone is not necessary to provide firms incentives to build a micro mill. Other firms have built MI.DA mills without the same restriction on competition, as discussed in more detail below. Indeed, in its negotiations with Danieli, PSG never sought, and

had no intention of seeking, a territorial restriction to insulate its intended MI.DA mill from competition.

7.    The nature and purpose of the exclusivity provision is evident from, among other things, the following:

(A)    CMC's first micro mill, built in 2009 in Mesa, Arizona, was the world's first reinforcing steel micro mill.  It was protected by a geographic exclusivity provision between CMC and Danieli with a 400-mile radius from Mesa, Arizona.

(B)    In 2017, after CMC had announced it was constructing its second micro mill in Durant, Oklahoma, its largest national competitor, Nucor Corporation ("Nucor"), announced that it was building a micro mill in Sedalia, Missouri, just under 400 miles from CMC's Durant micro mill.

(C)    CMC's third and latest micro mill will be built in Mesa, Arizona, and will be protected by the 500-mile territorial restriction as measured from CMC's old, soon-to-be-retired mini mill in Rancho Cucamonga, California.

(D)    Neither Nucor's Sedalia micro mill nor its forthcoming micro mill in Frostproof, Florida is insulated from competition by a territorial restriction.

8.    Rather than being necessary to incentivize investment in a new mill, CMC's exclusivity provision is unreasonably restrictive and had one purpose: preventing PSG from building its own MI.DA mill, from entering the relevant rebar manufacturing market, and from becoming a more effective competitor in the relevant rebar Furnish-and-Install markets.  This provision also effectively prevents construction of any rebar mill within the 500-mile radius for over five years because the most efficient means of manufacturing rebar is the MI.DA mill.  No territorial restriction is reasonable, as evidenced by, *inter alia*, Nucor's and PSG's willingness to build MI.DA mills without such a restriction.  At a minimum, a territorial restriction of this scope is unreasonable, as demonstrated, *inter alia*, by CMC's own willingness to construct MI.DA mills with substantially narrower restrictions.

9.    Danieli was a willing participant in this effort to prevent PSG from building a micro mill and thus increasing competition in both the rebar manufacturing market and the rebar Furnish-and-Install markets.  Granting CMC exclusive access to Danieli's unique technology, rather than providing access to both CMC and PSG, ensured that CMC would face less future competition.  CMC thus had an incentive to pay Danieli more for exclusive access.  Danieli could command a much higher price from CMC for its MI.DA mill with the territorial restriction.  It is

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF                    3

1   not surprising that Danieli was a willing participant in this effort to reduce competition by

2   misleading and obstructing PSG's good faith efforts to secure an agreement with Danieli to

3   purchase a MI.DA mill.

4   **JURISDICTION AND VENUE**

5          10.     This action is brought pursuant to Sections 4 and 16 of the Clayton Act, 15

6   U.S.C. §§ 15 and 26.  Plaintiff seeks statutory damages and injunctive relief from ongoing

7   violations of the antitrust laws of the United States, specifically, Sections 1 and 2 of the Sherman

8   Act, 15 U.S.C. §§ 1, 2.

9          11.     This Court has subject matter jurisdiction over the federal antitrust law claims

10  alleged in Counts One through Four pursuant to 28 U.S.C. § 1331 and Sections 4 and 16 of the

11  Clayton Act, 15 U.S.C. §§ 15(a) and 26.  It has supplemental jurisdiction over the state law claims

12  alleged in Counts Three through Eight pursuant to 28 U.S.C. § 1367 because those claims form

13  part of the same case or controversy and derive from a common nucleus of operative facts.

14         12.     This Court has personal jurisdiction over each defendant, because each defendant:

15  resides in this District; transacted business in this District; and/or committed overt acts in

16  furtherance of the illegal scheme and conspiracy alleged herein in this District.

17         13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because defendants

18  resided, transacted business, were found, or had agents in this District; most or all of the events

19  and effects giving rise to these claims occurred in this District; and/or a substantial portion of the

20  affected interstate trade and commerce discussed herein has been carried out in this District.

21  **INTRADISTRICT ASSIGNMENT**

22         14.     Pursuant to Civil Local Rule 3-2(c), this antitrust case shall not be assigned to a

23  particular Division of this District, but shall be assigned on a District-wide basis.

24  **INTERSTATE TRADE & COMMERCE**

25         15.     Defendants manufactured, sold, and/or provided rebar and rebar Furnish-and-Install

26  services in a continuous and uninterrupted flow of interstate commerce, including through and into

27  this District.

28         16.     Defendants' business activities substantially affected interstate trade and commerce

COMPLAINT FOR DAMAGES AND INJUNCTIVE      4
RELIEF

in the United States, including in this District.

## PARTIES

17.     Plaintiff PSG is a California corporation incorporated on October 9, 2014, with its principal place of business in San Diego, California.  PSG fabricates (or "furnishes") and installs rebar based on structural engineers' commercial construction plans using standard lengths of rebar purchased from steel mills.  PSG was formed by a team of seasoned professionals that previously worked at Pacific Coast Steel, a California corporation which sold a controlling interest to Gerdau Ameristeel Corporation in 2006 and transferred full ownership to that entity in 2011.  PSG purchases rebar from manufacturers like CMC and its various steel mill divisions/subsidiaries.  PSG competes with CMC and its various fabrication and Furnish-and-Install subsidiaries, including defendant CMC Rebar, in the relevant rebar Furnish-and-Install markets.

18.     Defendant CMC is a Delaware corporation founded in 1915 with its principal place of business in Irving, Texas.  It is traded on the New York Stock Exchange under the symbol "CMC" and is a component of the S&P 400.  CMC is the largest manufacturer and fabricator of rebar in the United States.  It currently operates 10 mills and 67 fabrication facilities (some used for Furnish-and-Install services) throughout the United States.  CMC is the parent company of CMC Rebar, CMC Steel, and CMC Steel US, LLC.

19.     Defendant CMC Rebar is a Texas corporation with its principal place of business in Seguin, Texas, and with offices throughout the country, including at least the following cities in California: San Diego, Etiwanda, Fontana, Fresno, Napa, San Bernardino, and Tracy.  It is a competitor of PSG in the rebar Furnish-and-Install markets.  CMC Rebar is a wholly owned subsidiary of defendant CMC.  As a result of CMC's equity acquisition of GRS's Furnish-and-Install business, CMC Rebar acquired the assets and liabilities of Gerdau Ameristeel US, Inc. ("GAUS"), a Florida corporation and one of two partners in GRS, a Delaware general partnership through which Gerdau conducted its Furnish-and-Install business.  As a successor in interest, CMC Rebar is liable for the below-cost pricing of GRS as alleged below.

20.     Defendant CMC Steel US is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Irving, Texas.  CMC Steel US is

owned by defendant CMC Rebar and, either directly or through its affiliates, manufactures and markets rebar and provides related services.  As a result of CMC's equity acquisition of GRS's Furnish-and-Install business, CMC Steel US acquired the assets and liabilities of Gerdau Ameristeel WC, Inc. ("GAWC"), a Delaware corporation and one of two partners in GRS.  As a successor in interest, CMC Steel US is liable for the below-cost pricing of GRS as alleged below.

21.     Defendant GRS is a Delaware general partnership with its principal place of business in San Diego, California.  Prior to CMC's equity acquisition, GRS was a competitor of PSG in the relevant Furnish-and-Install markets.  As part of the equity acquisition, GAUS sold its equity interest in GRS to defendant CMC Steel US, and GAWC sold its equity interest in GRS to defendant CMC Rebar.  As a result, defendants CMC Rebar and CMC Steel US, as successors in interest, are liable for the below-cost pricing of GRS as alleged below.

22.     Defendant Danieli is a Delaware corporation with its principal place of business in Cranberry Township, Pennsylvania.  Danieli supplies equipment and physical plants to the metals industry, including the building of mini mills and micro mills.  Danieli is the American subsidiary of Danieli C. SpA, an Italian company located in Buttrio, Italy.

**AGENTS AND CO-CONSPIRATORS**

23.     Various other persons or entities not named as defendants herein may have participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.  These other persons or entities may have facilitated, adhered to, participated in, or communicated with others regarding the alleged conspiracy in restraint of trade and the alleged conspiracy to monopolize addressed by this lawsuit.  Plaintiff reserves the right to name some or all of these persons or entities as defendants at a later date.

24.     Whenever this Complaint refers to an act, deed, or transaction of any business entity, the allegation means that the business entity engaged in that act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

**FACTUAL ALLEGATIONS**

**I.      Industry Background**

      **A.      The Upstream Market: Manufacturing Steel Reinforcing Bar**

      25.     Steel reinforcing bar or "rebar" is a steel bar used to reinforce concrete or masonry structures and add tensile strength.  The most common type of rebar, carbon steel or "black rebar," consists of hot-rolled round bars with heavy ridges or deformation patterns that assist in binding to the concrete or masonry.  Coatings such as epoxy resin may also be applied to prevent corrosion in saltwater environments.

      26.     Domestic rebar is typically manufactured to meet American Society for Testing and Materials ("ASTM") standards and sold in industry-standard sizes, lengths, and grades throughout the United States.

      27.     Domestic rebar sizes are expressed in imperial units corresponding to the diameter of the bar in increments of 1/8 of an inch.  For example, "#3" size rebar has a diameter of 3/8 of an inch.  Standard rebar sizes typically range from #3 (3/8 of an inch in diameter) to #18 (18/8 or 2.26 inches in diameter).

