UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC STEEL GROUP,<br><br>    Plaintiff,<br><br>    v.<br><br>COMMERCIAL METALS COMPANY, et al.,<br><br>    Defendants. | Case No. 20-cv-07683-HSG<br><br>**ORDER GRANTING MOTIONS TO DISMISS**<br><br>Re: Dkt. Nos. 39, 40, 41, 49 |

Pending before the Court are motions to dismiss filed by Defendants Commercial Metals Company and its subsidiaries and Defendant Danieli Corporation. Dkt. Nos. 39, 40. For the following reasons, the Court **GRANTS** the motions to dismiss with **LEAVE TO AMEND**.

I.   **BACKGROUND**

   A.   **Causes of Action**

Plaintiff Pacific Steel Group ("PSG" or "Plaintiff") brings this action for injunctive relief, damages, and restitution against Defendants Commercial Metals Company ("CMC") and its subsidiaries, CMC Steel Fabricators, Inc. d/b/a CMC Rebar ("CMC Rebar"), CMC Steel US, LLC ("CMC Steel US"), and Gerdau Reinforcing Steel ("GRS") (collectively, "CMC" or the "CMC Defendants") and Defendant Danieli Corporation ("Danieli") for violations of Sections 1 and 2 of the Sherman Act, California antitrust and unfair competition statutes, and California common law. Dkt. No. 1 ("Compl.") at 1. PSG lists eight causes of action:

1.   Conspiracy in restraint of trade against CMC and Danieli in violation of the Sherman Act (15 U.S.C. § 1) and the California Cartwright Act (Cal. Bus. & Prof. Code § 16720);

2.   Monopolization against CMC in violation of the Sherman Act (15 U.S.C. § 2);

1     3.     Attempted monopolization (in the alternative) against CMC in violation of the
2 Sherman Act (15 U.S.C. § 2);
3     4.     Conspiracy to monopolize against CMC and Danieli in violation of the Sherman
4 Act (15 U.S.C. §§ 1, 2) and the California Cartwright Act (Cal. Bus. & Prof. Code § 16720);
5     5.     Below cost sales against CMC Rebar, CMC Steel US, and GRS in violation of the
6 California Unfair Practices Act (Cal. Bus. & Prof. Code § 17043);
7     6.     Loss leader sales against CMC Rebar, CMC Steel US, and GRS in violation of the
8 California Unfair Practices Act (Cal. Bus. & Prof. Code § 17044);
9     7.     Unlawful and unfair business practices against all defendants in violation of the
10 California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200);
11     8.     Interference with prospective economic advantage against CMC in violation of
12 California common law.  Compl. ¶¶ 124-169.

### B. Parties

PSG is a fabricator and installer of steel reinforcing bar ("rebar") based in San Diego. Compl. ¶ 17. CMC is a U.S.-based manufacturer and fabricator of rebar and is the parent company to CMC Rebar, CMC Steel, and CMC Steel US. *Id.* ¶ 18. According to the Complaint, CMC is the largest rebar manufacturer and fabricator in the United States. *Id.* CMC Rebar is a subsidiary of CMC and is in the fabrication and installation market ("Furnish-and-Install"). *Id.* ¶ 19. As of 2018, CMC Rebar owns the assets and liabilities of GRS. *Id.* CMC Steel US is a subsidiary of CMC and markets and manufactures rebar, among other things. *Id.* ¶ 20. GRS, like PSG and CMC Rebar, is in the Furnish-and-Install market. *Id.* ¶ 21. Danieli builds mills and plants for metal industries. *Id.* ¶ 22.

### C. Factual Allegations

Entities in the Furnish-and-Install market, like PSG, buy rebar from rebar manufacturers, like CMC. *Id.* ¶ 3. PSG desires to vertically integrate by entering the rebar manufacturing market. *Id*. Rebar manufacturing is done in steel mills, of which there are three types: traditional integrated steel mills, mini mills (which came into prominence in the 1960s), and micro mills, the first of which was built in 2009 by CMC and Danieli. *Id.* ¶ 42-53. According to PSG, "building a

traditional integrated mill requires enormous startup costs and historically was only economical to build when done on an enormous scale with millions of tons of annual capacity or more" whereas "mini mills require lower capital costs and provide higher returns on equity" by controlling costs and using advanced technology. *Id.* ¶ 43, 48-49. Micro mills are allegedly the future of rebar manufacturing because, unlike traditional or mini mills, they "output[] directly into rebar." *Id.* ¶ 52. "This enables a micro mill not only to be more efficient, it also requires a smaller physical footprint and lower capital expenditures." *Id.* According to PSG, these gains in efficiency and lower startup costs are the reason that "[s]ince building its first micro mill over ten years ago, CMC has not built any other type of mill." *Id.* ¶ 57.

