Benjamin D. Brown (SBN 202545)
Daniel A. Small (admitted *pro hac vice*)
Daniel McCuaig (admitted *pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave., N.W., Suite 500, East Tower
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
bbrown@cohenmilstein.com
dsmall@cohenmilstein.com
dmccuaig@cohenmilstein.com

Matthew W. Ruan (SBN 264409)
COHEN MILSTEIN SELLERS & TOLL, PLLC
88 Pine St., Ste 1400
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
mruan@cohenmilstein.com

Christopher C. Wheeler (SBN 224872)
FARELLA BRAUN + MARTEL LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480
cwheeler@fbm.com

*Attorneys for Plaintiff Pacific Steel Group*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| PACIFIC STEEL GROUP,<br><br>                  Plaintiff,<br><br>v.<br><br>COMMERCIAL METALS COMPANY, et al.,<br><br>                  Defendants. | Case No. 4:20-cv-07683-HSG<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ..................................................................................................................1

JURISDICTION AND VENUE ...........................................................................................6

INTRADISTRICT ASSIGNMENT .....................................................................................7

PARTIES ..............................................................................................................................7

FACTUAL ALLEGATIONS ...............................................................................................9

I.      Industry Background ................................................................................................9

        A.      The Upstream Market: Manufacturing Steel Reinforcing Bar ...................9

        B.      The Downstream Market: Rebar Furnish-and-Install Services ...............12

II.     The Evolution from Integrated Mills to Mini Mills to Micro Mills...................14

III.    Pacific Steel's Entry Into the Rebar Furnish-and-Install Markets and CMC's Response..........................................................................................................21

IV.    Market Consolidation and CMC's Gerdau Acquisition .....................................24

V.     CMC's Opposition to Pacific Steel's Efforts to Import Steel Rebar From Turkey ............26

VI.    Pacific Steel's Attempt to Vertically Integrate and CMC's Response................28

RELEVANT MARKETS.....................................................................................................39

I.      The Relevant Rebar Manufacturing Market.......................................................39

        A.      The Product Market....................................................................................39

        B.      The Geographic Market ............................................................................39

        C.      CMC Market Power ...................................................................................44

        D.      Harm to Competition .................................................................................45

II.     The Relevant Rebar Furnish-and-Install Market.................................................47

        A.      The Product Market....................................................................................47

        B.      The Geographic Markets ...........................................................................47

        C.      CMC's Ability to Harm Competition and Competitors in the Relevant Markets..............................................................................................48

        D.      Harm to Competition .................................................................................49

INJURY TO PACIFIC STEEL GROUP ...................................................................50

CAUSES OF ACTION ..............................................................................................50

Count One: Conspiracy in Restraint of Trade ..........................................................50

Count Two: Monopolization .....................................................................................52

Count Three: Attempted Monopolization (In the Alternative) .................................54

Count Four: Conspiracy to Monopolize ...................................................................57

Count Five: Below Cost Sales ..................................................................................59

Count Six: Loss Leader Sales ...................................................................................60

Count Seven: Unlawful & Unfair Business Practices ..............................................60

Count Eight: Interference with Prospective Economic Advantage ..........................61

PRAYER FOR RELIEF ............................................................................................62

JURY DEMAND .......................................................................................................65

1   Plaintiff Pacific Steel Group ("Pacific Steel" or "Plaintiff") files this First Amended

2 Complaint for permanent injunctive relief and damages or restitution against defendants

3 Commercial Metals Company ("CMC") and its subsidiaries, C M C Steel Fabricators, Inc. d/b/a

4 CMC Rebar ("CMC Rebar"), and CMC Steel US, LLC ("CMC Steel US") (collectively,

5 "Defendants"), for violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2),

6 California antitrust and unfair competition statutes, and California common law.  This Amended

7 Complaint no longer names Danieli Corporation ("Danieli") as a defendant based on the Court's

8 May 21, 2021 Order dismissing the claims against Danieli (Order Granting Mots. to Dismiss, ECF

9 No. 74).  However, Plaintiff reserves all its appeal rights as to the May 21 Order, including its

10 right to appeal the dismissal of the claims against Danieli.

11   In furtherance of the claims asserted herein, Plaintiff alleges as follows:

12           **<u>INTRODUCTION</u>**

13   1.   This case is brought to remedy injuries to competition and Pacific Steel caused by

14 the unconscionable and illegal conduct of a multi-billion-dollar, multi-national steel conglomerate,

15 Defendant CMC, which extracted from Danieli, the only firm in the world that has built

16 continuous feed reinforcing steel rebar micro mills ("micro mills"), an agreement to withhold from

17 Pacific Steel the micro mill that Danieli had been on the verge of constructing for Pacific Steel.

18 Micro mills are by far the most efficient method for manufacturing steel reinforcing bar ("rebar"),

19 so much so that in the last quarter-century no mill to manufacture rebar has been built in the

20 United States that was not a micro mill.  The sole purpose of the agreement was to exclude Pacific

21 Steel (and all other potential entrants) from the relevant geographic market for rebar

22 manufacturing by blocking that uniquely efficient and effective, and profit-maximizing, means of

23 entry, thus artificially maintaining CMC's monopoly (and supracompetitive prices) in that rebar

24 market, as well as denying Pacific Steel the ability to supply itself and the rest of the relevant

25 downstream rebar fabrication and installation ("Furnish-and-Install") markets with lower-cost

26 rebar and a more efficient integrated process that otherwise would have enhanced competition in

27 those downstream markets.  (In the downstream markets, "fabrication" is a term of art used in the

28 industry that refers not to rebar manufacturing, but rather to cutting and bending rebar to conform

to building needs, which also is referred to as "furnishing" the rebar.)  In addition, Defendant CMC Rebar, through both its own conduct and that of Gerdau Reinforcing Steel ("GRS"), whose equity CMC purchased through CMC's subsidiaries CMC Rebar and CMC Steel US, has for years priced its Furnish-and-Install services below cost in an effort to minimize Pacific Steel's growth, profitability, effectiveness, and efficiency.  The result of Defendants' unlawful conduct has been and/or will be (1) the exclusion of a substantial, lower-cost competitor from the relevant upstream geographic market for rebar manufacturing (covering, at most, the majority of California and parts of Arizona, Nevada, and Utah) for over five years and (2) restraining competition in the relevant downstream geographic markets for Furnish-and-Install services (covering, at most, the majority of California and a small part of Nevada) by barring an additional, lower-priced supply of rebar for over five years.  The resulting harm to rebar consumers is substantial: by restraining the ability of Pacific Steel to become a stronger and more efficient competitor as quickly as it otherwise would have, CMC will force rebar consumers in California to pay in excess of $50,000,000 per year in artificially increased steel prices.

2.      Pacific Steel is a San Diego-based fabricator and installer of rebar founded in late 2014.  In response to Pacific Steel's entry into the regional Furnish-and-Install market, CMC Rebar and GRS began frequently offering their rebar Furnish-and-Install services below cost in order to stifle Pacific Steel's growth and profitability and to prevent Pacific Steel from achieving economies of scale, further investing in more efficient and effective operations, and becoming an even stronger competitor in the Furnish-and-Install market.

3.      Although this below-cost bidding caused Pacific Steel to lose projects and profits, Pacific Steel's superior efficiency and skill nonetheless enabled it to win enough bids to grow, albeit more slowly, in the regional Furnish-and-Install markets.  By 2019, Pacific Steel was poised to take the next step in becoming an even more efficient company: arranging for the building of California's first state-of-the-art, environmentally friendly rebar micro mill so that Pacific Steel could make rebar.  Such vertical integration would not only have created competition and added capacity and output in the relevant upstream market for rebar, which would have lowered upstream rebar prices, but also would have given Pacific Steel access to increased quantities of

rebar at lower prices in a more efficient integrated process, so that it could better compete with CMC Rebar and others in the relevant downstream Furnish-and-Install markets, which would have lowered prices in the downstream Furnish-and-Install markets.  This increase in locally-sourced lower-priced rebar would have been especially beneficial for the California construction market, which is undersupplied with locally-produced rebar and where consumers pay some of the highest rebar prices in the United States.

4.      Pacific Steel's plan was to have a micro mill built for it in Southern California, specifically in the high desert area near the greater Los Angeles basin, and it was on the cusp of an agreement with Danieli to purchase a micro mill from Danieli for construction at that location. This posed a multi-faceted threat to CMC because it would (a) create a new competitor in the rebar manufacturing market, (b) deprive CMC of rebar sales to Pacific Steel, which instead would supply itself, and (c) create a more efficient and effective competitor in the rebar Furnish-and-Install markets.

5.      The only commercially feasible way for Pacific Steel to enter the relevant rebar manufacturing market was to arrange for the construction of a micro mill, which CMC's CEO has described as "the technology of choice" for rebar manufacturing and "the most efficient, cost effective way to serve the market."  Barbara R. Smith, President and Chief Exec. Officer, CMC, CMC at Bank of Am. Glob. Metals, Mining & Steel Conf. (May 19, 2021).  Although some rebar continues to be supplied to the relevant rebar manufacturing market from legacy integrated mills and mini mills, there has not been an integrated rebar mill constructed in the United States since 1964 and there has not been a rebar mini mill constructed in the United States since 1996.  While most of these legacy mills have long been fully depreciated and currently remain economically viable for that reason, markets are slowly shifting to more efficiently-produced supply, which has lowered or over time will lower prices and render the older mini mill technology obsolete and commercially unviable.  Because many of the prime candidates to build micro mills are the owners of mini mills and integrated mills, and because these companies have little incentive to replace their large, fully-depreciated investments in older mills before the end of the mill's useful life, the transition to micro mills has been gradual.  But it has begun and will continue.  No new rebar

integrated mill has been built in the United States in more than a half-century because, compared to mini mills or micro mills, integrated mills require a significantly greater capital investment and employ older, less efficient technology.  Likewise, no new rebar mini mill has been built in the United States in a quarter-century because, compared to micro mills, mini mills require a significantly greater capital investment and employ older, less efficient technology.  As a result, in the last quarter-century, no mill to manufacture rebar has been built in the United States that was not a micro mill.  The only company in the world to have built a micro mill is Danieli.  CMC had previously arranged for the building of two such micro mills using Danieli's MI.DA technology.  When CMC's second Mesa, Arizona micro mill—CMC's third U.S. micro mill—comes online in 2023, it will be the fifth Danieli micro mill constructed in the United States and the 20th worldwide.

6.      Shortly after learning of Pacific Steel's plans to vertically integrate, CMC embarked on a scheme to eliminate this competitive threat by extracting from Danieli an agreement—tacked onto the contract to build CMC's second Mesa micro mill—not to sell a micro mill to any other company within a 500-mile radius of Rancho Cucamonga, California for 69 months.  The 500-mile radius prevents Pacific Steel from building its planned micro mill, and there is no other mill type or micro mill manufacturer, or location beyond the 500-mile radius, that would even come close to providing the benefits to Pacific Steel and the California consumer of a micro mill in the planned Southern California location.

7.      Exclusivity zones are not common in the industry and not necessary to provide firms incentives to build a micro mill.  Other micro mills have been built without the same restriction on competition, as discussed in more detail below.  Indeed, in its negotiations with Danieli, Pacific Steel never sought, and had no intention of seeking, a territorial restriction to insulate its intended micro mill from competition.

8.      The anticompetitive nature and purpose of the exclusivity provision is evident from, among other things, the following:

(A)      None of the micro mills built in the United States since Danieli built the very first micro mill for CMC have had any territorial exclusivity provisions whatsoever.

(B)    CMC's first micro mill, built in 2009 in Mesa, Arizona, was the world's first micro mill.  It was protected by a geographic exclusivity provision, which expired on January 1, 2021, between CMC and Danieli that prohibited Danieli from building another micro mill within a 400-mile radius from the location of CMC's micro mill in Mesa, Arizona.

(C)    In 2017, after CMC had announced it was having its second micro mill built by Danieli in Durant, Oklahoma, CMC's largest national competitor, Nucor Corporation ("Nucor"), announced that it was having a micro mill built by Danieli in Sedalia, Missouri, 371 miles from CMC's Durant micro mill, which was not protected by any territorial restriction.

(D)    Neither Nucor's Sedalia micro mill nor its forthcoming micro mill in Frostproof, Florida (also being built by Danieli) is insulated from competition by any territorial restriction.

(E)    CMC's third and latest micro mill will be built for it by Danieli in Mesa, Arizona, and will be protected by a <u>500-mile</u> territorial exclusivity restraint as measured from CMC's recently retired mini mill in <u>Rancho Cucamonga, California, hundreds of miles away from the Mesa mill location</u>.

9.      Rather than being necessary to incentivize investment in a new mill, CMC's exclusivity provision is unreasonably restrictive and had one purpose: preventing Pacific Steel from building its own micro mill, from entering the relevant rebar manufacturing market, and from becoming a more effective competitor in the relevant rebar Furnish-and-Install markets.  This provision also effectively prevents construction of any new rebar mill—by Pacific Steel or any other competitor—within the 500-mile radius for over five years because by far the most efficient means of manufacturing rebar is a micro mill and no firm in the United States has found it efficient to build any rebar manufacturing mill other than a micro mill in the last quarter century.  No potential competitor has built, and almost certainly none will build, a mini mill within the CMC exclusivity zone, nor will a potential competitor build a micro mill outside that zone for the purpose of supplying rebar to consumers within the zone, because it makes no business sense to enter the geographic market at a very significant competitive disadvantage vis-à-vis CMC's Mesa micro mills.  The expected return on such an investment would be too low to justify the risk of investing hundreds of millions of dollars in outdated technology or an inefficient mill location, and thus the investment will not be made.  The foreseeable and intended effect of the territorial restriction thus is to functionally foreclose Pacific Steel and any other potential rival from entering

1  the relevant rebar manufacturing market.

2        10.     No territorial restriction is necessary, as evidenced by, *inter alia*, Nucor's and

3  Pacific Steel's willingness to build micro mills without such a restriction, and even CMC's

4  willingness to build a micro mill without such a restriction in Durant—the difference between

5  CMC's competitive situation when it contracted with Danieli to build its Durant mill and CMC's

6  current competitive situation in California, of course, is that CMC knows that Pacific Steel seeks

7  to enter the relevant rebar manufacturing market with an efficient micro mill.  Were CMC seeking

8  merely to protect whatever intellectual property it might contribute to the mill Danieli currently is

9  building for CMC in Mesa, it could have done so in a far more targeted, less restrictive manner.

10  Moreover, the territorial restriction makes no sense as a means of protecting any CMC intellectual

11  property, as it does not block use of that technology in other areas, outside the exclusivity zone,

12  where CMC also competes.

13        11.     In the absence of the restriction, Pacific Steel would be moving forward with its

14  own micro mill.  Each month that Pacific Steel's entry into rebar manufacturing is delayed is

15  another month that California consumers and other nearby consumers will be forced to pay higher

16  prices for rebar produced hundreds of miles away using less efficient production techniques.

17                    **JURISDICTION AND VENUE**

18        12.     This action is brought pursuant to Sections 4 and 16 of the Clayton Act, 15

19  U.S.C. §§ 15 and 26.  Plaintiff seeks statutory damages and injunctive relief from ongoing

20  violations of the antitrust laws of the United States, specifically, Sections 1 and 2 of the Sherman

21  Act, 15 U.S.C. §§ 1 and 2.

22        13.     This Court has subject matter jurisdiction over the federal antitrust law claims

23  alleged in Counts One through Four pursuant to 28 U.S.C. § 1331 and Sections 4 and 16 of the

24  Clayton Act, 15 U.S.C. §§ 15(a) and 26.  It has supplemental jurisdiction over the state law claims

25  alleged in Counts Three through Eight pursuant to 28 U.S.C. § 1367 because those claims form

26  part of the same case or controversy and derive from a common nucleus of operative facts.

27        14.     This Court has personal jurisdiction over each Defendant because each Defendant:

28  resides in this District; transacted business in this District; and/or committed overt acts in

1   furtherance of the illegal scheme and conspiracy alleged herein in this District.

2       15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants

3   resided, transacted business, were found, or had agents in this District; most or all of the events

4   and effects giving rise to these claims occurred in this District; and/or a substantial portion of the

5   affected interstate trade and commerce discussed herein has been carried out in this District.

