UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PACIFIC STEEL GROUP,

           Plaintiff,

   v.

COMMERCIAL METALS COMPANY, et al.,

          Defendants.

Case No.  20-cv-07683-HSG

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**

Re: Dkt. No. 79

Plaintiff Pacific Steel Group ("Pacific Steel") brought this antitrust lawsuit on October 30, 2020.  *See* Dkt. No. 1 ("Compl.").  The Complaint alleges that Defendants Commercial Metals Company and its subsidiaries (collectively, "CMC") engaged in anti-competitive and monopolistic behavior in the steel rebar market.  The Court granted CMC's motion to dismiss the Complaint but gave Pacific Steel leave to amend.  Dkt. No. 74 ("Dismissal Order").  Pacific Steel then filed the Amended Complaint, which CMC now moves to dismiss.  Dkt. Nos. 76 ("FAC"), 79 ("Mot.").  CMC's motion is fully briefed.  *See* Dkt. Nos. 81 ("Opp."), 85 ("Reply").  The Court held a hearing on the motion, *see* Dkt. Nos. 87, 91, and now rules that it is **GRANTED IN PART and DENIED IN PART** for the following reasons.

## I.  BACKGROUND

### A.  The Rebar Industry

Steel reinforcing bar or "rebar" is a steel bar used to reinforce concrete in construction projects.  FAC ¶ 26.  Before rebar can be installed, it must first be cut and shaped according to an engineer's drawings.  *Id.* ¶ 36.  Skilled steelworkers called "fabricators" buy stock rebar from rebar manufacturers and then cut and bend the rebar at a fabrication plant per the engineer's plans.  *Id.*  Once the rebar is "fabricated," another team of skilled professionals delivers and installs it in

United States District Court
Northern District of California

1   construction projects.  *Id.* ¶ 38.  This process creates at least two separate markets: (1) an upstream

2   market for manufacturing rebar; and (2) downstream markets for furnishing and installing it

3   ("Furnish-and-Install").

4          For most of the last two centuries, steel was produced in massive mills with fuel-intensive

5   crucible furnaces fed by large amounts of iron ore, limestone, and metallurgical coal.  *Id.* ¶ 44.

6   These mills, called "traditional integrated mills," require large startup costs and, historically, were

7   only economical to build when done at scale with millions of tons of annual capacity or more.  *Id.*

8   ¶ 45.

9          Beginning in 1964, steel manufacturers transitioned to "mini mills."  Mini mills are steel

10  mills powered by an "electric arc furnace," which melts scrap metal recycled from used cars or

11  manufacturing byproducts.  *Id.* ¶¶ 46-48.  These mills are more efficient than traditional integrated

12  mills because rebar manufacturers can build them with lower capital costs and therefore receive

13  higher returns on equity.  *Id.* ¶ 50.  And the use of an electric arc furnace—which easily starts and

14  stops on a regular basis—allows rebar manufacturers to quickly adjust production levels in

15  response to market demand.  *Id.*  So, unlike traditional integrated mills—which operate profitably

16  by leveraging their size to achieve economies of scale—mini mills use technological advantages to

17  operate more efficiently.  *Id.* ¶ 51.

18         In 2009, CMC commissioned the building of the world's first "micro mill" in Mesa,

19  Arizona.  *Id.* ¶ 52.  Micro mills have since proven to be even more efficient than mini mills.  Like

20  mini mills, micro mills use an electric arc furnace, but instead of outputting pure steel billet

21  (which must be stored and later re-heated and rolled into rebar), a micro mill outputs *directly* into

22  rebar.  *Id.*  This advanced technology translates into significant cost advantages for rebar

23  manufacturers: each ton of rebar produced by a micro mill costs approximately $53 less to

24  manufacture than a ton produced by a mini mill.  *Id.* ¶ 56.  Today, the micro mill is not only the

25  most cost-effective and profit-maximizing means of entering a rebar manufacturing market, but

26  also the only means used to build any new rebar manufacturing facility in the United States in the

27  last quarter-century.  *Id.* ¶ 65.

28

**B.      Alleged Anticompetitive Conduct**

Defendant CMC is the largest manufacturer and among the largest fabricators of rebar in the United States.  *Id. ¶* 20.  Plaintiff Pacific Steel was formed in late 2014 and is a "Furnish-and-Install" reinforcing steel subcontractor.  *Id. ¶* 66.  As explained above, that means that Pacific Steel buys stock rebar from mills owned by manufacturers (such as CMC), cuts and bends it, and then transports and installs it in construction projects.  *Id.*  Pacific Steel currently competes downstream with CMC and its various subsidiaries in the Furnish-and-Install markets.  *Id. ¶* 19.  However, Pacific Steel would also like to enter the upstream rebar manufacturing market to compete with CMC there.  *Id. ¶¶* 4-5.  And Pacific Steel alleges that the only "commercially feasible" way it can do so is by building a micro mill.  *Id.*

The only company in the world to have built a micro mill is Danieli Corporation ("Danieli").  *Id. ¶* 5.  Using its proprietary "MI.DA" technology, Danieli has sold or is in the process of selling five micro mills in the United States and twenty worldwide.  *Id.*  CMC had previously arranged for Danieli to build two of those micro mills.  *Id.*  The first, built in 2009 in Mesa, Arizona, was protected by a now-expired geographic exclusivity provision that prohibited Danieli from building another micro mill within a 400-mile radius from Mesa.  *Id. ¶* 8.

When Pacific Steel decided in 2019 to explore building its own micro mill, it concluded that the best location was California, since that is where Pacific Steel was performing most of its Furnish-and-Install work.  *Id. ¶* 92.  Pacific Steel accordingly approached Danieli and began negotiations to build a micro mill in the high desert area near the greater Los Angeles basin.  *Id. ¶¶* 97-102.  Unbeknown to Pacific Steel, however, Danieli was simultaneously negotiating with CMC to build a new micro mill for CMC.  *Id. ¶* 103.  And in August 2020, CMC announced that it had contracted with Danieli to build a second micro mill in Mesa, Arizona.  *Id.*

As part of that agreement, Danieli agreed to another geographic exclusivity provision, under which it is prohibited from selling one of its proprietary micro mills to any company other than CMC within a 500-mile radius of Rancho Cucamonga, California for 69 months.  *Id. ¶* 106.[1]

---

[1] The lawfulness of this provision lies at the heart of Pacific Steel's federal Sherman Act claims. Going forward, the Court will refer to it as either the "CMC-Danieli Exclusivity Provision" or simply the "Exclusivity Provision."

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

1    This territorial restriction blocks any competitor from building a Danieli micro mill in all but the

2    northernmost reaches of California, in nearly all of Arizona, in all but the northernmost part of

3    Nevada, and in the southwest half of Utah, as shown in the following map:



Figure 1: 500−mile Exclusionary Zone around Rancho Cucamonga, CA

Note: 500-mile exclusionary zone is centered on Rancho Cucamonga, CA.

20   *Id.*

21        Pacific Steel alleges that CMC has engaged in anticompetitive conduct in both the

22   upstream and downstream markets.  As to the upstream market, Pacific Steel alleges that CMC's

23   geographic exclusivity provision with Danieli unlawfully excludes it and all other potential

24   entrants from the relevant geographic market for rebar manufacturing by blocking the uniquely

25   efficient, effective, and profit-maximizing means of entry.  *Id.* ¶ 1.  And as to the downstream

26   markets, Pacific Steel alleges that CMC Rebar and Gerdau Reinforcing Steel ("GRS") (which was

27   later acquired by CMC) have unlawfully priced their Furnish-and-Install services below cost and

28   as loss leaders to minimize Pacific Steel's growth and profitability.  *Id.* ¶ 68.