      28.     Domestic rebar is typically sold in standard straight lengths of 20, 30, 40, or 60 feet, as well as in coils.

      29.     Domestic rebar is graded with designations expressed using the minimum yield strength of the bar in thousands of pounds per inch ("ksi" or "1000 psi").  For example, grade 60 rebar—the most common grade used in modern U.S. construction—has a minimum yield strength of 60 thousand pounds per inch.  The most commonly manufactured grades in the U.S. are 60 and 75, although higher strength grades including 80 and 100 are also available.

      30.     The weight of rebar depends primarily on its diameter and length, ranging from approximately 0.4 pounds per linear foot for #3 rebar to 13.6 pounds per linear foot for #18 rebar.  Rebar's weight makes it expensive to ship, especially relative to the cost of manufacturing rebar.  There are substantial cost advantages to sourcing rebar locally to reduce shipping costs.  This is true for transporting both standard rebar to fabricators and fabricated rebar to construction sites.  One of the advantages of vertical integration by PSG would have been the placement of its micro

1  mill close to its rebar fabrication facilities to minimize shipping costs.

2      31.    The domestic rebar manufacturing markets are highly concentrated.  The two

3  largest suppliers, CMC and Nucor, currently account for 80% of rebar production nationally.  *See*

4  Fastmarkets AMM, "*CMC-Gerdau deal done; market impact murky,*" by Patrick Fitzgerald (Nov

5  5, 2018).  As CMC noted in its 2019 Form 10-K, "We produce a significant percentage of the total

6  domestic output of rebar and merchant bar, and believe we are the largest manufacturer of rebar in

7  the U.S."  CMC 2019 Form 10-K at pg. 7.

8      32.    While rebar consumption dropped nationally immediately following the 2007-2008

9  financial crisis, rebar consumption in the United States—including in the West and California

10  specifically—has since rebounded and demand in recent years has been strong.



| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total U.S. | 8.4 | 5.8 | 6.1 | 6.4 | 7.2 | 7.5 | 8.2 | 8.6 | 8.8 | 8.6 | 8.8 | 8.7 |
| Western Region | 1.9 | 1.2 | 1.1 | 1.2 | 1.3 | 1.5 | 1.7 | 1.9 | 1.8 | 1.8 | 2 | 1.8 |

**California Rebar Consumption**

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CA | 858,56 | 544,22 | 589,54 | 645,89 | 744,35 | 841,85 | 948,10 | 1,051, | 1,005, | 1,064, | 1,112, | 939,57 |

Source: Concrete Reinforcing Steel Inst., *Domestic Reinforcing Bar Consumption* (June 2020).

33.     California sources the vast majority of its rebar domestically.  Foreign imports make up only a small share (approximately 7%) of total rebar use.  In 2019, the bulk of rebar imports into California were into San Diego.  In 2019, California imported approximately 65,000 tons of rebar, of which 43,600 tons (67%) came into San Diego from Mexico.  Much smaller import volumes came into Los Angeles (5,100 tons) and San Francisco (16,300 tons), most of which were sourced from Asian exporters

   **B.     The Downstream Market: Rebar Furnish-and-Install Services**

34.     Before it can be installed in construction projects to reinforce concrete, rebar must be cut and shaped according to an engineer's drawings.  Such drawings often include an armature of bent and connected rebar that must be carefully manipulated by trained professionals called "fabricators."

35.     Since bending steel can alter its strength, this work must be performed very carefully by skilled, experienced steelworkers in order to meet code requirements and avoid

COMPLAINT FOR DAMAGES AND INJUNCTIVE     9
RELIEF

1  failure.  Once created, another team of skilled professionals installs the furnished rebar edifice on

2  site.

3        36.      Thus, fabricators (*e.g.*, PSG and CMC Rebar) purchase stock rebar from

4  manufacturers (*e.g.*, CMC), cut and bend the rebar at a fabrication plant per the engineer's plans,

5  and then deliver and install the fabricated rebar in construction projects.

6        37.      Fabricators have large fixed costs including their fabrication plant and equipment.

7  Thus, the closer to full capacity they can operate, the more efficient they are. The rebar that

8  fabricators must purchase or produce internally makes up a substantial share of their variable

9  costs. Thus, sourcing low-cost rebar is critical for fabricators being able to offer low prices and

10  compete effectively.

11        38.      Some larger rebar entities—including CMC and its chief competitor, Nucor—are

12  vertically integrated (*i.e.*, they own both steel mills and fabrication facilities, and they employ

13  labor forces to furnish and install fabricated rebar).  Of the 4.4 million tons of steel shipped from

14  CMC's mills in 2019, approximately 2.0 million tons were shipped to CMC's own fabrication

15  facilities.

16        39.      Vertical integration gives these larger entities a distinct competitive advantage over

17  their smaller, non-vertically integrated Furnish-and-Install competitors, such as PSG.  CMC

18  openly acknowledges these advantages:

19            While CMC steel products are renowned far and wide, it's our vertically
             integrated business model that really puts us on the map.  CMC was the first
20            steel manufacturer to introduce vertical integration in the United States,
             then adapted the concept for Europe. … This innovative approach is what
21            still enables CMC to remain a low-cost, high-quality producer that delivers
             exceptional value for our customers, suppliers and investors alike—all
22            around the world.

23  *See* CMC Website at https://www.cmc.com/en-us/locations (last accessed Oct. 30, 2020).

24        40.      According to CMC, vertical integration is critical to its "pull-through demand"

25  model.  *Id.*  A pull-through demand model is a manufacturing strategy whereby goods are not

26  produced until a customer has ordered them.  This enables the manufacturer to control the flow of

27  resources, since they are pulled into the production pipeline only as needed or requested, which in

28  turn optimizes facility utilization and reduces the cost of carrying inventory.

COMPLAINT FOR DAMAGES AND INJUNCTIVE    10
RELIEF

41.     CMC's wholly owned Furnish-and-Install subsidiary, defendant CMC Rebar, "is the nation's leading concrete reinforcing steel fabricator."  *See* CMC Website, https://www.cmc.com/en-us/what-we-do/america/fabrication/rebar-fabrication (last accessed Oct. 30, 2020).  As of August 2019, CMC operates 67 steel fabrication facilities, some of which provide Furnish-and-Install services, 63 of which are engaged in fabricating steel rebar and four of which engage in fabricating steel fence posts.  Seven of these facilities are in California.  CMC 2019 Form 10-K at pg. 5.

## II.     The Evolution from Integrated Mills to Mini Mills to Micro Mills

42.     For most of the last two centuries (*i.e.*, since the Bessemer process was invented), steel has been produced in massive mills with giant, fuel-intensive crucible furnaces fed by enormous amounts of iron ore, limestone, and metallurgical coal (or "coke").  A mill containing all of the components necessary to manufacture steel products from iron ore, referred to as an "integrated mill," requires multiple facilities performing multiple functions:

- *Iron Making*—where ore is converted to liquid or pig iron;
- *Steel Making*—where pig iron is converted to liquid steel;
- *Casting*—where liquid steel is solidified;
- *Roughing Rolling/Billet Rolling*—where solid steel is formed into shapes conducive to storage; and
- *Product rolling*—where stored steel is transformed into finished, marketable shapes.

43.     As a result, building a traditional integrated mill requires enormous startup costs and historically was only economical to build when done on an enormous scale with millions of tons of annual capacity or more.

44.     At the turn of the 20th century, the electric arc furnace ("EAF") was introduced in the United States.  An EAF heats charged material using an electric arc—an electrical breakdown of gas that produces a prolonged electrical discharge.  The first EAF installed in America was built by the Sanderson Brothers Steel Company in Syracuse, New York in 1907.  EAFs did not proliferate, however, until World War II, when the war effort created a surge in demand for steel and alloy steel for use in armaments.

45.     Eventually, this led to the creation of the first "mini mill"—a steel mill powered by an EAF used to re-melt, refine, and alloy scrap steel using a smaller footprint, and that could be built independent of the needs for traditional raw materials like iron ore and coke.  The first such mini mill was constructed by the Lake Ontario Steel Company in 1964 near Toronto, Ontario.

46.     Following years of technological advancements, the typical mini mill today uses an EAF to melt scrap metal recycled from used automobiles or manufacturing byproducts, which is then turned into steel billet using a continuous caster.  That steel billet is then warehoused until it is later heated and rolled into rebar.

47.     A mini mill typically consists of the following components:

- a melt shop with an electric arc furnace;
- casting equipment that shapes molten metal into billets;
- a reheating furnace that prepares billets for rolling;
- a rolling mill that forms rebar from heated billets;
- a mechanical cooling bed that receives the hot rebar from the rolling mill;
- finishing facilities that cut, shape, and assemble products in preparation for shipping; and
- warehousing facilities to store raw metal, metal billets, and finished rebar.

48.     Compared to traditional integrated steel mills, mini mills require lower capital costs and provide higher returns on equity.  Moreover, the use of EAFs—which can be easily started and stopped on a regular basis—means manufacturers can quickly adjust production levels in response to market demand.

49.     Thus, unlike traditional steel mills—which operate profitably by leveraging their sizes to achieve economies of scale (*i.e.*, the bigger the mill, the more efficient)—mini mills typically produce lower volumes but are nonetheless capable of generating profits on rebar through cost control and advanced technology.

50.     Mini mills do not require bulk transportation networks for obtaining raw materials or shipping finished products.  A mini mill often can be built closer to the manufacturer's customers, which reduces transportation costs.  As noted above, transportation costs are quite

significant in the steel industry due to the product's weight.  The practice in the industry is for the buyer of rebar to pay to ship the product from the mill to its fabrication facility.

51.     Not surprisingly, both CMC and Nucor—the two largest rebar manufacturers in the U.S.—moved away from traditional steel mills many years ago and exclusively utilized mini mills until 2009.   In 2009, CMC commissioned Danieli to build the world's first "micro mill" in Mesa, Arizona dubbed the "Micromill Danieli" or "MI.DA."