PSG wants to build a micro mill. *Id.* ¶ 3. According to the Complaint, "[t]he only commercially viable way for PSG to enter the relevant rebar manufacturing market [is] to construct a micro mill, as opposed to a mini mill that requires a significantly greater capital investment and employs older, less efficient technology." *Id.* ¶ 5.

Danieli is the only company to have developed and sold a micro mill. *Id.* Danieli has sold or is in the process of selling five such micro mills using its proprietary ("MI.DA") technology; three of these deals have gone to CMC and two to CMC's largest national competitor, Nucor Corporation. *Id.* ¶ 7. CMC's first micro mill, which was located in Mesa, Arizona, was subject to an exclusivity provision covering a radius of 400 miles from Mesa. *Id.*

PSG met with Danieli in late 2019 to begin negotiations to build an environmentally friendly micro mill. *Id.* ¶ 85. Initially, the plan was to build the micro mill in Pittsburg, California, which is outside of the 400-mile exclusivity provision of CMC's first micro mill. *Id.* ¶ 89. At the same time, however, Danieli was allegedly negotiating with CMC for CMC's purchase of another MI.DA mill to be located in Mesa, Arizona. *Id.* PSG's Pittsburg site location fell through, and it decided instead to secure property within the greater Los Angeles basin. *Id.* ¶ 91. Ultimately, negotiations between PSG and Danieli were cut short when Danieli and CMC finalized their agreement for a third micro mill. *Id.* ¶ 95. The agreement includes an exclusivity provision which bars Danieli from selling one of their proprietary micro mills to any company other than CMC within a 500-mile radius of Rancho Cucamonga, California for 69 months. *Id.* ¶

3

5. This radius covers approximately half of Utah, nearly all of Arizona, the majority of Nevada, and almost all of California (up to just south of Redding). *Id.* ¶ 97. Rancho Cucamonga is not the planned site of the new mill in Arizona, but instead is apparently the location of one of CMC's mini mills which is soon to be retired. *Id.* ¶ 98. PSG claims this new exclusivity agreement "effectively prevents construction of any rebar mill within the 500-mile radius for over five years because the most efficient means of manufacturing rebar is the MI.DA mill." *Id.* ¶ 8.

CMC's new mill will allegedly employ the "technology PSG had been led to believe it would be developing in conjunction with Danieli." *Id.* ¶ 95. PSG alleges that "CMC promoted the new mill as embracing the very alternative energy use concepts PSG had laid out to Danieli in their initial November 2019 meeting." *Id.* Additionally, PSG alleges that Danieli "inappropriately shared PSG's [Pittsburg, CA] site consideration with CMC." *Id.* ¶ 89. PSG alleges that CMC opted for a 500-mile exclusionary zone from Rancho Cucamonga, California—as opposed to Mesa, Arizona—in part because that zone includes Pittsburg, California. *Id.* ¶ 99; Dkt. No. 99 ("Opp.") at 8.

PSG also alleges that building a micro mill outside the reach of the 500-mile restriction is not commercially feasible due to the cost to transport rebar, especially to PSG's southern California facilities and customers. Compl. ¶ 101. According to PSG, a significant majority of rebar sales are to customers located within 500 miles of a mill. *Id.* ¶ 108.

Finally, PSG also alleges that Defendants in the Furnish-and-Install market (CMC Rebar, CMC Steel US, and GRS) have for years priced their services below cost and used loss leaders "in an effort to minimize PSG's growth, profitability, effectiveness, and efficiency." *Id.* ¶ 1. Allegedly, "[d]espite a California construction boom and rising demand for rebar Furnish-and-Install services, CMC Rebar and GRS have sustained heavy losses in their Furnish-and-Install businesses since at least 2017, due in large part to bidding below cost." *Id.* ¶ 63. PSG also claims that "CMC Rebar has been accused [by former employees] of below-cost bidding in other geographic areas," like Texas, in efforts to undercut competitors and force them to "go broke." *Id.* ¶¶ 64-65.

//

4

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Rule 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nevertheless, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

Yet even if the court concludes that a 12(b)(6) motion should be granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quotation omitted).