6   **INTRADISTRICT ASSIGNMENT**

7       16.    Pursuant to Civil Local Rule 3-2(c), this antitrust case shall not be assigned to a

8   particular Division of this District, but shall be assigned on a District-wide basis.

9   **INTERSTATE TRADE & COMMERCE**

10      17.    Defendants manufactured, sold, and/or provided rebar and rebar Furnish-and-Install

11  services in a continuous and uninterrupted flow of interstate commerce, including through and into

12  this District.

13      18.    Defendants' business activities substantially affected interstate trade and commerce

14  in the United States, including in this District.

15  **PARTIES**

16      19.    Plaintiff Pacific Steel is a California corporation incorporated on October 9, 2014,

17  with its principal place of business in San Diego, California.  Pacific Steel fabricates (or

18  "furnishes") and installs rebar based on structural engineers' commercial construction plans using

19  standard lengths of rebar purchased from steel mills.  Pacific Steel was formed by a team of

20  seasoned professionals that previously worked at Pacific Coast Steel, a California corporation

21  which sold a controlling interest to Gerdau Ameristeel Corporation in 2006 and transferred full

22  ownership to that entity in 2011.  Pacific Steel purchases rebar from manufacturers like CMC and

23  its various steel mill divisions/subsidiaries. Pacific Steel sought to enter the upstream rebar market

24  to compete with CMC, but has been excluded from doing so by CMC's exclusive territorial

25  restraint.  Pacific Steel competes downstream with CMC and its various Furnish-and-Install

26  subsidiaries, including Defendant CMC Rebar, in the relevant rebar Furnish-and-Install markets.

27      20.    Defendant CMC is a Delaware corporation founded in 1915 with its principal place

28  of business in Irving, Texas.  It is traded on the New York Stock Exchange under the symbol

"CMC" and is a component of the S&P 400.  CMC is the largest manufacturer and among the largest fabricators of rebar in the United States.  CMC currently operates nine rebar manufacturing mills and 62 fabrication facilities throughout the United States, and CMC is by far the largest rebar manufacturer in the relevant geographic market.  CMC is the parent company of CMC Rebar, CMC Steel, and CMC Steel US, LLC, and collectively they are the largest supplier of rebar Furnish-and-Install services in the relevant geographic markets.

21.     Defendant CMC Rebar is a Texas corporation with its principal place of business in Seguin, Texas, and with offices throughout the country, including at least the following cities in California: San Diego, Etiwanda, Fontana, Fresno, Napa, San Bernardino, and Tracy.  It is a competitor of Pacific Steel in the rebar Furnish-and-Install markets.  CMC Rebar is a wholly owned subsidiary of Defendant CMC.

22.     Defendant CMC Steel US is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Irving, Texas.  CMC Steel US is wholly owned by Defendant CMC and, either directly or through its affiliates, manufactures and markets rebar and provides related services.

23.     GRS was a Delaware general partnership with its principal place of business in San Diego, California that competed with Pacific Steel in the relevant Furnish-and-Install markets.  GRS's general partners were Gerdau Ameristeel US Inc. and Gerdau Ameristeel WC, Inc.  In 2018, Defendant CMC Rebar and Defendant CMC Steel US acquired the partnership interests of the two general partners.  The new general partners changed the partnership name to CMC Rebar West in 2019.  On January 1, 2021, CMC Rebar West merged into Defendant CMC Rebar.  As the successor in interest, Defendant CMC Rebar, is liable for the below-cost pricing of GRS and CMC Rebar West as alleged below.

## AGENTS AND CO-CONSPIRATORS

24.     Various other persons or entities not named as defendants herein may have participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.  These other persons or entities may have facilitated, adhered to, participated in, or communicated with others regarding the alleged conspiracy in restraint of trade

8

1  and the alleged conspiracy to monopolize addressed by this lawsuit.  Plaintiff reserves the right to

2  name some or all of these persons or entities as defendants at a later date.

3      25.     Whenever this Complaint refers to an act, deed, or transaction of any business

4  entity, the allegation means that the business entity engaged in that act, deed, or transaction by or

5  through its officers, directors, agents, employees, or representatives while actively engaged in the

6  management, direction, control, or transaction of the corporation's business or affairs.

7                                          **FACTUAL ALLEGATIONS**

8  **I.**      **Industry Background**

9      **A.**      **The Upstream Market: Manufacturing Steel Reinforcing Bar**

10      26.     Steel reinforcing bar or "rebar" is a steel bar used to reinforce concrete or masonry

11  structures and add tensile strength.  The most common type of rebar, carbon steel or "black rebar,"

12  consists of hot-rolled round bars with heavy ridges or deformation patterns that assist in binding to

13  the concrete or masonry.  Coatings such as epoxy resin may also be applied to prevent corrosion in

14  saltwater environments.

15      27.     Domestic rebar is typically manufactured to meet American Society for Testing and

16  Materials ("ASTM") standards and sold in industry-standard sizes, lengths, and grades throughout

17  the United States.

18      28.     Domestic rebar sizes are expressed in imperial units corresponding to the diameter

19  of the bar in increments of 1/8 of an inch.  For example, "#3" size rebar has a diameter of 3/8 of an

20  inch.  Standard rebar sizes typically range from #3 (3/8 of an inch in diameter) to #18 (18/8 or

21  2.26 inches in diameter).

22      29.     Domestic rebar is typically sold in standard straight lengths of 20, 30, 40, or 60

23  feet, as well as in coils.

24      30.     Domestic rebar is graded with designations expressed using the minimum yield

25  strength of the bar in thousands of pounds per inch ("ksi" or "1000 psi").  For example, grade 60

26  rebar—the most common grade used in modern U.S. construction—has a minimum yield strength

27  of 60 thousand pounds per inch.  The most commonly manufactured grades in the U.S. are 60 and

28  75, although higher strength grades including 80 and 100 are also available.

31.     The weight of rebar depends primarily on its diameter and length, ranging from approximately 0.4 pounds per linear foot for #3 rebar to 13.6 pounds per linear foot for #18 rebar. Rebar's weight makes it expensive to ship, especially relative to the cost of manufacturing rebar. There are substantial cost advantages to sourcing rebar locally to reduce shipping costs.  This is true for transporting both standard rebar to fabricators and fabricated rebar to construction sites. One of the advantages of vertical integration by Pacific Steel would have been the placement of its micro mill close to its rebar fabrication facilities to minimize shipping costs.

32.     The domestic rebar manufacturing markets are highly concentrated.  The two largest suppliers, CMC and Nucor, currently account for 80% of rebar production nationally.  *See* Fastmarkets AMM, "*CMC-Gerdau deal done; market impact murky,*" by Patrick Fitzgerald (Nov. 5, 2018).  As CMC noted in its 2020 Form 10-K, "We produce a significant percentage of the total U.S. output of rebar and merchant bar. We also believe we are the largest manufacturer, and among the largest fabricators, of rebar in the U.S."  CMC, Annual Report (Form 10-K) (Oct. 15, 2020), at 5.  CMC is also by far the largest rebar manufacturer in the local geographic market that is relevant to this case, with a share of that market in excess of 85% currently.  Its share will grow to over 90% in early 2023 when its new Mesa mill begins operations.

33.     While rebar consumption dropped nationally immediately following the 2007-2008 financial crisis, rebar consumption in the United States—including in the West and California specifically—has since rebounded and demand in recent years has been strong.



| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total U.S. | 8.4 | 5.8 | 6.1 | 6.4 | 7.2 | 7.5 | 8.2 | 8.6 | 8.8 | 8.6 | 8.8 | 8.7 |
| Western Region | 1.9 | 1.2 | 1.1 | 1.2 | 1.3 | 1.5 | 1.7 | 1.9 | 1.8 | 1.8 | 2 | 1.8 |



| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CA | 858,56 | 544,22 | 589,54 | 645,89 | 744,35 | 841,85 | 948,10 | 1,051, | 1,005, | 1,064, | 1,112, | 939,57 |

Source: Concrete Reinforcing Steel Inst., *Domestic Reinforcing Bar Consumption* (June 2020).

34.     California sources the vast majority of its rebar domestically.  Foreign imports

11

1   make up only a small share (approximately 7%) of total rebar use.  In 2019, the bulk of rebar

2   imports into California were into San Diego.  In 2019, California imported approximately 65,000

3   tons of rebar, of which 43,600 tons (67%) came into San Diego from Mexico.  Much smaller

4   import volumes came into Los Angeles (5,100 tons) and San Francisco (16,300 tons), most of

5   which were sourced from Asian exporters.

6         35.     California suffers from a dearth of local rebar manufacturing. CMC's Mesa mill is

7   the only micro mill manufacturing rebar in the relevant geographic market.  Nucor owns a mini

8   mill in Kingman, Arizona that is capable of producing rebar coil, but that mill has an annual

9   capacity for that product of only around 50,000 tons—approximately one-seventh of CMC's Mesa

10   micro mill's capacity—and the sizing and use limitations inherent in rebar coil mean that it is a

11   suitable substitute for only a small portion of CMC's Mesa sales.  Since CMC shuttered its

12   Rancho Cucamonga mini mill in October 2020, no rebar manufacturing mill of any type is located

13   in California.  CMC's dominance of local rebar production enables it to charge high monopoly

14   prices for rebar in that market.  If a Danieli micro mill were to be built in its planned California

15   location—far closer to major California customers than CMC's micro mill in Mesa—competition

16   would lower prices by as much as $50 per ton, which would generate savings of approximately

17   $50 million per year for California rebar consumers.  Rebar prices in California are, and have been

18   historically, amongst the highest in the United States.

19        **B.**      **The Downstream Market: Rebar Furnish-and-Install Services**

20         36.     Before it can be installed in construction projects to reinforce concrete, rebar must

21   be cut and shaped according to an engineer's drawings.  Such drawings often include an armature

22   of bent and connected rebar that must be carefully manipulated by trained professionals called

23   "fabricators."

24         37.     Since bending steel can alter its strength, this work must be performed very

25   carefully by skilled, experienced steelworkers in order to meet code requirements and avoid

26   failure.  Once created, another team of skilled professionals installs the furnished rebar edifice on

27   site.

28         38.     Thus, fabricators (*e.g.*, Pacific Steel and CMC Rebar) purchase stock rebar from

1   manufacturers (*e.g.*, CMC), cut and bend the rebar at a fabrication plant per the engineer's plans,

2   and then deliver and install the fabricated rebar in construction projects.

3          39.    Fabricators have large fixed costs including their fabrication plant and equipment.

4   Thus, the closer to full capacity they can operate, the more efficient they are.  The rebar that

5   fabricators must purchase or produce internally makes up a substantial share of their variable

6   costs.  Thus, sourcing low-cost rebar is critical for fabricators being able to offer low prices and

7   compete effectively.

8          40.    Some larger rebar entities—including CMC and its chief competitor, Nucor—are

9   vertically integrated (*i.e.*, they own both steel mills and fabrication facilities, and they employ

10  labor forces to furnish and install fabricated rebar).  Of the 4.4 million tons of steel shipped from

11  CMC's mills in 2019, approximately 2.0 million tons were shipped to CMC's own fabrication

12  facilities.

13         41.    Vertical integration has efficiencies that gives these larger entities a distinct

14  competitive advantage over their smaller, non-vertically integrated Furnish-and-Install

15  competitors, such as Pacific Steel.  CMC openly acknowledges these advantages:

16             While CMC steel products are renowned far and wide, it's our vertically
               integrated business model that really puts us on the map. CMC was the first
17             steel manufacturer to introduce vertical integration in the United States,
               then adapted the concept for Europe.… This innovative approach is what
18             still enables CMC to remain a low-cost, high-quality producer that delivers
               exceptional value for our customers, suppliers and investors alike—all
19             around the world.

20  *See Our Global Reach*, CMC, https://www.cmc.com/en-us/locations (last visited June 1, 2021).

21         42.    According to CMC, vertical integration is critical to its "pull-through demand"

22  model.  CMC, Inv. Presentation (Apr. 7, 2021), at 8,

23  https://s3.amazonaws.com/b2icontent.irpass.cc/653/183713.pdf (last visited June 5, 2021)

24  (hereinafter, "CMC Inv. Presentation, Apr. 2021").  A pull-through demand model is a

25  manufacturing strategy whereby goods are not produced until a customer has ordered them.  This

26  enables the manufacturer to control the flow of resources, since they are pulled into the production

27  pipeline only as needed or requested, which in turn optimizes facility utilization and reduces the

28

13

1   cost of carrying inventory.  This makes the integrated process more efficient.

2       43.     CMC's wholly owned Furnish-and-Install subsidiary, Defendant CMC Rebar, "is

3   the nation's leading concrete reinforcing steel fabricator. . . ."  *See Rebar Fabrication*, CMC,

4   https://www.cmc.com/en-us/what-we-do/america/fabrication/rebar-fabrication (last visited June 1,

5   2021).  As of August 2020, CMC operates 67 steel fabrication facilities worldwide, CMC, Annual

6   Report (Form 10-K) (Oct. 15, 2020), at 4, 18, five of which are in California and provide Furnish-

7   and-Install services.

8   **II.      The Evolution from Integrated Mills to Mini Mills to Micro Mills**

9       44.     For most of the last two centuries (*i.e.*, since the Bessemer process was invented),

10  steel has been produced in massive mills with giant, fuel-intensive crucible furnaces fed by

11  enormous amounts of iron ore, limestone, and metallurgical coal (or "coke").  A mill containing

12  all of the components necessary to manufacture steel products from iron ore, referred to as an

13  "integrated mill," requires multiple facilities performing multiple functions:

14              •   *Iron Making*—where ore is converted to liquid or pig iron;

15              •   *Steel Making*—where pig iron is converted to liquid steel;

16              •   *Casting*—where liquid steel is solidified;

17              •   *Roughing Rolling/Billet Rolling*—where solid steel is formed into shapes
18                  conducive to storage; and

19              •   *Product rolling*—where stored steel is transformed into finished, marketable
20                  shapes.

21      45.     As a result, building a traditional integrated mill requires enormous startup costs

22  and historically was only economical to build when done on an enormous scale with millions of

23  tons of annual capacity or more.

24      46.     At the turn of the 20th century, the electric arc furnace ("EAF") was introduced in

25  the United States.  An EAF heats charged material using an electric arc—an electrical breakdown

26  of gas that produces a prolonged electrical discharge.  The first EAF installed in America was built

27  by the Sanderson Brothers Steel Company in Syracuse, New York in 1907.  EAFs did not

28  proliferate, however, until World War II, when the war effort created a surge in demand for steel

and alloy steel for use in armaments.

47.     Eventually, this led to the creation of the first "mini mill"—a steel mill powered by an EAF used to re-melt, refine, and alloy scrap steel using a smaller footprint, and that required lower capital costs than an integrated mill and could be built independent of the needs for traditional raw materials like iron ore and coke.  The first such mini mill was constructed by the Lake Ontario Steel Company in 1964 near Toronto, Ontario.

48.     Following years of technological advancements, the typical mini mill today uses an EAF to melt scrap metal recycled from used automobiles or manufacturing byproducts, which is then turned into steel billet using a continuous caster.  That steel billet is then warehoused until it is later heated and rolled into rebar.

49.     A mini mill typically consists of the following components:

- a melt shop with an EAF;

- casting equipment that shapes molten metal into billets;

- a reheating furnace that prepares billets for rolling;

- a rolling mill that forms rebar from heated billets;

- a mechanical cooling bed that receives the hot rebar from the rolling mill;

- finishing facilities that cut, shape, and assemble products in preparation for shipping; and

- warehousing facilities to store raw metal, metal billets, and finished rebar.

50.     Compared to traditional integrated steel mills, building mini mills required lower capital costs and provided higher returns on equity.  Moreover, the use of EAFs—which can be easily started and stopped on a regular basis—means manufacturers can quickly adjust production levels in response to market demand.