4

United States District Court
Northern District of California

Based on those facts, Pacific Steel brought a lawsuit in October 2020 alleging the following eight causes of action:

1. Conspiracy in restraint of trade against CMC and Danieli in violation of the Sherman Act (15 U.S.C. § 1) and the California Cartwright Act (Cal. Bus. & Prof. Code § 16720);

2. Monopolization against CMC in violation of the Sherman Act (15 U.S.C. § 2);

3. Attempted monopolization (in the alternative) against CMC in violation of the Sherman Act (15 U.S.C. § 2);

4. Conspiracy to monopolize against CMC and Danieli in violation of the Sherman Act (15 U.S.C. §§ 1, 2) and the California Cartwright Act (Cal. Bus. & Prof. Code § 16720);

5. Below cost sales against CMC Rebar, CMC Steel US, and GRS in violation of the California Unfair Practices Act (Cal. Bus. & Prof. Code § 17043);

6. Loss leader sales against CMC Rebar, CMC Steel US, and GRS in violation of the California Unfair Practices Act (Cal. Bus. & Prof. Code § 17044);

7. Unlawful and unfair business practices against all defendants in violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200);

8. Interference with prospective economic advantage against CMC in violation of California common law.

Compl. ¶¶ 148-94.

In May 2021, the Court dismissed Pacific Steel's complaint, holding that it failed to allege facts that plausibly stated a violation of the federal antitrust laws. Dkt. No. 74. Having dismissed the federal claims, the Court also declined to exercise supplemental jurisdiction over Pacific Steel's state law claims. *Id.* Pacific Steel has now filed its Amended Complaint, which CMC again moves to dismiss. *See* Dkt. Nos. 76, 79.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be

United States District Court
Northern District of California

granted under Rule 12(b)(6).  Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Nevertheless, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

If the court concludes that a 12(b)(6) motion should be granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quotation omitted).

## III.  DISCUSSION

CMC contends that the Amended Complaint should be dismissed in its entirety with prejudice under Rule 12(b)(6) because it fails to allege any plausible claims for relief.[2]  The Court disagrees, and finds that the Amended Complaint narrowly but plausibly alleges that CMC violated the Sherman Act.  The Court previously declined to assert supplemental jurisdiction over Pacific Steel's state law claims unless and until Pacific Steel stated a valid federal claim.  Because

---

[2] In support of its motion, CMC asks the Court to take judicial notice of Exhibit A, which is FABco, LLC's Original Verified Petition and Application for Temporary Restraining Order and Temporary and Permanent Injunctions, and supporting Affidavits, filed in the 101st Judicial District Court of Dallas County, Texas on August 4, 2016.  *See* Dkt. No. 80.  Pacific Steel has not opposed this request.  The Court finds Exhibit A judicially noticeable because it is a matter of public record whose authenticity is not in dispute.  *See Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012).  The Court takes notice of the existence of the document and the allegations made in it, but does not presume that those allegations are true.

Pacific Steel has now done so, the Court exercises supplemental jurisdiction over all of Pacific Steel's state law claims except for its predatory pricing claims and finds that all are adequately pled.

### A.    Market Definition

The first step in any antitrust case is to accurately define the relevant market in which the defendant competes.  The relevant market encompasses "the area of effective competition," which includes both a geographic market and a product market.  *See Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (citations and quotation marks omitted); *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018).  The plaintiff must not only plausibly allege that a relevant market exists, but also that the defendant has power within that market.  *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008).

Pacific Steel is not required to plead these elements with specificity because the validity of the relevant market is usually a factual element rather than a legal one.  *Id.*  The Amended Complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from its face that the alleged market suffers a fatal legal defect.  *Id.*  But there are some legal principles that govern the definition of a relevant market, and a complaint that alleges a "facially unsustainable" market definition must be dismissed under Rule 12(b)(6).  *Id.*  One of those principles is that the relevant market must include "the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business."  *Id.*

Pacific Steel alleges that the relevant market is a rebar manufacturing market that covers a 500-mile radius centered in the high desert area near the greater Los Angeles basin.  As described below, the Court finds that this proposed market definition narrowly survives scrutiny under Rule 12(b)(6).

### i.    Product Market

Pacific Steel must first plausibly allege a relevant product market.  A properly defined product market includes not only the product at issue, but also all "economic substitutes" for that product.  *Newcal Indus., Inc.*, 513 F.3d at 1045 (citation omitted).  Whether a product can be substituted is "determined by the reasonable interchangeability of use or the cross-elasticity of

United States District Court
Northern District of California

1   demand between the product itself and substitutes for it." *Id.* (citing *Brown Shoe v. United States*,

2   370 U.S. 294, 325 (1962)).

3        The Court previously found that Pacific Steel plausibly alleged that there are no economic

4   substitutes for rebar.  Dismissal Order at 8.  This is because other materials that are effective in

5   reinforcing concrete, like stainless steel, allegedly cost far more than rebar.  FAC ¶ 118.  Those

6   other materials therefore "are not commercially viable alternatives for commercial construction

7   projects." *Id.*  The Court continues to find these factual allegations plausible and sufficient at this

8   stage.

9            ii.    **Geographic Market**

10       Pacific Steel also bears the burden of alleging the relevant geographic market.  *Newcal*

11  *Indus., Inc.*, 513 F.3d at 1045, n.4.  The relevant geographic market is the "area of effective

12  competition where buyers can turn for alternate sources of supply."  *Tanaka v. Univ. of S.*

13  *California*, 252 F.3d 1059, 1063 (9th Cir. 2001) (internal punctuation and citations omitted); *see*

14  *also Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).  Once that area of effective

15  competition is determined, market shares and ultimately market power can be calculated based on

16  the suppliers who participate in the market.

17       The 2010 Department of Justice and Federal Trade Commission Horizontal Merger

18  Guidelines ("Merger Guidelines") explain the two ways that agencies and courts define a

19  geographic market.  One is based on the location of the relevant suppliers and the other is based on

20  the location of the relevant customers.  *See* Merger Guidelines §§ 4.2.1, 4.2.2.  A geographic

21  market based on the location of the suppliers must include all the firms with relevant production,

22  sales, or service facilities in the specified region.  *Id.* § 4.2.1.  A supplier-based market

23  accordingly must be broad enough to "encompass the region from which sales are made."  *Id.*

24        On the other hand, when the market is based on the location of the relevant customers,

25  some suppliers that sell into the relevant market may be located outside the boundaries of the

26  geographic market.  *Id.* § 4.2.2.  The Guidelines account for this on the back end, however, by

27  including in the market share calculation all the firms that sell to customers in the geographic

28  region, regardless of the location of the supplier making those sales.  *Id.*  Under either approach