52.     Like a mini mill, Danieli's micro mill utilizes an EAF and continuous casting, but instead of outputting steel billet (which must be stored and later re-heated and rolled into rebar), a micro mill outputs directly into rebar.  This enables a micro mill not only to be more efficient, it also requires a smaller physical footprint and lower capital expenditures.  Below is a diagram of a micro mill plant layout.



⊕ **Fig 2**  **Plant layout**
1. Scrap yard. Continuous scrap charging with preheating system
2. AC electric arc furnace
3. Ladle furnace
4. Ultra-high-speed single-strand continuous casting machine
5. Induction equalising furnace
6. 16-stand continuous rolling mill
7. Direct rolling and bundling
8. Wire tying machines
9. Finished product storage
10. Fume treatment plant
11. Water treatment plant
12. Roll shop

53.     Accordingly, micro mills result in even greater benefits and efficiencies than mini mills as compared to conventional mills, including lower start-up costs, lower labor costs, lower energy costs, higher yields, and lower inventory costs.

54.     As Danieli's marketing materials indicate, the micro mill, which produces 200,000 to 500,000 tons per year, "is designed to serve a specific market (local or regional), focusing on a

specific product range and making extensive use of local scrap supply.  This, together with the continuous uninterrupted production cycle from raw material to finished product, and the extreme compactness of the plant, makes such plants extremely cost-efficient."

55.     CMC's first micro mill was so successful that, on July 27, 2015, CMC announced it was building a second micro mill, in Durant, Oklahoma.  As CMC noted in its press release, "The addition of a second mill to CMC's portfolio of highly efficient, customer focused and cost effective steel production facilities will enhance CMC's position as a leading supplier of long products[1] in the U.S. market."

56.     Five years later, on August 14, 2020, CMC announced it was building a third micro mill, again in Mesa, Arizona.  According to its press release, CMC's third micro mill will cost $300 million and be operational in early 2023.  CMC Press Release (Aug. 13, 2020).  CMC further stated that the new micro mill would "allow CMC to more efficiently meet West Coast demand for rebar and merchant bar quality (MBQ) products, while helping optimize the output of its national mill network by replacing higher cost rebar capacity."  *Id.*

57.     Since building its first micro mill over ten years ago, CMC has not built any other type of mill.  The reason for this is simple: micro mills—with their smaller footprint, lower startup costs, and lower operating costs—represent the latest and greatest in steel-making technology.

58.     Not surprisingly, CMC openly praises the advantages of micro mills.  As stated in its latest Form 10-K:

> Our two EAF micro mills utilize similar equipment and processes as [those of its mini mills]; however, these facilities utilize unique continuous process technology where metal flows uninterrupted from melting to casting to rolling.  The facilities are more compact than existing, larger capacity steel mini mills, and production is dedicated to a limited product range.  In addition, our two EAF micro mills are the only facilities in the U.S. capable of producing spooled rebar.

CMC Form 10-K at pg. 4.

59.     Similarly, in a recent investor presentation from June 2020, CMC touted that it is a

---

[1] "Long products" is a term used in the steel industry to refer to wire, rod, rail and bar (including rebar) steel products.

1  "pioneer of unique continuous process technology," "[o]ne of the latest innovations in steelmaking

2  technology," where CMC "[m]elts, casts, and rolls steel in a single uninterrupted flow" which

3  "[r]educes manufacturing cost."  CMC Investor Relations, June 2020, pg. 11.

4       60.     Today, the most cost-effective means of entering a rebar manufacturing market—

5  and, for PSG, the only viable means of entry—is the micro mill, and Danieli is the only company

6  in the world to have ever built one.

7  **III.**    **PSG's Entry Into the Rebar Furnish-and-Install Markets and CMC's Response**

8       61.     PSG was formed in late 2014 and is a "Furnish-and-Install" reinforcing steel

9  subcontractor, meaning it purchases regularly stocked rebar from mills owned by manufacturers

10  such as CMC, Nucor, and Gerdau, cuts and bends the rebar per a structural engineer's drawings,

11  and then transports and installs the fabricated rebar in construction projects using its team of union

12  ironworkers.

13       62.     PSG was formed by seasoned steel professionals that previously had worked at

14  Pacific Coast Steel, a rebar company sold to Gerdau in 2006.  Both CMC Rebar and GRS viewed

15  PSG as a potential market disrupter because of the quality and efficiency of its operations.  PSG is

16  a data driven company; it regularly and timely collects and analyzes data from all aspects of its

17  operations.  As a fabricator, it has an innovative shop set up, sets high standards of performance,

18  ensures appropriate engagement by leadership, and rewards success.  As an installer, PSG

19  emphasizes pre-planning of work, sets high standards for performance, and rewards success.

20  PSG's innovative and efficient operations and its high performance standards yield superior

21  performance and lower costs.

22       63.     In response to PSG's entry, CMC Rebar and GRS both began aggressively bidding

23  Furnish-and-Install rebar projects in an effort to prevent PSG from gaining a foothold in the

24  market.  These bids were frequently made below cost and served as loss leaders specifically

25  designed and intended to divert projects away from PSG and prevent it from growing, achieving

26  economies of scale, investing in even more efficient and effective operations, and gaining further

27  efficiency and effectiveness as a competitor.  Despite a California construction boom and rising

28  demand for rebar Furnish-and-Install services, CMC Rebar and GRS have sustained heavy losses

1   in their Furnish-and-Install businesses since at least 2017, due in large part to bidding below cost.

2   CMC Rebar's and GRS's below-cost bidding has slowed PSG's growth and depressed its profits

3   considerably.

4          64.   CMC Rebar has been accused of below-cost bidding in other geographic areas.

5   According to the sworn affidavit of Hantse Costas, a former sales manager at CMC who became

6   Vice President of Sales for a Texas fabricator, FABco LLC:

> Over the last several years, I have become familiar with the Houston, Texas, and San Antonio, Texas, rebar fabrication markets and the current market rates within the industry. Based on my experience and knowledge of the winning bids of CMC in those areas, CMC's pricing in these markets over the last several months is directly below FABco's breakeven point. ***Additionally, based upon my previous work for and knowledge of CMC, I believe CMC's recent prices submitted on bids in the Houston and San Antonio markets are at a level so low that its Rebar Fabrication division in these two markets is not making a profit on these jobs.*** As a result of CMC's undercutting, FABco has recently experienced a significant drop in the amount of bids that it has been awarded. I have learned that CMC has won those bids. CMC's prices are also markedly below what is traditionally the customary range for the rebar fabrication markets in Houston and San Antonio.

15   *Id*. at ¶ 4 (emphasis added).

16          65.   The purpose behind CMC Rebar's below-cost bidding in the San Antonio and

17   Houston markets was explained by another affidavit from a different former CMC employee, Adrian

18   Cano, who was employed by CMC for over eight years including as the Manager of Distribution for

19   the Central Region. *See* Affidavit of Adrian Cano (Aug. 3, 2016) ¶ 2. According to Mr. Cano:

> By [February 2015], FABco was beginning to be viewed as a serious competitor of CMC in the Central Region because FABco was taking a significant amount of market share away from CMC and several key employees had defected to FABco.
>
>              \*\*\*\*\*
>
> In the first quarter of 2016, while I was a [CMC] Sales Manager focused on the Houston area, Andrew Houser, Director of Sales for Rebar Fabrication Central Region, instructed me and other sales agents to "take FABco out" if we were competing with FABco on a bid. Shortly thereafter, Andrew Houser left CMC and was replaced by Matt Schewe. Matt Schewe and Chris Stowers, Director of Operations for Rebar Fabrication Central Region, instructed me to do everything we can to undercut FABco's pricing. I was told that FABco would not be able to maintain operations if we undercut their pricing and that they would "go broke." Chris Stowers also

informed me that he had "seen FABco's books" and knew that we could take them out and put them out of business.

*Id*. at ¶¶ 5 - 10.

66.    The FABco litigation against CMC resulted in a multi-million-dollar settlement.

67.    As these sworn affidavits indicate, CMC Rebar has engaged in below-cost bidding more than once in an attempt to extinguish or minimize competition from smaller fabricators that are poised to become more efficient and effective competitors.

## IV.    Market Consolidation and CMC's Gerdau Acquisition

68.    In large part due to CMC Rebar and GRS's below-cost bidding practices, some of the largest fabricators in the market were running into serious financial trouble and sustaining massive losses in 2017.

69.    As a result of such losses, on January 2, 2018, CMC announced that it had entered into an agreement to acquire four steel mills (including one in Rancho Cucamonga, California) and 33 rebar fabrication facilities across the United States from Gerdau S.A. and its subsidiaries (the "Gerdau Acquisition").[2]   The Gerdau Acquisition combined two of the three largest vertically integrated rebar manufacturers and fabricators in the country.

70.    The Gerdau Acquisition closed on November 5, 2018.  Following this acquisition, CMC had seven mini mills (Alabama, California, Florida, New Jersey, South Carolina, Tennessee, and Texas), two micro mills (Arizona and Oklahoma) and one rolling mill (Arkansas) throughout the United States.  As touted by CMC in its 2019 annual report:

> With the completed acquisition of significant additional U.S. assets, fiscal 2019 was a truly transformative year for CMC.  Through the acquisition, we have added 33 steel fabrication facilities, four steel mini mills, 2.7 million tons of capacity and 2,500 new colleagues to CMC.  As a result, at the close of fiscal 2019, CMC had more than 60 fabrication facilities across the country and 10 U.S. steel mills.