In *Khoja v. Orexigen Therapeutics*, the Ninth Circuit clarified the judicial notice rule and incorporation by reference doctrine. *See* 899 F.3d 988 (9th Cir. 2018). Under Federal Rule of Evidence 201, a court may take judicial notice of a fact "not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Accordingly, a court may take "judicial notice of matters of public record," but "cannot take judicial notice of disputed facts contained in such public records." *Khoja*, 899 F.3d at 999 (citation and quotations omitted). The Ninth Circuit has clarified that if a

court takes judicial notice of a document, it must specify what facts it judicially noticed from the document. *Id*. at 999.  Further, "[j]ust because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Id*.  As an example, the Ninth Circuit held that for a transcript of a conference call, the court may take judicial notice of the fact that there was a conference call on the specified date, but may not take judicial notice of a fact mentioned in the transcript, because the substance "is subject to varying interpretations, and there is a reasonable dispute as to what the [document] establishes." *Id*. at 999–1000.

### III. DISCUSSION

#### A. Sherman Act Antitrust Plaintiffs Must Establish A Geographic Market, A Product Market, And Market Power

"A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'" *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (citing *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (U.S. 2018)).  "[T]he plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008).  Such allegations need not be pled with specificity. *Id.*  Although the "validity of the 'relevant market' is typically a factual element rather than a legal one," an antitrust complaint may be dismissed under Rule 12(b)(6) "if the complaint's 'relevant market' definition is facially unsustainable." *Id.*  "The relevant market must include both a geographic market and a product market." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018).  PSG alleges two relevant markets: a rebar manufacturing market centered near Los Angeles, which PSG seeks to enter, and Furnish-and-Install markets in the Los Angeles Basin and the San Francisco Bay Area, in which PSG currently competes.

##### i. Geographic Market

A properly defined geographic market extends to the "area of effective competition" in which "buyers can turn for alternative sources of supply." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) (citation and internal quotation marks omitted).  PSG alleges the

relevant Furnish-and-Install market covers a 200-mile radius from the Los Angeles basin (PSG's Southern California fabrication facilities), and a 200-mile radius from the San Francisco Bay Area (PSG's Northern California fabrication facilities).  Compl. ¶ 117.  PSG alleges the relevant rebar manufacturing market covers a "500-mile radius from the high desert area near the greater Los Angeles basin."  *Id.* ¶ 109.

With respect to the Furnish-and-Install market, PSG alleges that rebar is "costly to ship due to its weight and irregular shape[,]" and that "additional trips to the construction site are sometimes needed."  *Id.* ¶ 115.  Therefore, "[t]he large majority of sales of Furnish-and-Install services are provided at construction sites within 200 miles of the fabrication plant."  *Id.* ¶ 116.  As a result, the alleged Furnish-and-Install product market extends 200 miles from each of PSG's fabrication facilities.  The Court finds that PSG has plausibly alleged this market. [1]

With respect to the rebar manufacturing market, PSG contends that "[r]ebar's weight makes it expensive to ship, especially relative to the cost of manufacturing rebar."  Compl. ¶ 30.  "There are substantial cost advantages to sourcing rebar locally to reduce shipping costs."  *Id.*  As a result, "[a] significant majority of rebar sales are to customers located within 500 miles of a mill, and most of those sales are to customers located less than 400 miles away."  *Id.* ¶ 108.  On this basis, PSG alleges that the relevant rebar market is defined by the outer limits of what is economical to ship.

CMC contends that PSG's allegations regarding the geographic market are conclusory and implausible.  Dkt. No. 40 ("CMC Mot.") at 8.  CMC argues that a geographic market must include all sellers to whom a purchaser can reasonably turn, including imports, and that because at least some rebar in California is supplied by imports, PSG's claimed geographic market is implausible.  *Id.* (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)).  PSG acknowledges that foreign imports account for at least some (roughly 7%) of total rebar sourced in California.  Compl. ¶ 33.[2]

---

[1] While CMC asserts that "[t]his geographic scope is not supported by any facts," CMC Mot. at 14, CMC fails to address the alleged facts about the Furnish-and-Install market's geographic scope, and fails to explain why these facts do not satisfy the pleading standard.
[2] CMC notes that the complaint does not allege the percentage of rebar bought from domestic

7

The question of what constitutes a relevant market is factual, and not usually appropriate to resolve at the motion to dismiss stage. *Newcal Indus.*, 513 F.3d at 1045. Because PSG has plausibly alleged that transportation costs are a determinative factor in the geographic scope of the rebar market and that the majority of rebar sales are to customers located within 500 miles of a mill, its alleged geographic market is not "facially unsustainable." *Id.* Accordingly, the Court finds that PSG has plausibly alleged a geographic rebar manufacturing market.