51.     Thus, unlike traditional steel mills—which operate profitably by leveraging their sizes to achieve economies of scale (*i.e.*, the bigger the mill, the more efficient)—mini mills, because of technological advantages compared to integrated mills, can operate more efficiently at lower volumes than integrated mills.  The Burns Harbor, Indiana mill, built in 1964 and currently owned by Cleveland Cliffs, was the last integrated steel mill built in the United States.  Mini mills

do not require bulk transportation networks for obtaining raw materials or shipping finished products to the same extent as do integrated mills.  A mini mill often can be built closer to the manufacturer's customers than can an integrated mill, which reduces transportation costs relative to those of an integrated mill.  The practice in the industry is for the buyer of rebar to pay to ship the product from the mill to its fabrication facility.  The Kingman, Arizona mini mill built by North Star Steel in 1996 and acquired by Nucor in 2003 was the last rebar-producing mini mill built in the United States.

52.   In 2009, CMC commissioned Danieli, the American subsidiary of Danieli C. SpA, an Italian company located in Buttrio, Italy, to build the world's first "micro mill" in Mesa, Arizona, dubbed the "Micromill Danieli" or "MI.DA."  Like a mini mill, Danieli's micro mill utilizes an EAF and continuous casting, but instead of outputting steel billet (which must be stored and later re-heated and rolled into rebar), a micro mill outputs directly into rebar.  This means a micro mill not only to is more efficient, but also requires a smaller physical footprint and lower capital expenditures.  Eliminating the reheating furnace, which is necessary for a mini mill but not for a micro mill, saves approximately $25 million in construction costs.  Likewise, eliminating the structure required to store steel billets before they are reheated saves an additional $12-15 million in construction costs.  Below is a diagram of a micro mill plant layout.

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. 4:20-CV-07683-HSG

⊕ **Fig 2** **Plant layout**

1. Scrap yard. Continuous scrap charging with preheating system
2. AC electric arc furnace
3. Ladle furnace
4. Ultra-high-speed single-strand continuous casting machine
5. Induction equalising furnace

6. 16-stand continuous rolling mill
7. Direct rolling and bundling
8. Wire tying machines
9. Finished product storage
10. Fume treatment plant
11. Water treatment plant
12. Roll shop

53.     Micro mills also offer lower operational costs than mini mills.  CMC's CEO recently explained in an analyst conference that the micro mill is "the most efficient, cost effective way to serve the market," going on to elaborate that, compared to a mini mill,

> you save a tremendous amount on energy because you are not reheating the billet before your rolling operation. You save on alloy material due to the nature and the characteristic and technology of the micro mill. So it reduces your alloying cost. It reduces your maintenance cost because you no longer have a reheat furnace to maintain. It reduces maintenance costs associated with your rolling operations because when the billet enters your rolling mills, it creates certain stress on those pieces of equipment that doesn't occur when you're rolling in a continuous fashion.
>
> And the one of the more significant benefits is yield savings. Because when you have a single billet, you are cropping the head and the tail of the billet as it moves through their rolling operations to remove the impurities. And in a continuous operation, you do not have to perform that cropping operation over that yield loss. So it's much more energy-efficient and much lower cost to operate.

Barbara R. Smith, President and Chief Exec. Officer, CMC, CMC at Bank of Am. Glob. Metals, Mining & Steel Conf. (May 19, 2021).[1]

_____

[1] (transcript available in Westlaw's FD (Fair Disclosure) Wire,

54.     Each aspect of cost savings identified by Ms. Smith is significant:

(A)     The "tremendous amount" of energy savings "because you are not reheating the billet before your rolling operation" equates to cost savings of approximately $6.50 per ton.

(B)     The "reduc[tion of] your alloying cost" equates to cost savings of approximately $15 per ton.

(C)     The "reduc[tion of] your maintenance cost because you no longer have a reheat furnace to maintain" equates to cost savings of approximately $4.50 per ton.

(D)     The "reduc[tion of] maintenance costs associated with your rolling operations because when the billet enters your rolling mills, it creates certain stress on those pieces of equipment that doesn't occur when you're rolling in a continuous fashion" equates to cost savings of approximately $5.50 per ton.

(E)     The "yield savings" realized because "in a continuous operation, you do not have to" "crop[] the head and the tail of the billet as it moves through their rolling operations to remove the impurities" equates to cost savings of approximately $9.60 per ton.

55.     In addition to the cost savings identified by Ms. Smith at the Bank of America investor conference, micro mills offer significant labor cost savings compared to mini mills. Running a micro mill does not require any reheat-furnace operators, and requires fewer material handling and finishing employees.  These labor efficiencies add up to cost savings of approximately $11.40 per ton.

56.     All told—and even holding aside the lower capital and land-acquisition costs required to build a micro mill—each ton of rebar produced by a micro mill costs approximately $53 less to manufacture than a ton of rebar produced by a mini mill such as the one CMC recently shuttered at Rancho Cucamonga.  Producing a ton of rebar using a micro mill located near the Los Angeles basin would cost approximately $195 plus the cost of scrap metal (which fluctuates by hundreds of dollars per ton but rarely if ever exceeds $500 per ton), whereas producing a ton of rebar using a traditional mini mill at the same location would cost approximately $248 (*i.e.*, 27% more than $195) plus the cost of scrap metal.  In a jointly-produced presentation deck celebrating the 2009 Mesa micro mill, Danieli and CMC estimated the "Cost Advantages vs. Traditional

https://www.veracast.com/webcasts/bofa/globalmetalsminingandsteel2021/idP2Z85W.cfm#/player/html5/speed/v150).

MiniMills" of Danieli micro mills to total approximately $40-54 per ton and claimed that "[t]he estimated competitive edge against the average performance of a traditional Minimill is between 10%-30%." Steven Henderson et al., MI.DA.®, the new generation of Danieli Minimills, Danieli Innovation Meeting (Oct. 13, 2010), at 13 (hereinafter, "MI.DA, The New Generation of Danieli Minimills"). This dramatic cost disadvantage vis-à-vis micro mills renders investment in new rebar mini mills nonviable. Foreclosing potential competitors from building micro mills in a geographic market thus functionally forecloses them from investing in that geographic market.

57.     The more efficient micro mill manufacturing process also translates into a lower environmental impact than would be created by a mini mill for each ton of rebar produced, primarily due to the energy savings from heating the steel just once rather than letting it cool and then reheating it. Many consumers expressly consider the energy consumption and emissions associated with rebar production in determining which supplier to use. Thus, rebar produced with the micro mill manufacturing process is generally more desirable for consumers compared to rebar produced from older manufacturing processes. The smaller plant footprint required for a micro mill often allows it to be situated closer to major markets, which also results in reduced transportation requirements, energy consumption, and emissions relative to rebar that must be shipped from farther away.

58.     As Danieli's marketing materials indicate, the micro mill, which produces 200,000 to 500,000 tons per year, "is designed to serve a specific market (local or regional), focusing on a specific product range and making extensive use of local scrap supply. This, together with the continuous uninterrupted production cycle from raw material to finished product, and the extreme compactness of the plant, makes such plants extremely cost-efficient." Paolo Losso, *The Danieli Micromill*, Millennium Steel, 94 (2016).

59.     CMC's first micro mill was so successful that, on July 27, 2015, CMC announced it was building a second micro mill, in Durant, Oklahoma. As CMC noted in its press release, "[t]he addition of a second mill to CMC's portfolio of highly efficient, customer focused and cost effective steel production facilities will enhance CMC's position as a leading supplier of long

1   products[2] in the U.S. market."

2        60.    Five years later, on August 14, 2020, CMC announced it was building a third micro

3   mill, again in Mesa, Arizona.  According to its press release, CMC's third micro mill will cost

4   $300 million and be operational in early 2023.  Press Release, CMC, CMC Announces Plans to

5   Build Its Third Micro Mill (Aug. 13, 2020).  CMC further stated that the new micro mill would

6   "allow CMC to more efficiently meet West Coast demand for rebar and merchant bar quality

7   (MBQ) products, while helping optimize the output of its national mill network by replacing

8   higher cost rebar capacity."  *New steel micro mill to be built in* Mesa, MesaNow (Aug. 17, 2020),

9   https://mesanow.org/news/public/article/2625.  CMC later clarified that the "high[er] cost [rebar]

10  capacity" its new micro mill will be "replac[ing]" is the "outdated, inefficient" mini mill in

11  Rancho Cucamonga that CMC recently shuttered.  CMC Investor Day 2020 Presentation (Aug.

12  13, 2020), at 50, 59, https://s3.amazonaws.com/b2icontent.irpass.cc/653/181960.pdf.

13       61.    Since building its first micro mill over ten years ago, CMC has not built any other

14  type of mill.  Nor has any other U.S. rebar manufacturer.  The reason for this is simple: micro

15  mills—with their smaller footprint, lower startup costs, and lower operating costs—represent by

16  far the most efficient option when it comes to building new rebar manufacturing mills.  Indeed, a

17  new mini mill would immediately be vulnerable to entry by a micro mill and its lower production

18  costs.

19       62.    Not surprisingly, CMC continued to openly praise the advantages of micro mills in

20  its Form 10-K in 2019:

> Our two EAF micro mills utilize similar equipment and processes as
> [those of its mini mills]; however, these facilities utilize unique
> continuous process technology where metal flows uninterrupted
> from melting to casting to rolling. The facilities are more compact
> than existing, larger capacity steel mini mills, and production is
> dedicated to a limited product range. In addition, our two EAF micro
> mills are the only facilities in the U.S. capable of producing spooled
> rebar.

26  CMC, Annual Report (Form 10-K) (Oct. 25, 2019), at 4.

27  _____

[2] "Long products" is a term used in the steel industry to refer to wire, rod, rail, and bar (including
28  rebar) steel products.

63.     Similarly, in a recent investor presentation from June 2020, CMC touted that it is a "pioneer of unique continuous process technology," and that the micro mill is "[o]ne of the latest innovations in steelmaking technology," where CMC "[m]elts, casts, and rolls steel in a single uninterrupted flow" which "[r]educes manufacturing cost."  CMC, Inv. Presentation (June 2020), at 11.

64.     CMC's financial results have proven the dramatic superiority of micro mills.  In a recent investor presentation, CMC demonstrated that its return on invested capital ("ROIC") jumped up with the commissioning of the Durant micro mill, from less than 4% in 2017 to nearly 9% in 2018.[3]  As CMC has stated, "ROIC on previous micro mills has been exceptional."[4]  For the new micro mill at Mesa, CMC expects an "annual EBITDA benefit of $50 million,"[5] and a ROIC of greater than 10% and potentially double that amount.[6]

65.     Today, the micro mill is not only the most cost-effective, and the profit-maximizing, means of entering a rebar manufacturing market, but also the only means used to build any rebar manufacturing facility in the United States in the last quarter-century.  As the expected return on investment to build a new mini mill is insufficient to justify the investment, the micro mill is functionally the only potential means of entry by Pacific Steel (or any other company) and Danieli is the only company in the world to have ever built a micro mill.

III.   **Pacific Steel's Entry Into the Rebar Furnish-and-Install Markets and CMC's Response**

66.     Pacific Steel was formed in late 2014 and is a "Furnish-and-Install" reinforcing steel subcontractor, meaning it purchases regularly stocked rebar from mills owned by manufacturers, such as CMC, Nucor, and Gerdau, cuts and bends the rebar per a structural engineer's drawings, and then transports and installs the fabricated rebar in construction projects using its team of union ironworkers.

---

[3] CMC Inv. Presentation, Apr. 2021 at 24.
[4] CMC, Strategically Transformed, Delivering Superior Shareholder Value, at 70.
[5] CMC, Inv. Presentation, Bank of Am. Conf. – May 2021, at 6,
https://s3.amazonaws.com/b2icontent.irpass.cc/653/183945.pdf (last visited June 9, 2021)
(hereinafter, "CMC Inv. Presentation, May 2021").
[6] CMC Inv. Presentation, Apr. 2021, at 21.

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. 4:20-CV-07683-HSG

67.     Pacific Steel was formed by seasoned steel professionals that previously had worked at Pacific Coast Steel, a rebar company sold to Gerdau in 2006.  Both CMC Rebar and GRS viewed Pacific Steel as a potential market disrupter because of the quality and efficiency of its operations.  Pacific Steel is a data driven company; it regularly and timely collects and analyzes data from all aspects of its operations.  As a fabricator, it has an innovative shop set up, sets high standards of performance, ensures appropriate engagement by leadership, and rewards success.  As an installer, Pacific Steel emphasizes pre-planning of work, sets high standards for performance, and rewards success.  Pacific Steel's innovative and efficient operations and its high performance standards yield superior performance and lower costs.

68.     In response to Pacific Steel's entry, CMC Rebar and GRS both began aggressively bidding Furnish-and-Install rebar projects in a targeted way to prevent Pacific Steel from gaining a foothold in the market.  These bids frequently were made below cost and served as loss leaders specifically designed and intended to divert projects away from Pacific Steel and prevent it from growing, achieving economies of scale, investing in even more efficient and effective operations, and gaining further efficiency and effectiveness as a competitor.  An individual with direct knowledge of the matter has confirmed CMC's strategy of bidding below its costs for Furnish-and-Install rebar projects in both Southern California and Northern California.  Despite a California construction boom and rising demand for rebar Furnish-and-Install services, CMC Rebar and GRS (including its successor, CMC Rebar West) have sustained heavy losses in their Furnish-and-Install businesses since at least 2017, due in large part to bidding below cost.  CMC Rebar's and GRS's below-cost bidding has slowed PSG's growth and depressed its profits considerably.

69.     For example, CMC Rebar bid below its Furnish-and-Install costs  in July 2020 to win the contract to install 6,394 tons of fabricated rebar in a 44-story high rise project at 696 S. New Hampshire in Los Angeles, California.  Pacific Steel's bid for the project was $11,395,000, which was sufficient to cover its costs, including overhead, and allowed for a modest net profit.  CMC Rebar's bid came in more than 5% lower than the competition.  On information and belief, CMC Rebar bid this project below its costs.

70.     As another example, CMC Rebar bid below its Furnish-and-Install costs in March 2021 to win the contract to install 4,925 tons of fabricated rebar in a 41-story high rise project at 800 South Broadway in San Diego, California.  Pacific Steel's bid for the project was $10,795,000, which was sufficient to cover its costs, including overhead, and allowed for a modest net profit.  CMC Rebar's bid came in approximately $600,000 lower.  On information and belief, CMC Rebar bid this project below its costs.

71.     Similarly, Gerdau bid below its Furnish-and-Install costs in November 2018 to win the contract to install 1,034 tons of fabricated rebar in the Hotel Del Coronado North Parking Structure.  Pacific Steel's bid for the project was $2,237,000, which was sufficient to cover its costs, including overhead, and allowed for a modest net profit.  Gerdau's bid came in approximately 8% lower.  On information and belief, Gerdau bid this project  below its costs.

72.     CMC Rebar employees have admitted to engaging in  bidding below profitable levels in other geographic areas.  According to the sworn affidavit of Hantse Costas, a former sales manager at a CMC subsidiary who became Vice President of Sales for a Texas fabricator, FABco LLC:

> Over the last several years, I have become familiar with the Houston, Texas, and San Antonio, Texas, rebar fabrication markets and the current market rates within the industry.  Based on my experience and knowledge of the winning bids of CMC in those areas, CMC's pricing in these markets over the last several months is directly below FABco's breakeven point.  ***Additionally, based upon my previous work for and knowledge of CMC, I believe CMC's recent prices submitted on bids in the Houston and San Antonio markets are at a level so low that its Rebar Fabrication division in these two markets is not making a profit on these jobs.***  As a result of CMC's undercutting, FABco has recently experienced a significant drop in the amount of bids that it has been awarded.  I have learned that CMC has won those bids.  CMC's prices are also markedly below what is traditionally the customary range for the rebar fabrication markets in Houston and San Antonio.

Costas Aff. ¶ 4, *FABco, LLC v. CMC*, No. DC-16-09402 (Dallas Cnty., Aug. 3, 2016) (emphasis added).