United States District Court
Northern District of California

8

1     the geographic market and market share, when taken together, must account for the relevant firms
2     who supply the market.
3          Ultimately, a common method of confirming the relevant geographic market is to
4     determine whether a hypothetical monopolist could impose a "small but significant non-transitory
5     increase in price" (SSNIP) in the proposed market. *Id.* § 4. If enough consumers would respond
6     to a SSNIP by purchasing the product from outside the proposed geographic market, making the
7     SSNIP unprofitable, the proposed market definition is too narrow. *See Saint Alphonsus Med. Ctr.-*
8     *Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015).
9          Pacific Steel's original complaint abided by these principles. It alleged that the relevant
10    rebar manufacturing market covers a "500-mile radius from the high desert area near the greater
11    Los Angeles basin." *See* Dismissal Order at 7 (citing Compl. ¶ 109). This proposed market was
12    based on the location of the relevant customers. Because steel rebar is a heavy product that is
13    expensive to ship, especially compared to the lower cost of manufacturing it, Pacific Steel alleged
14    that a "significant majority" of rebar sales are to customers located within 500 miles of a mill.
15    Compl. ¶¶ 107-08. Under the Merger Guidelines, CMC's alleged competitors in this customer-
16    based market would be all the rebar manufacturers that sell to customers within the 500-mile
17    radius, regardless of the location of those manufacturers. *See* Merger Guidelines § 4.2.2. So when
18    the original complaint alleged that CMC "accounted for approximately 50% of the total rebar
19    sold" in its proposed market, it did so accounting for the sales of manufacturers located outside the
20    500-mile radius. Compl. ¶ 111. The Court noted the fact-intensive nature of market definition
21    questions, found Pacific Steel's 500-mile geographic rebar manufacturing market plausible, and
22    calculated CMC's share of sales in that market to be about 50 percent. *See* Dismissal Order at 8-9.
23         Since then, a major factual development appears to have forced Pacific Steel to recalculate
24    CMC's market share. In October 2020, presumably after Pacific Steel drafted its original
25    complaint, CMC closed its mini mill in Rancho Cucamonga, California. FAC ¶ 35. One might
26    think that by closing one of its two rebar manufacturing mills in the proposed geographic market,
27
28

United States District Court
Northern District of California

United States District Court
Northern District of California

CMC would lose rebar production capacity and therefore some market share.[3]  Thus, when Pacific Steel filed its Amended Complaint, it acknowledged that CMC's share of its originally proposed market "may have dropped" below 50% with the closure of its Rancho Cucamonga mill.  *Id.* ¶ 132.  And at oral argument, Pacific Steel's counsel went further and clarified that CMC's current market share of the originally proposed market is likely now "in the neighborhood of 25 percent."  *See* Dkt. No. 91 at 22 ("[W]e do not contest that the current market share numbers are quite low, in the neighborhood of 25 percent.").  So on one hand, Pacific Steel acknowledges that CMC's production capacity and share of sales have dropped since it filed the original complaint.

But on the other, the Amended Complaint now claims that "CMC accounts for over 85% of the rebar produced from within the relevant geographic market" and on this basis calculates CMC's market share to be over 85%.  *See* Opp. at 12-13 (citing FAC ¶¶ 32, 129, 131).  In other words, in Pacific Steel's view, CMC lost one of its two rebar manufacturing mills in the geographic market but *gained* over 35% of the relevant market share.

The Amended Complaint accomplishes this feat by revising the alleged geographic market in two steps.  First, it now defines the market based on the location of the relevant rebar manufacturers instead of the customers.  *See* FAC ¶ 120 ("The relevant geographic market for rebar manufacturing in this case *consists of suppliers located within* a 500-mile radius from the high desert area near the greater Los Angeles basin") (emphasis added).  And second, while the Amended Complaint keeps the 500-mile radius, for purposes of calculating market share it now seeks to exclude the rebar sales of all manufacturers outside the radius—regardless of how much rebar those manufacturers ship into the market.  *See* Opp. at 9; FAC ¶ 126.

---

[3] While the Complaint calculated CMC's market share as the percentage of *rebar sales*, the Amended Complaint now calculates market share as the percentage of *rebar production capacity*.  *See id.* ¶ 131 ("CMC accounts for over 85% of the rebar produced from within the relevant geographic market[.]").  Pacific Steel contends that this change is immaterial because the relevant suppliers' sales and production capacity should be nearly identical.  *See* Dkt. No. 91 ("In this case, the -- the sales and the production capacity are identical.").  This is because when you define a market based on the location of the relevant suppliers, all sales made by suppliers are counted regardless of the location of the customer making the purchase.  *See* Merger Guidelines § 4.2.2; *see also id.* ("Competitors in the market are firms with relevant *production*, sales, or service facilities in that region.) (emphasis added).  The Court finds this factual allegation plausible and will analyze sales and production capacity interchangeably at this stage in the litigation.

Pacific Steel's first step is not inherently problematic. Even CMC agrees that defining the geographic market based on the location of the supplier, instead of the customer, is appropriate here because there is no allegation that CMC engages in price discrimination based on customer identity or location. *See* Merger Guidelines § 4.2.2 ("When the hypothetical monopolist could discriminate based on customer location, the Agencies may define geographic markets based on the locations of targeted customers."); *see also* Reply at 3. As CMC sees it, though, the problem with step one is that even though Pacific Steel says its new market is based on the location of the relevant suppliers, it is actually based on the location of Pacific Steel's preferred customers. *See* Reply at 3.

On close inspection, the Court agrees that key features of Pacific Steel's newly proposed geographic market appear designed to capture Pacific Steel's preferred customers—not CMC's rival suppliers. For one, the center of the market's radius is near the greater Los Angeles basin even though the Amended Complaint admits that, now that CMC has closed its Rancho Cucamonga mill, "no rebar manufacturing mill of any type is located in California." FAC ¶ 35. Centering the market in the Los Angeles basin may be the best means of capturing the relevant base of *rebar customers*. But since there are no suppliers in California at all, this center point does not appear designed to capture the relevant firms supplying the market.

The 500-mile outer boundary also seems arbitrary. While the Court originally credited Pacific Steel's allegation that 500 miles is the outer limit of what is economical for suppliers to ship to customers, this same "shipping cost" rationale does not equally support a 500-mile boundary for a supplier-based market. *See* Dismissal Order at 7. If rebar manufacturers can sell to customers within 500 miles of their mills, as originally alleged, then a rival manufacturer located, say, 800 miles away from CMC's mill in Mesa, Arizona could theoretically compete with it for any centrally located customer. Either way, the customer would pay the same shipping costs. *See* FAC ¶ 51 ("The practice in the industry is for the buyer of rebar to pay to ship the product from the mill to its fabrication facility."); Compl. ¶¶ 107-08. In short, both the center and the boundary of Pacific Steel's geographic market merit real scrutiny.

But at this early stage in the litigation, Pacific Steel is not required to plead the relevant

11

1    geographic market with specificity.  *See Newcal Indus., Inc.*, 513 F.3d at 1045; *see also Home*

2    *Placement Serv., Inc. v. Providence J. Co.*, 682 F.2d 274, 280 (1st Cir. 1982) ("The purpose of

3    market definitions is not to frustrate anti-trust plaintiffs by requiring the proof of bright lines

4    which do not exist, but is to help identify monopoly power, that is, 'the power to control prices or

5    exclude competition.'") (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377,

6    391, 76 S. Ct. 994, (1956)).  The Merger Guidelines similarly make clear that "[r]elevant markets

7    need not have precise metes and bounds."  Merger Guidelines § 4.  So while the Court understands

8    CMC's skepticism, it finds that the proper stage to test the Amended Complaint's proposed

9    geographic market boundaries is summary judgment or trial.

10        Relatedly, CMC also takes issue with the Amended Complaint's exclusion of all suppliers

11   located outside the 500-mile radius.  Recall that when markets are defined by the location of the

12   relevant suppliers, as Pacific Steel says its new market is, the geographic region must be broad

13   enough to "encompass the region from which sales are made."  *Id.* § 4.2.1.  In CMC's view, the

14   Amended Complaint violates this principle by artificially and improperly limiting the supplier

15   base to mills physically located within the 500-mile radius.  Reply at 3.