CMC 2019 Annual Report at 3.

---

[2] In particular, Gerdau's Furnish-and-Install business was conducted through a Delaware partnership, GRS, the two partners in which were GAUS and GAWC.  As part of the Gerdau Acquisition, GAUS sold its interest in GRS to defendant CMC Steel US and GAWC sold its interest in GRC to defendant CMC Rebar.

71.     The Gerdau Acquisition doubled the number of CMC's rebar fabrication plants and, immediately afterwards, CMC referred to itself "[a]s one of the largest rebar fabricators in the U.S." *Id.* at pg. 11.  Today, CMC touts itself as "*the* United States' largest manufacturer and fabricator of steel reinforcing bar."  *See* CMC Website, https://www.cmc.com/en-us/investors (last accessed Oct. 30, 2020) (emphasis added).

72.     By the time the Gerdau Acquisition closed, despite a strong construction boom in California, other large fabricators were also running into financial trouble thanks to CMC Rebar's and GRS's below-cost pricing.  Alamillo Rebar, Inc. ("Alamillo") was one such company.  On February 4, 2019, PSG and Alamillo entered into a series of agreements whereby PSG agreed to complete Alamillo's backlog of work and purchased much of its rebar equipment and inventory.

73.     A few months later, on June 24, 2019, PSG entered into a similar agreement with another rebar fabricator, Harris Rebar Northern California, Inc. ("Harris"), whereby PSG purchased most of Harris's rebar equipment and inventory.  Harris, which was owned by Nucor, suffered diminished profits just like Alamillo despite the strong demand in California for rebar and Furnish-and-Install services created by the construction boom.  Harris was yet another casualty of CMC Rebar's and GRS's below-cost bidding scheme.  By the end of 2019, CMC Rebar's and GRS's below-cost pricing had eliminated or marginalized three of its four largest rebar Furnish-and-Install competitors in the relevant markets.

V.     **CMC's Opposition to PSG's Efforts to Import Steel Rebar From Turkey**

74.     CMC continued to look for ways to marginalize PSG as a competitor in the relevant Furnish-and-Install markets.  CMC went to unusual lengths to oppose PSG's efforts to access a foreign supply of steel rebar as an important supplement to domestic supply.

75.     On March 8, 2018, President Trump issued a proclamation under Section 232 of the Trade Expansion Act of 1962 (the "232 Steel Tariff") which imposed a 25% tariff on all imported steel with certain exemptions.  The effect was to render all non-exempt foreign steel non-competitive in the United States.

76.     In June 2018, PSG applied to the U.S. Department of Commerce for an exclusion to allow it to import foreign steel from Turkey without imposition of the 25% tariff.  PSG

requested this exclusion on the grounds that there was insufficient supply of local domestic steel rebar to meet its demands.

77.     CMC and several other steel rebar manufacturers (including Nucor, Gerdau, and Steel Dynamics, Inc. ("SDI")), filed formal objections to PSG's application.  CMC's objection—filed under penalty of perjury with a certification acknowledging that it is a criminal offense to willfully make a false statement to the U.S. government—stated that it had rebar readily available meeting the specifications requested by PSG.  Based in large part on CMC's representations that it could supply PSG with the rebar it needed, PSG's exclusion request was denied.

78.     On September 4, 2018, PSG's CEO, Eric Benson, wrote Marty Lancial, CMC's Director of Mill & Post Sales (West Region), regarding CMC's objection.  In his letter, Mr. Benson noted that CMC's objection represented that it would be able to fulfill 100% of PSG's steel rebar requests within 47 days, and then requested that CMC commit to immediately provide PSG with the 67,000 tons of rebar for which PSG was seeking an exemption.  PSG offered to pay for the materials COD (cash on delivery) or to post a standby letter of credit ensuring payment to CMC.

79.     Mr. Lancial responded that either CMC would need to review PSG's credit and financial statements, or PSG must "…accept credit terms of cash in advance of production."  This response was not in good faith.  Cash payment has never been required prior to production in the rebar industry, as there is little risk of obsolescence after rebar is produced.

80.     Moreover, CMC refused to provide PSG with information regarding the quantities, mill locations, and freight assumptions underlying CMC's commitment to provide the requested rebar.  Instead, Mr. Lancial simply directed PSG to CMC's website, which listed only Mesa, Arizona as a supplying mill with the note "INQ" or "inquire" as to price and availability.  That was precisely what PSG had been doing over the preceding several weeks to no avail.

81.     Nonetheless, on October 10, 2018, Mr. Lancial—despite taking ten days to respond to Mr. Benson's previous letter and refusing to provide him with any of the information he requested regarding the necessary purchase terms, including the price of the rebar to be sold—wrote to Mr. Benson stating that CMC would honor PSG's steel rebar order only if placed by

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF     19

October 12, 2018 (*i.e.*, two days later).  It became clear at this point that, despite its representations to the contrary to the U.S. government, CMC never intended to sell PSG the volume of rebar for which it had requested an exclusion from the 232 Steel Tariff.

82.    Contrary to what CMC had represented to the U.S. Department of Commerce, Mr. Lancial acknowledged that CMC had no ability to fulfill the thousands of tons of coiled rebar included in PSG's exemption request.  He stated that CMC might be in a better position to provide "some" coiled rebar from its new Oklahoma mill in about six months.

83.    By misleading the United States government, CMC blocked PSG's efforts to import competitively priced rebar from abroad.

**VI.**    **PSG's Attempt to Vertically Integrate and CMC's Response**

84.    When PSG decided in 2019 that the time was right to explore building its own micro mill, it quickly concluded that the optimal location to minimize transportation costs was in California where it was performing the majority of its Furnish-and-Install work. Two of PSG's fabrication facilities are in the Los Angeles basin and two are in the San Francisco Bay Area. Recognizing the regulatory environment in California had been perceived as a barrier to entry for some (and in fact described by CMC as a hostile regulatory environment), PSG envisioned an approach that embraced the regulatory environment within its home state.  PSG's plan was to design a mill to use the most carbon friendly manufacturing processes technologically available and to power the mill from alternative energy sources to the greatest extent possible.  PSG's plan was to locate its mill in an area that enabled the mill to draw upon California's vast network of wind and solar energy production.  With those objectives in mind, PSG embarked on a site selection process and concurrently narrowed their options for a mill equipment provider to one company, Danieli.

85.    In November 2019, PSG arranged a meeting with Paolo Losso, the President of Danieli.  PSG shared with Mr. Losso its vision of building a state-of-the-art micro mill within California powered in large part by solar and wind energy, that would enable PSG to produce up to 380,000 metric tons of rebar per year.  Danieli promoted its mill to PSG as the most energy efficient and only viable continuous feed reinforcing steel mill option in the world.  This new mill

would not only have increased rebar output in California, but it would have done so by utilizing state-of-the-art technology that was lower cost and more environmentally friendly than a traditional integrated mill, mini mill, or even any other micro mill in existence.  It also would have avoided the need to transport scrap out of California to other states, only to then transport the finished rebar product back to California, resulting in lower prices and less pollution.

86.     Near the conclusion of their initial meeting, Mr. Benson expressed PSG's interest in obtaining a formal quotation from Danieli for a MI.DA mill.  Mr. Losso indicated he would be very happy to provide the same and did so a few weeks later.  Mr. Losso also mentioned near the conclusion of this meeting that he might have a small problem that he would have to overcome as Danieli had a "non-compete of sorts" with CMC from when they purchased the original Mesa, Arizona mill.  Mr. Benson inquired as to the details of that "non-compete" or, as would later become clear, an exclusivity agreement, and what that might mean for Danieli's ability to sell PSG a MI.DA mill.  Mr. Losso quickly commented that it was a vague 400-mile restriction, unlikely enforceable by CMC, and that Mr. Benson should not concern himself with the restriction.  He stated that it would not preclude Danieli from selling PSG a mill even if the mill were located within the 400-mile restriction.  Mr. Losso commented that it was "merely a political" issue that he would have to deal with CMC on were PSG to move forward with a mill.

87.     In late 2019, Mr. Benson forwarded an article to Mr. Losso on a new and exciting technology being developed by a start-up company called Heliogen that had created a highly efficient way of harnessing solar energy and converting it into a source of power.  Mr. Benson felt it was important to explore this new technology and arranged a meeting with Heliogen and Danieli in Pasadena, California in January of 2020.

88.     A meeting with Heliogen occurred on January 8, 2020 and in attendance were three Danieli representatives, Mr. Losso, Carlo Brunatto and Federico Tortul, and two representatives from PSG, Mr. Benson and David Perkins, PSG's in-house counsel.  Subsequent to the meeting with Heliogen at a lunch between PSG and Danieli, Mr. Losso indicated that Danieli was working on a power solution of their own that would allow the use of alternative sources of power to be deployed in conjunction with standard energy from a grid provider.  This was in essence to be a

MI.DA Micromill hybrid version.  Mr. Benson expressed excitement at the prospect of a hybrid mill and mentioned that one of the sites PSG was currently entertaining was close to large wind and solar energy installations not far from where Heliogen had their test site.  At that lunch, Mr. Perkins asked specifically about the 400-mile restriction Mr. Losso had disclosed to Mr. Benson in their November meeting as the property PSG was considering was just inside that radius.  Mr. Losso again said that it would not be a problem, only a political obstacle that he would overcome.