### ii. Product Market

A properly defined product market "must encompass the product at issue as well as all economic substitutes for the product." *Id.* at 1045 (citation omitted). Whether a product can be substituted is "determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Id.* (citing *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962)). Concerning the rebar manufacturing market, PSG alleges that "[s]teel rebar is used to reinforce concrete slabs in construction projects. . . . It is virtually impossible to complete a commercial construction project without using rebar to reinforce concrete structures." Compl. ¶ 106. Alternatives, like stainless steel, are far more expensive and are not commercially viable. *Id.* Concerning the Furnish-and-Install market, PSG alleges that fabrication and installation "services are necessary for steel rebar to be used to reinforce concrete in a structure, and there are no substitutes for these services." *Id.* ¶ 114. These factual allegations are sufficient to plausibly allege a product market.

### iii. CMC's Market Power

PSG's Sherman Act claims also require plausible allegations of market power. *See Newcal Indus.*, 513 F.3d at 1044 n. 3 ("The 'relevant market' and 'market power' requirements apply identically under the two different sections of the Act, meaning that the requirements apply identically to all six of [plaintiff's] claims.").[3] Market power is demonstrated by a party's "ability

---

suppliers located outside of PSG's geographic market and requests judicial notice of documents that purport to show PSG's purchase of rebar from Washington, Nevada, Oregon, and Texas. CMC Mot. at 3-4, 9. The Court **DENIES** CMC's request for judicial notice, Dkt. No. 41, because CMC asks the Court to resolve a factual dispute through "judicial notice of disputed facts contained in such . . . records." *See Khoja*, 899 F.3d at 999.

[3] PSG argues that because it has alleged direct evidence the Defendants excluded competition, it

to raise prices profitably by restricting output." *Am. Express Co.*, 138 S. Ct. at 2288 (citation omitted). "Market power cannot be inferred solely from the existence of entry barriers and a dominant market share." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995). "The ability to control output and prices—the essence of market power—depends largely on the ability of existing firms to quickly increase their own output in response to a contraction by the defendant." *Id.*

The Ninth Circuit has explained that "[w]hile market share is just the starting point for assessing market power, . . . market share, at least above some level, could support a finding of market power in the absence of contrary evidence." *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 950-51 (9th Cir. 1996) (quoting *Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 925 (9th Cir.1980)). "Where such an inference is not implausible on its face, an allegation of a specific market share is sufficient, as a matter of pleading, to withstand a motion for dismissal." *Id.* (emphasis removed).

With respect to the rebar market, PSG "believes that CMC has accounted for approximately 50% of the total rebar sold in the relevant market during the relevant time period." Compl. ¶ 111. CMC contends that this allegation is conclusory and below the threshold of 65% market share generally required by courts. CMC Mot. at 7. The Ninth Circuit, however, has been "reluctant to apply such bright-line rules regarding market share in deciding whether a defendant has market power to restrict output or raise prices." *Rebel Oil*, 51 F.3d at 1438 n.10. The Ninth Circuit has advised courts to be "wary of the numbers game of market percentage," and instead consider relevant market factors including "market share, entry barriers and the capacity of existing competitors to expand output." *Id.* Given that the complaint includes allegations of 50% market share and "[s]ubstantial barriers to entry . . . that make CMC's market power durable," Compl. ¶¶ 71, 111-112, the Court finds that PSG has plausibly alleged CMC's market power in

---

need not establish CMC's market power. Opp. at 12-13. But the Supreme Court has made clear that a market power analysis is required for antitrust claims based on vertical restraints. *Am. Express*, 138 S. Ct. at 2285 n.7 ("Vertical restraints often pose no risk to competition unless the entity imposing them has market power, which cannot be evaluated unless the Court first defines the relevant market. . . . '[T]he possibly anticompetitive manifestations of vertical arrangements can occur only if there is market power.'" (citations omitted)).

the rebar manufacturing market.