73.     The purpose behind CMC Rebar's below-cost bidding in the San Antonio and Houston markets was explained by another affidavit from a different former CMC employee, Adrian

23

Cano, who was employed by CMC or its subsidiaries for over eight years, including as the Manager of Distribution for the Central Region. *See* Cano Aff., *FABco, LLC v. CMC* (Dallas Cnty., Aug. 3, 2016) ¶ 2.  According to Mr. Cano:

> By [February 2015], FABco was beginning to be viewed as a serious competitor of CMC in the Central Region because FABco was taking a significant amount of market share away from CMC and several key employees had defected to join FABco.
>
> *****
>
> In the first quarter of 2016, while I was a [CMC] Sales Manager focused on the Houston area, Andrew Houser, Director of Sales for Rebar Fabrication Central Region, instructed me and other sales agents to "take FABco out" if we were competing with FABco on a bid.  Shortly thereafter, Andrew Houser left CMC and was replaced by Matt Schewe.  Matt Schewe and Chris Stowers, Director of Operations for Rebar Fabrication Central Region, instructed me to do everything we can to undercut FABco's pricing.  I was told that FABco would not be able to maintain operations if we undercut their pricing and that they would "go broke."   Chris Stowers also informed me that he had "seen FABco's books" and knew that we could take them out and put them out of business.

*Id*. at ¶¶ 5, 10.

74.     The FABco litigation against CMC resulted in a multi-million-dollar settlement.

75.     As these sworn affidavits indicate, CMC subsidiaries have engaged in below-cost bidding more than once in an attempt to extinguish or minimize competition from smaller fabricators that are poised to become more efficient and effective competitors.

## IV.     Market Consolidation and CMC's Gerdau Acquisition

76.     In large part due to CMC Rebar's and GRS's below-cost bidding practices, some of the largest fabricators in the market were running into serious financial trouble and sustaining massive losses in 2017.

77.     As a result of such losses, on January 2, 2018, CMC announced that it had entered into an agreement to acquire four steel mills (including one in Rancho Cucamonga, California) and 33 rebar fabrication facilities across the United States from Gerdau S.A. and its subsidiaries

(the "Gerdau Acquisition").[7]   The Gerdau Acquisition combined two of the three largest vertically integrated rebar manufacturers and fabricators in the country.

78.     The Gerdau Acquisition closed on November 5, 2018.  Following this acquisition, CMC and its wholly-owned subsidiaries had seven mini mills (in Alabama, California, Florida, New Jersey, South Carolina, Tennessee, and Texas), two micro mills (in Arizona and Oklahoma), and one rolling mill (in Arkansas) throughout the United States.  As touted by CMC in its 2019 annual report:

> With the completed acquisition of significant additional U.S. assets, fiscal 2019 was a truly transformative year for CMC.  Through the acquisition, we have added 33 steel fabrication facilities, four steel mini mills, 2.7 million tons of capacity and 2,500 new colleagues to CMC.  As a result, at the close of fiscal 2019, CMC had more than 60 fabrication facilities across the country and 10 U.S. steel mills.

CMC, *Ready to XL*, 2019 Annual Report, at 3.

79.     The Gerdau Acquisition doubled the number of CMC's rebar fabrication plants and, immediately afterwards, CMC referred to itself "[a]s one of the largest rebar fabricators in the U.S."  *Id.* at pg. 11.  Today, CMC touts itself as "*the* United States' largest manufacturer and fabricator of steel reinforcing bar. . . ."  *See Who is CMC?*, CMC, https://www.cmc.com/en-us/investors (last visited June 1, 2021) (emphasis added).

80.     By the time the Gerdau Acquisition closed, despite a strong construction boom in California, other large fabricators also were running into financial trouble thanks to CMC Rebar's and GRS's below-cost pricing.  Alamillo Rebar, Inc. ("Alamillo") was one such company.  On February 4, 2019, Pacific Steel and Alamillo entered into a series of agreements whereby Pacific Steel agreed to complete Alamillo's backlog of work and purchased much of its rebar equipment and inventory.

81.     A few months later, on June 24, 2019, Pacific Steel entered into a similar

---

[7] In particular, Gerdau S.A.'s Furnish-and-Install business was conducted through a Delaware partnership, GRS, the two partners in which were Gerdau Ameristeel US Inc. ("GAUS") and Gerdau Ameristeel WC, Inc. ("GAWS").  As part of the Gerdau Acquisition, GAUS sold its interest in GRS to Defendant CMC Steel US and GAWC sold its interest in GRS to Defendant CMC Rebar.

1   agreement with another rebar fabricator, Harris Rebar Northern California, Inc. ("Harris"),

2   whereby Pacific Steel purchased most of Harris's rebar equipment and inventory.  Harris, which

3   was owned by Nucor, suffered diminished profits just like Alamillo despite the strong demand in

4   California for rebar and Furnish-and-Install services created by the construction boom.  Harris was

5   yet another casualty of CMC Rebar's and GRS's below-cost bidding scheme.  By the end of 2019,

6   CMC Rebar's and GRS's below-cost pricing had eliminated or marginalized three of its four

7   largest rebar Furnish-and-Install competitors in the relevant markets.

8   **V.**      **CMC's Opposition to Pacific Steel's Efforts to Import Steel Rebar From Turkey**

9          82.     CMC continued to look for ways to marginalize Pacific Steel as a competitor in the

10   relevant Furnish-and-Install markets.  CMC went to unusual lengths to oppose Pacific Steel's

11   efforts to access a foreign supply of steel rebar as an important supplement to domestic supply.

12          83.     On March 8, 2018, President Trump issued a proclamation under Section 232 of the

13   Trade Expansion Act of 1962 (the "232 Steel Tariff") which imposed a 25% tariff on all imported

14   steel with certain exemptions.  The effect was to render all non-exempt foreign steel non-

15   competitive in the United States.

16          84.     In June 2018, Pacific Steel applied to the U.S. Department of Commerce for an

17   exclusion to allow it to import foreign steel from Turkey without imposition of the 25% tariff.

18   Pacific Steel requested this exclusion on the grounds that there was insufficient supply of local

19   domestic steel rebar to meet its demands.

20          85.     CMC and several other steel rebar manufacturers (including Nucor, Gerdau, and

21   Steel Dynamics, Inc. ("SDI")), filed formal objections to Pacific Steel's application.  CMC's

22   objection—filed under penalty of perjury with a certification acknowledging that it is a criminal

23   offense to willfully make a false statement to the U.S. government—stated that it had rebar readily

24   available meeting the specifications requested by Pacific Steel.  Based in large part on CMC's

25   representations that it could supply Pacific Steel with the rebar it needed, Pacific Steel's exclusion

26   request was denied.

27          86.     On September 4, 2018, Pacific Steel's CEO, Eric Benson, wrote Marty Lancial,

28   CMC's Director of Mill & Post Sales (West Region), regarding CMC's objection.  In his letter,

26

Mr. Benson noted that CMC's objection represented that it would be able to fulfill 100% of Pacific Steel's steel rebar requests within 47 days, and then requested that CMC commit to immediately provide Pacific Steel with the 67,000 tons of rebar for which Pacific Steel was seeking an exemption.  Pacific Steel offered to pay for the materials COD (cash on delivery) or to post a standby letter of credit ensuring payment to CMC.

87.     Mr. Lancial responded that either CMC would need to review Pacific Steel's credit and financial statements, or Pacific Steel must "…accept credit terms of cash in advance of production."  This response was not in good faith.  Cash payment has never been required prior to production in the rebar industry, as there is little risk of obsolescence after rebar is produced.

88.     Moreover, CMC refused to provide Pacific Steel with information regarding the quantities, mill locations, and freight assumptions underlying CMC's commitment to provide the requested rebar.  Instead, Mr. Lancial simply directed Pacific Steel to CMC's website, which listed only Mesa, Arizona as a supplying mill with the note "INQ" or "inquire" as to price and availability.  That was precisely what Pacific Steel had been doing over the preceding several weeks to no avail.

89.     Nonetheless, on October 10, 2018, Mr. Lancial—despite taking ten days to respond to Mr. Benson's previous letter and refusing to provide him with any of the information he requested regarding the necessary purchase terms, including the price of the rebar to be sold— wrote to Mr. Benson stating that CMC would honor Pacific Steel's steel rebar order only if placed by October 12, 2018 (*i.e.*, two days later).  It became clear at this point that, despite its representations to the contrary to the U.S. government, CMC never intended to sell Pacific Steel the volume of rebar for which it had requested an exclusion from the 232 Steel Tariff.

90.     Contrary to what CMC had represented to the U.S. Department of Commerce, Mr. Lancial acknowledged that CMC had no ability to fulfill the thousands of tons of coiled rebar included in Pacific Steel's exemption request.  He stated that CMC might be in a better position to provide "some" coiled rebar from its new Oklahoma mill in about six months.

91.     By misleading the United States government, CMC protected its rebar monopoly and blocked Pacific Steel's efforts to import rebar from abroad that CMC itself was unwilling to

sell to Pacific Steel, which would advance CMC's economic interests only if, with a better rebar supply, Pacific Steel would impose a competitive constraint in the relevant Furnish-and-Install markets that would lower CMC's profits in those markets.  CMC's willingness to mislead the government in this way thus indicates that CMC believed that Pacific Steel could impose a competitive constraint on CMC's profits in the relevant Furnish-and-Install markets.

## VI.   Pacific Steel's Attempt to Vertically Integrate and CMC's Response

92.   When Pacific Steel decided in 2019 that the time was right to explore building its own micro mill, it quickly concluded that the optimal location to minimize transportation costs was in California, where it was performing the majority of its Furnish-and-Install work.  Two of Pacific Steel's rebar fabrication facilities are in the Los Angeles basin and one is in the San Francisco Bay Area.  Recognizing the regulatory environment in California had been perceived as a barrier to entry for some (and in fact described by CMC as a hostile regulatory environment), Pacific Steel envisioned an approach that embraced the regulatory environment within its home state.  Pacific Steel's plan was to design a mill to use the most carbon friendly manufacturing processes technologically available and to power the mill from alternative energy sources to the greatest extent possible.  Pacific Steel's plan was to locate its mill in an area that enabled the mill to draw upon California's vast network of wind and solar energy production.  With those objectives in mind, Pacific Steel embarked on a site selection process and concurrently narrowed their options for a mill equipment provider to one company, Danieli.

93.   In November 2019, Pacific Steel arranged a meeting with Paolo Losso, the President of Danieli.  Pacific Steel shared with Mr. Losso its vision of building a state-of-the-art micro mill within California powered in large part by solar and wind energy, that would enable Pacific Steel to produce up to 380,000 metric tons of rebar per year.  Danieli promoted its micro mill to Pacific Steel as the most energy efficient and only viable continuous feed reinforcing steel mill option in the world.  This new micro mill would not only have increased rebar output in California, but it would have done so by utilizing state-of-the-art technology that was lower cost and more environmentally friendly than a traditional integrated mill, mini mill, or even any other micro mill in existence (all of which also were from Danieli).  It also would have avoided the need

28

to transport scrap out of California to other states, only to then transport the finished rebar product back to California, resulting in lower costs, lower prices, and less pollution.

94.     Near the conclusion of their initial meeting, Mr. Benson expressed Pacific Steel's interest in obtaining a formal quotation from Danieli for a micro mill.  Mr. Losso indicated he would be very happy to provide the same and provided that formal price quote for the new micro mill a few weeks later.  Mr. Losso also mentioned near the conclusion of this meeting that he might have a small problem that he would have to overcome as Danieli had a "non-compete of sorts" with CMC from when CMC purchased the original Mesa, Arizona mill.  Mr. Benson inquired as to the details of that "non-compete" or, as would later become clear, an exclusivity agreement, and what that might mean for Danieli's ability to sell Pacific Steel a micro mill.  Mr. Losso quickly commented that it was a vague 400-mile restriction, unlikely enforceable by CMC, and that Mr. Benson should not concern himself with the restriction.  He stated that it would not preclude Danieli from selling Pacific Steel a mill even if the mill were located within the 400-mile restriction.  Mr. Losso commented that it was "merely a political" issue on which he would have to deal with CMC were Pacific Steel to move forward with a micro mill.

95.     In late 2019, Mr. Benson forwarded an article to Mr. Losso on a new and exciting technology being developed by a start-up company called Heliogen that had created a highly efficient way of harnessing solar energy and converting it into a source of power.  Mr. Benson felt it was important to explore this new technology and arranged a meeting with Heliogen and Danieli in Pasadena, California in January of 2020.

96.     A meeting with Heliogen occurred on January 8, 2020 and in attendance were three Danieli representatives, Mr. Losso and two engineering executives, Carlo Brunatto and Federico Tortul, each of whom had flown in from Italy for the meeting, and two representatives from Pacific Steel, Mr. Benson and David Perkins, Pacific Steel's in-house counsel.  Subsequent to the meeting with Heliogen at a lunch between Pacific Steel and Danieli, Mr. Losso indicated that Danieli was working on a power solution of its own that would allow the use of alternative sources of power to be deployed in conjunction with standard energy from a grid provider.  This was in essence to be a MI.DA micro mill hybrid version.  Mr. Benson expressed excitement at the

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. 4:20-CV-07683-HSG

prospect of a hybrid mill and mentioned that one of the sites Pacific Steel was currently entertaining was close to large wind and solar energy installations not far from where Heliogen had its test site.  At that lunch, Mr. Perkins asked specifically about the 400-mile restriction that Mr. Losso had disclosed to Mr. Benson in their November meeting as the property Pacific Steel was considering was inside that radius.  Mr. Losso again said that it would not be a problem, only a political obstacle that he would overcome.

97.     As part of its site selection process, in early March 2020, Pacific Steel was actively considering a site in Pittsburg, California that would require the infeed of the mill scrap to enter from the opposite direction from the proposed footprint of the mill Danieli had offered to Pacific Steel.  Mr. Benson, cognizant of the 400-mile potential restriction with CMC, wrote to Mr. Losso as follows: "I have located another property that would be outside of the 400 mile radius agreement you have with CMC.  The property could work very well for us, but it would lay out better if the scrap could be fed from the opposite side from your previous mills.  Is this possible/practical?"  Mr. Losso replied on March 20, 2020 that it was possible, and provided a sketch of the layout.  At that time, unbeknownst to Pacific Steel, Danieli had begun negotiating to build another micro mill for CMC in Mesa, Arizona.  Without Pacific Steel's authorization and contrary to Pacific Steel's wishes, Danieli disclosed to CMC the Pittsburg site Pacific Steel was considering for its own micro mill.

98.     On March 5, 2020, Mr. Benson inquired in a phone conversation with Mr. Losso if Danieli had finalized its pricing on the "Hybrid" mill concept as he was eager to update Pacific Steel's construction budget.  Mr. Benson also asked Mr. Losso to provide an updated written proposal or commercial offering (as the prior proposal had recently expired) with the revised pricing.  Mr. Losso promised those would be forthcoming soon.  On April 7, 2020, Mr. Losso sent Mr. Benson a presentation on the Hybrid mill concept but no updated proposal or commercial offering.

99.     On May 4, 2020, Mr. Benson advised Mr. Losso in an email that the property Pacific Steel was pursuing in Pittsburg had fallen through and that Pacific Steel would be going back to some previous options in the California high desert.  On May 18, 2020, Mr. Losso wrote

30

to Mr. Benson: "let's find a place where the sun shines all of the time and build a Mi.Da-Hybrid together."  Given the exchange of detailed quotes and the meetings among the companies' top executives regarding the potential plant locations and layout as well as the hybrid power concept, this exchange represented a "green light" to move forward toward finalizing the agreement.

100.    According to Danieli, the proposed MI.DA-Hybrid Micromill, compared to a mini mill of similar capacity, would have provided substantial savings and would have reduced carbon dioxide emissions by many kilograms per metric ton.

101.    On June 16, 2020, Mr. Benson informed Mr. Losso that Pacific Steel had narrowed down its property search and was actively considering the same property that Mr. Benson had mentioned to Mr. Losso in February.  That property was just under 400 miles from the CMC Mesa mill.  Mr. Benson indicated he had other options but liked this particular site the best.  Again, Mr. Losso did not encourage Pacific Steel to pursue an alternate site outside of the 400-mile radius. That same day, Pacific Steel announced they had hired veteran steel executive Mark Olson as Vice President of Mill Operations.  Prior to joining Pacific Steel to run its future mill operations, Mr. Olson was Vice President of Operations for Gerdau Long Steel North America, where he led Gerdau's North American mill operations.