16        Pacific Steel maintains that its exclusion of these suppliers is justified.  It alleges that any

17   firm supplying rebar into the market from outside the 500-mile radius cannot effectively compete

18   with CMC's Mesa micro mill (or Nucor's Kingman mini mill).  Opp. at 9.  That these external

19   suppliers can (and do) sell rebar into the 500-mile radius, Pacific Steel contends, merely reflects

20   "the fact that supracompetitive prices have induced customers to buy from suppliers outside the

21   area, even though that requires incurring heavy transportation costs that inefficiently drive up

22   delivered prices."  FAC ¶ 126.  In short, "high local rebar prices" and a "dearth of local

23   production" have led some buyers to purchase from "relatively distant" suppliers.  *Id.* ¶ 128.  As

24   Pacific Steel sees it, including the firms outside the 500-mile radius would "overstate their ability

25   to constrain local rebar prices within the relevant geographic market" and would therefore

26   "commit the Cellophane fallacy that the Guidelines and academic literature warn against."  *Id.* ¶¶

27   126, 128.

28        Pacific Steel's explanation is not entirely persuasive.  To begin with, the Court does not

United States District Court
Northern District of California

believe that it is at risk of committing the "cellophane fallacy." This theory arose out of criticism of the Supreme Court's decision in *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956), which analyzed a market in which cellophane wrap, then a relatively recent innovation, competed with other flexible wrap products. The Supreme Court held that the product market included all wrap products that customers turned to at prevailing prices. *Id.* Critics of the decision argued that cellophane in fact was its own market because it was far superior in quality to other products, and they claimed that the only reason consumers were turning to inferior products was because the price of cellophane had been set too high. *See generally* Donald F. Turner, *Antitrust Policy and the Cellophane Case*, 70 HAR. L. REV. 281, 285 (1956); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 471, 112 S. Ct. 2072, 2084 (1992) ("The existence of significant substitution in the event of *further* price increases or even at the *current* price does not tell us whether the defendant *already* exercises significant market power.") (emphasis in original) (citations and quotations omitted).

The Court is unaware of any court addressing the cellophane fallacy in a market involving a commodity like rebar, where there are no allegations of price discrimination, and no product stands out as superior to others. Nor has Pacific Steel presented a single case in which a court cited the cellophane fallacy to declare that a geographic market is narrower than would result from a straightforward application of the principles discussed above. The "cellophane fallacy" is therefore of questionable, if any, relevance to this case.

But as a matter of economic logic, the Court understands the broader point that "[d]efining a market broadly to include relatively distant product or geographic substitutes can lead to misleading market shares." Merger Guidelines § 4; *see also United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1121 (N.D. Cal. 2004) ("Courts should be wary of defining markets so broadly that a seller's existing market power is missed."). By way of example, the Merger Guidelines provide the following hypothetical, which the Court finds particularly relevant to this case:

> *Example 12:* The merging parties both have manufacturing plants in City X. The relevant product is expensive to transport and suppliers price their products for pickup at their locations. Rival plants are some distance away in City Y. A hypothetical monopolist controlling all

1

2

3

> plants in City X could profitably impose a SSNIP at these plants.
> Competition from more distant plants would not defeat the price
> increase because supplies coming from more distant plants require
> expensive transportation. The relevant geographic market is defined
> around the plants in City X.

4

5

6

Merger Guidelines § 4.2.1.  The short of it is that a narrow geographic market may be proper when a hypothetical monopolist controlling local plants could use its cost advantages to profitably impose a price increase without fearing competition from rivals.  *Id.*

7

8

9

10

11

12

13

14

15

16

17

18

19

    The Court can thus see how at least *some* "relatively distant" rebar manufacturers who supply the relevant market may ultimately have little competitive significance due to their transportation cost disadvantages.  These manufacturers should be excluded from the geographic market.  But Pacific Steel goes much further.  When its representation that CMC's current market share is "in the neighborhood of 25 percent" is coupled with its allegation that the only other mill in the area (Nucor's Kingman, Arizona mill) has "a rebar capacity of less than 10% of the combined capacity of the two CMC mills," it becomes clear that Pacific Steel's alleged market seeks to exclude *the majority* of rebar supplying it.  *See* Dkt. No. 91 at 22; FAC ¶¶ 122, 132.  This unusually narrow market warrants skepticism—particularly since CMC's rival suppliers may be able to offset transportation cost disadvantages with friendlier regulatory environments, lower labor costs, or more government subsidies.  *See, e.g.*, Compl. ¶ 108 (explaining that foreign firms can import rebar into California because "foreign steel producers have lower labor costs and often receive substantial government subsidies to offset the high shipping costs.").

20

21

22

23

24

25

26

27

28

    All of this is to say that the Court has significant questions about the ultimate viability of the Amended Complaint's proposed geographic market.  But again, under controlling law, Pacific Steel is not required to plead its geographic market with specificity.  *See Newcal Indus., Inc.*, 513 F.3d at 1045.  And at bottom, which mills can effectively compete with CMC's Mesa mill, and whether CMC could profitably impose a SSNIP without fearing competition from more distant plants, are ultimately factual questions that cannot be resolved at the motion to dismiss stage.  *See Eastman Kodak Co.*, 504 U.S. at 482 ("The proper market definition . . . can be determined only after a factual inquiry into the commercial realities faced by consumers.") (citations and quotation marks omitted).  At this stage, the Court cannot conclude that Pacific Steel's proposed geographic

market is facially unsustainable as a matter of law.  Because the validity of the geographic market is ultimately a factual element rather than a legal one, the Court finds that the Amended Complaint's alleged geographic market narrowly survives scrutiny under Rule 12(b)(6).

### iii.    Market Power

Pacific Steel's Sherman Act claims also require plausible allegations of CMC's market power.  *See Newcal Indus.*, 513 F.3d at 1044.  The essence of market power is a firm's "ability to raise prices profitably by restricting output."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2288 (2018) (citation omitted).  The Ninth Circuit has explained that calculating the defendant's market share allows for a proper understanding of its influence and relative power in the relevant market.  *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997).  This is because a dominant share of the market often carries with it the power to control output across the market and in so doing control prices.  *Id.*

Market power cannot be inferred solely from a dominant market share.  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995).  The ability to control output and prices ultimately depends on the ability of existing firms to quickly increase their own output in response to a contraction by the defendant.  *Id.*  But even though market share is "just the starting point for assessing market power," a plausible allegation of sufficient market share is usually sufficient to withstand a motion for dismissal.  *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 950-51 (9th Cir. 1996) (citations and quotations omitted).  Courts generally require a 65% market share to establish a prima facie case of market power.  *Eastman Kodak Co.*, 125 F.3d at 1206.

Pacific Steel claims it has direct evidence of CMC's ability to restrict output and consequently raise prices above those that would be charged in a competitive market.  *See* Opp. at 12.  This direct evidence is the alleged fact that rebar prices rose by nearly 50% in the six months after CMC closed its Rancho Cucamonga mill.  FAC ¶ 121.  In response, CMC claims that the global COVID-19 pandemic has had a major impact on supply and demand in construction markets throughout the country, and it cites several sources (outside of the complaint) indicating that the increased price of rebar has been a nationwide trend.  *See* Reply at 7.

The Court finds that little can reasonably be inferred from the alleged price increase.  To

be clear, this finding has nothing to do with CMC's contrary factual arguments about nationwide rebar prices. The Court gives those assertions no weight because at this stage in the litigation it must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek*, 519 F.3d at 1031. But even at this early stage, the Court cannot accept as true allegations that are "merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d at 1055 (citations omitted). Because the Amended Complaint says nothing about price trends outside the alleged geographic market, the Court has no basis to use the alleged price increase to measure CMC's market power.