89.     As part of their site selection process, in early March 2020, PSG was actively considering a site in Pittsburg, California that would require the infeed of the mill scrap to enter from the opposite direction from the proposed footprint of the mill Danieli had offered to PSG. Mr. Benson, cognizant of the 400-mile potential restriction with CMC, wrote to Mr. Losso as follows: "I have located another property that would be outside of the 400 mile radius agreement you have with CMC.  The property could work very well for us, but it would lay out better if the scrap could be fed from the opposite side from your previous mills.  Is this possible/practical?" Mr. Losso then replied on March 20, 2020 that it was possible, and provided a sketch of the layout.  At this same time, Danieli was actively negotiating with CMC for their purchase of another MI.DA mill for Mesa, Arizona.  Danieli inappropriately shared PSG's site consideration with CMC.

90.     On March 5, 2020, Mr. Benson inquired in a phone conversation with Mr. Losso if Danieli had finalized its pricing on the "Hybrid" mill concept as he was eager to update PSG's construction budget.  Mr. Benson also asked Mr. Losso to provide an updated written proposal or commercial offering (as their prior proposal had recently expired) with the revised pricing.  Mr. Losso promised those would be forthcoming soon. On April 7, 2020, Mr. Losso sent Mr. Benson a presentation on the Hybrid mill concept but no updated proposal or commercial offering.

91.     On May 4, 2020, Mr. Benson advised Mr. Losso in an email that the property PSG was pursuing in Pittsburg had fallen through and that PSG would be going back to some previous options in the California high desert.  On May 18, 2020, Mr. Losso wrote to Mr. Benson: "let's find a place where the sun shines all of the time and build a Mi.Da-Hybrid together."  By this time Danieli, unbeknownst to PSG, was conspiring with CMC to craft a broad and fully encompassing

1  geographic restriction and had no intention of selling PSG a MI.DA-Hybrid Micromill.

2      92.     According to Danieli, the proposed MI.DA-Hybrid Micromill, compared to a mini

3  mill of similar capacity, would have provided substantial savings and would have reduced carbon

4  dioxide emissions by many kilograms per metric ton.

5      93.     On June 16, 2020, Mr. Benson informed Mr. Losso that PSG had narrowed down

6  its property search and was actively considering the same property that Mr. Benson had mentioned

7  to Mr. Losso in February.  That property was just under 400 miles from the CMC Mesa mill.  Mr.

8  Benson indicated he had other options but liked this particular site the best.  Again, Mr. Losso did

9  not encourage PSG to pursue an alternate site outside of the 400-mile radius.  That same day, PSG

10  announced they had hired veteran steel executive Mark Olson as Vice President of Mill

11  Operations.  Prior to joining PSG to run its future mill operations, Mr. Olson was Vice President

12  of Operations for Gerdau Long Steel North America, where he led Gerdau's North American mill

13  operations.

14      94.     On June 19, 2020 Mr. Benson had a lengthy conversation with Mr. Losso and

15  advised him that PSG had successfully secured the property in the high desert area near the greater

16  Los Angeles basin, and shared with Mr. Losso the exact location and details of that property.  Mr.

17  Benson asked yet again for an updated commercial proposal and Mr. Losso indicated the proposal

18  would be forwarded as soon as Danieli finalized its cost on certain components.  On July 6, 2020,

19  Mr. Losso then sent Mr. Benson a message indicating an updated proposal would be forthcoming

20  by July 17, 2020.  No such proposal ever issued by Danieli.  Thus, while PSG believed it was well

21  on its way to becoming vertically integrated and able to more effectively compete with CMC and

22  others, CMC and Danieli were conspiring to deny PSG access to the very technology Danieli had

23  so proudly initially promoted to PSG.

24      95.     On August 13, 2020, CMC announced it was building a third Danieli MI.DA micro

25  mill, only this mill was to employ the "Q One" technology PSG had been led to believe it would

26  be developing in conjunction with Danieli.  In fact, CMC promoted the new mill as embracing the

27  very alternative energy use concepts PSG had laid out to Danieli in their initial November 2019

28  meeting.

COMPLAINT FOR DAMAGES AND INJUNCTIVE   23
RELIEF

96.     Danieli quickly informed PSG that, in negotiating the contracts for this new micro mill, CMC requested an exclusivity provision preventing Danieli from building a micro mill for CMC's competitors.  But the exclusivity provision was even more onerous than before: instead of preventing Danieli from building another micro mill within 400 miles of Mesa, Arizona, this time Danieli was prevented from building another micro mill within **500** miles of <u>Rancho Cucamonga, California</u>.

97.     This exclusivity foreclosed any competitor from building a Danieli MI.DA mill in all but the northernmost reaches of California, in nearly all Arizona, in all but the northernmost part of Nevada, and in the southwest half of Utah, as shown in the following map.  This area of foreclosure was not only large, it covered the areas near PSG's fabrication facilities and potential customers with the greatest amount of sunshine—areas of importance to a potential competitor, like PSG, that sought to power the plant in part with solar energy.



Figure 1: 500−mile Exclusionary Zone around Rancho Cucamonga, CA

Note: 500-mile exclusionary zone is centered on Rancho Cucamonga, CA.

98.     The differences in the new exclusivity provision are important for several reasons:

(A)     Despite the fact that Danieli had successfully built multiple micro mills since the first Mesa micro mill, thus eliminating much of the risk that

existed earlier, this provision actually *increased* the geographic scope of the restriction from 400 miles to 500 miles;

(B) In contrast to CMC, which increased its area of exclusivity from 400 to 500 miles, Nucor recently completed construction of one MI.DA mill (in Sedalia, Missouri) and is building another (in Frostproof, Florida) without *any* exclusive territory.

(C) Similarly, when negotiating with Danieli, PSG never requested, and had no intention of requesting, an exclusive territory for its MI.DA mill to be built in Southern California.

(D) The area of exclusivity is not measured from Mesa, Arizona, from where the rebar produced at the new mill would be shipped, but from one of CMC's other steel mills, soon to be retired, in an entirely different geographic area, Rancho Cucamonga, California[3]; and

(E) When CMC commissioned Danieli to build CMC's second micro mill, in Durant, Oklahoma, the agreement with Danieli did not include a similar exclusivity provision.  In the same year the Durant mill went online, Nucor announced it was building a Danieli micro mill in Sedalia, Missouri, which is within 400 miles of Durant.

99.     The objective of CMC's latest, even more restrictive exclusivity provision is clear and unambiguous: it was devised to prevent PSG from building the planned MI.DA mill, thereby thwarting competitive entry into the relevant rebar manufacturing market and eliminating PSG's ability to lower its costs and become an even more effective competitor in the relevant rebar Furnish-and-Install markets through vertical integration and lower cost rebar supply closer to its fabrication facilities.

100.    Danieli was complicit in this effort to deny PSG access to the MI.DA mill, and for good reason.  Danieli's technology, given its unique advantages, was valuable to CMC, but it was far more valuable to CMC if CMC had sole access to it in the relevant rebar manufacturing market.  Exclusive access not only forecloses PSG's entry into the relevant rebar manufacturing market, but blocks entry by other potential competitors as well.  This allows CMC to make greater sales and higher profits, and thus would enable Danieli to command a higher price from CMC for

---

[3] In October 2019 CMC revealed that it intended to shutter the melt shop of the Rancho Cucamonga facility.  *See* https://spectrumnews1.com/ca/la-west/business/2019/10/18/part-of-rancho-cucamonga-steel-mill-to-close--layoffs-expected (last accessed Oct. 30, 2020).  Then in October 2020, it was reported that CMC would close the Rancho Cucamonga mill completely.  See https://steelguru.com/steel/cmc-to-close-rancho-cucamonga-steel-mill-in-california-in-december/564397 (last accessed Oct. 30, 2020).

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF            25

its MI.DA mill. Similarly, by limiting competition in the rebar manufacturing market, CMC protected itself from more aggressive competition in the rebar Furnish-and-Install market by denying its Furnish-and-Install rivals a low-cost rebar supply. Because Danieli's micro mill technology was much more valuable to CMC on an exclusive, rather than non-exclusive basis, CMC had strong incentives to pay Danieli more for that exclusivity.

101. Building a micro mill outside the reach of the 500-mile restriction is not commercially feasible for PSG. As discussed above, steel rebar is heavy and transportation costs are a significant portion of the total cost of rebar production and rebar Furnish-and-Install services. The high cost of transporting rebar and rebar fabricated products makes building outside the geographic restriction uneconomical. While certain areas outside the 500-mile radius, such as the far north of California (assuming regular sunshine and an available work force), might allow PSG to supply its San Francisco Bay Area fabrication facilities and other fabrication facilities in Northern California at competitive prices, they would put PSG at a significant competitive disadvantage for sales to potential customers in Southern California. Demand for rebar in Southern California is very substantial, and PSG would lose out on significant sales in that area if its mill were located far to the north. Additionally, Los Angeles is one of the largest scrap markets in the United States. Scrap represents the largest input cost in manufacturing reinforcing steel. Similar to finished goods, shipping scrap long distances is very costly.

102. Transporting steel great distances is not only costly, but it is harmful to the environment. As noted by the California legislature in passing the Buy Clean California Act, "[g]reat quantities of emissions are released during the manufacture and transport of products used in public infrastructure projects." Assembly Bill No. 262 § 1(e) (approved by Gov. Brown on October 15, 2017).

103. As of January 1, 2020, the Buy Clean California Act requires all contractors bidding on a project for the State of California involving steel rebar to submit an Environmental Product Declaration ("EDP"). The EDP for steel rebar requires project bidders to provide information regarding materials, products, energy, and emissions, not only for the production of steel rebar, but for "transport to the reinforcing bar fabricator." (North American Product

1    Category Rule for Designated Steel Construction Products § 6.2.2.3.)  The State of California

2    spends $10 billion annually on infrastructure projects.  Any steel rebar manufacturer or fabricator

3    who wants to participate in one of these projects must submit this form.