With respect to the Furnish-and-Install market, "PSG estimates that CMC Rebar's market share in each of the relevant markets has ranged between 15% and 30% during the relevant time period." Compl. ¶ 119. But a market share of somewhere between 15% and 30% does not appear to be enough to establish market power. *See Distance Learning Co. v. Maynard*, No. 19-cv-03801-KAW, 2020 WL 2995529, at *7 (N.D. Cal. June 4, 2020) (noting "the 'gray area of the law' between the 30% and 65% thresholds identified by the Ninth Circuit."). PSG disagrees and cites three cases in support of its argument that market power can exist below 30% of market share. Opp. at 14 (citing *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1301 (9th Cir. 1982); *United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2nd Cir. 2003); *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000)). But none of those cases stand for the proposition that a market share below 30%, *standing alone*, equates to market power. The court in *Twin City Sportservice* "found unreasonable restraint of trade had been evidenced not only by Sportservice's 24 percent share of the relevant market, but also from its continuing *pattern of conduct that produced that market share*," including predatory franchise agreements. 676 F.2d at 1301 (emphasis added). The court in *Visa U.S.A.* found defendants had market power because merchants "could not refuse to accept payment by Visa [47% market share] or MasterCard [26% market share], even if faced with significant price increases, because of customer preference." 344 F.3d at 239-40. And the court in *Toys "R" Us* found that defendant had market power not because of its 20% market share but because of "direct evidence of anticompetitive effects." 221 F.3d at 937. In short, market power can be plausibly alleged even with a low market share if other anticompetitive factors are adequately alleged.

Here, PSG's allegations regarding the Furnish-and-Install market are focused on state law unfair practices claims rather than Sherman Act violations. Compl. ¶¶ 148-157. PSG does allege that Defendants' anticompetitive behavior in the rebar manufacturing market will result in loss of access to a lower-cost supply of rebar for PSG's Furnish-and-Install business, *Id.* ¶¶ 128, 133-134, 140-141, 146-147, but these allegations are conclusory and stem from alleged anticompetitive behavior in the rebar manufacturing market rather than the Furnish-and-Install market. Taking

1  PSG's allegations as a whole, the Court finds that PSG has not plausibly alleged that CMC's
2  market share of 15-30% coupled with other behavior establishes market power in the Furnish-and-
3  Install market.  According, PSG's Sherman Act claims against CMC in the Furnish-and-Install
4  market are **DISMISSED WITH LEAVE TO AMEND**.

### iv. Danieli's Market Power

As discussed above, "[i]n order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market.'" *Newcal Indus.*, 513 F.3d at 1044.  But PSG does not allege that Danieli has market power in either the rebar manufacturing market or the Furnish-and-Install market.  *See* Compl. at 28-29, 31.  Rather, Danieli builds and supplies steel mills.  *Id.* ¶ 22.

Still, PSG contends that a supplier that has entered into an anticompetitive vertical agreement with a customer may be subject to antitrust liability for harm caused in the customer's downstream market, relying on *Beech Cinema, Inc. v. Twentieth Century Fox-Film Corp.*, 622 F.2d 1106 (2d Cir. 1980), and similar cases.  Opp. at 31.  The Court finds that *Beech Cinema* and the other cases cited by PSG are of limited persuasive value.  In addition to being out of circuit authority that is decades old, the cases relied upon by PSG do not squarely analyze whether a supplier like Danieli can be held liable under the Sherman Act for anticompetitive behavior in a market in which it does not participate.  In the absence of clear authority to the contrary, the Court will rely on Ninth Circuit precedent holding that "to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market.'" *Newcal Indus.*, 513 F.3d at 1044.  PSG is not pleading that the market for steel mills is being restrained.  Rather, PSG is pleading that the rebar manufacturing and Furnish-and-Install markets are being restrained.  But Danieli is not a participant in those markets and is not alleged to have market power within them.

Further, PSG's arguments come close to implying that Danieli has an antitrust duty to deal with PSG.  As Danieli points out, PSG does not allege that it was barred from contracting with another builder of steel mills, or with Danieli to build a different type of steel mill, such as a mini mill, within the exclusivity zone.  Dkt. No. 39 at 3-4.  Rather, PSG alleges that it was barred from

contracting with Danieli for one specific type of steel mill, i.e. a micro mill, that it preferred at a location of its choosing. "As the Supreme Court has repeatedly emphasized, there is 'no duty to deal under the terms and conditions preferred by [a competitor's] rivals[.]'" *Qualcomm*, 969 F.3d at 993 (citations omitted). Likewise, "the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Id.* "This is because the antitrust laws, including the Sherman Act, were enacted for the protection of *competition,* not *competitors*." *Id.* (citations and quotation marks omitted). The limited exception to the "general rule that there is no antitrust duty to deal comes under the Supreme Court's decision in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)." *Id.* The Ninth Circuit has explained that the *Aspen Skiing* exception applies in limited circumstances where a company (1) "unilateral[ly] terminat[es]. . .a voluntary and profitable course of dealing;" (2) "the only conceivable rationale or purpose is 'to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition;'" and (3) "the refusal to deal involves products that the defendant already sells in the existing market to other similarly situated customers." *Id.* (citations omitted). It may be that PSG is able to adequately allege facts supporting this exception, but it has not done so in the current complaint. Accordingly, the Court **DISMISSES WITH LEAVE TO AMEND** the claims against Danieli.