102.    On June 19, 2020, Mr. Benson had a lengthy conversation with Mr. Losso and advised him that Pacific Steel had successfully secured the property in the high desert area near the greater Los Angeles basin, and shared with Mr. Losso the exact location and details of that property.  Mr. Benson asked yet again for an updated commercial proposal and Mr. Losso indicated the proposal would be forwarded as soon as Danieli finalized its costs on certain components.  On July 6, 2020, Mr. Losso sent Mr. Benson a message indicating an updated proposal would be forthcoming by July 17, 2020.  No such proposal ever came from Danieli. Instead, at the same time that Pacific Steel believed it was well on its way to becoming vertically integrated and able to more effectively compete with CMC and others, CMC was extracting from Danieli an agreement to deny Pacific Steel access to the very technology Danieli had so proudly initially promoted to Pacific Steel.

103.    On August 13, 2020, CMC announced it was building a third Danieli micro mill,

31

1    only this mill was to employ Danieli's "Q One" technology, which Danieli had developed

2    independent of any input from CMC and had offered to Pacific Steel as a means to power the

3    contemplated Pacific Steel micro mill through the use of alternative energy sources such as wind

4    and solar, *i.e.*, Danieli's "MI.DA-Hybrid Micromill" option.  Prior to the CMC announcement,

5    Pacific Steel had no idea that Danieli was negotiating with CMC to build a new micro mill for

6    CMC.  Pacific Steel had not sought from Danieli access to any new technology that Danieli might

7    in the future develop in conjunction with CMC or any other rebar manufacturer.  In particular,

8    Pacific Steel was unaware that CMC's second Mesa micro mill would be a "dual line" mill,

9    capable of manufacturing both rebar and merchant bar.  Rather, Pacific Steel sought essentially the

10   same "single line," *i.e.*, rebar only, micro mill that Danieli already had built 19 times previously,

11   augmented by the Q One technology that Pacific Steel had embraced from the onset of its

12   discussions with Danieli.

13          104.    Danieli quickly informed Pacific Steel that, in negotiating the contracts for the new

14   CMC micro mill, CMC requested an exclusivity provision preventing Danieli from building a

15   micro mill for any of CMC's competitors.  But the exclusivity provision CMC demanded was

16   even more onerous than the restriction associated with the original Mesa mill: instead of

17   preventing Danieli from building another micro mill within 400 miles of Mesa, Arizona, this time

18   Danieli was prevented from building another micro mill within <u>500</u> miles of <u>Rancho Cucamonga,</u>

19   <u>California</u>.  And the provision was not limited to the new "dual line" mill, but rather applied as

20   well to the "single line" micro mill that had been around since 2009.  This new territorial

21   restriction thus effectively resuscitated CMC's 2009 territorial restriction (which expired at the

22   end of 2020), expanded it from 400 miles to 500 miles, and moved it from Mesa to Rancho

23   Cucamonga—all while <u>not</u> being limited to the new "dual line" technology, but instead sweeping

24   in as well Danieli's 11 year old "single line" micro mill technology.

25          105.    Prior to learning from Danieli that it had agreed to the territorial restriction with

26   CMC, Pacific Steel had not been aware that Danieli even was considering granting such

27   geographic exclusivity to any rebar manufacturer.  Certainly, Pacific Steel had no opportunity to

28   compete to be awarded such exclusivity by Danieli.

106.   CMC's geographic exclusivity blocked any competitor from building a Danieli micro mill in all but the northernmost reaches of California, in nearly all of Arizona, in all but the northernmost part of Nevada, and in the southwest half of Utah, as shown in the following map. This area of foreclosure was not only large, but more importantly represented areas where Pacific Steel would most vigorously compete with CMC.  CMC intended the clause to limit a potential competitor to two unacceptable choices: (1) build a micro mill at a distant location driving up its transportation costs and putting it at a substantial competitive disadvantage compared to CMC's Mesa micro mills, or (2) build a high-cost, inefficient mini mill within the exclusivity zone, also putting it at significant competitive disadvantage relative to CMC's Mesa micro mills.  Neither option would provide an expected return on investment sufficient to justify the investment.  In fact, CMC's own decision to shutter its inefficient mini mill at Rancho Cucamonga, California in favor of its forthcoming second Mesa micro mill is evidence that mini mills are not effective competitors of micro mills.  If CMC is unable to operate an existing, fully-depreciated mini mill at a level of profitability sufficient to justify its operations, no potential competitor could rationally invest hundreds of millions of dollars to build such a mill only to face the same inefficiencies that caused CMC to shutter its legacy mini mill.



Figure 1: 500-mile Exclusionary Zone around Rancho Cucamonga, CA

Note: 500-mile exclusionary zone is centered on Rancho Cucamonga, CA.

107.   The differences between the original Mesa territorial restriction and the new exclusivity provision are important for several reasons:

(A)   Despite the fact that, since the first Mesa micro mill, CMC has not contributed any meaningful intellectual property or processes to the subsequent 18 micro mills that Danieli has successfully sold and built around the world , this provision actually *increased* the geographic scope of the restriction from 400 miles to 500 miles;

(B)   In contrast to CMC, which increased its area of exclusivity from 400 to 500 miles, Nucor recently completed one micro mill, in Sedalia, Missouri, and is having another built by Danieli in Frostproof, Florida, both without *any* exclusive territory.

(C)   Similarly, when negotiating with Danieli, Pacific Steel never requested, and had no intention of requesting, an exclusive territory for its micro mill to be built in Southern California.

(D)   The area of exclusivity is measured not from Mesa, Arizona, where the rebar from the new mill will be produced and shipped, but from the site of the Rancho Cucamonga mini mill (almost 350 miles west of Mesa) that CMC has now shuttered[8]—on land that CMC no longer even owns; and

---

[8] Tracy Porter, Triple M and CMC's Growth Strategy, CMC 2020 Virtual Inv. Day (Aug. 13, 2020), at 21 (stating CMC's "intent is to have an orderly exit to operations in Rancho," including

(E)    When CMC commissioned Danieli to build CMC's second micro mill, in Durant, Oklahoma, the agreement with Danieli did not include a similar exclusivity provision.  In the same year the Durant mill went online, Nucor announced it was building a Danieli micro mill in Sedalia, Missouri, which is within 400 miles of Durant.

(F)    The exclusivity clause is being applied to single line rebar micro mills (for which the 2009 exclusivity agreement has expired) while the only new technology in the new Mesa facility relates to its dual line feature capable of producing merchant bar (which is of no interest to Pacific Steel) as well as rebar.

108.    The objective of CMC's latest, even more restrictive, exclusivity provision is clear and unambiguous: it was devised to prevent Pacific Steel from building its planned micro mill, thereby thwarting competitive entry into the relevant rebar manufacturing market and eliminating Pacific Steel's ability to lower its costs and become an even more effective competitor in the relevant rebar Furnish-and-Install markets through vertical integration and lower cost rebar supply closer to its fabrication facilities.

109.    CMC's exclusive access to Danieli's micro mill technology in the relevant geographic market for rebar manufacturing not only thwarts Pacific Steel's entry into that rebar market, but blocks entry by other potential rebar competitors as well, enabling CMC to continue to realize supracompetitive profits in the relevant rebar manufacturing market.  Similarly, by excluding competition in the relevant rebar manufacturing market, CMC protected itself from more aggressive competition in the rebar Furnish-and-Install market by denying its Furnish-and-Install rivals both a low-cost rebar supply and the other efficiencies of vertical integration.

110.    After disclosing to Pacific Steel the territorial restriction it had agreed to with CMC, Danieli apologized and indicated that its preference would have been to sell Pacific Steel a micro mill but CMC insisted on the territorial restriction.  Danieli then offered to sell Pacific Steel a mini mill rather than the micro mill previously offered.  Pacific Steel carefully reviewed Danieli's proposed alternative but concluded it would be significantly more expensive to construct than the previously-discussed micro mill, materially less efficient to operate, and would be less

---

"[s]huttering the rolling operation," and "[c]ompetitively market[ing] the land," and citing "[h]igh power cost and regulatory compliance.").  On information and belief, CMC has since closed on the sale of the land.

desirable from an environmental and regulatory standpoint. Ultimately, Pacific Steel concluded that Danieli's proposed alternative was simply economically unviable. Accordingly, Pacific Steel has not contracted with Danieli to build a mini mill instead of the micro mill. Furthermore, Danieli has remained willing to sell Pacific Steel a mini mill, which is more expensive to build than a micro mill, and Pacific Steel has no reason to believe that Danieli would refuse to sell Pacific Steel the desired micro mill if CMC's territorial restriction were voided.

111.    Building a micro mill outside the reach of the 500-mile restriction would be a very poor strategy for Pacific Steel or any other potential CMC competitor. As discussed above, steel rebar is heavy and transportation costs are a significant portion of the total cost of rebar production and rebar Furnish-and-Install services. The high cost of transporting scrap to the mill, and then rebar and rebar fabricated products from the mill, would put a micro mill located outside the geographic restriction at a very substantial competitive disadvantage compared to CMC's Mesa micro mills—so much so that the expected returns on investment of using a distant micro mill to compete in the relevant geographic market would be insufficient to attract the capital necessary to construct such a mill. While certain areas outside the 500-mile radius, such as the far north of California (assuming regular sunshine and an available work force), might allow Pacific Steel to supply its San Francisco Bay Area fabrication facilities and other fabrication facilities in Northern California at competitive prices, they would put Pacific Steel at a significant competitive disadvantage for sales to potential customers in Southern California. Demand for rebar in Southern California is very substantial, and Pacific Steel would lose out on significant sales in that area if its mill were located far to the north. Additionally, Los Angeles is one of the largest scrap markets in the United States. Scrap represents the largest input cost in manufacturing reinforcing steel. Similar to finished goods, shipping scrap long distances is very costly.

112.    Even if Pacific Steel or another would-be CMC competitor were to enter the relevant rebar manufacturing market and try to compete against CMC's Mesa micro mills with a less efficient, inferior, and more expensive mill and/or one sited in an inferior, less efficient location outside the 500-mile exclusionary zone, CMC's exclusivity provision still would have succeeded in raising its rivals' costs substantially and thus in ensuring continued supracompetitive

1   profits for itself and continued supracompetitive prices for California rebar consumers.

2   113.   Transporting steel great distances not only is costly, but also is harmful to the

3   environment.  As noted by the California legislature in passing the Buy Clean California Act,

4   "[g]reat quantities of emissions are released during the manufacture and transport of products used

5   in public infrastructure projects."  Assembly Bill No. 262 § 1(e) (approved by Gov. Brown on

6   October 15, 2017).

7   114.   One of the reasons it does not make economic sense for Pacific Steel to build a mill

8   using older, less environmentally friendly technology is that doing so would handicap Pacific

9   Steel's ability to compete for $10 billion in annual California state projects.  As of January 1,

10  2020, the Buy Clean California Act requires all contractors bidding on a project for the State of

11  California involving steel rebar to submit an Environmental Product Declaration ("EDP").  The

12  EDP for steel rebar requires project bidders to provide information regarding materials, products,

13  energy, and emissions, not only for the production of steel rebar, but for "transport to the

14  reinforcing bar fabricator."  (North American Product Category Rule for Designated Steel

15  Construction Products § 6.2.2.3.)  Any steel rebar manufacturer or fabricator that wants to

16  participate in one of California's infrastructure projects must submit this form. Pacific Steel's plan

17  to build the solar-powered micro mill would have allowed it to compete for California state rebar

18  projects under the Buy Clean California Act.

19  115.   Under the California Environmental Quality Act ("CEQA"), any proposed steel

20  mill that Pacific Steel seeks to construct would require preparation of an Environmental Impact

21  Report ("EIR") prior to receiving regulatory approval, the purpose of which "is to provide public

22  agencies and the public in general with detailed information about the effect which a proposed

23  project is likely to have on the environment; to list ways in which the significant effects of such a

24  project might be minimized; and to indicate alternatives to such a project."  California Public

25  Resources Code § 21061.  The EIR would require, among other things, a detailed statement

26  regarding "[m]itigation measures proposed to minimize significant effects on the environment,

27  including, but not limited to, measures to reduce the wasteful, inefficient, and unnecessary

28  consumption of energy" and "[a]lternatives to the proposed project."  *Id*. at § 21100.  Given the

exclusive territorial restriction, Pacific Steel would need to disclose that any proposed mill that could be constructed with the territorial restriction in place would have a greater negative impact on the environment than would a Danieli micro mill located within the exclusive territory—and thus would not be the most environmentally-friendly alternative otherwise available.  Such disclosure likely would negatively impact Pacific Steel's ability to obtain regulatory approval to construct a rebar mill other than a Danieli micro mill within the exclusive territory.

116.     In its press release announcing its plans to build a new micro mill in Mesa, Arizona, CMC stated that "[t]he new facility will replace higher cost rebar capacity and allow CMC to more efficiently meet West Coast demand for rebar and MBQ [merchant bar quality] products."  Press Release, CMC, CMC Announces Plans to Build Its Third Micro Mill (Aug. 13, 2020), at 1.  CEO Barbara Smith continued: "This is a smart growth initiative that feeds the large underlying West Coast demand for rebar and merchant bar, replacing inefficient existing rebar capacity with environmentally friendly technology."  *Id.*  The "inefficient existing rebar capacity" to which Ms. Smith referred apparently was the Rancho Cucamonga mini mill that CMC shuttered in October 2020.  CMC by its own actions thus has demonstrated that it is uneconomic to continue operating a mini mill that already exists in southern California, much less to build a new mini mill there.

117.     Pacific Steel already has suffered harm as a result of the exclusivity provision, having committed millions of dollars to land acquisition, engineering, environmental, due diligence and other consulting costs in anticipation of having Danieli build it a micro mill near the Los Angeles basin.  But for that territorial restriction, Pacific Steel would have finalized its contract with Danieli and made far greater progress toward constructing the new mill.  Each month that goes by without work on a micro mill in the state of California equates to another month in which California consumers will have to pay the higher prices associated with a local monopoly in rebar manufacturing.  In addition, each month's delay in the construction of Pacific Steel's micro mill means another month that California consumers will suffer the adverse environmental impacts of transporting scrap out of California only to be re-processed as rebar and then shipped back into the state to meet California's rebar needs.  That environmental impact translates into the

38

1    carbon equivalent of adding nearly 31,000 cars to California roadways annually.

2                              **RELEVANT MARKETS**

3    **I.       The Relevant Rebar Manufacturing Market**

4              **A.       The Product Market**

5             118.    Steel rebar is used to reinforce concrete in construction projects.  The properties of

6    steel—including its tensile strength, the similarity of its thermal expansion properties to those

7    properties in concrete, and its well understood elastic and fatigue properties—make steel rebar

8    highly effective in reinforcing concrete.  While some other materials, such as stainless steel, are

9    also highly effective, they cost far more than steel and are not commercially viable alternatives for

10   commercial construction projects.  It is virtually impossible to complete a commercial

11   construction project without using rebar to reinforce concrete structures.  There are no other

12   products with meaningful cross-elasticities of demand capable of constraining the price of rebar.

13   A small but significant non-transitory increase in the price of steel rebar above the competitive

14   level would not cause enough customers to switch to other products to make the increase

15   unprofitable.

16            **B.       The Geographic Market**

17            119.    The standard method for defining markets, widely accepted by courts and

18   economists, is set forth in the Horizontal Merger Guidelines from the U.S. Department of Justice

19   and Federal Trade Commission ("the Agencies").  2 Fed. Trade Comm'n App. D-7 § 4 (2020)

20   (hereinafter, "Guidelines").  Under these Guidelines, "the Agencies normally define geographic

21   markets based on the *locations of suppliers*," rather than based on customer location.  *Id.* at § 4.2

22   (emphasis added).  Under the Guidelines, a proposed geographic market is valid if a hypothetical

23   monopolist located in that market could profitably impose at least a small but significant and non-

24   transitory increase in price (a "SSNIP") above competitive levels from at least one of its locations.

25   *Id.* at § 4.2.1.[9]  The Agencies most often use a SSNIP of five percent.  *Id.* at § 4.1.2.  The relevant

26   ───────────────────────

27   [9] Although a SSNIP above *prevailing* prices often is the benchmark used in merger cases, in
     monopolization cases the *competitive* price level is the correct benchmark because an existing
     monopolist already would have raised prices to the monopoly level.  *Id.* at § 4.1.2 & n.5.

28

                                         39

geographic market is "the smallest relevant market satisfying the hypothetical monopolist test." *Id.* at § 4.1.1.