Pacific Steel also alleges that "CMC accounts for over 85% of the rebar produced from within the relevant geographic market" and further claims that CMC's market share "will rise to over 90% in early 2023 with the completion of CMC's new Mesa mill." FAC ¶ 131. As explained above, this 85% market share calculation is based on a geographic market that does not account for much of the rebar supplying the relevant market. *See id.* ¶ 129 ("Rebar that is imported into that area from other areas is outside the relevant geographic market and thus does not count in market share calculations."). Again, the Court has questions about this unusually narrow geographic market. But its viability raises fact-intensive questions that cannot be resolved at this stage. Because the geographic market is itself not "implausible on its face," the Amended Complaint's allegation that CMC has an 85% share of that market is sufficient, as a matter of pleading, to state a prima facie case of market power. *Cost Mgmt. Servs.*, 99 F.3d at 950-51.

The Amended Complaint is on stronger ground when it alleges that there are barriers to entering the rebar manufacturing market that make CMC's market power durable. As alleged, building any steel mill takes years and costs hundreds of millions of dollars, and operating one requires navigating significant business and environmental regulations. FAC ¶ 134. It is plausible that these costs and regulations make entry difficult, costly, and uncommon. Considering both CMC's alleged share of the market and the substantial barriers to entering that market, the Court finds that the Amended Complaint plausibly alleges that CMC has the power to control rebar output across the market and in so doing raise prices above those that would be charged in a

competitive market.  Pacific Steel has therefore alleged a plausible relevant market.

**B.    Sherman Act Liability**

Pacific Steel's Sherman Act claims challenge the CMC-Danieli Exclusivity Provision. That provision prohibits Danieli from selling one of its proprietary micro mills to any company other than CMC within a 500-mile radius of Rancho Cucamonga, California for 69 months.  The Amended Complaint's first cause of action alleges that the Exclusivity Provision violates Section 1 of the Sherman Act (15 U.S.C. § 1), and its second through fourth causes of action similarly allege that CMC violated Section 2 (15 U.S.C. § 2) by using the Exclusivity Provision to maintain its monopoly power in the rebar manufacturing market.  FAC ¶¶ 148-52, 155, 162, 169.

To establish liability under § 1, a plaintiff must plausibly allege and ultimately prove (1) the existence of an agreement, and (2) that the agreement was an "unreasonable" restraint of trade. *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016).  The first element is easily satisfied here.  The parties do not dispute that a contract exists between CMC and Danieli, and the Amended Complaint's factual allegations are sufficient to establish an agreement.  So as to Pacific Steel's § 1 claim, the only question is whether the challenged agreement is an "unreasonable" restraint of trade.  At this stage, Pacific Steel has the initial burden of plausibly alleging that the challenged restraint has a "substantial anticompetitive effect that harms consumers in the relevant market." *Qualcomm Inc.*, 969 F.3d at 991.  If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. *Id.*

While § 1 of the Sherman Act targets *concerted* anticompetitive conduct, § 2 targets *independent* anticompetitive conduct. *Id.* at 989-90.  The statute makes it illegal to "monopolize . . . any part of the trade or commerce among the several States."  15 U.S.C. § 2.  To establish liability under § 2, a plaintiff must show: (1) the possession of monopoly power in the relevant market; (2) the willful acquisition or maintenance of that power; and (3) causal antitrust injury. *Qualcomm Inc.*, 969 F.3d at 990.

Pacific Steel's § 1 and § 2 theories ultimately rest on the same alleged anticompetitive conduct—the CMC-Danieli Exclusivity Provision.  That is not unusual.  Whether the alleged

17

antitrust violation involves concerted anticompetitive conduct under § 1 or independent anticompetitive conduct under § 2, the three-part burden-shifting test under the rule of reason is "essentially the same," and "courts often review claims under each section simultaneously." *Id.* at 991; *see also Epic Games, Inc. v. Apple Inc.*, No. 4:20-CV-05640-YGR, 2021 WL 4128925, at *91 (N.D. Cal. Sept. 10, 2021).

CMC contends that Pacific Steel's claims fail to allege anticompetitive conduct because they do not plausibly allege that the CMC-Danieli Exclusivity Provision substantially forecloses or harms competition. Mot. at 6. The Court previously dismissed all Pacific Steel's Sherman Act claims on this ground. *See* Dismissal Order at 12-18. It is a close call, but the Court finds that the Amended Complaint has sufficiently remedied the prior deficiencies to survive a motion to dismiss. The Court will first explain why the Amended Complaint plausibly alleges that CMC engaged in anticompetitive conduct under both sections of the Sherman Act. It will then address CMC's § 2 specific arguments separately.

### i. Anticompetitive Conduct

The Court relied on two key legal premises to analyze the original complaint's Sherman Act claims. First, it applied the "rule of reason" burden-shifting framework instead of the per se rule. *See* Dismissal Order at 13-14. This was because, as more fully explained there, vertical restraints like the Exclusivity Provision are almost always analyzed under the rule of reason unless there are allegations of price-fixing. *See id.*; *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 735-36, 108 S. Ct. 1515, 1525 (1988); *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010) ("[A]n exclusive-dealing arrangement does not constitute a per se violation of section 1.").[4]

Second, the Court found exclusive dealing precedent to be the closest analogue to Pacific Steel's claims. Dismissal Order at 14. It recognized that technically the Exclusivity Provision is not "an agreement between a vendor and a buyer that prevents the buyer from purchasing a given

---

[4] Pacific Steel appears to renew its argument that the per se rule should apply because the Exclusivity Provision is "facially and nakedly exclusionary." Opp. at 7-8. Its position is preserved for appeal, but nothing in its brief persuades the Court to revisit this issue.

United States District Court
Northern District of California

good from any other vendor." *See Allied Orthopedic*, 592 F.3d at 996. But as in exclusive dealing cases, the fundamental harm alleged here is market foreclosure due to an exclusive relationship between a provider (Danieli) and its customer (CMC). The Court found this contractual relationship similar enough to a traditional exclusive-dealing relationship to make that precedent helpful, and it accordingly asked whether the Exclusivity Provision "forecloses competition" in a "substantial share" of the rebar manufacturing market. *See* Dismissal Order at 14-15 (citing *Allied Orthopedic*, 592 F.3d at 996 ("Under the antitrust rule of reason, an exclusive dealing arrangement violates Section 1 only if its effect is to 'foreclose competition in a substantial share of the line of commerce affected.'")). Nothing in the Amended Complaint or the parties' latest round of briefing has undermined these premises, so the Court will continue to abide by them.