4           104.    PSG's plan to build the solar powered Danieli micro mill would have allowed it to

5    compete for California state rebar projects under the Buy Clean California Act.  One of the

6    reasons it does not make economic sense for PSG to build a mill using older, less environmentally

7    friendly technology is that doing so would handicap PSG's ability to compete for $10 billion in

8    annual California state projects.

9           105.     In its press release announcing its plans to build a third micro mill in Mesa,

10   Arizona, CMC stated that "[t]he new facility will replace higher cost rebar capacity and allow

11   CMC to more efficiently meet West Coast demand for rebar and MBQ [merchant bar quality]

12   products."  CMC Press Release dated Aug. 18, 2020.  CEO Barbara Smith continued: "This is a

13   smart growth initiative that feeds the large underlying West Coast demand for rebar and merchant

14   bar, replacing inefficient existing rebar capacity with environmentally friendly technology."

15                                    **RELEVANT MARKETS**

16   **I.      The Relevant Rebar Manufacturing Market**

17          **A.      The Product Market**

18          106.    Steel rebar is used to reinforce concrete slabs in construction projects.  The

19   properties of steel—including its tensile strength, the similarity of its thermal expansion properties

20   to those properties in concrete, and its well understood elastic and fatigue properties—make steel

21   rebar highly effective in reinforcing concrete.  While some other materials, such as stainless steel,

22   are also highly effective, they cost far more than steel and are not commercially viable alternatives

23   for commercial construction projects.  It is virtually impossible to complete a commercial

24   construction project without using rebar to reinforce concrete structures.  There are no other

25   products with meaningful cross-elasticities of demand capable of constraining the price of rebar.

26   A small but significant non-transitory increase in the price of steel rebar above the competitive

27   level would not cause enough customers to switch to other products to make the increase

28   unprofitable.

**B.      The Geographic Market**

107.    As alleged above, steel rebar is a very heavy product that is expensive to ship, especially in relation to the cost of manufacturing the product.  Transporting rebar long distances makes the delivered cost of the rebar too high for it to be priced competitively.

108.    A significant majority of rebar sales are to customers located within 500 miles of a mill, and most of those sales are to customers located less than 400 miles away.  The 400-mile and 500-mile exclusive territories created by CMC's agreements with Danieli suggest that these distances are the outer limits of the area in which CMC competes for most of its customers.  While steel rebar sometimes is shipped more than 500 miles, including imports from overseas, such rebar comprises a small share of total domestic consumption, and occurs only when unusually low rebar prices are available under special circumstances.  For example, imports are only about seven percent of total California rebar consumption, and can exist only because foreign steel producers have lower labor costs and often receive substantial government subsidies to offset the high shipping costs.

109.    The geographic scope of the relevant rebar manufacturing market is no greater than a 500-mile radius from the high desert area near the greater Los Angeles basin, the planned location of the MI.DA mill PSG intended to build.  A small but significant non-transitory increase above the competitive level in the price of rebar produced in that area would not cause enough customers to buy from a mill more than 500 miles from that area to cause the increase to be unprofitable.

**C.      CMC Market Power**

110.    CMC did not need market power to exclude PSG from the relevant rebar manufacturing market.  CMC was able to exclude PSG by conspiring with the sole provider of the technology PSG needs to profitably enter the market.  CMC secured Danieli's agreement to withhold that technology from PSG, blocking PSG's entry.

111.    Nonetheless, CMC has had substantial market power, and monopoly power, in the relevant rebar manufacturing market during the relevant time period.  PSG understands and believes that CMC has accounted for approximately 50% of the total rebar sold in the relevant

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF          28

1   market during the relevant time period.

2       112.    Substantial barriers to entry exist in the relevant rebar manufacturing market that

3   make CMC's market power durable.  Building a steel mill, even a smaller and less expensive

4   micro mill, takes years and costs hundreds of millions of dollars.  In addition, there are significant

5   business and environmental regulations that must be satisfied to operate a steel mill.  These costs

6   and regulations make entry difficult, costly, and uncommon.

7       **D.      Harm to Competition**

8       113.    CMC's and Danieli's conspiracy to exclude PSG from the relevant rebar

9   manufacturing market, as alleged above, harmed competition and had the following

10  anticompetitive effects:

11          a.      PSG was prevented from entering the relevant rebar manufacturing market.

12      As alleged above, PSG would have been a lower-cost producer and would have had the

13      ability and incentive to price below the market and spur greater price competition, and

14      would have done so;

15          b.      PSG's exclusion from the relevant rebar manufacturing market excluded

16      additional production capacity and output from the market, which would have intensified

17      competition; and

18          c.      CMC's restrictive agreement with Danieli not only prevented PSG from

19      entering the rebar manufacturing market, it prevented other potential competitors from

20      entering the market and prevented incumbent competitors from switching to or adding the

21      more cost-effective micro mill technology.  CMC's anticompetitive agreement foreclosed

22      the most efficient means of entry or expansion—the MI.DA mill—to any and all

23      competitors.

24  **II.    The Relevant Rebar Furnish-and-Install Market**

25      **A.      The Product Market**

26      114.    As alleged above, once the decision has been made to reinforce concrete with steel

27  rebar, the manufactured rebar must be cut to the size and bent to the shape specified in the project

28  engineer's drawings, and the rebar so fabricated must be delivered to the construction site and

1  installed prior to being encased in concrete.  These services are necessary for steel rebar to be used

2  to reinforce concrete in a structure, and there are no substitutes for these services.  A small but

3  significant non-transitory increase in the price of rebar Furnish-and-Install services above the

4  competitive level would not cause enough customers to switch to another type of service provider

5  to make the increase unprofitable.

6  **B.  The Geographic Markets**

7  115.  Fabricated rebar is costly to ship due to its weight and irregular shape.  Less rebar

8  can be loaded into a truck or railcar after the rebar has been bent into various shapes and cut into

9  various sizes as part of the fabrication process.  Further, additional trips to the construction site are

10  sometimes needed if the original delivery was short on the required number of a particular shape

11  and size of rebar.  Thus, shipping is a very substantial factor in defining the geographic scope of

12  the relevant rebar Furnish-and-Install markets.  Further, Furnish-and-Install services are provided

13  after the rebar has been shipped from the manufacturer to the fabrication facility.  The further the

14  fabrication facility is from its rebar supplier, the more transportation cost the facility has incurred,

15  and, and all else equal, the less additional shipping cost it can incur to be able to deliver fabricated

16  rebar to the construction site at a competitive price.

17  116.  The large majority of sales of Furnish-and-Install services are provided at

18  construction sites within 200 miles of the fabrication plant, and most of those sales are provided at

19  construction sites much closer than 200 miles.  In addition, if the fabrication facility is not close to

20  its rebar supplier, then it likely can only sell at competitive prices to customers less than 200 miles

21  away.

22  117.  The geographic scope of the relevant Furnish-and-Install markets is no greater than

23  a 200-mile radius from the Los Angeles Basin, the area in which PSG's Southern California

24  fabrication facilities are located, and no greater than a 200-mile radius from the San Francisco Bay

25  Area, the area in which PSG's Northern California fabrication facilities are located.  A small but

26  significant non-transitory increase in the price of rebar Furnish-and-Install services in either of

27  these regions above the competitive level would not cause enough customers to switch to

28  fabricators outside the region to make the increase unprofitable.

COMPLAINT FOR DAMAGES AND INJUNCTIVE     30
RELIEF

C.      **CMC Market Power**

118.    CMC's substantial assets and revenues, including in rebar manufacturing, and in other geographic markets outside the geographic markets relevant to in this case, enable it to sustain losses for an extended period of time through below-cost pricing on sales of Furnish-and-Install services in the relevant markets.  This is true whether or not CMC Rebar has market power in the relevant rebar Furnish-and-Install markets.  CMC Rebar also has the ability to harm competition and competitors through below-cost pricing in the relevant Furnish-and-Install markets whether or not it has market power in those markets.

119.    Nonetheless, CMC Rebar has had substantial market power in the relevant rebar Furnish-and-Install markets during the relevant time period. PSG understands and believes that CMC Rebar is the largest provider of rebar Furnish-and-Install services in the relevant markets. PSG estimates that CMC Rebar's market share in each of the relevant markets has ranged between 15% and 30% during the relevant time period.  CMC Rebar has several fabrication facilities in the relevant markets and enjoys significant competitive advantages with customers located close to those facilities.

120.    CMC Rebar's market power in the relevant markets is durable.  Substantial barriers to entry exist in the relevant markets.  Assembling the necessary skilled workforce—including trained steelworkers, rebar detailers, and fabricators—is very difficult, as is the ability to accurately estimate costs and operate efficiently in order to profitably win bids.  Moreover, given the catastrophic consequences of improperly fabricated or installed rebar, as well as the workplace dangers associated with installing rebar, the industry is heavily regulated.  Navigating and complying with these myriad regulations requires substantial knowledge, skill, and resources.

D.      **Harm to Competition**

121.    The conspiracy to exclude PSG from the relevant rebar manufacturing market, as alleged above, diminished competition in the relevant rebar Furnish-and-Install markets by denying PSG a lower-cost supply of rebar, thereby preventing PSG from becoming a lower-cost, lower-priced, and more effective competitor in the relevant rebar Furnish-and-Install markets. Excluding PSG from the rebar manufacturing market also prevented PSG from offering lower-

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF

31

priced rebar to other rebar Furnish-and-Install firms.  Lower rebar costs would have made those other firms more vigorous competitors, thus increasing overall market competition.

122.    CMC Rebar's and GRS's below-cost pricing in the relevant rebar Furnish-and-Install markets, as alleged above, reduced competition in those markets by unlawfully taking sales from PSG, diminishing PSG's revenues, profits, and growth, and preventing PSG from investing further in more efficient and effective operations, and from realizing greater economies of scale.