### B. First Cause of Action: Conspiracy In Restraint Of Trade By CMC And Danieli In Violation Of The Sherman Act, Section 1

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. The Supreme Court has long held that, "the phrase 'restraint of trade' is best read to mean 'undue restraint.'" *Am. Express Co.*, 138 S. Ct. at 2283. Therefore, "[t]o establish liability under § 1, a plaintiff must prove (1) the existence of an agreement, and (2) that the agreement was in unreasonable restraint of trade." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016) (citation omitted). Because PSG's Sherman Act claims against CMC in the Furnish-and-Install Market and against Danieli are not adequately pled, as discussed above, the Court need only consider whether

12

1  PSG has adequately alleged an unreasonable restraint of trade against CMC in the rebar
2  manufacturing market.

### i. Existence Of An Agreement

The parties do not dispute that a contract exists between CMC and Danieli, and PSG's factual allegations are sufficient to establish an agreement. Therefore, the first element of a Sherman Act Section 1 claim is satisfied.

### ii. An Unreasonable Restraint of Trade

A restraint of trade may be found unreasonable under either a per se rule or the "rule of reason" burden-shifting framework. *Am. Express*, 138 S. Ct. at 2283-2284. A minority of restraints are found per se unreasonable because they "always or almost always tend to restrict competition and decrease output. . . . Restraints that are not unreasonable per se are judged under the 'rule of reason.'" *Id.* (citation omitted). "The rule of reason requires courts to conduct a fact-specific assessment of 'market power and market structure . . . to assess the [restraint]'s actual effect' on competition." *Id.* (citation omitted).

"Typically only 'horizontal' restraints—restraints 'imposed by agreement between competitors'—qualify as unreasonable *per se*." *Id.* at 2284 (citation omitted). A common example is price fixing. On the other hand, vertical restraints should nearly always be analyzed under the rule of reason. *Id.*; *see also Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010) ("[A]n exclusive-dealing arrangement does not constitute a per se violation of section 1."). PSG contends that CMC and Danieli's conduct is a per se violation of federal and California state antitrust laws. Compl. ¶ 127. But the parties do not dispute that the agreement at issue—establishing the micro-mill exclusivity zone—is vertical, and PSG has not pled that CMC and Danieli agreed to set prices. *See Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847-WHO, 2014 WL 524076, at *9 (N.D. Cal. Feb. 6, 2014) ("A vertical restraint of trade is not per se illegal under § 1 of the Sherman Act unless it includes some agreement on price or price levels." (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 717 (1988))). PSG has not provided any other reason why the Court should analyze the agreements at issue under the per se rule. As a result, the Court finds that the rule of reason

13

1 applies.

2       In its motion to dismiss, CMC argues that PSG fails to adequately allege that entry into the
3 rebar manufacturing market is foreclosed by the exclusivity zone, relying on caselaw that
4 addresses "exclusive-dealing" arrangements. CMC Mot. at 9-10. 12-14. In response, PSG argues
5 that it is not bringing an exclusive-dealing claim, such that market foreclosure is not at issue.
6 Opp. at 21. Rather, PSG argues that the relevant question is whether the contract restriction
7 constitutes "anticompetitive conduct." *Id.* The Court finds this argument curious. It is true that
8 the CMC-Danieli exclusivity zone is not "an agreement between a vendor and a buyer that
9 prevents the buyer from purchasing a given good from any other vendor" and thus does not fit
10 squarely within the traditional definition of an exclusive-dealing relationship. *See Allied*
11 *Orthopedic* 592 F.3d at 996. But the "anticompetitive conduct" that PSG alleges is an exclusive
12 relationship between a provider of an essential input into a market, i.e. steel mills, and a customer.
13 *See* Compl. ¶ 110 ("CMC was able to exclude PSG by conspiring with the sole provider of the
14 technology PSG needs to profitably enter the market."). And the harm alleged by PSG is
15 foreclosure from the rebar manufacturing market. *Id.* ¶ 100 ("Exclusive access not only
16 *forecloses* PSG's entry into the relevant rebar manufacturing market, but blocks entry by other
17 potential competitors as well.") (emphasis added).