120.    The relevant geographic market for rebar manufacturing in this case consists of suppliers located within a 500-mile radius from the high desert area near the greater Los Angeles basin, the planned location of the Danieli micro mill that Pacific Steel intended to build before it was blocked from doing so.

121.    The validity of this relevant geographic market has recently been confirmed by a dramatic new development.  Prior to late 2020, there were only three rebar manufacturing facilities within the relevant geographic market, two of them owned by CMC and the third (owned by Nucor) capable of only limited rebar output.  Then, in late 2020, CMC closed one of those facilities, its Rancho Cucamonga mini mill.  Tracy Porter, Triple M and CMC's Growth Strategy, CMC 2020 Virtual Inv. Day (Aug. 13, 2020), at 21.  This mill closure has created the perfect storm for consumers, *i.e.*, unprecedented supply shortages in the geographic market accompanied by price increases of nearly 50% in the past six months alone.  Meanwhile, CMC's Mesa mill enjoys record mill spreads and record profits.  If suppliers located outside the relevant geographic market were reasonably interchangeable with suppliers in the relevant market, closing one supplier within the relevant market could not have had such a dramatic effect on prices because such a price increase would have been constrained by substitution to suppliers located outside the relevant market.  This new development thus provides a natural experiment that goes beyond indicating that a hypothetical monopolist in the posited geographic market could raise prices by 5% to show that an actual monopolist in the posited geographic market was able to raise prices by nearly ten times that 5% standard.  This new evidence also confirms the strong anticompetitive effect that flows from blocking Pacific Steel from building a micro mill within that geographic market.  The large price increase that resulted from eliminating production capacity in the relevant market (*i.e.*, closing the Rancho Cucamonga mill) supports the converse conclusion: that blocking new production capacity in the relevant market prevents the large price decrease that would result from the additional (highly efficient) local production.  This conclusion is highly relevant to market definition because market definition is just a tool to help infer likely anticompetitive

1  effects.  *See* Guidelines § 4.1.1 (stressing the "overarching principle that the purpose of defining

2  the market and measuring market shares is to illuminate the evaluation of competitive effects.")

3      122.    Moreover, the recent market price increases of nearly 50% (largely led by CMC)

4  were from a local price level that was already at a monopoly level, given that (before the recent

5  closure of its Rancho Cucamonga mini mill) CMC had two of the three mills located within the

6  relevant geographic market, with Nucor's Kingman, Arizona mill having a rebar capacity of less

7  than 10% of the combined capacity of the two CMC mills.

8      123.    Other evidence further supports the above definition of the relevant geographic

9  market.  First, as the Guidelines stress, "The scope of geographic markets often depends on

10  transportation costs."  Guidelines § 4.2.  Thus, "the cost and difficulty of transporting the product

11  (or the cost and difficulty of a customer traveling to a seller's location), in relation to its price"

12  provides "reliable evidence" supporting a geographic market.  *Id.* at § 4.2.1.  As alleged above,

13  steel rebar is a very heavy product that is expensive to ship, especially in relation to the cost of

14  manufacturing the product.  Transporting rebar long distances from outside the relevant

15  geographic market makes the delivered cost of the rebar too high for it to constrain local prices to

16  competitive levels.

17      124.    Second, the 400-mile and 500-mile exclusive territories created by CMC's

18  agreements with Danieli suggest that these distances are the outer limits of the area in which CMC

19  competes for most of its customers.  It would make no sense for those exclusive agreements to

20  specify that geographic range unless CMC believed that competition within that range would

21  constrain prices in a way that competition outside that range could not.  As the Guidelines point

22  out, "evidence on whether sellers base business decisions on the prospect of customers switching

23  between geographic locations in response to relative changes in price or other competitive

24  variables" provides "reliable evidence" supporting a geographic market.  *Id.* at § 4.2.1.  Here,

25  CMC's business decision to restrict competition within 400 to 500 miles of its mills, but not

26  beyond, indicates that it does not believe that the prospect of customers switching to suppliers

27  outside that area would provide a sufficient competitive constraint to be worth preventing.

28      125.    Third, CMC's CEO confirmed at a May 19, 2021 investor conference that "a 500-

mile shipping range" for steel rebar is "the most efficient, cost-effective way to serve the market." Barbara R. Smith, President and Chief Exec. Officer, CMC, CMC at Bank of Am. Glob. Metals, Mining & Steel Conf. (May 19, 2021) (transcript available at ).  It necessarily follows that any supplier outside a 500-mile shipping range will be serving the market in an inefficient, cost-ineffective way that will not serve the market as well and thus will not constrain prices to competitive levels.

126.   Because the relevant geographic market consists of suppliers located within a 500-mile radius from the high desert area near the greater Los Angeles basin, it does not include suppliers located outside that area, even if supracompetitive prices have induced some customers within the area to import rebar from suppliers outside that area.  The reasons are several.  To begin with, "[w]hen the geographic market is defined based on supplier locations, sales made by suppliers located in the geographic market are counted, *regardless of the location of the customer making the purchase*."  Guidelines § 4.2.1 (emphasis added).  Further, importing manufactured rebar into the area from suppliers outside the area here reflects the fact that supracompetitive prices have induced customers to buy from suppliers outside the area, even though that requires incurring heavy transportation costs that inefficiently drive up delivered prices.  To include such firms within the market would commit the Cellophane fallacy that the Guidelines and academic literature warn against.  *Id*. at § 4.1.2, n.5; 2B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶550a (4th and 5th ed. 2021) (stressing that trade flow data can be misleading on geographic market definition because, if firms are already charging supracompetitive prices in a geographic area, that can induce higher amounts of importation than would exist at competitive levels).

127.   For example, suppose that the competitive price for widgets both in a local geographic market and in other geographic markets was $50 and that the shipping cost to import widgets into the local geographic market from other geographic markets was $50 as well.  Suppose further a local firm excluded competitors from the local geographic market and raised prices to $100.  At that $100 price, some consumers would import from firms outside the market at $100 because that would cover the out-of-market competitive price of $50 plus the $50 the shipping cost.  But that would not alter the fact that the local firm was able to exploit its local

monopoly to raise prices way above the competitive level of $50, and thus such induced importation would not mean that the geographic market should be broadened to include either the out-of-market firms or their sales into the local area.

128.    As the Guidelines stress, "[d]efining a market broadly to include relatively distant product or geographic substitutes can lead to misleading market shares. This is because the competitive significance of distant substitutes is unlikely to be commensurate with their shares in a broad market…. As a result, properly defined antitrust markets often exclude some substitutes to which some customers might turn in the face of a price increase even if such substitutes provide alternatives for those customers." *Id.* at § 4.  For example, the Guidelines explain that if an increase in motorcycle prices would lead some buyers to switch to cars, a relatively distant product, cars should not be included in the market or market shares because including them would overstate their ability to constrain motorcycle prices.  *Id.* at § 4, Ex. 4.  Similarly, even though high local rebar prices and a dearth of local production have led some buyers to purchase from relatively distant suppliers, the latter should not be included in the market or market shares because including them would overstate their ability to constrain local rebar prices within the relevant geographic market.  A market is too narrowly defined only if competition from outside that market "is so ample that even the complete elimination of competition within" the market would not significantly harm customers (*i.e.*, would not result in a five percent or greater price increase).  *Id.* at § 4.  But that is clearly not the case here, given that reducing output within the relevant geographic market contributed to a price increase of nearly 50% over already monopolistic levels, thus clearly showing that competition from suppliers outside that geographic market did not suffice to prevent harm to customers.

129.    In short, the hypothetical monopolist test supports defining the relevant geographic market as suppliers located within a 500-mile radius from the high desert area near the greater Los Angeles basin, even though customers located in that area do import rebar from suppliers outside that area.  CMC provides nearly all of the rebar manufacturing located within that area (with its Mesa mill), and its market share is over 85% currently and will rise above 90% when its second Mesa mill comes online in early 2023.  Rebar that is imported into that area from other areas is

43

1   outside the relevant geographic market and thus does not count in market share calculations.

2       **C.      CMC Market Power**

3       130.    CMC did not need market power in the relevant rebar manufacturing market to

4   exclude Pacific Steel from the relevant rebar manufacturing market.  Rather, CMC's status as

5   Danieli's most important customer in the United States allowed CMC to extract from Danieli, the

6   sole provider of the micro mill technology Pacific Steel would require to feasibly enter the market,

7   its agreement to withhold that technology from Pacific Steel, blocking Pacific Steel's entry.

8       131.    Nonetheless, CMC has had substantial market power, and monopoly power, in the

9   relevant rebar manufacturing market during the relevant time period.  CMC accounts for over 85%

10  of the rebar produced from within the relevant geographic market, which market share will rise to

11  over 90% in early 2023 with the completion of CMC's new Mesa mill—and if its exclusivity

12  provision is allowed to stand, CMC will maintain that market share for at least five additional

13  years.  CMC's status as the sole significant producer of rebar within the relevant geographic

14  market grants it the power to set its prices well above competitive levels: all rebar shipped into the

15  relevant geographic market to satisfy demand must be transported long distances at considerable

16  expense and thus must be priced high; with only a small amount of rebar available from in-market

17  competition, CMC's market power is not constrained and it is able to realize supracompetitive

18  profits simply by meeting the prices of rebar produced far away and pocketing the equivalent of

19  the substantial transportation costs that CMC does not incur.  CMC likewise is able to keep all the

20  cost savings it realizes from manufacturing at a micro mill (compared to a mini mill) rather than

21  sharing those benefits with rebar consumers because there is no other micro mill proximate

22  enough to provide competitive pressure in the relevant market.

23      132.    Moreover, Pacific Steel understands and believes that, even if the market were

24  incorrectly defined to count rebar shipped into the relevant market from outside the relevant

25  geographic market, CMC accounted for approximately 50% of the total rebar sold in the relevant

26  market during the relevant time period prior to shuttering its Rancho Cucamonga mill in October

27  2020.  While CMC's share of this too-broadly defined market may have dropped with the closure

28  of its Rancho Cucamonga mill, its share will rebound back to about 50% once its second Mesa

44

1   micro mill comes online in early 2023.

2       133.    No matter how market share is calculated, a new micro mill operating within the

3   relevant geographic market by a CMC competitor inevitably would lead to lower rebar prices for

4   consumers in the relevant rebar manufacturing market—especially if operated by a new-entrant

5   "maverick" firm like Pacific Steel.  *See* Guidelines § 2.1.5.  And CMC's territorial restriction

6   forecloses exactly that result.

7       134.    Substantial barriers to entry exist in the relevant rebar manufacturing market that

8   make CMC's market power durable.  Building a steel mill, even a smaller and less expensive

9   micro mill, takes years and costs hundreds of millions of dollars.  In addition, there are significant

10  business and environmental regulations that must be satisfied to operate a steel mill.  These costs

11  and regulations make entry difficult, costly, and uncommon.  Finally, CMC's own exclusive

12  territorial restraint creates a powerful barrier to entry by precluding any entrant from using the

13  most efficient type of mill for making rebar.

14      **D.      Harm to Competition**

15      135.    As the sole manufacturer of rebar with a micro mill within the relevant geographic

16  market, CMC faces insufficient constraints to cause it to price its rebar at the competitive level—

17  and thus rebar consumers are forced to pay inflated prices for rebar produced by CMC's in-market

18  micro mill.  Local prices have risen so high that many rebar consumers have turned to buying

19  from less efficient, faraway mini mills, but doing so incurs the high prices that reflect the

20  significant additional costs of producing and transporting that rebar.  The only realistic way for

21  those rebar consumers to benefit from competitive rebar pricing is for one or more micro mills to

22  be built within the relevant geographic market by CMC's competitors—unsurprisingly, exactly the

23  path foreclosed by CMC's territorial restriction.

24      136.    An agreement is unlawful under the rule of reason if its anticompetitive harms

25  outweigh its procompetitive benefits.  The anticompetitive harms of CMC's territorial restriction

26  are obvious: it blocks any potential competitor from entering the relevant rebar manufacturing

27  market because they will not do so in a manner that is far less efficient and effective than the

28  incumbent's micro mills, thus leading to reduced rebar output, higher rebar prices, lower rebar

45

quality, and worse environmental impacts.  There are no procompetitive benefits resulting from CMC's territorial restriction.

137.   The exclusivity provision that CMC extracted from Danieli to exclude Pacific Steel (and every other potential entrant) from the relevant rebar manufacturing market, as alleged above, harmed competition and had the following anticompetitive effects:

a.   Pacific Steel was prevented from entering the relevant rebar manufacturing market.  As alleged above, Pacific Steel would have been a lower-cost producer and would have had the ability and incentive to price below the market and spur greater price competition, and would have done so;

b.   Pacific Steel's exclusion from the relevant rebar manufacturing market excluded additional production capacity and output from the market, which would have intensified competition;

c.   CMC's restrictive agreement with Danieli not only prevented Pacific Steel from entering the relevant rebar manufacturing market, but also prevented other potential competitors from entering that market.  CMC's anticompetitive agreement foreclosed the most efficient means of entry or expansion in the relevant geographic market—the micro mill—to any and all competitors; and

d.   Even if Pacific Steel or another competitor were able to enter (or expand in) the relevant rebar manufacturing market by building a less efficient, inferior, and more expensive mill and/or one sited in an inferior, less efficient location outside the 500-mile exclusionary zone, CMC's anticompetitive agreement with Danieli still would harm competition by foreclosing CMC's rivals from the most efficient mill option and thus raising their costs of construction, operations and/or transportation—the increased costs of which would substantially diminish CMC's rivals' ability to compete in the relevant rebar manufacturing market and would flow through in the form of higher prices to rebar consumers both from the rivals (because their costs would be higher) and from CMC (because it would face less competitive pressure from its weakened rivals).  Moreover, the rebar produced by a micro mill is more desirable than the rebar produced from older mini

mills.  The rebar from micro mills does not twist at the ends and is easier to separate than rebar from mini mills.  And rebar from a local micro mill has a smaller environmental impact than rebar from a mini mill or a micro mill located further away.  Thus, even if another competitor could enter or expand in a manner not prohibited by the territorial restriction, the resulting product would be more expensive to produce, more expensive to ship, less easy to use, and/or produced at a higher environmental cost.  For these reasons, it could not compete on equal footing with rebar produced via a micro mill within 500 miles of Rancho Cucamonga.

## II.      The Relevant Rebar Furnish-and-Install Market

### A.      The Product Market

138.    As alleged above, once the decision has been made to reinforce concrete with steel rebar, the manufactured rebar must be cut to the size and bent to the shape specified in the project engineer's drawings, and the rebar so fabricated must be delivered to the construction site and installed prior to being encased in concrete.  These services are necessary for steel rebar to be used to reinforce concrete in a structure, and there are no substitutes for these services.  A small but significant non-transitory increase in the price of rebar Furnish-and-Install services above the competitive level would not cause enough customers to switch to another type of service provider to make the increase unprofitable.

### B.      The Geographic Markets

139.    Fabricated rebar is costly to ship due to its weight and irregular shape.  Less rebar can be loaded into a truck or railcar after the rebar has been bent into various shapes and cut into various sizes as part of the fabrication process.  Further, additional trips to the construction site are sometimes needed if the original delivery was short on the required number of a particular shape and size of rebar.  Thus, shipping is a very substantial factor in defining the geographic scope of the relevant rebar Furnish-and-Install markets.  Further, Furnish-and-Install services are provided after the rebar has been shipped from the manufacturer to the fabrication facility.  The further the fabrication facility is from its rebar supplier, the more transportation cost the facility has incurred, and, and all else equal, the less additional shipping cost it can incur to be able to deliver fabricated

1    rebar to the construction site at a competitive price.

2        140.    The large majority of sales of Furnish-and-Install services are provided at

3    construction sites within 200 miles of the fabrication plant, and most of those sales are provided at

4    construction sites much closer than 200 miles.  In addition, if the fabrication facility is not close to

5    its rebar supplier, then it likely can only sell at competitive prices to customers less than 200 miles

6    away.

7        141.    The geographic scope of the relevant Furnish-and-Install markets is no greater than

8    a 200-mile radius from the Los Angeles Basin, the area in which Pacific Steel's Southern

9    California fabrication facilities are located, and no greater than a 200-mile radius from the San

10   Francisco Bay Area, the area in which Pacific Steel's Northern California fabrication facilities are

11   located.  A small but significant non-transitory increase in the price of rebar Furnish-and-Install

12   services in either of these regions above the competitive level would not cause enough customers

13   to switch to fabricators outside the region to make the increase unprofitable.