Based on those premises, the Court found that the original complaint did not plausibly allege how the Exclusivity Provision substantially forecloses or harms competition. Pacific Steel premised its original § 1 and § 2 claims on the allegation that the Exclusivity Provision *completely* foreclosed competitors from entering the relevant rebar manufacturing market. *See* Dismissal Order at 15-18. But the Ninth Circuit has indicated that when analyzing whether an agreement forecloses competition, courts should consider the "the full range" of opportunities that the agreement leaves open to the defendant's competitors. *See id.* at 15 (citing *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162-63 (9th Cir. 1997) (citations omitted)). And here, the Exclusivity Provision does not prevent CMC's competitors from building a mini mill in Southern California or a micro mill outside the 500-mile radius. Since Pacific Steel's own factual allegations showed that competitors supplied half of the rebar manufacturing market using one of those two channels, its claim that the CMC-Danieli Exclusivity Provision blocked the *only* way to enter the rebar manufacturing market was fatally unsupported. *Id.*

The Amended Complaint attempts to cure this deficiency by alleging that mini mill technology is or soon will be "obsolete and commercially unviable." FAC ¶ 5. It alleges that micro mills are so technologically advanced that no other kind of rebar mill has been built in the United States since the last mini mill was built in 1996. *Id.* It quantifies how much more expensive it is to build and operate a mini mill than a micro mill. *Id.* ¶ 56. And while it

19

acknowledges that some suppliers can still manufacture rebar at fully-depreciated (*i.e.*, paid for) mini mills until those mills deteriorate, it alleges that those mini mills will at that point be shuttered—not renovated, rebuilt, or replaced with new mini mills. *Id.* ¶ 5. As a case in point, it presents the example of CMC's mini mill at Rancho Cucamonga, which CMC recently shuttered and sold to partially fund its plans to build another micro mill. *Id.* ¶¶ 106-07, 116. In short, the Amended Complaint claims that the only "commercially feasible way" to enter the relevant rebar manufacturing market is to do exactly what the CMC-Danieli Exclusivity Provision prevents: arrange for the construction of a micro mill within the relevant market.

The Court finds that, with these allegations, the Amended Complaint plausibly explains how the Exclusivity Provision could foreclose competitors from entering the relevant market and therefore have a substantial anticompetitive effect. It remains true that the Exclusivity Provision does not prevent CMC's competitors from building a mini mill in the relevant market. But the Amended Complaint now explains that this manner of entry is impractical because "it makes no business sense" to enter the geographic market by buying soon-to-be obsolete technology. *Id.* ¶ 9. If this is true, then even existing suppliers (like Nucor) may soon find themselves blocked from the market because once their current mills deteriorate the Exclusivity Provision would prevent them from building new micro mills in the relevant market. It is also important that any market foreclosure caused by the Exclusivity Provision would be exacerbated by its relatively lengthy 69-month duration. *Cf. Omega Env't, Inc.*, 127 F.3d at 1163 (finding that the "the short duration" of an exclusive dealing agreement "substantially" negated its potential to foreclose competition); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984) (exclusive-dealing contracts terminable in less than a year are presumptively lawful). Ultimately, the Amended Complaint alleges enough facts from which the Court can plausibly infer that the expense of shipping rebar—coupled with the cost advantages of micro mills over mini mills—render illusory CMC's rivals' theoretical freedom to manufacture rebar in locations outside the territory or by using alternative technologies. This alleged tendency to foreclose entry into the relevant market states a legitimate antitrust concern. *See Omega Env't, Inc.*, 127 F.3d at 1162 ("The main antitrust objection to exclusive dealing is its tendency to 'foreclose' existing competitors *or new entrants*

from competition in the covered portion of the relevant market during the term of the agreement.")
(emphasis added).

CMC disagrees.  It contends that any of its competitors could operate profitably by
building a mini mill in Southern California because they would have a cost advantage over the
suppliers that transport rebar from farther away.  Reply at 9.  It claims that its competitors could
also profitably enter the market by building a micro mill outside the 500-mile radius.  *Id.*  And it
argues that any of the Exclusivity Provision's anticompetitive effects are outweighed by its
legitimate justifications and procompetitive effects, like the protection of CMC's trade secrets and
the stimulation of interbrand competition.  Reply at 10-11.

This all could well prove true.  For instance, if it is both true that CMC owns the only
micro mill in the relevant market, and that CMC's current market share is "in the neighborhood of
25 percent," then Pacific Steel will ultimately have to explain why it "makes no business sense" to
supply the market the way 75% of the current suppliers do.  FAC ¶ 9; Dkt. No. 91 at 22.  But the
fundamental problem with CMC's arguments is that they are (again) brought at the wrong stage of
this litigation.  A motion to dismiss is simply not the right vehicle to resolve fact-intensive
inquiries like whether CMC's rivals can profitably manufacture rebar in locations outside the
territory or by using alternative technologies.  At this stage, the Court finds that the Amended
Complaint narrowly but adequately explains how the Exclusivity Provision could foreclose
competitors from entering the market and thus substantially harm competition.

### i.    Section II Liability

To establish liability under Section 2 of the Sherman Act, a plaintiff must show: (a) the
possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance
of that power; and (c) causal antitrust injury.  *Qualcomm*, 969 F.3d at 990.  "Antitrust injury"
means an injury of the type the antitrust laws were intended to prevent and that flows from that
which makes defendants' acts unlawful.  *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013).
Basically, this means that Pacific Steel must adequately allege that its injury "flows from an
anticompetitive aspect or effect" of CMC's behavior.  *Pool Water Prods. v. Olin Corp.*, 258 F.3d
1024, 1034 (9th Cir. 2011).

United States District Court
Northern District of California

United States District Court
Northern District of California

1          As an initial matter, Pacific Steel seems to suggest that whether or not it can show the

2   substantial market foreclosure necessary for a § 1 claim, it can still establish competitive harm

3   under § 2 simply by showing that CMC "has, by raising its rivals' costs, weakened competitive

4   constraints that it otherwise would face, freeing it to charge supracompetitive prices." *Id.* at 14.

5          This position is unsupported.  Pacific Steel's main authority for this view is *United States*

6   *v. Dentsply Int'l, Inc.*, but the Third Circuit made clear there that when analyzing exclusive

7   dealing contracts under § 2, the test is also "whether the challenged practices bar a *substantial*

8   number of rivals or *severely* restrict the market's ambit."  399 F.3d 181, 191 (3d Cir. 2005)

9   (emphases added).  It is true that the D.C. Circuit has said that "a monopolist's use of exclusive

10   contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts

11   foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1

12   violation."  *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001).  But that would

13   seem to qualify *how much* foreclosure can be deemed "substantial" in the context of § 2 claim, not

14   *whether* a plaintiff must show market foreclosure at all.  After all, the plaintiffs there alleged that

15   Microsoft's exclusive contracts foreclosed competition in the market for operating systems by

16   "closing to rivals a *substantial percentage of the available opportunities* for browser distribution."

17   *Id.* (emphasis added).  The only cases Pacific Steel cites within this Circuit have questionable if

18   any relevance, since they analyze starkly different anticompetitive harms and do not involve

19   exclusive dealing arrangements at all.[5]

20          The bottom line is that Pacific Steel must allege and ultimately prove that the effect of

21   CMC's contract with Danieli is to foreclose competition in a "substantial share" of the rebar

22   manufacturing industry.  *Allied Orthopedic*, 592 F.3d at 996.  The ultimate manner, extent, and

23   percentage of market foreclosure that Pacific Steel must prove for each claim is a question for a

24   _____

25   [5] *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008) (addressing "bundling," which is when a firm sells a bundle of goods or services for a lower price than the

26   seller charges for the goods or services purchased individually); *Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 1997) (insurance policy holders alleged that their insurer engaged in a "classic

27   kickback scheme" with a third-party hospital, under which the insurer clandestinely negotiated a discount for its portion of the hospital charges incurred by its insureds but failed to pass along the

28   savings in violation of the underlying health insurance policy).

later day.[6]  For now, the Court finds that the Amended Complaint plausibly describes how Pacific Steel's alleged foreclosure from the relevant rebar manufacturing market flows from an anticompetitive aspect of the Exclusivity Provision for the reasons discussed above in Section III.B.i.  The final element of its § 2 claim is therefore satisfied.