## INJURY TO PACIFIC STEEL GROUP

123.    Defendants' conduct as alleged herein has injured and/or will injure PSG in its business or property by denying sales and profits to PSG in both the relevant market for rebar manufacturing and the relevant markets for rebar Furnish-and-Install services, and by lowering the value of PSG's business.

## CAUSES OF ACTION

### Count One: Conspiracy in Restraint of Trade
**Section 1 of the Sherman Act, 15 U.S.C. § 1 and
Cartwright Act. Cal. Bus. & Prof. Code § 16720
(Asserted Against CMC and Danieli)**

124.    PSG repeats and reasserts each of the allegations in paragraphs 1 through 123 as fully set forth herein.

125.    In or around August 2020, CMC and Danieli entered into a contract, combination, and conspiracy in unreasonable restraint of trade that prevents CMC's competitors and potential competitors, including PSG, from building a Danieli micro mill within a 500-mile radius of Rancho Cucamonga, California for a period of 69 months.  That contract, combination, and conspiracy has unreasonably restrained and/or will unreasonably restrain trade and commerce in the relevant rebar manufacturing market and in the relevant rebar Furnish-and-Install markets in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and constitutes an unlawful trust in violation of the Cartwright Act, California Business & Professions Code § 16720.

126.    As a direct and foreseeable result of CMC's and Danieli's anticompetitive conspiracy, competition in the relevant rebar manufacturing market is unreasonably restrained in at least the following ways:  (1) a lower-cost producer with the ability and incentive to price below

the market and spur greater price competition is excluded from the market; (2) additional production capacity and output and the resulting additional competition is excluded from the market; and (3) other potential entry into the relevant rebar manufacturing market is foreclosed.

127.    CMC's and Danieli's anticompetitive conduct constitutes a per se violation of federal and California state antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.  The anticompetitive effects of CMC's and Danieli's conspiracy far outweigh any purported non-pretextual, pro-competitive justifications.

128.    As a direct and foreseeable result of CMC's and Danieli's anticompetitive conspiracy, PSG has been and/or will be injured in its business and property and has suffered and/or will suffer damages in amounts to be proven at trial, in at least the following ways: (1) PSG is prevented from selling steel rebar; it will lose sales of rebar and the profits thereon; and the value of its business has been and will be diminished; and (2) PSG is losing access to a lower-cost supply of rebar for its rebar Furnish-and-Install business, which will lower its profits and has lowered and will lower the value of its business.

**Count Two: Monopolization**
**Section 2 of the Sherman Act, 15 U.S.C. § 2**
**(Against CMC)**

129.    PSG repeats and reasserts each of the allegations in paragraphs 1 through 128 as fully set forth herein.

130.    CMC has monopoly power in the relevant rebar manufacturing market, including the power to control prices and exclude competition.

131.    CMC has willfully, knowingly, and intentionally maintained its monopoly power in the relevant rebar manufacturing market by engaging in anticompetitive conduct, namely, conspiring with Danieli to exclude competition, and not through a superior product or service, business acumen, or historical accident.  By engaging in the foregoing conduct, CMC has violated, and continues to violate, Section 2 of the Sherman Act, 15 U.S.C. § 2.

132.    As a direct and foreseeable result of CMC's anticompetitive and monopolistic conduct, competition in the relevant rebar manufacturing market has been and/or will be unreasonably restrained in at least the following ways:  (1) a lower-cost producer with the ability

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF          33

and incentive to price below the market and spur greater price competition is excluded from the market; (2) additional production capacity and output and the resulting additional competition is excluded from the market; and (3) other potential entry into the relevant rebar manufacturing market is foreclosed.

133.     As a direct and foreseeable result of CMC's anticompetitive and monopolistic conduct, competition in the relevant rebar Furnish-and-Install market has been and/or will be unreasonably restrained in at least the following way:  PSG is denied a lower-cost supply of rebar, thereby preventing PSG from becoming a lower-cost, lower-priced, and more effective competitor in the relevant rebar Furnish-and-Install markets.

134.     As a direct and foreseeable result of this anticompetitive and monopolistic conduct, PSG has been and/or will be injured in its business and property and has suffered and/or will suffer damages in amounts to be proven at trial, in at least the following ways: (1) PSG is prevented from selling rebar; it will lose sales of rebar and the profits thereon; and the value of its business has been and will be diminished; and (2) PSG is losing access to a lower-cost supply of rebar for its rebar Furnish-and-Install business, which will lower its profits and has lowered and will lower the value of its business.

**Count Three: Attempted Monopolization (In the Alternative)**
**Section 2 of the Sherman Act, 15 U.S.C. § 2**
**(Against CMC)**

135.     PSG repeats and reasserts each of the allegations in paragraphs 1 through 134 as fully set forth herein.

136.     CMC has monopoly power or, at a minimum, a dangerous probably of acquiring monopoly power in the relevant rebar manufacturing market, including the power to control prices and exclude competition.

137.     CMC has willfully, knowingly, and intentionally engaged in anticompetitive conduct—namely, conspiring with Danieli to exclude competition as alleged above—with the specific intent of attempting to monopolize the relevant rebar manufacturing market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

138.     CMC's anticompetitive course of conduct alleged herein has been directed at

accomplishing the unlawful objective of controlling prices and/or preventing competition in the relevant rebar manufacturing market.  CMC's anticompetitive course of conduct has created a dangerous probability that it will succeed, to the extent it has not already, in its attempt to monopolize this market.

139.    As a direct and foreseeable result of CMC's anticompetitive and monopolistic conduct, competition in the relevant rebar manufacturing market has been and/or  will be unreasonably restrained in at least the following ways:  (1) a lower-cost producer with the ability and incentive to price below the market and spur greater price competition is excluded from the market; (2) additional production capacity and output and the resulting additional competition is excluded from the market; and (3) other potential entry into the relevant rebar manufacturing market is foreclosed.

140.    As a direct and foreseeable result of CMC's anticompetitive and monopolistic conduct, competition in the relevant rebar Furnish-and-Install market has been and/or will be unreasonably restrained in at least the following way:  PSG is denied a lower-cost supply of rebar, thereby preventing PSG from becoming a lower-cost, lower-priced, and more effective competitor in the relevant rebar Furnish-and-Install markets.

141.    As a direct and foreseeable result of this anticompetitive and monopolistic conduct, PSG has been and/or will be injured in its business and property and has suffered and/or will suffer damages in amounts to be proven at trial, in at least the following ways: (1) PSG is prevented from selling steel rebar; it will lose sales of rebar and the profits thereon; and the value of its business has been and will be diminished; and (2) PSG is losing access to a lower-cost supply of rebar for its rebar Furnish-and-Install business, which will lower its profits and has lowered and will lower the value of its business.

**Count Four: Conspiracy to Monopolize**
**Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 and**
**Cartwright Act, Cal. Bus. & Prof. Code § 16720**
**(Against CMC and Danieli)**

142.    PSG repeats and reasserts each of the allegations in paragraphs 1 through 141 as fully set forth herein.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF          35

143.   CMC has monopoly power in the relevant rebar manufacturing market, including the power to control prices and exclude competition.

144.   CMC has willfully and intentionally conspired with Danieli to maintain its monopoly power in the relevant rebar manufacturing market, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 and the Cartwright Act, California Business & Professions Code § 16720, *et seq.*  This conspiracy consists of an agreement between CMC and Danieli that prevents CMC's competitors and potential competitors, including PSG, from building a Danieli micro mill within a 500-mile radius of Rancho Cucamonga, California for a period of 69 months. The conspiracy enables CMC to exclude competition and maintain its monopoly power in the relevant rebar manufacturing market.

145.   As a direct and foreseeable result of CMC's anticompetitive and monopolistic conduct, competition in the relevant rebar manufacturing market has been and/or will be unreasonably restrained in at least the following ways:  (1) a lower-cost producer with the ability and incentive to price below the market and spur greater price competition is excluded from the market; (2) additional production capacity and output and the resulting additional competition is excluded from the market; and (3) other potential entry into the relevant rebar manufacturing market is foreclosed.

146.   As a direct and foreseeable result of CMC's anticompetitive and monopolistic conduct, competition in the relevant rebar Furnish-and-Install market has been and/or will be unreasonably restrained in at least the following way:  PSG is denied a lower-cost supply of rebar, thereby preventing PSG from becoming a lower-cost, lower-priced, and more effective competitor in the relevant rebar Furnish-and-Install markets.

147.   As a direct and foreseeable result of this anticompetitive and monopolistic conduct, PSG has been and/or will be injured in its business and property and has suffered and/or will suffer damages in amounts to be proven at trial, in at least the following ways: (1) PSG is prevented from selling steel rebar; it will lose sales of rebar and the profits thereon; and the value of its business has been and will be diminished; and (2) PSG is losing access to a lower-cost supply of rebar for its rebar Furnish-and-Install business, which will lower its profits and has

1   lowered and will lower the value of its business.

2   **<u>Count Five: Below Cost Sales</u>**

    **California Unfair Practices Act, Cal. Bus. & Prof. Code § 17043**

3   **(Against CMC Rebar, CMC Steel US, and GRS)**

4       148.   PSG repeats and reasserts each of the allegations in paragraphs 1 through 147 as

5   fully set forth herein.

6       149.   CMC Rebar and GRS (and its other partner CMC Steel US) are and have been for

7   some time engaged in the business of selling rebar Furnish-and-Install services within the State of

8   California.

9       150.   CMC Rebar and GRS (and its other partner CMC Steel US) have sold rebar

10   Furnish-and-Install services in California at a price less than their cost and with the purpose of

11   injuring competitors and destroying competition in the relevant rebar Furnish-and-Install markets

12   in violation of the California Unfair Practices Act, California Business & Professions Code

13   § 17043.