18       Given that the harm alleged by PSG is market foreclosure due to an exclusive relationship
19 between a provider and its customer, the Court is not persuaded by PSG's argument that the
20 authority on exclusive dealing and market foreclosure is irrelevant. On the contrary, the Court
21 finds that the contractual relationship at issue between CMC and Danieli is analogous enough to a
22 traditional exclusive-dealing relationship to make the precedent in that area helpful in analyzing
23 PSG's allegations of anticompetitive conduct. *See Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d
24 1157, 1162 (9th Cir. 1997) ("The main antitrust objection to exclusive dealing is its tendency to
25 'foreclose' existing competitors or new entrants from competition in the covered portion of the
26 relevant market during the term of the agreement.").

27       "Under the antitrust rule of reason, an exclusive dealing arrangement violates Section
28 1 only if its effect is to 'foreclose competition in a substantial share of the line of commerce

United States District Court
Northern District of California

affected.'" *Allied Orthopedic*, 592 F.3d at 996. The Ninth Circuit has indicated that in analyzing allegations of market foreclosure, courts are to consider alternative sources available to competitors. *Omega Env't*, 127 F.3d at 1162-63 (quoting with approval the proposition that the "foreclosure calculation 'includes the full range of selling opportunities reasonably open to rivals, namely, all the product and geographic sales they may readily compete for, using easily convertible plants and marketing organizations.'").[4]

PSG claim that it is foreclosed from the rebar manufacturing market by the exclusivity zone is undermined by PSG's own factual allegations. The premise of PSG's claim is that entry into the rebar manufacturing market *must* be via a micro mill built by Danieli. *See* Compl. ¶¶ 5, 113, 126. In support, PSG alleges that "all three of the new mills CMC has built (or is building) since 2009 are [micro] mills . . . as are both of the mills built recently by Nucor Corporation." Opp. at 4; Compl. ¶¶ 55-57, 98. But this, at best, suggests only that micro mills are preferable to mini mills, not that mini mills are obsolete, or that "[t]he *only* commercially viable way for PSG to enter the relevant rebar manufacturing market [is] to construct a micro mill." Compl. ¶ 5 (emphasis added).

On the contrary, a necessary implication of PSG's allegations is that other competitors are operating successfully in the rebar manufacturing market without micro mills. For example, PSG alleges that CMC controls 50% of the Los Angeles-based rebar manufacturing market even though CMC is the only manufacturer in the region using a micro mill. *Id.* ¶ 111. Thus, accepting PSG's allegations as true, at least half of the market is being supplied by traditional or mini mills. CMC itself uses mini mills and has purchased them quite recently: while it may be true that all of the mills CMC has built recently are micro mills, CMC agreed to acquire four steel mills from Gerdau in 2018, none of which are micro mills. *Id.* ¶ 69. PSG concedes that mini mills are "capable of generating profits on rebar through cost control and advanced technology." *Id.* ¶ 49. Finally, PSG

---

[4] While the Ninth Circuit's decision in *Omega Environmental* dealt with a claim under Section 3 of the Clayton Act, the Ninth Circuit has applied similar standards in Sherman Act cases and held that "a *greater* showing of anticompetitive effect is required to establish a Sherman Act violation than a section three Clayton Act violation in exclusive-dealing cases." *Twin City Sportservice*, 676 F.2d at 1304 n.9 (emphasis added).

15

alleges that it is a superior competitor. *Id.* ¶ 62 ("PSG's innovative and efficient operations and its high performance standards yield superior performance and lower costs"). So, a reasonable inference is that PSG could, like those companies already in the rebar market, compete using a mini mill.

In short, PSG's claim elides the difference between "the most efficient means of entry or expansion—the MI.DA mill—" and the ability to enter the market at all. *Id.* ¶ 113. It may be true that micro mills are highly efficient and an improvement on mini mills. *Id.* ¶ 52-60. Micro mills can, for example, output directly to rebar rather than steel billets (which must later be crafted into rebar); mini mills cannot. *Id.* But neither PSG's allegations, nor reasonable inferences from them, plausibly allege that building a micro mill with Danieli is the *only* way to enter the rebar manufacturing market. Because PSG's restraint of trade claim is based on its complete exclusion from the rebar manufacturing market and because the facts alleged by PSG suggest that manufacturing using mini mills is a viable means of competing in the market, the Court finds that PSG has not adequately alleged an unreasonable restraint of trade.[5] Accordingly, PSG's conspiracy in restraint of trade claim is **DISMISSED WITH LEAVE TO AMEND**.

**C. Second Through Fourth Causes of Action: Monopolizations Claims In Violation Of The Sherman Act, Section 2**

To establish liability under Section 2 of the Sherman Act, "a plaintiff must show: (a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury." *Qualcomm*, 969 F.3d at 990 (quotation marks omitted).