14       **C.    CMC's Ability to Harm Competition and Competitors in the Relevant**
         **Markets**
15

16       142.    Pacific Steel understands and believes that CMC Rebar is the largest provider of

17   rebar Furnish-and-Install services in the relevant markets.  PSG estimates that CMC Rebar's

18   market share in each of the relevant markets has ranged between 15% and 30% during the relevant

19   time period.  CMC Rebar has several fabrication facilities in the relevant markets and enjoys

20   significant competitive advantages with customers located close to those facilities.

21       143.    CMC's substantial assets and revenues, including in rebar manufacturing, and in

22   other geographic markets outside the geographic markets relevant to in this case, enable it to

23   sustain losses for an extended period of time through below-cost pricing on sales of Furnish-and-

24   Install services in the relevant markets.  This is true whether or not CMC Rebar has market power

25   in the relevant rebar Furnish-and-Install markets.  CMC Rebar also has the ability to harm

26   competition and competitors through below-cost pricing in the relevant Furnish-and-Install

27   markets whether or not it has market power in those markets.

28       144.    Substantial barriers to entry exist in the relevant markets.  Assembling the

                                              48

necessary skilled workforce—including trained steelworkers, rebar detailers, and fabricators—is very difficult, as is the ability to accurately estimate costs and operate efficiently in order to profitably win bids.  Moreover, given the catastrophic consequences of improperly fabricated or installed rebar, as well as the workplace dangers associated with installing rebar, the industry is heavily regulated.  Navigating and complying with these myriad regulations requires substantial knowledge, skill, and resources.  Finally, CMC's own exclusive territory restraint creates a large barrier to entry by denying downstream Furnish-and-Install rivals access to efficiently produced rebar, one of their biggest input costs.

### D.      Harm to Competition

145.     The conspiracy to exclude Pacific Steel (and every other potential entrant) from the relevant rebar manufacturing market, as alleged above, diminished competition in the relevant rebar Furnish-and-Install markets by denying Pacific Steel a lower-cost supply of rebar as well as other efficiencies from vertical integration, thereby preventing Pacific Steel from becoming a lower-cost, lower-priced, and more effective competitor in the relevant rebar Furnish-and-Install markets.  Excluding Pacific Steel (and every other potential entrant) from the rebar manufacturing market also prevented Pacific Steel (and every other potential entrant) from offering lower-priced rebar to other rebar Furnish-and-Install firms.  Lower rebar costs would have made those other firms more vigorous competitors, thus increasing overall market competition.

146.     CMC Rebar's and GRS's below-cost pricing in the relevant rebar Furnish-and-Install markets, as alleged above, reduced competition in those markets by unlawfully taking sales from Pacific Steel, diminishing Pacific Steel's revenues, profits, and growth, and preventing Pacific Steel from investing further in more efficient and effective operations, and from realizing greater economies of scale.  CMC Rebar's and GRS's below-cost pricing in the relevant rebar Furnish-and-Install markets also reduced competition in those markets by unlawfully taking sales from other market participants including Harris and Alamillo, diminishing their revenues, profits, and growth, and preventing them from investing further in more efficient and effective operations, and from realizing greater economies of scale.

**INJURY TO PACIFIC STEEL GROUP**

147.   Defendants' conduct as alleged herein has injured and/or will injure Pacific Steel in its business or property by denying sales and profits to Pacific Steel in both the relevant market for rebar manufacturing and the relevant markets for rebar Furnish-and-Install services, and by lowering the value of Pacific Steel's business.

**CAUSES OF ACTION**

**Count One: Conspiracy in Restraint of Trade**
**Section 1 of the Sherman Act, 15 U.S.C. § 1 and**
**Cartwright Act. Cal. Bus. & Prof. Code § 16720**
**(Asserted Against CMC)**

148.   Pacific Steel repeats and reasserts each of the allegations in paragraphs 1 through 147 as fully set forth herein.

149.   In or around August 2020, CMC and Danieli entered into a contract, combination, and conspiracy in unreasonable restraint of trade that prevents CMC's competitors and potential competitors, including Pacific Steel, from building a Danieli micro mill within a 500-mile radius of Rancho Cucamonga, California for a period of 69 months.  That contract, combination, and conspiracy has unreasonably restrained and/or will unreasonably restrain trade and commerce in the relevant rebar manufacturing market and in the relevant rebar Furnish-and-Install markets in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and constitutes an unlawful trust in violation of the Cartwright Act, California Business & Professions Code § 16720.

150.   As a direct and foreseeable result of CMC's and Danieli's anticompetitive conspiracy, competition in the relevant rebar manufacturing market is unreasonably restrained in at least the following ways:  (1) a lower-cost producer with the ability and incentive to price below the market and spur greater price competition is excluded from the market; (2) additional production capacity and output and the resulting additional competition is excluded from the market; and (3) other potential entry into the relevant rebar manufacturing market is thwarted. Even if Pacific Steel or another competitor were able to enter (or expand in) the relevant rebar manufacturing market by building a less efficient, inferior, and more expensive mill and/or one sited in an inferior, less efficient location outside the 500-mile exclusionary zone, CMC's and

Danieli's anticompetitive conspiracy still would have the direct and foreseeable result of unreasonably restraining competition in the relevant rebar manufacturing market by foreclosing CMC's rivals from the most efficient mill option and thus raising their costs of construction, operations and/or transportation—the increased costs of which would substantially weaken CMC's rivals' ability to compete in the relevant rebar manufacturing market and would flow through in the form of higher prices to rebar consumers both from the rivals (because their costs would be higher) and from CMC (because it would face less competitive pressure from its weakened rivals).

151.    CMC's anticompetitive conduct constitutes an unreasonable and unlawful restraint of trade in violation of federal and California state antitrust laws.  The exclusivity agreement that CMC extracted from Danieli is a naked restraint of trade with no efficiency justification and the sole purpose and effect of preventing entry into the relevant rebar manufacturing market by blocking by far the most efficient and effective, and the profit-maximizing, means of entry.  No potential competitor will enter the relevant market with a mini mill because the expected return on investment is too small to justify the investment.  Similarly, no potential competitor will enter the relevant market outside the exclusivity zone, even with a micro mill, because the expected return on investment in light of the high transportation costs is too low to justify the investment.  Even if, contrary to expectation, a competitor entered the relevant market, the territorial restriction would raise its production and/or transportation costs substantially, weakening its ability to constrain CMC's inflated prices.  In any case, the anticompetitive effects of CMC and Danieli's conspiracy far outweigh any purported non-pretextual, pro-competitive justifications.

152.    As a direct and foreseeable result of CMC's and Danieli's anticompetitive conspiracy, Pacific Steel has been and/or will be injured in its business and property and has suffered and/or will suffer damages in amounts to be proven at trial, in at least the following ways: (1) Pacific Steel is prevented from selling steel rebar; it will lose sales of rebar and the profits thereon; and the value of its business has been and will be diminished; and (2) Pacific Steel is losing access to efficient integration and a lower-cost supply of rebar for its rebar Furnish-and-Install business, which will lower its profits and has lowered and will lower the value of its

business.  Even if Pacific Steel were able to enter the relevant rebar manufacturing market by building a less efficient, inferior, and more expensive mill and/or one sited in an inferior, less efficient location outside the 500-mile exclusionary zone, Pacific Steel still has been and/or will be injured in its business and property by CMC's and Danieli's anticompetitive conspiracy in that Pacific Steel is prevented from acquiring the most efficient mill option for manufacturing steel rebar and thus will lose rebar sales and profits, and the value of its business has been and will be diminished.  Likewise, even if Pacific Steel or another competitor were able to enter (or expand in) the relevant rebar manufacturing market by building a less efficient, inferior, and more expensive mill and/or one sited in an inferior, less efficient location outside the 500-mile exclusionary zone, Pacific Steel still has been and/or will be injured in its business and property by CMC's and Danieli's anticompetitive conspiracy in that Pacific Steel is denied the most efficient new supply of rebar and thus is forced to pay higher prices for the rebar it uses in its rebar Furnish-and-Install operations.

**<u>Count Two: Monopolization</u>**
**Section 2 of the Sherman Act, 15 U.S.C. § 2**
**(Against CMC)**

153.    Pacific Steel repeats and reasserts each of the allegations in paragraphs 1 through 152 as fully set forth herein.

154.    CMC has monopoly power in the relevant rebar manufacturing market, including the power to control prices and exclude competition.

155.    CMC has willfully, knowingly, and intentionally maintained its monopoly power in the relevant rebar manufacturing market by engaging in anticompetitive conduct, namely, conspiring with Danieli to exclude entry and competition, and not through a superior product or service, business acumen, or historical accident.  By engaging in the foregoing conduct, CMC has violated, and continues to violate, Section 2 of the Sherman Act, 15 U.S.C. § 2.

156.    As a direct and foreseeable result of CMC's anticompetitive and monopolistic conduct, competition in the relevant rebar manufacturing market has been and/or will be unreasonably restrained in at least the following ways:  (1) a lower-cost producer with the ability and incentive to price below the market and spur greater price competition is excluded from the

52

market; (2) additional production capacity and output and the resulting additional competition is excluded from the market; and (3) other potential entry into the relevant rebar manufacturing market is thwarted.  Even if Pacific Steel or another competitor were able to enter (or expand in) the relevant rebar manufacturing market by building a less efficient, inferior, and more expensive mill and/or one sited in an inferior, less efficient location outside the 500-mile exclusionary zone, CMC's anticompetitive and monopolistic conduct still would have the direct and foreseeable result of unreasonably restraining competition in the relevant rebar manufacturing market by foreclosing CMC's rivals from the most efficient mill option and thus raising their costs of construction, operations and/or transportation—the increased costs of which would significantly diminish CMC's rivals' ability to compete in the relevant rebar manufacturing market and would flow through in the form of higher prices to rebar consumers both from the rivals (because their costs would be higher) and from CMC (because it would face less competitive pressure from its weakened rivals).

157.    CMC's anticompetitive conduct constitutes an unreasonable and unlawful restraint of trade in violation of federal and California state antitrust laws.  The exclusivity agreement that CMC extracted from Danieli is a naked restraint of trade with no efficiency justification and the sole purpose and effect of preventing entry into the relevant rebar manufacturing market by blocking by far the most efficient and effective, and the profit-maximizing, means of entry.  No potential competitor will enter the relevant market with a mini mill because the expected return on investment is too small to justify the investment.  Similarly, no potential competitor will enter the relevant market outside the exclusivity zone, even with a micro mill, because the expected return on investment in light of the high transportation costs is too low to justify the investment.  Even if, contrary to expectation, a competitor entered the relevant market, the territorial restriction would raise its production and/or transportation costs substantially, weakening its ability to constrain CMC's inflated prices.  In any case, the anticompetitive effects of CMC and Danieli's conspiracy far outweigh any purported non-pretextual, pro-competitive justifications.

158.    As a direct and foreseeable result of CMC's anticompetitive and monopolistic conduct, competition in the relevant rebar Furnish-and-Install markets has been and/or will be

unreasonably restrained in at least the following way:  Pacific Steel and CMC's other rivals in the relevant rebar Furnish-and-Install markets are denied efficient integration and a lower-cost supply of rebar, thereby preventing Pacific Steel and CMC's other rivals in the relevant rebar Furnish-and-Install markets from becoming lower-cost, lower-priced, and more effective competitors in the relevant rebar Furnish-and-Install markets.

159.     As a direct and foreseeable result of this anticompetitive and monopolistic conduct, Pacific Steel has been and/or will be injured in its business and property and has suffered and/or will suffer damages in amounts to be proven at trial, in at least the following ways:  (1) Pacific Steel is prevented from selling rebar; it will lose sales of rebar and the profits thereon; and the value of its business has been and will be diminished; and (2) Pacific Steel is losing access to efficient integration and a lower-cost supply of rebar for its rebar Furnish-and-Install business, which will lower its profits and has lowered and will lower the value of its business.  Even if Pacific Steel were able to enter the relevant rebar manufacturing market by building a less efficient, inferior, and more expensive mill and/or one sited in an inferior, less efficient location outside the 500-mile exclusionary zone, Pacific Steel still has been and/or will be injured in its business and property by CMC's anticompetitive and monopolistic conduct in that Pacific Steel is prevented from acquiring the most efficient mill option for manufacturing steel rebar and thus will lose rebar sales and profits, and the value of its business has been and will be diminished. Likewise, even if Pacific Steel or another competitor were able to enter (or expand in) the relevant rebar manufacturing market by building a less efficient, inferior, and more expensive mill and/or one sited in an inferior, less efficient location outside the 500-mile exclusionary zone, Pacific Steel still has been and/or will be injured in its business and property by CMC's anticompetitive and monopolistic conduct in that Pacific Steel is denied the most efficient new supply of rebar and thus is forced to pay higher prices for the rebar it uses in its rebar Furnish-and-Install operations.

**<u>Count Three: Attempted Monopolization (In the Alternative)</u>**
**Section 2 of the Sherman Act, 15 U.S.C. § 2**
**(Against CMC)**

160.     Pacific Steel repeats and reasserts each of the allegations in paragraphs 1 through 159 as fully set forth herein.

161.    CMC has monopoly power or, at a minimum, a dangerous probability of acquiring monopoly power in the relevant rebar manufacturing market, including the power to control prices and exclude competition.

162.    CMC has willfully, knowingly, and intentionally engaged in anticompetitive conduct—namely, conspiring with Danieli to exclude competition as alleged above—with the specific intent of attempting to monopolize the relevant rebar manufacturing market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

163.    CMC's anticompetitive course of conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the relevant rebar manufacturing market.  CMC's anticompetitive course of conduct has created a dangerous probability that it will succeed, to the extent it has not already, in its attempt to monopolize this market.

164.    As a direct and foreseeable result of CMC's anticompetitive and monopolistic conduct, competition in the relevant rebar manufacturing market has been and/or will be unreasonably restrained in at least the following ways:  (1) a lower-cost producer with the ability and incentive to price below the market and spur greater price competition is excluded from the market; (2) additional production capacity and output and the resulting additional competition is excluded from the market; and (3) other potential entry into the relevant rebar manufacturing market is thwarted.  Even if Pacific Steel or another competitor were able to enter (or expand in) the relevant rebar manufacturing market by building a less efficient, inferior, and more expensive mill and/or one sited in an inferior, less efficient location outside the 500-mile exclusionary zone, CMC's anticompetitive and monopolistic conduct still would have the direct and foreseeable result of unreasonably restraining competition in the relevant rebar manufacturing market by foreclosing CMC's rivals from the most efficient mill option and thus raising their costs of construction, operations and/or transportation—the increased costs of which would substantially weaken CMC's rivals' ability to compete in the relevant rebar manufacturing market and would flow through in the form of higher prices to rebar consumers both from the rivals (because their costs would be higher) and from CMC (because it would face less competitive pressure from its

1    weakened rivals).

2        165.    CMC's anticompetitive conduct constitutes an unreasonable and unlawful restraint

3    of trade in violation of federal and California state antitrust laws.  The exclusivity agreement that

4    CMC extracted from Danieli is a naked restraint of trade with no efficiency justification and the

5    sole purpose and effect of preventing entry into the relevant rebar manufacturing market by

6    blocking by far the most efficient and effective, and the profit-maximizing, means of entry.  No

7    potential competitor will enter the relevant market with a mini mill because the expected return on

8    investment is too small to justify the investment.  Similarly, no potential competitor will enter the

9    relevant market outside the exclusivity zone, even with a micro mill, because the expected return

10   on investment in light of the high transportation costs is too low to justify the investment.  Even if,

11   contrary to expectation, a competitor entered the relevant market, the territorial restriction would

12   raise its production and/or transportation costs substantially, weakening its ability to constrain

13   CMC's inflated prices.  In any case, the anticompetitive effects of CMC and Danieli's conspiracy

14   far outweigh any purported non-pretextual, pro-competitive justifications.