CMC also challenges the first two elements of Pacific Steel's § 2 claims.  As to the first one, CMC claims it does not have a monopoly in any "plausibly defined" rebar manufacturing market.  Mot. at 8-9.  Although market power and monopoly power are "related but distinct concepts," CMC's monopoly power argument is based on the same line of reasoning that the Court already addressed when analyzing CMC's market power in the market definition context.[7]  As explained there, the market definition disputes in this case are fact-intensive and cannot be resolved at this early stage in the case.  Considering both CMC's alleged 85% share of the market and the substantial barriers to entering that market, the Court finds that the Amended Complaint plausibly alleges that CMC has the power to control rebar output across the market and to control prices in doing so.[8]

---

[6] The Court is aware that the Eleventh Circuit has said that "an exclusive dealing arrangement can be harmful when it allows a monopolist to maintain its monopoly power by raising its rivals' costs sufficiently to prevent them from growing into effective competitors."  *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 832 (11th Cir. 2015).  Even assuming courts in this Circuit would find that theory persuasive, and to the extent Pacific Steel seeks to advance it here, the Court notes that, for practical and evidentiary purposes, there is little (if any) daylight between whether the Exclusivity Provision (a) raises costs sufficient to prevent CMC's rivals from growing into effective competitors in the rebar manufacturing market; and (b) forecloses competition or entry into the rebar manufacturing market.

[7] The Supreme Court has explained that market power is the ability to raise prices above those that would be charged in a competitive market, while monopoly power is the power to control prices or exclude competition.  *See NCAA v. Bd. of Regents of the Univ. of Oklahoma*, 468 U.S. 85, 109 n.38, 104 S. Ct. 2948 (1984); *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S. Ct. 1698, 1704 (1966).  The difference between the two is a matter of degree.  Monopoly power under § 2 requires "something greater" than market power under § 1, and courts have described the distinction as "substantial" market power or an "extreme degree" of market power.  *See Epic Games, Inc.*, 2021 WL 4128925, at *92 (collecting cases).

[8] *See United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S. Ct. 1698, 1704 (1966) (finding that a market share of 87% "leaves no doubt" that the defendants have monopoly power); *Syufy Enterprises v. Am. Multicinema, Inc.*, 793 F.2d 990, 996 (9th Cir. 1986) (finding market share of 60–69%, when coupled with other evidence of additional factors, adequate to support a jury determination of monopoly power); *Epic Games, Inc.*, 2021 WL 4128925, at *93 ("The threshold of market share for finding a prima facie case of monopoly power is generally no less than 65% market share.").

United States District Court
Northern District of California

1    As to the second element, CMC argues that the Amended Complaint failed to plausibly

2    plead that CMC had a "specific intent" to monopolize the rebar manufacturing market, a required

3    element of Pacific Steel's attempted monopolization and conspiracy to monopolize claims.  *See*

4    *Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).  The Court disagrees.

5    The Amended Complaint alleges that the "sole purpose of the [Exclusivity Provision] was to

6    exclude Pacific Steel (and all other potential entrants) from the relevant geographic market for

7    rebar manufacturing by blocking the most efficient and effective, and the profit-maximizing,

8    means of entry, thus artificially maintaining CMC's monopoly (and supracompetitive prices) in

9    that rebar market."  FAC ¶ 1.  In the Court's view, this allegation is sufficiently supported by the

10   fact that CMC specifically centered its zone of exclusivity near the site of Pacific Steel's planned

11   micro mill rather than its own new mill in Mesa, Arizona.  *Id.* ¶¶ 6, 8, 104, 107.

12       For those reasons, the Court finds that Pacific Steel's Sherman Act claims are adequately

13   pled at this stage and denies CMC's motion to dismiss as to those claims.

14       **C.    State Law Claims**

15       Pacific Steel also alleges several claims against CMC that sound in California state law.

16   The Court previously declined to assert supplemental jurisdiction over these claims unless and

17   until Pacific Steel stated a valid federal claim.  Dismissal Order at 18.  Because Pacific Steel has

18   now done so, the Court must determine whether it may properly exercise jurisdiction over the state

19   law claims.

20       The Amended Complaint asserts that the Court has federal question jurisdiction over the

21   federal antitrust claims and supplemental jurisdiction over the state law claims.  *See* FAC ¶ 13.

22   This Court may exercise supplemental jurisdiction over the state law claims only if they are part of

23   the same "case or controversy" as the federal claims.  28 U.S.C. § 1367(a).  Claims are part of the

24   same case when they stem from a "common nucleus of operative facts" and are "such that a

25   plaintiff would ordinarily be expected to try them in one judicial proceeding."  *Kuba v. 1–A Agric.*

26   *Ass'n*, 387 F.3d 850, 855 (9th Cir. 2004) (internal quotation marks omitted).  Exactly how similar

27   the claims must be is not entirely clear, but most courts hold that § 1367(a) requires only a "loose

28

United States District Court
Northern District of California

1    factual connection between the claims."[9]

2         The Court can easily determine that it has jurisdiction over most of the state law claims.

3    To the extent Pacific Steel's Cartwright Act and UCL claims are derivative of the federal Sherman

4    Act claims, those claims are necessarily based on the same underlying facts.  Similarly, because

5    Pacific Steel's claim for interference with prospective economic advantage is based on the

6    negotiation, pursuit, and effect of the CMC-Danieli Exclusivity Provision, it shares a common

7    nucleus of operative facts with the federal Sherman Act claims based on the anticompetitive

8    effects of that provision.  *See* FAC ¶ 190-94.

9         Pacific Steel's predatory pricing claims present more difficult questions.  These claims are

10   based on CMC Rebar's bids in Furnish-and-Install markets, so it is far from obvious that they stem

11   from the same "common nucleus of operative facts" as the Sherman Act claims based on the

12   CMC-Danieli Exclusivity Provision.  *See Kuba*, 387 F.3d at 855.  The two sets of claims appear to

13   concern different markets, different parties, different contracts, and a different course of conduct.

14   *Cf. Prolite Bldg. Supply, LLC v. MW Manufacturers, Inc.*, 891 F.3d 256, 258 (7th Cir. 2018)

15   ("[S]upplemental jurisdiction is appropriate when the supplemental claim involves the same

16   parties, contracts, and course of action as the claim conferring federal jurisdiction.").  The parties

17   did not brief the issue and the Amended Complaint merely offers one conclusory and unpersuasive

18   sentence.  *See* FAC ¶ 13 ("It has supplemental jurisdiction over the state law claims alleged in

19   Counts Three through Eight pursuant to 28 U.S.C. § 1367 because those claims form part of the

20   same case or controversy and derive from a common nucleus of operative facts.").  This is

21   insufficient.

22        Because Pacific Steel but has not met its burden of establishing the Court's jurisdiction

23

24   _____

25   [9] *See Elements Spirits, Inc. v. Iconic Brands, Inc.*, No. 15-CV-02692-DDP-AGR, 2015 WL
     5470297, at *4 (C.D. Cal. Sept. 17, 2015) (citing *Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir.
26   1995)); 13D Fed. Prac. & Proc. Juris. § 3567.1 (3d ed.) (collecting cases); *see also Prolite Bldg.
     Supply, LLC v. MW Manufacturers, Inc.*, 891 F.3d 256, 258 (7th Cir. 2018) ("How loose is that?
27   What does enough commonality really mean? Still, unless there is a phrase better than 'nucleus of
     operative facts,' there's no point in complaining. No one has come up with a better phrase, despite
28   a lot of trying, so we apply this one as best we can.").

over its predatory pricing claims, the Court dismisses them with leave to amend.[10]  Having

resolved the jurisdictional questions, the Court proceeds to the merits.