14       151.   CMC Rebar and GRS (and its other partner CMC Steel US) were not only aware

15   that their acts would injure PSG or destroy competition in the relevant rebar Furnish-and-Install

16   markets, they engaged in below-cost sales for the sole and express purpose of injuring PSG and

17   competition.

18       152.   As a result of these acts, PSG has been injured in the form of lost profits and

19   diminished business value in an amount to be proved at trial.

20   **<u>Count Six: Loss Leader Sales</u>**

    **California Unfair Practices Act, Cal. Bus. & Prof. Code § 17044**

21   **(Against CMC Rebar, CMC Steel US, and GRS)**

22       153.   PSG repeats and reasserts each of the allegations in paragraphs 1 through 152 as

23   fully set forth herein.

24       154.   CMC Rebar and GRS (and its other partner CMC Steel US) are and have been for

25   some time engaged in the business of selling rebar Furnish-and-Install services within the State of

26   California.

27       155.   CMC Rebar and GRS (and its other partner CMC Steel US) have sold rebar

28   Furnish-and-Install services in the State of California as a loss leader, such that the effect has been

1   to divert trade from PSG and injure PSG specifically and competition generally, in violation of the

2   California Unfair Practices Act, California Business & Professions Code § 17044.

3       156.    CMC Rebar and GRS (and its other partner CMC Steel US) were not only aware

4   that their acts would injure PSG or destroy competition in the relevant rebar Furnish-and-Install

5   markets, they engaged in loss leader sales for the sole and express purpose of injuring PSG and

6   competition.

7       157.    As a result of these acts, PSG has been injured in the form of lost profits and

8   diminished business value in an amount to be proved at trial.

9                    **Count Seven: Unlawful & Unfair Business Practices**
                **California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200**
10                              **(Against All Defendants)**

11      158.    PSG repeats and reasserts each of the allegations in paragraphs 1 through 157 as

12  fully set forth herein.

13      159.    The conduct complained of herein—including defendants' below cost and loss

14  leader sales and imposition of an exclusivity provision to restrain competition and unlawfully

15  maintain monopoly power—constitutes unlawful business practices in that they violate the various

16  federal and California state antitrust laws and the California common law described in the other

17  counts alleged in this Complaint.

18      160.    This conduct also constitutes unfair business practices in that, even assuming it

19  does not violate state or federal antitrust laws or California common law, it threatens an incipient

20  violation of those antitrust laws and violates the policy and spirit of those laws because its effects

21  are comparable to a violation of the law and significantly threatens or harms competition.

22      161.    Defendants' anticompetitive behavior, as described above, is unfair,

23  unconscionable, and unlawful, and in any event is a violation of the policy or spirit of the federal

24  and California state antitrust laws and the California common law because it significantly harms

25  and threatens competition.

26      162.    Defendants' anticompetitive behavior and unfair business practices are part of an

27  ongoing practice, and any purported utility of their conduct is outweighed by the gravity of the

28  consequences to PSG and competition.

163.    Defendants' unfair, unconscionable, and unlawful business practices constitute unfair competition in violation of the Unfair Competition Law, California Business & Professions Code § 17200, *et seq.*

164.    As a result of defendants' unlawful and/or unfair business practices, PSG has been and will be injured in its business and property through lost income and profits, increased costs, and diminished business value.  In addition, defendants have been unjustly enriched as a result of these same unlawful and/or unfair business practices through increased profits.

### Count Eight: Interference with Prospective Economic Advantage
**California Common Law**
**(Against CMC)**

165.    PSG repeats and reasserts each of the allegations in paragraphs 1 through 164 as fully set forth herein.

166.    PSG had an economic relationship with Danieli, with the probability of future economic benefit to PSG in the form of commissioning Danieli to build PSG a micro mill in California.

167.    With the knowledge and purpose of disrupting that relationship, CMC entered into an agreement with Danieli containing an exclusivity provision that was designed to and in fact did disrupt PSG's relationship with Danieli.

168.    The acts resulting in CMC's disruption of PSG's relationship with Danieli were wrongful independent of the interference itself, as they violated California state and federal antitrust laws, as well as California's Unfair Competition Law and Unfair Practices Act.

169.    As a direct and foreseeable result of this disruption, PSG was unable to commission Danieli to build the proposed rebar mill, resulting in harm to PSG in the form of lost profits and diminished business value in an amount to be proved at trial.

### PRAYER FOR RELIEF

170.    WHEREFORE, plaintiff demands a trial by jury and hereby respectfully requests that, based on the verdict of the jury, the Court enter a judgment against defendants which:

A.    Adjudges and decrees that defendants CMC and Danieli entered into a conspiracy in unreasonable restraint of trade in the relevant rebar manufacturing market in

1  violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Cartwright Act, California

2  Business & Professions Code § 16720;

3      B.    Adjudges and decrees that defendant CMC monopolized or, in the

4  alternative, attempted to monopolize the relevant rebar manufacturing market in violation of

5  Section 2 of the Sherman Act, 15 U.S.C. § 2;

6      C.    Adjudges and decrees that defendants CMC and Danieli conspired such that

7  CMC could unlawfully maintain its monopoly in the relevant rebar manufacturing market in

8  violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, the Cartwright Act, California

9  Business & Professions Code § 16700, *et seq.*;

10      D.    Adjudges and decrees that CMC Rebar, CMC Steel US, and GRS engaged

11  in below-cost sales and/or loss leaders in violation of California's Unfair Practices Act, California

12  Business & Professions Code § 17000, *et seq.*;

13      E.    Adjudges and decrees that defendants engaged in unlawful and/or unfair

14  business practices in violation of California's Unfair Competition Law, California Business &

15  Professions Code § 17200, *et seq.*;

16      F.    Adjudges and decrees that defendant CMC unlawfully interfered with

17  plaintiff's prospective business advantage in violation of California common law;

18      G.    Invalidates the exclusivity provisions preventing plaintiff from building the

19  Danieli micro mill in the desired location;

20      H.    Provides permanent injunctive relief preventing defendants from continuing

21  the unlawful acts described above;

22      I.    Awards plaintiff threefold damages or single damages, as required by

23  statute, or, alternatively, restitution, caused by defendants' conduct;

24      J.    Awards plaintiff reasonable attorneys' fees and costs incurred in pursuing

25  this action;

26      K.    Awards pre-judgment and post-judgment interest at the maximum legal

27  rate; and

28      L.    Awards such other relief as the Court deems just and proper.

COMPLAINT FOR DAMAGES AND INJUNCTIVE     40
RELIEF

1    Dated: October 30, 2020                    FARELLA BRAUN + MARTEL LLP

2

3                                               By:    /s/ Christopher C. Wheeler
4                                                      Christopher C. Wheeler

5                                               Christopher C. Wheeler (SBN 224872)
                                                FARELLA BRAUN + MARTEL LLP
6                                               235 Montgomery Street, 17th Floor
                                                San Francisco, CA 94104
7                                               Telephone: (415) 954-4400
                                                Facsimile: (415) 954-4480
8                                               cwheeler@fbm.com

9                                               Benjamin D. Brown (SBN 202545)
                                                Daniel A. Small (*pro hac vice pending*)
10                                              COHEN MILSTEIN SELLERS & TOLL, PLLC
                                                1100 New York Ave., N.W., Suite 500, East Tower
11                                              Washington, D.C. 20005
                                                Telephone: (202) 408-4600
12                                              Facsimile: (202) 408-4699
                                                bbrown@cohenmilstein.com
13                                              dsmall@cohenmilstein.com

14                                              Matthew W. Ruan (SBN 264409)
                                                COHEN MILSTEIN SELLERS & TOLL, PLLC
15                                              88 Pine St., Ste 1400
                                                New York, NY 10005
16                                              Telephone: (212) 838-7797
                                                Facsimile: (212) 838-7745
17                                              mruan@cohenmilstein.com

18

19

20

21

22

23

24

25

26

27

28

1

## JURY DEMAND

2

Plaintiff demands a jury trial on all claims and issues that are so triable.

3      Dated: October 30, 2020                    FARELLA BRAUN + MARTEL LLP

4

5                                                 By:      /s/ Christopher C. Wheeler

6                                                       Christopher C. Wheeler

7                                                 Christopher C. Wheeler (SBN 224872)
                                                  FARELLA BRAUN + MARTEL LLP
8                                                 235 Montgomery Street, 17th Floor
                                                  San Francisco, CA 94104
9                                                 Telephone: (415) 954-4400
                                                  Facsimile: (415) 954-4480
10                                                cwheeler@fbm.com

11                                                Benjamin D. Brown (SBN 202545)
                                                  Daniel A. Small (pro hac vice pending)
12                                                COHEN MILSTEIN SELLERS & TOLL, PLLC
                                                  1100 New York Ave., N.W., Suite 500, East Tower
13                                                Washington, D.C. 20005
                                                  Telephone: (202) 408-4600
14                                                Facsimile: (202) 408-4699
                                                  bbrown@cohenmilstein.com
15                                                dsmall@cohenmilstein.com

16                                                Matthew W. Ruan (SBN 264409)
                                                  COHEN MILSTEIN SELLERS & TOLL, PLLC
17                                                88 Pine St., Ste 1400
                                                  New York, NY 10005
18                                                Telephone: (212) 838-7797
                                                  Facsimile: (212) 838-7745
19                                                mruan@cohenmilstein.com

20     39522\13734068.2

21

22

23

24

25

26

27

28