"'Antitrust injury' means 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Somers v. Apple, Inc.*, 729 F.3d

---

[5] The Court notes that the exclusionary zone challenged by PSG centers on Rancho Cucamonga, California and not Mesa, Arizona, the site of the planned CMC micro mill. While certainly revealing with respect to CMC's motives, this fact does not obviate the need for PSG to plausibly allege all necessary elements of its Sherman Act claims. Additionally, even if CMC had opted to center the second exclusionary zone on Mesa, Arizona, that still would have foreclosed PSG from building a micro mill in the greater Los Angeles basin.

16

953, 963 (9th Cir. 2013). Essentially, PSG must adequately allege that its loss "flows from an *anticompetitive* aspect or effect of" Defendants' behavior. *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2011). "'If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal per se.'" *Id.* A causal link between a plaintiff's injuries and a defendant's actions alone is not enough to sustain an antitrust claim. *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 902 (9th Cir. 2008).

PSG alleges that competition in the rebar manufacturing market has been harmed in a number of ways: PSG claims that it would have been a "a lower-cost producer with the ability and incentive to price below the market and spur greater price competition" had it entered the rebar manufacturing market; that "additional production capacity and output and the resulting additional competition is excluded from the market"; and that "other potential entry into the relevant rebar manufacturing market is foreclosed." Compl. ¶ 126. But the only basis upon which PSG rests these claims is the allegation that "[t]he *only* commercially viable way for PSG to enter the relevant rebar manufacturing market [is] to construct a micro mill." *Id.* ¶ 5 (emphasis added). As discussed above, PSG's allegations, and reasonable inferences drawn from them, do not adequately foreclose the possibility that PSG or other competitors could enter the rebar market using mini mills rather than a micro mill built by Danieli, which is the only type of steel mill affected by the alleged anticompetitive conduct.

PSG also claims personal injuries, asserting that, since it is barred from the rebar manufacturing market, "it will lose sales of rebar and the profits thereon; and . . . [it] is losing access to a lower-cost supply of rebar for its rebar Furnish-and-Install business." Compl. ¶ 134. Setting aside the issue of whether PSG is in fact barred from the rebar manufacturing market, injuries to a competitor that do not also harm competition are not grounds for antitrust claims. *See Qualcomm*, 969 F.3d at 993 (explaining that "the antitrust laws, including the Sherman Act, were enacted for the protection of *competition,* not *competitors*" and therefore the Sherman Act generally "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with

17

whom he will deal."); *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003) ("Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury.").

To that end, competition may be promoted rather than harmed by vertical agreements, like the ones at issue here, because they have "potential to stimulate interbrand competition, 'the primary concern of antitrust law.'" *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 724 (1988). And PSG, as a purchaser of rebar, may in fact be helped by this interbrand competition if it results in lower priced rebar available from CMC. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 329 (1990) (finding that plaintiff did not suffer antitrust injury in part because the alleged conspiracy would have worked to its advantage). That said, vertical restraints certainly can injure competition when they "foreclose competitors from entering or competing in a market." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198-1200 (9th Cir. 2012). But, again, PSG has not adequately pled that it has been prevented from entering the rebar manufacturing market.

In short, because PSG's has not adequately pled causal antitrust injury, its monopolization claims are **DISMISSED WITH LEAVE TO AMEND**.

### D.    Fifth Through Eighth Causes of Action (State Law Claims)

A district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction. *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010) (citing 28 U.S.C. § 1367(c)(3)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* (citation and internal quotations omitted).

PSG alleges that the Court has subject matter jurisdiction over the federal claims and supplemental jurisdiction over the state claims. Compl. ¶ 11. Having dismissed all the federal claims, the Court, in its discretion, declines to assert supplemental jurisdiction over the remaining state law claims unless and until PSG can state a valid federal claim. Accordingly, PSG's state law claims are **DISMISSED** without prejudice. Plaintiff may reassert these claims (but no new

state law claims) in any amended complaint.

## IV. CONCLUSION

The Court **GRANTS** Defendants' motions to dismiss with **LEAVE TO AMEND**.[6] Dkt. Nos. 39, 40.  Plaintiff may not add any new causes of action or defendants to an amended complaint, and any amended complaint must be filed within 21 days from the date of this Order.

**IT IS SO ORDERED.**

Dated: 5/21/2021

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge

---

[6] The Court also **DENIES AS MOOT** Defendants' motion to stay discovery pending the Court's decision on Defendants' motion to dismiss.  Dkt. No. 49.

19