15       166.    As a direct and foreseeable result of this anticompetitive and monopolistic conduct,

16   Pacific Steel has been and/or will be injured in its business and property and has suffered and/or

17   will suffer damages in amounts to be proven at trial, in at least the following ways: (1) Pacific

18   Steel is prevented from selling steel rebar; it will lose sales of rebar and the profits thereon; and

19   the value of its business has been and will be diminished; and (2) Pacific Steel is losing access to

20   efficient integration and a lower-cost supply of rebar for its rebar Furnish-and-Install business,

21   which will lower its profits and has lowered and will lower the value of its business.  Even if

22   Pacific Steel were able to enter the relevant rebar manufacturing market by building a less

23   efficient, inferior, and more expensive mill and/or one sited in an inferior, less efficient location

24   outside the 500-mile exclusionary zone, Pacific Steel still has been and/or will be injured in its

25   business and property by CMC's anticompetitive and monopolistic conduct in that Pacific Steel is

26   prevented from acquiring the most efficient mill option for manufacturing steel rebar and thus will

27   lose rebar sales and profits, and the value of its business has been and will be diminished.

28   Likewise, even if Pacific Steel or another competitor were able to enter (or expand in) the relevant

1  rebar manufacturing market by building a less efficient, inferior, and more expensive mill and/or

2  one sited in an inferior, less efficient location outside the 500-mile exclusionary zone, Pacific Steel

3  still has been and/or will be injured in its business and property by CMC's anticompetitive and

4  monopolistic conduct in that Pacific Steel is denied the most efficient new supply of rebar and

5  thus is forced to pay higher prices (which include monopoly rents when Pacific Steel purchases

6  rebar from CMC) for the rebar it uses in its rebar Furnish-and-Install operations.

7

8  **Count Four: Conspiracy to Monopolize**
   **Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 and**
   **Cartwright Act, Cal. Bus. & Prof. Code § 16720**
   **(Against CMC)**

9

10     167.    Pacific Steel repeats and reasserts each of the allegations in paragraphs 1 through

11  166 as fully set forth herein.

12     168.    CMC has monopoly power in the relevant rebar manufacturing market, including

13  the power to control prices and exclude competition.

14     169.    CMC has willfully and intentionally conspired with Danieli to maintain its

15  monopoly power in the relevant rebar manufacturing market, in violation of Sections 1 and 2 of

16  the Sherman Act, 15 U.S.C. §§ 1, 2 and the Cartwright Act, California Business & Professions

17  Code § 16720, *et seq*.  This conspiracy consists of an agreement between CMC and Danieli that

18  prevents CMC's competitors and potential competitors, including Pacific Steel, from building a

19  Danieli micro mill within a 500-mile radius of Rancho Cucamonga, California for a period of 69

20  months.  The conspiracy enables CMC to exclude competition and maintain its monopoly power

21  in the relevant rebar manufacturing market.

22     170.    As a direct and foreseeable result of CMC's and Danieli's anticompetitive

23  conspiracy, competition in the relevant rebar manufacturing market has been and/or will be

24  unreasonably restrained in at least the following ways:  (1) a lower-cost producer with the ability

25  and incentive to price below the market and spur greater price competition is excluded from the

26  market; (2) additional production capacity and output and the resulting additional competition is

27  excluded from the market; and (3) other potential entry into the relevant rebar manufacturing

28  market is thwarted.  Even if Pacific Steel or another competitor were able to enter (or expand in)

57

the relevant rebar manufacturing market by building a less efficient, inferior, and more expensive mill and/or one sited in an inferior, less efficient location outside the 500-mile exclusionary zone, CMC's and Danieli's anticompetitive conspiracy still would have the direct and foreseeable result of unreasonably restraining competition in the relevant rebar manufacturing market by foreclosing CMC's rivals from the most efficient mill option and thus raising their costs of construction, operations and/or transportation—the increased costs of which would substantially weaken CMC's rivals' ability to compete in the relevant rebar manufacturing market and would flow through in the form of higher prices to rebar consumers both from the rivals (because their costs would be higher) and from CMC (because it would face less competitive pressure from its weakened rivals).

171.    CMC's anticompetitive conduct constitutes an unreasonable and unlawful restraint of trade in violation of federal and California state antitrust laws.  The exclusivity agreement that CMC extracted from Danieli is a naked restraint of trade with no efficiency justification and the sole purpose and effect of preventing entry into the relevant rebar manufacturing market by blocking by far the most efficient and effective, and the profit-maximizing, means of entry.  No potential competitor will enter the relevant market with a mini mill because the expected return on investment is too small to justify the investment.  Similarly, no potential competitor will enter the relevant market outside the exclusivity zone, even with a micro mill, because the expected return on investment in light of the high transportation costs is too low to justify the investment.  Even if, contrary to expectation, a competitor entered the relevant market, the territorial restriction would raise its production and/or transportation costs substantially, weakening its ability to constrain CMC's inflated prices.  In any case, the anticompetitive effects of CMC and Danieli's conspiracy far outweigh any purported non-pretextual, pro-competitive justifications.

172.    As a direct and foreseeable result of CMC's and Danieli's anticompetitive conspiracy, Pacific Steel has been and/or will be injured in its business and property and has suffered and/or will suffer damages in amounts to be proven at trial, in at least the following ways: (1) Pacific Steel is prevented from selling steel rebar; it will lose sales of rebar and the profits thereon; and the value of its business has been and will be diminished; and (2) Pacific Steel is

58

losing access to efficient integration and a lower-cost supply of rebar for its rebar Furnish-and-Install business, which will lower its profits and has lowered and will lower the value of its business. Even if Pacific Steel were able to enter the relevant rebar manufacturing market by building a less efficient, inferior, and more expensive mill and/or one sited in an inferior, less efficient location outside the 500-mile exclusionary zone, Pacific Steel still has been and/or will be injured in its business and property by CMC's and Danieli's anticompetitive conspiracy in that Pacific Steel is prevented from acquiring the most efficient mill option for manufacturing steel rebar and thus will lose sales of rebar and profits thereon, and the value of its business has been and will be diminished. Likewise, even if Pacific Steel or another competitor were able to enter (or expand in) the relevant rebar manufacturing market by building a less efficient, inferior, and more expensive mill and/or one sited in an inferior, less efficient location outside the 500-mile exclusionary zone, Pacific Steel still has been and/or will be injured in its business and property by CMC's and Danieli's anticompetitive conspiracy in that Pacific Steel is denied the most efficient new supply of rebar and thus is forced to pay higher prices (which include monopoly rents when Pacific Steel purchases rebar from CMC) for the rebar it uses in its rebar Furnish-and-Install operations.

## **Count Five: Below Cost Sales**
### **California Unfair Practices Act, Cal. Bus. & Prof. Code § 17043**
### **(Against CMC Rebar)**

173.    Pacific Steel repeats and reasserts each of the allegations in paragraphs 1 through 172 as fully set forth herein.

174.    CMC Rebar (including through its predecessors, CMC Rebar West and GRS) is and/or has been for some time engaged in the business of selling rebar Furnish-and-Install services within the State of California.

175.    CMC Rebar (including through its predecessors, CMC Rebar West and GRS) has sold rebar Furnish-and-Install services in California at a price less than their cost and with the purpose of injuring competitors and destroying competition in the relevant rebar Furnish-and-Install markets in violation of the California Unfair Practices Act, California Business & Professions Code § 17043.

176.     CMC Rebar (including through its predecessors, CMC Rebar West and GRS) was not only aware that its acts would injure Pacific Steel or destroy competition in the relevant rebar Furnish-and-Install markets, it engaged in below-cost sales for the sole and express purpose of injuring Pacific Steel and competition.

177.     As a result of these acts, Pacific Steel has been injured in the form of lost profits and diminished business value in an amount to be proved at trial.

**Count Six: Loss Leader Sales**
**California Unfair Practices Act, Cal. Bus. & Prof. Code § 17044**
**(Against CMC Rebar)**

178.     Pacific Steel repeats and reasserts each of the allegations in paragraphs 1 through 177 as fully set forth herein.

179.     CMC Rebar (including through its predecessors, CMC Rebar West and GRS) is and/or has been for some time engaged in the business of selling rebar Furnish-and-Install services within the State of California.

180.     CMC Rebar (including through its predecessors, CMC Rebar West and GRS) has sold rebar Furnish-and-Install services in the State of California as a loss leader, such that the effect has been to divert trade from Pacific Steel and injure Pacific Steel specifically and competition generally, in violation of the California Unfair Practices Act, California Business & Professions Code § 17044.

181.     CMC Rebar (including through its predecessors, CMC Rebar West and GRS) was not only aware that its acts would injure Pacific Steel or destroy competition in the relevant rebar Furnish-and-Install markets, it engaged in loss leader sales for the sole and express purpose of injuring Pacific Steel and competition.

182.     As a result of these acts, Pacific Steel has been injured in the form of lost profits and diminished business value in an amount to be proved at trial.

**Count Seven: Unlawful & Unfair Business Practices**
**California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200**
**(Against All Defendants)**

183.     Pacific Steel repeats and reasserts each of the allegations in paragraphs 1 through

1  182 as fully set forth herein.

2      184.    The conduct complained of herein—including Defendants' below cost and loss

3  leader sales and imposition of an exclusivity provision to restrain competition and unlawfully

4  maintain monopoly power—constitutes unlawful business practices in that they violate the various

5  federal and California state antitrust laws and the California common law described in the other

6  counts alleged in this Complaint.

7      185.    This conduct also constitutes unfair business practices in that, even assuming it

8  does not violate state or federal antitrust laws or California common law, it threatens an incipient

9  violation of those antitrust laws and violates the policy and spirit of those laws because its effects

10  are comparable to a violation of the law and significantly threatens or harms competition.

11      186.    Defendants' anticompetitive behavior, as described above, is unfair,

12  unconscionable, and unlawful, and in any event is a violation of the policy or spirit of the federal

13  and California state antitrust laws and the California common law because it significantly harms

14  and threatens competition.

15      187.    Defendants' anticompetitive behavior and unfair business practices are part of an

16  ongoing practice, and any purported utility of their conduct is outweighed by the gravity of the

17  consequences to Pacific Steel and competition.

18      188.    Defendants' unfair, unconscionable, and unlawful business practices constitute

19  unfair competition in violation of the Unfair Competition Law, California Business & Professions

20  Code § 17200, *et seq*.

21      189.    As a result of Defendants' unlawful and/or unfair business practices, Pacific Steel

22  has been and will be injured in its business and property through lost income and profits, increased

23  costs, and diminished business value.  In addition, Defendants have been unjustly enriched as a

24  result of these same unlawful and/or unfair business practices through increased profits.

25      **Count Eight: Interference with Prospective Economic Advantage**
**California Common Law**

26  **(Against CMC)**

27      190.    Pacific Steel repeats and reasserts each of the allegations in paragraphs 1 through

28  189 as fully set forth herein.

191.    Pacific Steel had an economic relationship with Danieli, with the probability of future economic benefit to Pacific Steel in the form of commissioning Danieli to build Pacific Steel a micro mill in California.

192.    With the knowledge and purpose of disrupting that relationship, CMC entered into an agreement with Danieli containing an exclusivity provision that was designed to and in fact did disrupt Pacific Steel's relationship with Danieli.

193.    The acts resulting in CMC's disruption of Pacific Steel's relationship with Danieli were wrongful independent of the interference itself, as they violated California state and federal antitrust laws, as well as California's Unfair Competition Law and Unfair Practices Act.

194.    As a direct and foreseeable result of this disruption, Pacific Steel was unable to commission Danieli to build the proposed rebar mill, resulting in harm to Pacific Steel in the form of lost profits and diminished business value in an amount to be proved at trial.

## PRAYER FOR RELIEF

195.    WHEREFORE, Plaintiff demands a trial by jury and hereby respectfully requests that, based on the verdict of the jury, the Court enter a judgment against defendants which:

A.    Adjudges and decrees that Defendant CMC and Danieli entered into a conspiracy in unreasonable restraint of trade in the relevant rebar manufacturing market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Cartwright Act, California Business & Professions Code § 16720;

B.    Adjudges and decrees that Defendant CMC monopolized or, in the alternative, attempted to monopolize the relevant rebar manufacturing market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

C.    Adjudges and decrees that Defendant CMC and Danieli conspired such that CMC could unlawfully maintain its monopoly in the relevant rebar manufacturing market in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, the Cartwright Act, California Business & Professions Code § 16700, *et seq.*;

D.    Adjudges and decrees that CMC Rebar and CMC Steel US engaged in below-cost sales and/or loss leaders in violation of California's Unfair Practices Act, California

1    Business & Professions Code § 17000, *et seq.*;

2          E.      Adjudges and decrees that Defendants engaged in unlawful and/or unfair

3    business practices in violation of California's Unfair Competition Law, California Business &

4    Professions Code § 17200, *et seq.*;

5          F.      Adjudges and decrees that Defendant CMC unlawfully interfered with

6    plaintiff's prospective business advantage in violation of California common law;

7          G.      Invalidates the exclusivity provisions preventing Plaintiff from building the

8    Danieli micro mill in the desired location;

9          H.      Provides permanent injunctive relief preventing defendants from continuing

10   the unlawful acts described above;

11         I.      Awards Plaintiff threefold damages or single damages, as required by

12   statute, or, alternatively, restitution, caused by Defendants' conduct;

13         J.      Awards Plaintiff reasonable attorneys' fees and costs incurred in pursuing

14   this action;

15         K.      Awards pre-judgment and post-judgment interest at the maximum legal

16   rate; and

17         L.      Awards such other relief as the Court deems just and proper.

18   Dated: June 11, 2021                    FARELLA BRAUN + MARTEL LLP

19

20                                    By:    /s/ Christopher C. Wheeler

21                                           Christopher C. Wheeler

22                                    Christopher C. Wheeler (SBN 224872)
                                      FARELLA BRAUN + MARTEL LLP
23                                    235 Montgomery Street, 17th Floor
                                      San Francisco, CA 94104
24                                    Telephone: (415) 954-4400
                                      Facsimile: (415) 954-4480
25                                    cwheeler@fbm.com

26

27

28

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. 4:20-CV-07683-HSG

Benjamin D. Brown (SBN 202545)
Daniel A. Small (admitted *pro hac vice*)
Daniel McCuaig (admitted *pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave., N.W., Suite 500, East Tower
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
bbrown@cohenmilstein.com
dsmall@cohenmilstein.com
dmccuaig@cohenmilstein.com

Matthew W. Ruan (SBN 264409)
COHEN MILSTEIN SELLERS & TOLL, PLLC
88 Pine St., Ste 1400
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
mruan@cohenmilstein.com

*Counsel for Plaintiff Pacific Steel Group*

1

## JURY DEMAND

2

Plaintiff demands a jury trial on all claims and issues that are so triable.

3    Dated: June 11, 2021                    FARELLA BRAUN + MARTEL LLP

4

5                                      By:    /s/ Christopher C. Wheeler

6                                             Christopher C. Wheeler

7                                      Christopher C. Wheeler (SBN 224872)
                                       FARELLA BRAUN + MARTEL LLP
8                                      235 Montgomery Street, 17th Floor
                                       San Francisco, CA 94104
9                                      Telephone: (415) 954-4400
                                       Facsimile: (415) 954-4480
10                                     cwheeler@fbm.com

11
                                       Benjamin D. Brown (SBN 202545)
12                                     Daniel A. Small (admitted *pro hac vice*)
                                       Daniel McCuaig (admitted *pro hac vice*)
13                                     COHEN MILSTEIN SELLERS & TOLL, PLLC
                                       1100 New York Ave., N.W., Suite 500, East Tower
14                                     Washington, D.C. 20005
                                       Telephone: (202) 408-4600
15                                     Facsimile: (202) 408-4699
                                       bbrown@cohenmilstein.com
16                                     dsmall@cohenmilstein.com
                                       dmccuaig@cohenmilstein.com
17

18                                     Matthew W. Ruan (SBN 264409)
                                       COHEN MILSTEIN SELLERS & TOLL, PLLC
19                                     88 Pine St., Ste 1400
                                       New York, NY 10005
20                                     Telephone: (212) 838-7797
                                       Facsimile: (212) 838-7745
21                                     mruan@cohenmilstein.com

22
                                       *Counsel for Plaintiff Pacific Steel Group*
23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. 4:20-CV-07683-HSG