### i.  Cartwright Act

Like § 1 of the Sherman Act, California's Cartwright Act bans agreements that "prevent

competition in . . . [the] sale or purchase of . . . any commodity."  Cal. Bus. & Prof. Code §

16720(c).  Because it was modeled after the Sherman Act, "[t]he analysis under California's

antitrust law mirrors the analysis under federal law."  *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*,

236 F.3d 1148, 1160 (9th Cir. 2001).   Since the Court found Pacific Steel's Sherman Act claims

adequately pled, it reaches the same conclusion for the Cartwright Act claims.

### ii.  Interference with Prospective Economic Advantage

Pacific Steel also brings a common law claim for interference with prospective economic

advantage.  This claim proceeds in two steps.  It first alleges that Pacific Steel stood to benefit

economically from commissioning Danieli to build a micro mill in California.   FAC ¶ 191.  It

then claims that CMC entered the Exclusivity Provision with the intent of disrupting Pacific

Steel's relationship with Danieli.  *Id.* ¶ 192.  CMC contends that the Amended Complaint has not

pled enough facts to make this claim plausible.  The Court disagrees.

To state a claim for intentional interference with prospective economic advantage, Pacific

Steel must allege the following five elements: (1) an economic relationship between the plaintiff

and some third party, with the probability of future economic benefit to the plaintiff; (2) the

defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant

designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic

---

[10] The Court is of the view that a plaintiff seeking to establish a violation of the "below-cost" and "loss leader" sales provisions of the California Unfair Practices Act "must allege, in other than conclusionary terms, the defendant's sales price, costs in the product, and cost of doing business." *Fisherman's Wharf Bay Cruise Corp. v. Superior Ct. of San Francisco*, 114 Cal. App. 4th 309, 322, 7 Cal. Rptr. 3d 628, 639 (2003); *see also G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 275, 195 Cal. Rptr. 211, 223 (1983); *Arena Rest. & Lounge LLC v. S. Glazer's Wine & Spirits, LLC*, No. 17-CV-03805-LHK, 2018 WL 4334631, at *4 (N.D. Cal. Sept. 10, 2018); *Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.*, No. 12-CV-05847-WHO, 2013 WL 5694452, at *17 (N.D. Cal. Oct. 18, 2013).  The Amended Complaint fails to plead these terms and would accordingly be subject to dismissal even if Pacific Steel established a basis for supplemental jurisdiction.  Should Pacific Steel choose to further amend its complaint, it must also remedy this deficiency.

United States District Court
Northern District of California

harm to the plaintiff proximately caused by the acts of the defendant. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153, 131 Cal. Rptr. 2d 29 (2003). To succeed on that claim, Pacific Steel must plead and ultimately prove that CMC's conduct was "wrongful by some legal measure other than the fact of interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393, 45 Cal. Rptr. 2d 436 (1995). An act is independently "wrongful" if it is unlawful, i.e., "if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea Supply*, 29 Cal. 4th at 1159, 131 Cal. Rptr. 2d 29.

CMC argues that Pacific Steel's economic relationship with Danieli was: (a) too speculative to be actionable; and (b) in any event not disrupted by CMC's conduct. Mot. at 17-18. At least at this stage in the proceedings, the Court disagrees on both fronts. Pacific Steel alleges that it sought and obtained a formal quote from Danieli to build its preferred micro mill, and towards that end even successfully secured a site near the greater Los Angeles basin. FAC ¶¶ 93-94, 102. As alleged, Pacific Steel's relationship with Danieli was real, ongoing, and much further along in the process than, for instance, a plaintiff who does nothing more than submit a bid in response to a public entity's solicitation for bids. *See Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*, 2 Cal. 5th 505, 516, 388 P.3d 800, 807 (2017). And as to "the probability of future economic benefit," the Amended Complaint amply explains how Pacific Steel was prepared to benefit from the dramatic cost savings micro mills provide. *See* FAC ¶¶ 56, 92-93.

The Amended Complaint also plausibly alleges that CMC disrupted the Pacific Steel-Danieli relationship with the Exclusivity Provision. For example, it alleges that after Danieli disclosed the Exclusivity Provision to Pacific Steel, "Danieli apologized and indicated that its preference would have been to sell Pacific Steel a micro mill but CMC insisted on the territorial restriction." FAC ¶ 110. Based on these facts, the Court finds that it is reasonably probable that but for CMC's inclusion of the Exclusivity Provision in its contract with Danieli—which is itself an allegedly unlawful act—Danieli and Pacific Steel would have moved forward with the planned micro mill. In other words, Pacific Steel has sufficiently alleged that it suffered actual disruption of negotiations or potential contracts with Danieli to state a claim for intentional interference. *See*

*Sybersound Recs., Inc. v. UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir. 2008).  CMC's motion to dismiss this claim is denied.

### iii.   UCL

Finally, Pacific Steel asserts a claim against CMC under California's Unfair Competition Law (UCL), which prohibits "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  This is a tag-along claim that can be resolved summarily.

Each prong of the UCL is a separate and distinct theory of liability and an independent basis for relief.  *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007) (citation omitted); *see also Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 973 P.2d 527, 539 (1999).  Here, Pacific Steel alleges that CMC violated the "unlawful" and "unfair" prongs by its predatory pricing and by using the Exclusivity Provision to unlawfully maintain monopoly power.  Compl. ¶ 184.  These claims are duplicative of other claims and accordingly rise and fall as they do.[11]  As California courts have explained, engaging in a separate inquiry into essentially the same question under the unfair competition law would needlessly "invite conflict and uncertainty."  *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 113 Cal. Rptr. 2d 175, 184 (2001).  So Pacific Steel's UCL claims based on the unfairness and unlawfulness of the CMC-Danieli Exclusivity Provision survive for the same reasons the Sherman Act claims do.  And the UCL claims based on CMC's alleged predatory pricing are dismissed for the same reasons as the UPA claims.

//

//

//

---

[11] *See GreenCycle Paint, Inc. v. PaintCare, Inc.*, 250 F. Supp. 3d 438, 451 (N.D. Cal. 2017) ("[C]laims raised under the UCL's unlawful prong rise or fall with the Court's determination of liability with respect to the underlying violation.") (citing *Krantz v. BT Visual Images*, 89 Cal. App. 4th 164, 178, 107 Cal. Rptr. 2d 209 (2001)); *Hicks v. PGA Tour, Inc.*, 165 F. Supp. 3d 898, 911 (N.D. Cal. 2016) ("[W]here the same conduct alleged to be unfair under the UCL is also alleged to be a violation of another law, the UCL claim rises or falls with the other claims."), *aff'd in part*, *vacated on other grounds*, 897 F.3d 1109 (9th Cir. 2018).

## IV.    CONCLUSION

The Court **GRANTS IN PART and DENIES IN PART** Defendants' motion to dismiss. Specifically, the motion is granted only as to Plaintiff's predatory pricing claims, and Plaintiff is given leave to amend those claims.  Plaintiff may not add any new causes of action or defendants to an amended complaint, and any amended complaint must be filed within 21 days from the date of this Order.

Given the age of this case, the Court intends to promptly set a case schedule without regard to whether Plaintiff opts to further amend its complaint.  To that end, the Court SETS a telephonic case management conference on May 10, 2022, at 2:00 p.m., and DIRECTS the parties to submit a joint case management statement by May 3, 2022.  All counsel shall use the following dial-in information to access the call:

Dial-In:  888-808-6929;

Passcode:  6064255

For call clarity, parties shall NOT use speaker phone or earpieces for these calls, and where at all possible, parties shall use landlines.

**IT IS SO ORDERED.**

Dated:  4/26/2022

HAYWOOD S. GILLIAM, JR.
United States District Judge