Benjamin D. Brown (SBN 202545)
Daniel McCuaig (pro hac vice)
Nathaniel D. Regenold (pro hac vice)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
bbrown@cohenmilstein.com
dmccuaig@cohenmilstein.com
nregenold@cohenmilstein.com

Christopher C. Wheeler (SBN 224872)
Cameron J. Gibbs (SBN 346524)
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480
cwheeler@fbm.com
cgibbs@fbm.com

*Attorneys for Plaintiff Pacific Steel Group*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| PACIFIC STEEL GROUP,<br><br>Plaintiff,<br><br>vs.<br><br>COMMERCIAL METALS COMPANY, et al.,<br><br>Defendants. | Case No. 4:20-cv-07683-HSG<br><br>**PLAINTIFF PACIFIC STEEL GROUP'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY ON COUNTS ONE (CONSPIRACY IN RESTRAINT OF TRADE) AND EIGHT (INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE)**<br><br>The Honorable Haywood S. Gilliam, Jr.<br><br>Hearing Date:   December 7, 2023<br>Time:   2:00 p.m.<br>Courtroom:   2, 4th Floor |

**REDACTED PURSUANT TO THE COURT'S OCTOBER 27, 2023 ORDER**

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD: PLEASE TAKE NOTICE that on December 7, 2023, or as soon thereafter as the matter may be heard by the Honorable Haywood S. Gilliam, Jr., in Courtroom 2, 4th Floor, of the above-entitled Court, located at 1301 Clay Street, Oakland, California 94612, Plaintiff Pacific Steel Group ("Pacific Steel") will and hereby does move pursuant to Federal Rule of Civil Procedure 56 for an Order granting Plaintiff's Motion for Summary Judgment as to Liability on Counts One (Conspiracy in Restraint of Trade) and Eight (Intentional Interference with Prospective Economic Advantage).

This Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, any opposition and reply briefs, the Declaration of Cameron Gibbs and all exhibits thereto, all pleadings and records on file herein, and such other evidence and arguments as may be presented to the Court prior to or at the hearing of this Motion.

By:  */s/ Christopher C. Wheeler*

Christopher C. Wheeler (SBN 224872)
Cameron J. Gibbs (SBN 346524)
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480
cwheeler@fbm.com
cgibbs@fbm.com

Benjamin D. Brown (SBN 202545)
Daniel McCuaig (*pro hac vice*)
Nathaniel D. Regenold (*pro hac vice*)
COHEN MILSTEIN SELLERS
   & TOLL PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
bbrown@cohenmilstein.com
dmccuaig@cohenmilstein.com
nregenold@cohenmilstein.com

*Attorneys for Plaintiff Pacific Steel Group*

# TABLE OF CONTENTS

RELIEF REQUESTED ........................................................................................................ vi

STATEMENT OF ISSUES TO BE DECIDED.................................................................... vii

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

FACTUAL BACKGROUND ............................................................................................. 3

I.      STEEL REBAR PRODUCTION AND ITS CALIFORNIA HISTORY............................ 3

II.     DANIELI'S MIDA MICRO MILL TECHNOLOGY STANDS ALONE ......................... 5

III.    PACIFIC STEEL GROUP PURSUES A MIDA MILL TO VERTICALLY
        INTEGRATE ..................................................................................................... 7

IV.     CMC SOUGHT AND OBTAINED AN EXCLUSIVE TERRITORIAL
        RESTRAINT TARGETED TO BLOCK OR DELAY PACIFIC STEEL'S ENTRY .......... 8

V.      IMMEDIATE AFTERMATH OF THE TERRITORIAL EXCLUSION ......................... 12

VI.     PACIFIC STEEL RESUMES PROGRESS TOWARD A MIDA MILL ......................... 14

LEGAL STANDARD ......................................................................................................... 15

ARGUMENT ..................................................................................................................... 15

I.      UNCONTROVERTED EVIDENCE ESTABLISHES PACIFIC STEEL'S RIGHT
        TO SUMMARY JUDGMENT AS TO LIABILITY ON ITS CLAIM FOR
        CONSPIRACY IN RESTRAINT OF TRADE. ...................................................... 16

        A.      UNCONTROVERTED EVIDENCE ESTABLISHES PACIFIC STEEL'S
                PRIMA FACIE CASE. .......................................................................... 16

                1.      Direct Evidence of Exclusion, and Thus Reduced Output, Satisfies
                        Step One of the Ninth Circuit's Section 1 Framework.............................. 16

                2.      Alternatively, CMC's High Market Share, Coupled with High
                        Barriers to Entry and the Supracompetitive Prices CMC Charges
                        for AZ-1's Rebar, Satisfies Step One Through Indirect Evidence............. 18

                        a.      The Relevant Market Consists of Suppliers Within
                                a 500-Mile Radius from the High Desert Area Near Los
                                Angeles. ..................................................................... 18

                        b.      CMC Has Market Power in the RGM. ........................... 21

                        c.      CMC's Territorial Exclusion Harms Competition. ...................... 22

        B.      CMC'S INABILITY TO ADDUCE EVIDENCE OF NON-PRETEXTUAL
                PROCOMPETITIVE EFFECTS ESTABLISHES PACIFIC STEEL'S
                RIGHT TO SUMMARY JUDGMENT AS TO LIABILITY AT STEP
                TWO OF THE NINTH CIRCUIT'S SECTION 1 FRAMEWORK. ...................... 22

1

      C.      HIGHER REBAR PRICES IMPOSED ON SOUTHERN CALIFORNIA
REBAR CUSTOMERS IS TEXTBOOK ANTITRUST HARM. ...........................24

II.    THE RECORD ESTABLISHES PACIFIC STEEL'S RIGHT TO SUMMARY
JUDGMENT AS TO LIABILITY ON ITS CLAIM FOR INTENTIONAL
INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE. ........................25

CONCLUSION ..................................................................................................................25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...........................................................................................................15

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*,
    236 F.3d 1148 (9th Cir. 2001)............................................................................................2

*E.W. French & Sons, Inc. v. General Portland Inc.*,
    885 F.2d 1392 (9th Cir. 1989) (Farris, J., concurring) ...............................................16

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023).................................................................................... *passim*

*Fed. Trade Comm'n v. Qualcomm, Inc.*,
    969 F.3d 974 (9th Cir. 2020)............................................................................................22

*FTC v. Ind. Fed. of Dentists*,
    476 U.S. 447 (1986) ...........................................................................................................17

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997)..........................................................................................23

*Intel Corp. v. Fortress Inv. Grp. LLC*,
    511 F. Supp. 3d 1006 (N.D. Cal. 2021) ..........................................................................17

*Miller v. Glenn Miller Prod., Inc.*,
    454 F.3d 975 (9th Cir. 2006)............................................................................................15

*Nat'l Collegiate Athletic Ass'n v. Alston*,
    141 S. Ct. 2141 (2021) ......................................................................................................22

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984) .............................................................................................................22

*In re NCAA Student-Athlete Name & Likeness Litig.*,
    37 F. Supp. 3d 1126 (N.D. Cal. 2014) ............................................................................23

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) ..........................................................................................16, 17, 18

*Pacific Steel Grp. v. Com. Metals Co.*,
    No. 20-cv-07683-HSG, 2021 WL 2037961 (N.D. Cal. May 21, 2021)......................14

*Rebel Oil Co. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995)......................................................................................16, 18

*Retrophin, Inc. v. Questcor Pharms., Inc.*,
    41 F. Supp. 3d 906 (C.D. Cal. 2014)..................................................................24

*Rivera v. Philip Morris, Inc.*,
    395 F.3d 1142 (9th Cir. 2005).......................................................................15

*Safeway, Inc. v. Abbott Lab'ys*,
    761 F. Supp.2d 874 (N.D. Cal. 2011) .........................................................22

*New York ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015).........................................................................24

*United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare*
    *Fund v. Teikoku Pharma USA*,
    296 F. Supp. 3d 1142 (N.D. Cal. 2017) ....................................................21

*United States v. Syufy Enters.*,
    903 F.2d 659 (9th Cir. 1990).......................................................................21

## STATE CASES

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal.4th 1134 (2003)................................................................................24

## FEDERAL RULES AND REGULATIONS

Fed. R. Civ. P. 56(a)............................................................................14, 15

## OTHER AUTHORITIES

Areeda & Hovenkamp, Antitrust Law ¶ 391e...................................................24

Horizontal Merger Guidelines (2010) §§ 2.1.5, 4.2.1 .......................19, 21, 22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**RELIEF REQUESTED**

Pacific Steel Group ("Pacific Steel") respectfully requests that the Court enter judgment against Commercial Metals Company pursuant to Federal Rule of Civil Procedure 56 on Pacific Steel's claims for conspiracy in restraint of trade and intentional interference with prospective economic advantage.

1

**STATEMENT OF ISSUES TO BE DECIDED**

2   Whether Pacific Steel Group ("Pacific Steel") is entitled to summary judgment because

3 there is no genuine issue of material fact on the following issues related to Pacific Steel's

4 claims:

5   *First*, there is no genuine issue of material fact that the exclusive territorial restraint

6 challenged in this case is an agreement subject to challenge under Section 1 of the Sherman Act.

7   *Second*, there is no genuine issue of material fact that the exclusive territorial restraint

8 challenged in this case foreclosed Pacific Steel from building a steel rebar mill for a period of

9 time, as Commercial Metals Company ("CMC") intended.

10   *Third*, there is no genuine issue of material fact that rebar output has been reduced by

11 that period of foreclosure.

12   *Fourth*, there is no genuine issue of material fact that the exclusive territorial restraint

13 challenged in this case was not necessary for Danieli Corporation ("Danieli") to build a MiDa-S

14 mill for CMC.

15   *Fifth*, there is no genuine issue of material fact that CMC owns no intellectual property

16 rights in Danieli's MiDa technology.

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

Prior to discovery, Commercial Metals Company ("CMC") urged this Court to dismiss this case because, it claimed, several of Pacific Steel Group's ("Pacific Steel") factual allegations were "implausible." It was "utterly implausible," CMC averred, that its territorial exclusion had been intended to exclude new competition from the California rebar manufacturing market or, in any event, that Pacific Steel could not enter that market using other technologies or from other locations.[1] Failing that, it was "implausible" that Pacific Steel's "entry alone would . . . have a significant impact on competition," as a 500-mile-radius relevant geographic market was "not only implausible but wholly unrealistic."[2] And it was "implausible" that CMC's territorial exclusion lacked "any procompetitive effect" or that CMC owned no "business secrets" or "trade secrets or intellectual property" (collectively, "IP") in Danieli's MiDa micro mill equipment or design.[3]

Discovery has proven each of those positions to be unequivocally false. Shortly after learning that Pacific Steel had purchased land outside of Los Angeles, California, to build a competing rebar micro mill and had hired industry veteran Mark Olson to run it, CMC demanded that Danieli—the company Pacific Steel had selected to build its mill, and the same company that builds CMC's micro mills—scuttle Pacific Steel's market entry plans by granting CMC a territorial exclusion in connection with its own contract to purchase a new micro mill in Mesa, Arizona. CMC insisted on this restraint—a 500-mile radius around Rancho Cucamonga, California—explaining to Danieli that Pacific Steel's ██████████████████████████████████████████████████.[4] When Danieli pushed back with the same argument that CMC's lawyers make in this case—that blocking Pacific Steel from building a MiDa mill wouldn't solve CMC's problem because Pacific Steel could enter with other technology—CMC unambiguously rejected the claim: █████████████████████

---

[1] Dkt. 62 at 6:27-7:4, 11:18-21; Dkt. 79 at 7:17-8:9.
[2] Dkt. 79 at 7:4-5; Dkt. 40 at 9:16-20.
[3] Dkt. 85 at 11:3-11; Dkt. 62 at 10:22-11-6.
[4] Declaration of Cameron J. Gibbs ISO Motion for Summary Judgment, Ex. 34 at 11.  All "Ex." cites are to the Gibbs Declaration.

1  t ████████████████████████████████████████████████████[5]

2          And CMC was correct. After Danieli acceded to CMC's demands for a territorial

3  exclusion, Pacific Steel's entry into the rebar manufacturing market was significantly delayed.

4  After scrambling to explore whether other technologies could support its entry, Pacific Steel

5  concluded that its planned entry would have to wait out the territorial restriction.[6] The exclusive

6  territorial restraint at the center of this case was always and only about protecting CMC from

7  effective competition to supply rebar to Southern California; it was never meant—or able—to

8  protect any CMC IP in MiDa mills because, per CMC and Danieli's agreement, CMC never

9  owned any: ████████████████████████████████████████████

10  ████████████████████████████[7]

11          Discovery has eviscerated both (1) CMC's challenges to Pacific Steel's Section 1 prima

12  facie case and (2) CMC's claimed procompetitive justifications for its exclusive territorial

13  restraint. Thus, under Ninth Circuit law, CMC's liability under Section 1 (and California's

14  Cartwright Act) can be established without the need for this Court to evaluate less restrictive

15  alternatives (the unambiguous existence of which discovery has made plain) or to balance pro-

16  and anticompetitive effects. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 985-86 (9th

17  Cir. 2023); *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001)

18  (noting "the analysis under California's antitrust laws mirrors the analysis under federal law").

19          Likewise, discovery has revealed with stark clarity how CMC moved quickly and

20  directly from (1) learning of Pacific Steel's economic relationship with Danieli to (2) plotting to

21  disrupt that relationship to (3) actually disrupting that relationship, (4) for its own economic

22  benefit and to Pacific Steel's economic harm. With no evidence to the contrary, CMC also is

23  liable for intentional interference with prospective economic advantage as a matter of law.

24

25

26

27  ────────────────
[5] *Id.*

28  [6] *See* Ex. 18 at 196:25-204:21; Ex. 1 ¶¶ 18-36.
[7] Ex. 35 at 2.

**FACTUAL BACKGROUND**

**I.     STEEL REBAR PRODUCTION AND ITS CALIFORNIA HISTORY**

Steel concrete reinforcing bar ("rebar") is a widely used construction material that provides support to concrete structures.[8] Rebar is manufactured according to industry-specific standards and regulations,[9] has no meaningful substitutes,[10] and is, in the words of Barbara Smith, CMC's outgoing Chief Executive Officer, ████████████████████████████ ████████████████████████[11] Because of its commodity nature, firms that sell rebar compete principally on price, inclusive of the "freight cost" to deliver rebar to customers.[12]

Since the Industrial Revolution, steel has been manufactured in "integrated steel mills," which use large "blast furnaces" to smelt pig iron into steel, which in turn can be converted into products like rebar.[13] In 1906, the first electric arc furnace ("EAF") was used to convert recycled steel ("scrap") into new steel products.[14] Because of the proliferation over the ensuing decades of steel products—and the resultant abundance of scrap—EAFs are now a major source of steel, especially rebar, production in the United States. Indeed, the last integrated steel mill built in the United States began operations in 1964.[15]

Demand for rebar in Southern California is driven by construction projects[16] and runs approximately ██████ tons per year.[17] Before its closure in late 2020, the traditional mini mill

---

[8] *See Reinforcing Steel*, Concrete Reinforcing Steel Institute, https://www.crsi.org/reinforcing-basics/reinforcing-steel/ (last visited Oct. 30, 2023). Rebar, and the equipment and machinery used to manufacture it, is a good that travels in interstate commerce. *See* Ex. 13 at 16-17.
[9] *See Rebar Sizes, Grades, and Types*, BigRentz (July 27, 2021), https://www.bigrentz.com/blog/rebar-sizes; Ex. 2 ¶¶ 25-26.
[10] *See* Ex. 2 ¶ 31; Ex. 19 at 24:18-23.
[11] Ex. 36 at 2-3; *see* Ex. 2 ¶ 29; Ex. 3 ¶¶ 17-25.
[12] *See* Ex. 2 ¶ 29; Ex. 3 ¶ 29 & tbl. 2.
[13] *See Steel Production*, American Iron and Steel Institute, https://www.steel.org/steel-technology/steel-production/ (last visited Oct. 30, 2023).
[14] *See Our History*, Crucible Industries, http://www.crucibleservice.com/history.aspx?c=20 (last visited Oct. 30, 2023).
[15] *See Legacy of Steel / Burns Harbor Steel Plant*, Indiana Historical Bureau, https://www.in.gov/history/state-historical-markers/find-a-marker/find-historical-markers-by-county/indiana-historical-markers-by-county/legacy-of-steel-burns-harbor-steel-plant/ (last visited Oct. 30, 2023).
[16] *See* Ex. 3 ¶¶ 32-34.
[17] *See* Ex. 37 at 3; Ex. 38 at 4; *see also* Ex. 3 at 20, Fig. 8; Ex. 39 at 16-19.

in Rancho Cucamonga (the "Rancho mill") was the only rebar mill in all of California.[18] Acquired by Gerdau in 2010, the Rancho mill had an annual rebar capacity of ███ tons, essentially all of which was sold to customers within ██ miles of the mill.[19] In October 2019, just a year after it acquired the Rancho mill from Gerdau, CMC began a two-step process of shuttering the mill—first its melt shop (decreasing the mill's annual rebar capacity by ████ ██),[20] and then the rest of its operations by January 2021.[21] ████████████████████

███████████████████████████████████████████████████████

██████[22] but during this interim period between the Rancho mill closing and the new mill achieving its anticipated annual rebar capacity of ████████,[23] the local rebar demand previously satisfied by the Rancho mill must be met by rebar shipped in from distant mills, despite added freight costs.[24] The mismatch between local supply and local demand is significant: ████████████████████████████████████████████████

███████████[25]

In considering where to locate the new micro mill it is building in Mesa, CMC listed the

████████████████     ██████████████████████

[18] *See* Ex. 13 at 71.

[19] *See Gerdau Agrees to Acquire California Steel Mill*, Recycling Today (Sept. 16, 2010), https://www.recyclingtoday.com/news/gerdau-tamco-acquisition/; Ex. 40 at 3.

[20] *See* Ex. 40 at 3; Ex. 41; *Rancho Cucamonga Steel Mill Cuts 110 Jobs As It Quits Scrap Metal, Melting Police-Seized Guns*, Daily Bulletin (Oct. 23, 2019), https://www.dailybulletin.com/2019/10/23/rancho-cucamonga-steel-mill-cuts-110-jobs-as-it-quits-scrap-metal-melting-police-seized-guns/.

[21] *See* Ex. 4 ¶ 10; *Commercial Metals to Shutter Rancho Cucamonga Steel Mill, Citing High Costs in California*, Daily Bulletin (Oct. 16, 2020), https://www.dailybulletin.com/2020/10/16/commercial-metals-to-shutter-rancho-cucamonga-steel-mill-citing-high-costs-in-california/.

[22] *See* Ex. 42 at 5 (████████████████████████████████████████

███████████████████████████████████████████████████).

[23] *See* Ex. 20 at 28:25-29:8.

[24] *See* Ex. 21 at 145:3-146:25; Ex. 43 at 26-33; Ex. 38 at 2-4, 14; Ex. 44 at 5; Ex. 40 at 6.

[25] *See* Ex. 45 at 18 (red text).

1  t ██████████████████ and it ████████████████████████████



11  ██████████████████████████████████████████████████████[26]

12  According to CMC executive Andrew Sarat, ████████████████████████████████

13  ████████████████████████████████████████████[27] In its

14  contemporaneous business documents reflecting mill site considerations for both its new Mesa

15  mill and the MiDa mill it has just begun to build in West Virginia, CMC ████████████

16  ████████████████████████████████████████████████████████████

17  █████████████████████████████████████████████.[29]

## II. DANIELI'S MIDA MICRO MILL TECHNOLOGY STANDS ALONE.

In the 1990s, Danieli developed its "MicroMill Danieli" or "MiDa" mill technology to

enable the manufacture of rebar at smaller, cheaper, and more efficient mills than anything else

in commercial operation then or now.[30] After advancing the technology internally, ████████████

██████████████████████████████████[31] CMC executives visited the

Sidenor Sovel mill while under construction to ████████████████████████████████ and

---

[26] Ex. 46 at 12, 15 (emphasis in original).
[27] Ex. 20 at 121:14-25.
[28] *See* Ex. 22 at 264:23-265:6.
[29] *See, e.g.*, Ex. 45 at 9-10, 14, 18; Ex. 47 at 5, 12, 15; Ex. 48 at 2, 6, 14; Ex. 43 at 26-32, 40-42; Ex. 49 at 71-74; Ex. 50 at 5-8; Ex. 51 at 9-12.
[30] *See* Ex. 50 at 4-8.
[31] *See* Ex. 23 at 136:4-138:13; Ex. 50 at 10.

█████████████████████████████████████████████████████████████

██████████████[32] Every rebar mill built in the United States since has been a MiDa mill.[33]

There are two key differentiators between a MiDa mill and a traditional mini mill. First, the MiDa mill uses a continuous casting-and-rolling process to connect the melt shop directly to the rolling mill.[34] ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████[35] ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████[36]

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████[37] █████████████

████████████████████[38] ██████████████████████████████████████

██████████████████[39] ████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████[40] In contrast, the DRB finishing end ████████████████ to

_____

[32] Ex. 23 at 136:4-138:13. ██████████████████████████████████████
██████████████████████████████. *See id.*

[33] *See* Ex. 1 ¶ 12.

[34] Terminologically, rebar manufacturing can be divided into two halves. The first half takes place in the "melt shop," where steel is melted and cast into steel billets—the raw material of rebar. The second half takes place in the "rolling mill," where steel billets are heated and rolled into steel products. Rolling mills often are specialized by product. *See Mill Product Guide*, CMC, https://www.cmc.com/getmedia/6a5b7606-5a5c-4d43-ab67-4c0b7d7c82cf/Mill_Product_Guide.pdf (last visited Oct. 29, 2023).

[35] *See* Ex. 2 App. E; Ex. 23 at 24:16-23; Ex. 52 at 6-7, 14-15, 18.

[36] *See* Ex. 1 ¶¶ 42, 46.

[37] *See* Ex. 52 at 6-7, 21, 30.

[38] Rolling stands shape rebar to its desired specifications (*e.g.*, diameter, ribbing) as the hot steel passes through the rolling mill. *See* Ex. 19 at 29:17-30:3.

[39] *See* Ex. 1 ¶ 43.

[40] *See* Ex. 1 ¶ 57; Ex. 5 ¶ 37; Ex. 2 ¶ 25; *Straight Rebar*, Gerdau, https://www2.gerdau.com/products/straight-rebar#:~:text=%E2%80%8BTypical%20lengths%20are%2020,produced%20in%20grades%2060%2C%2080 (last visited Nov. 1, 2023).

1 ████████████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████████[41]

## III.   PACIFIC STEEL GROUP PURSUES A MIDA MILL TO VERTICALLY INTEGRATE.

Founded in late 2014, Pacific Steel is a rebar fabrication-and-installation ("F&I") company that operates in several Western states, most prominently California.[42] In contrast to the upstream manufacturing of rebar at steel mills, "fabrication" is the downstream cutting and bending of rebar to meet a project's specifications, and "installation" is the placement of rebar at construction sites.[43] In its first five years of operations, Pacific Steel grew into one of the largest rebar F&I businesses operating in the West, with current revenues ████████████████ ████████████████████████[44] despite needing to purchase rebar from rebar manufacturers.[45]

In late 2019—after CMC acquired the Rancho mill, giving it control of over ████ of the rebar manufacturing capacity located within 500 miles of Pacific Steel's Southern California F&I operations[46]—Pacific Steel decided to build its own rebar mill close to the center of its Southern California F&I business and self-supply its own rebar.[47] Pacific Steel thus approached Danieli to inquire about building a MiDa mill in Southern California.[48] Over the next months, top executives at Pacific Steel and Danieli developed the project, and Danieli ██████████████ ██████████████████████████████████████[49] According to Paolo Losso, President of Danieli's U.S. subsidiary, ██████████████████████████████████

---

[41] *See* Ex. 1 ¶ 44; Ex. 23 at 26:24-27:13; Ex. 50 at 31-32.
[42] *See* Ex. 5 ¶ 1.
[43] *See id.* ¶¶ 16-21.
[44] *See id.* ¶ 1.
[45] *See* Ex. 6 ¶¶ 10-11 & fig. 1; Ex. 18 at 40:3-22.
[46] *See* Ex. 3 ¶ 136 & tbl. 6.
[47] *See* Ex. 53 at 5-6 (████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████).
[48] *See* Ex. 23 at 46:11-15.
[49] *Id.* at 48:20-49:18; 46:16-47:18; *see* Ex. 54.

1  ███████████████████████████████████████████████████████████████[50]

2       Pacific Steel advanced the project even before executing a contract with Danieli. In

3  June 2020, Pacific Steel acquired a mill site in Mojave, California,[51] and hired Mark Olson to

4  "lead the regulatory approval process and construction" of the mill.[52] Pacific Steel also actively

5  coordinated with local utilities, regulatory bodies, and project construction engineers to

6  commence a large-scale construction project promptly after executing a contract.[53]

7       This forward progress stalled in mid-July 2020 when Danieli failed to provide the

8  updated commercial proposal Pacific Steel had requested and expected.[54] The updated proposal

9  never arrived because, unbeknownst to Pacific Steel, Danieli and CMC had entered into an

10 agreement that prohibited Danieli from selling a MiDa mill to Pacific Steel within 500 miles of

11 Rancho Cucamonga, blocking Pacific Steel's efforts to build a rebar mill in Southern California.

## IV.  CMC SOUGHT AND OBTAINED AN EXCLUSIVE TERRITORIAL RESTRAINT TARGETED TO BLOCK OR DELAY PACIFIC STEEL'S ENTRY.

14      While working with Pacific Steel, Danieli was simultaneously negotiating ████████ a

15 n████████████████████████████████████████[55] which CMC saw as

16 ██████████████████████████████████████████████[56] In

17 those negotiations, ████████████████████████████████████.[57]

18 ███████████████████████████████████████████████████

19 ████████████████████████████████████████████████████

---

[50] Ex. 23 at 48:10-19, 153:8-12; *see* Ex. 18 at 169:1-14.

[51] *See* Ex. 55; Ex. 24 at 71:4-72:8.

[52] *See* Ex. 56 at 1; Ex. 57 at 1; Ex. 25 at 14:17-20.

[53] *See, e.g.*, Ex. 58 at 1 (RE Warner); Ex. 59 at 1 (Union Pacific Railroad); Ex. 60 at 1 (Ramboll Engineering); Ex. 61 at 2 (Southern California Edison); Ex. 62 at 1 (Kern County Planning & Natural Resources).

[54] *See* Ex. 63 at 2 (promising to send an "updated commercial proposal"); Ex. 18 at 190:1-22.

[55] *See* Ex. 64 at 3; Ex. 23 at 143:5-144:9. Merchant bar refers to several structural steel products, including angles, channels, and flats, that are not substitutable for rebar. *See* Ex. 19 at 24:12-23; *see also* Ex. 13 at 14. "MiDa-S" stands for "MicroMill Danieli – Shapes" and describes Danieli mill technology that enables the continuous casting-and-rolling of rebar and merchant bar in the same mill. *See* Ex. 44 at 15.

[56] Ex. 38 at 4; *see* Ex. 44 at 8-9; Ex. 40 at 3, 5.

[57] *See* Ex. 65 at 1; Ex. 23 at 95:22-97:2, 97:10-98:16.

1  ███████████████████████[58]████████████████████████████[59]█

2  ████████████████████████████████████[60]

3       Upon learning of Pacific Steel's plans to build a MiDa mill in California,[61] CMC devised

4  a plan t███████████████████████████████████████

5  ████[62] On July 1, 2023, CMC executives Kolin Keller and Steven Henderson exchanged

6  emails about ████████████████████████████████████

7  ████████████████████[63]████████████████████████

8  ████████████████████████████████████████████████

9  ████████████████████████████████████████████████

10  ██████████[64]████████████████████████████████

11  ██████[65]

12       ███████████████████████████████████████████████

13  ████████████████████████████████████████████████████

14  ████████████████████████████████████

15  ██████[66]████████████████████████████████████████

16  ████████████████████████████[67]

17       Leading up to that July 20, 2020 call, Messrs. Keller and Henderson prepared talking

18  points for Ms. Smith ██████████████████████████████████

19  ████████████[68]████████████████████████[69]████████

20

21  _____
   [58] *See* Ex. 66 at 5 (██████████████████████████████████

22  ██████████████████████████████); *see also* Ex. 23 at 40:24-42:6.
   [59] *See* Ex. 67 at 3; Ex. 26 at 139:4-12.

23  [60] *See* Ex. 68 at 1; Ex. 67 at 3.
   [61] *See* Ex. 56 at 1; Ex. 69 at 1.

24  [62] ███████████████████████████████████████████████
   ██████████ *See* Ex. 70 at 1-2; Ex. 71 at 1.

25  [63] Ex. 72 at 1.

26  [64] *Id.*
   [65] *Id.*

27  [66] *See* Ex. 73 at 1; Ex. 74 at 1-2.
   [67] *See* Ex. 75 at 1; Ex. 76 at 1-2; Ex. 77 at 1; Ex. 78 at 1.

28  [68] *See* Ex. 79 at 1; Ex. 80 at 1.
   [69] Ex. 80 at 1.

1

2

3 [70]

4

5 [71]

6    On her call with Mr. Danieli on July 20, 2020, Ms. Smith communicated CMC's

7

8 [72]    [73]

9    [74]

10    Over the next few days,

11    [75]

12

13

14 [76]

15    [77]

16

17

18

19 [78]

20    [79]

21

22

23 _____

24 [70] *Id.*; *see* Ex. 21 at 173:11-15.
[71] Ex. 80 at 1.

25 [72] *Id.*
[73] Ex. 21 at 175:1-13, 178:10-179:19; *see* Ex. 82 at 1-2.

26 [74] *See* Ex. 21 at 180:5-9.
[75] *See, e.g.*, Ex. 83; Ex. 84; Ex. 34.

27 [76] Ex. 84.
[77] Ex. 34 at 11.

28 [78] *Id.*
[79] *Id.*



[redacted][80] [redacted][81] [redacted][82] a [redacted][83] [redacted][84]

[redacted][85] [redacted].[86] [redacted][87] [redacted][88] [redacted][89]

A [redacted][90]

---

[80] *See* Ex. 85 at 2.

[81] *See* Ex. 35 at 4.

[82] *See Commercial Metals Company Announces Plans to Build its Third Micro Mill*, CMC (Aug. 13, 2020), https://ir.cmc.com/profiles/investor/NewsPrint.asp?b=653&ID=93118&m=rl&v=5&G=597.

[83] *See* Ex. 86 at 49.

[84] *See* Ex. 63 at 1-2; *see also* Ex. 87 at 1 [redacted].

[85] *See Grand Opening for CMC's Newest Mill*, Recycling Today (Dec. 9, 2009), https://www.recyclingtoday.com/news/cmc_mesa-arizona_rebar_micromill/.

[86] *See* Ex. 88 at 1.

[87] *See CMC Breaks Ground on Micromill in Oklahoma*, Recycling Today (May 3, 2018), https://www.recyclingtoday.com/news/cmc-steel-micro-mill-oklahoma-groundbreaking/.

[88] *See* Ex. 89 at 1-3. [redacted] *Id.* at 1-2.

[89] *See* Ex. 27 at 52:25-53:5; *Commercial Metals Company Selects Berkeley County, West Virginia as Site of its Fourth Micro Mill*, CMC (Dec. 8, 2022), https://ir.cmc.com/Commercial-Metals-Company-Selects-Berkeley-County--West-Virginia-as-Site-of-its-Fourth-Micro-Mill-12-8-2022.

[90] Ex. 23 at 86:2-23. [redacted]

## V.     IMMEDIATE AFTERMATH OF THE TERRITORIAL EXCLUSION

Upon learning that Danieli was no longer able to sell a MiDa mill to Pacific Steel in Southern California, Pacific Steel sought to identify viable alternatives. There were none.[91]

On August 28, 2020, ███████████████████████████ ███████████████████████████████████[92] ███████████████████████████ ███████████████████████[93] T███████████████████████████████[94] █ ████████████████████████████████████████

First, rather than a continuous casting-and-rolling process, the proposed fallback mill ████████████████████████████████████████ ████████████████████████████████ ███████████████████████████████[95] ████████ ██████████████████████████████████ ██████████[96]__███████████████[97] ███████████ ████████████████████████████████████ ██████████████████[98]__██████████████████[99]

Second, Danieli's proposed fallback mill ███████████████████████████

---

[91] As detailed below, the "alternative" mill designs that Pacific Steel considered were effectively theoretical, as none of the mills proposed by Danieli, SMS, and Primetals had ever been built. As a result, Pacific Steel lacked real-world data with which to assess those alternative mills' actual capabilities, requirements, and environmental costs, making it even more unlikely that such mills would obtain California regulatory approval. *See* Ex. 7 ¶¶ 14-15; Ex. 20 at 59:23-60:22, 64:9-15; Ex. 8 ¶¶ 63-74.

[92] *See* Ex. 87 at 5; Ex. 23 at 55:15-59:12.

[93] *See* Ex. 93 at 1, 5.

[94] *See* Ex. 23 at 56:6-20; 65:12-66:12.

[95] *See* Ex. 23 at 57:2-58:18; Ex. 93 at 1, 8, 12; *see also* Ex. 19 at 121:5-13 ████████████ ███████.

[96] *See* Ex. 27 at 152:19-24; Ex. 28 at 64:3-11.

[97] *See* Ex. 21 at 208:11-209:8 ████████████████████████████████████ ███████████; Ex. 27 at 35:23-36:9 (same); Ex. 94 at 10-11; Ex. 29 at 111:12-19 ███████████████████████████████████████████.

[98] *See* Ex. 4 ¶ 27; Ex. 9 ¶¶ 110-11.

[99] *See* Ex. 23 at 64:3-11; *compare* Ex. 95 at 48 (cobble rate for CMC SC) *with* Ex. 96 at 99 (cobble rate for CMC AZ-1).

1  ██████████████████████████████████████████████.[100] ████████████

2  ██████████████████████████████████████████████████████████████

3  ██████████████████████████████████████████████████████████████

4  ████████████████████████████████████.[101] With these shortcomings, it would have been

5  economically irrational for Pacific Steel (or any external funder) to invest in such a mill.[102]

6          Pacific Steel also could not acquire a viable mill from one of Danieli's competitors.

7  In 2020, before CMC and Danieli agreed to the territorial exclusion restraint, Pacific Steel

8  requested technical proposals for mill designs comparable to Danieli's MiDa mill from the only

9  other steel mill manufacturers that conceivably could offer such a mill—SMS and Primetals—

10 ████████████████████████████████████████████████████

11 ████████████.[103] Neither mill supplier offered Pacific Steel a micro mill. In August 2020, ████

12 ████████████████████████████████████████████████████████████

13 ████████████.[104] ████████████████████████████████████████

14 ████████████████████████████████████.[105] ████████████

15 ████████████████████████████████████.[106]

16          Finally, Pacific Steel determined that building a MiDa mill at the periphery of the

17 territorial exclusion was not feasible because potential site locations were sparsely populated

18 (*i.e.*, lacked sufficient labor), lacked access to sufficient raw materials or utilities (*e.g.*, scrap

19 metal, electricity, water), and would have placed Pacific Steel at a significant competitive

20

21 _____

22 [100] *See* Ex. 23 at 58:25-59:12; Ex. 93 at 1; Ex. 87 at 1, 4; Ex. 23 at 147:25-149:9 ████████████

23 ████████████████████.
   [101] *See* Ex. 23 at 236:3-237:20; Ex. 1 ¶¶ 38, 43-45, 57; Ex. 5 ¶¶ 35-38.

24 [102] *See* Ex. 1 ¶¶ 37-57; Ex. 97; Ex. 9 ¶¶ 104, 107; Ex. 8 ¶¶ 11-34.
   [103] *See* Ex. 1 ¶¶ 27-28; Ex. 27 at 21:6-22:9; Ex. 30 at 151:17-152:8.

25 [104] *See* Ex. 1 ¶ 23. ████████████████████████████████████████

26 ████████████████████████████████████████████████████
   ██      *See id.* ¶¶ 24-26; Ex. 30 at 25:16-26:10, 27:3-21.

27 [105] *See* Ex. 1 ¶ 28; Ex. 98 at 6-8, 18-21; Ex. 31 at 49:14-15, 50:25-51:9.
   [106] In January 2022, ████████████████████████████████████████████

28 ████████████████████████
   *See* Ex. 99 at 1; Ex. 100 at 1; Ex. 31 at 24:3-25:22, 62:9-23.

1  disadvantage by requiring significant freight costs to serve Southern California consumers.[107]

2  CMC's COO, Mr. Porter, was proven correct in his assertion that only a Danieli MiDa mill built

3  within the exclusion zone could support Pacific Steel's plan to vertically integrate.

4  **VI.  PACIFIC STEEL RESUMES PROGRESS TOWARD A MIDA MILL.**

5         On October 30, 2020, Pacific Steel initiated this action, alleging claims against both

6  CMC and Danieli under Sections 1 and 2 of the Sherman Act, California antitrust and unfair

7  competition statutes, and California common law.[108] On May 21, 2021, this Court granted

8  Defendants' motions to dismiss with leave to amend.[109] Several weeks later, Pacific Steel filed

9  its first amended complaint, and CMC again moved to dismiss shortly thereafter.[110]

10         On November 11, 2021, while CMC's second motion to dismiss was pending, CMC and

11  Danieli amended their August 7, 2020 agreement to remove the Rancho MiDa exclusion.[111]

12  Danieli later notified Pacific Steel that it once again could sell Pacific Steel a MiDa mill in

13  Southern California,[112] and on December 15, 2021—nearly 17 months after CMC and Danieli

14  agreed to block Pacific Steel from building a MiDa mill—Danieli provided an updated MiDa

15  mill commercial offer to Pacific Steel.[113] By then, Pacific Steel's mill project had fallen behind

16  other steel manufacturers' own mill projects, which had been able to retain contractors and

17  proceed with construction while Pacific Steel was foreclosed from purchasing a MiDa mill.[114]

18         Since that time, Pacific Steel has worked diligently toward building a MiDa mill in

19  Southern California. After standard negotiations, Pacific Steel and Danieli executed a contract

20  for a MiDa mill on March 31, 2022.[115] From then on, Pacific Steel has continually worked to

21  obtain the requisite regulatory approval to build the mill, to secure outside financing to help pay

22  for the mill, to engineer the mill equipment and buildings, and to prepare the site for

23  ――――――――――――――
    [107] *See* Ex. 14 at 8-9.
24  [108] *See* Dkt. 1.
    [109] *See Pacific Steel Grp. v. Com. Metals Co.*, 2021 WL 2037961 (N.D. Cal. May 21, 2021).
25  [110] *See* Dkt. 76; Dkt. 79. Pacific Steel did not name Danieli as a defendant in its amended
26  complaint. *See* Dkt. 76 at 1.
    [111] *See* Ex. 101 at 1; Ex. 32 at 205:20-24.
27  [112] *See* Ex. 18 at 221:18-222:8, 229:5-11; Ex. 1 ¶ 31; Ex. 102 at 2-3.
    [113] *See* Ex. 103 at 5; Ex. 18 at 226:9-19, 229:12-16.
28  [114] *See* Ex. 10 ¶¶ 9-21; Ex. 7 ¶¶ 24-26.
    [115] *See* Ex. 104 at 1; Ex. 18 at 227:1-18.

1  construction.[116] It is impossible, however, for Pacific Steel to get back the time it lost while it

2  was blocked from building a MiDa mill in the Los Angeles region.

**LEGAL STANDARD**

4      A party may "move for summary judgment" on any "claim or defense—or [any] part of

5  each claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate if no genuine

6  issue exists regarding any material fact. *Id.* An issue of fact is genuine "if the evidence is such

7  that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

8  *Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if the resolution of that factual dispute

9  would affect the outcome of the claim or defense. *Miller v. Glenn Miller Prod.*, *Inc.*, 454 F.3d

10  975, 987 (9th Cir. 2006). The moving party bears the initial burden of showing the absence of an

11  issue of material fact, at which point the nonmoving party must demonstrate a genuine issue of

12  material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).

**ARGUMENT**

14      Pacific Steel's core theory in this case is that the purpose and effect of the territorial

15  exclusion was to block Pacific Steel from entering the rebar manufacturing market in the Los

16  Angeles area in order to protect CMC from effective competition in that market. The undisputed

17  facts of this case establish: (1) when CMC learned that Pacific Steel intended to build a Danieli

18  MiDa mill in Southern California, CMC sought to block that competitive threat by demanding that

19  Danieli accede to a facially exclusionary agreement to refuse to supply any of CMC's competitors

20  with a MiDa mill within 500 miles of Rancho Cucamonga, California, for a meaningful period of

21  time; (2) CMC and Danieli executed a contract including that exclusionary agreement on August

22  7, 2020, and the exclusionary agreement remained in force at least until the contract was amended

23  on November 11, 2021; (3) the exclusionary agreement in fact blocked Pacific Steel from building

24  a rebar mill in Southern California, delaying Pacific Steel's progress constructing such a mill for at

25  least the period of time during which the territorial exclusion was in force, thus causing economic

26  harm to Pacific Steel and reducing rebar output and driving up prices to Southern California rebar

27  consumers; and (4) the exclusionary agreement generated no procompetitive benefits. On this

28

---

[116] *See* Ex. 15 at 8-70.

record, Pacific Steel is entitled to summary judgment as to liability on its claims for:

(1) conspiracy in restraint of trade in violation of Section 1 of the Sherman Act and the Cartwright

Act; and (2) intentional interference with prospective economic advantage.

**I.      UNCONTROVERTED EVIDENCE ESTABLISHES PACIFIC STEEL'S RIGHT TO SUMMARY JUDGMENT AS TO LIABILITY ON ITS CLAIM FOR CONSPIRACY IN RESTRAINT OF TRADE.**

Section 1 inquiries have "both a threshold component (whether there is a contract, combination, or conspiracy) and a merits component (whether it is unreasonable)." *Epic Games*, 67 F.4th at 981. There is no dispute that the contractual clause challenged here clears the threshold,[117] and straightforward application of the Ninth Circuit's Section 1 burden-shifting framework demonstrates that Pacific Steel's claim for conspiracy in restraint of trade also satisfies the merits component on the undisputed facts of this case.[118] *See id.* at 981-86, 90, 93-94.

**A.      UNCONTROVERTED EVIDENCE ESTABLISHES PACIFIC STEEL'S PRIMA FACIE CASE.**

At the first step of the Ninth Circuit's Section 1 framework, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* at 983. "Antitrust plaintiffs can make their step-one showing either 'directly or indirectly.'" *Id.* (quoting *Ohio v. Am. Express Co.* ("*Amex*"), 138 S. Ct. 2274, 2284 (2018)). Although it need not do so, the evidentiary record in this case independently establishes Pacific Steel's prima facie case via *both* direct and indirect evidence.

**1.      Direct Evidence of Exclusion, and Thus Reduced Output, Satisfies Step One of the Ninth Circuit's Section 1 Framework.**

"Market power may be demonstrated through . . . direct evidence of the injurious exercise of market power." *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). "Direct evidence includes proof of actual detrimental effects on competition, such as

---

[117] *See* Ex. 13 at 10-11; *see also* Ex. 35 at 4; Ex. 85 at 2.
[118] Although Pacific Steel maintains that CMC's conduct also amounts to monopolization (or attempted monopolization) and participation in a conspiracy to do so, it recognizes that its Section 2 claims remain subject to factual disputes precluding summary judgment on those claims.

1   reduced output, increased prices, or decreased quality in the relevant market." *Amex*, 138 S. Ct.

2   at 2285 (cleaned up). Although rarely available, direct evidence is recognized as superior to

3   indirect evidence because it provides a "direct answer" to the "ultimate issue in a rule of reason

4   case," whereas circumstantial evidence based on "the market definition approach is only an

5   indirect and attenuated way of measuring anticompetitive effect." *E.W. French & Sons, Inc. v.*

6   *General Portland Inc.*, 885 F.2d 1392, 1405 (9th Cir. 1989) (Farris, J., concurring).

7        At the motion to dismiss stage, this Court read a footnote from *Amex* to require "market

8   power analysis . . . for antitrust claims based on vertical restraints." ECF 74 at 8 & n.3 (citing

9   *Amex*, 138 S. Ct. at 2285 n.7). Subsequently, the Ninth Circuit clarified that direct evidence of

10  market power can obviate the need to define the relevant market even in a vertical restraints case

11  and explained that *Amex* did not upset the longstanding rule that market definition is required

12  only in "most, though not all, Rule of Reason cases." *Epic Games*, 67 F.4th at 974; *see also id.*

13  at 974 n.6 ("[W]e have never held that a precise market definition is an absolute requirement 'in

14  any antitrust case.'"). In that vertical restraints case, the Ninth Circuit "beg[a]n [its] analysis

15  with market definition," but it expressly made clear that it did so only "[b]ecause Epic . . .

16  presented both direct and indirect evidence of Apple's market power." *Id.* at 974-75; *see also*

17  *Intel Corp. v. Fortress Inv. Grp. LLC*, 511 F. Supp. 3d 1006, 1014 (N.D. Cal. 2021) ("Market

18  power is essentially a surrogate for detrimental effects. If a plaintiff can make a showing of

19  actual anticompetitive effects, then a full-blown market analysis is not necessary.").[119]

20       Here, the undisputed evidence shows that CMC intentionally suppressed rebar output by

21  excluding Pacific Steel from the market. Plaintiff's expert Dr. Leitzinger will testify that the

22  Mojave mill would have contributed about ███████ new tons of rebar to the market each year, in

23

---

24  [119] Notably, unlike the restraints challenged in *Epic Games* and *Amex*, the restraint challenged here
    is facially exclusionary. There is no need to wade into the intricacies of market definition to

25  determine whether the restraint *could* exclude or otherwise harm competition because it clearly *did*.
    To this point, the Supreme Court in *Amex* explained that "[v]ertical restraints often pose no risk to

26  competition unless the entity imposing them has market power." 138 S. Ct. at 2286 n.7. Here, the
    restraint's harm results from Danieli's position as the only provider of viable micro mill technology.

27  Vertical or not, the restraint functions as a boycott of CMC's would-be competitors by the monopoly
    provider of an essential input—and boycotts, as well as practices that resemble them, are the very

28  restraints identified in *Amex* as being so facially anticompetitive that no market definition is
    required. *Id.* (citing *FTC v. Ind. Fed. of Dentists*, 476 U.S. 447, 460-61 (1986)).

addition to the approximately ███████ tons that the mill would produce for Pacific Steel's existing furnish-and-install business.[120] CMC's expert Dr. Shehadeh does not dispute this output reduction and in fact opines that the Mojave mill would have supplied *more* rebar to the market.[121] Nor can CMC genuinely dispute that its conduct succeeded in keeping the Mojave mill's rebar out of the market. The undisputed evidence confirms both that Pacific Steel was on the cusp of purchasing a MiDa mill until CMC's territorial exclusion blocked Danieli from selling it one for well over a year and that Pacific Steel and Danieli promptly reached agreement once they were free to do so. *See supra* Part IV. That delay ineluctably caused a reduction of rebar output and thus is "direct evidence of the injurious exercise of market power." *Rebel Oil*, 51 F.3d at 1434. That, standing alone, demonstrates the actual anticompetitive effects of the territorial exclusion, satisfying step one of the Ninth Circuit's Section 1 framework.

### 2. Alternatively, CMC's High Market Share, Coupled with High Barriers to Entry and the Supracompetitive Prices CMC Charges for AZ-1's Rebar, Satisfies Step One Through Indirect Evidence.

Although unnecessary given the direct evidence noted above, Pacific Steel also can use indirect evidence to prove the anticompetitive effects of CMC's exclusion zone. To do so, "the plaintiff must prove that the defendant has market power and present 'some evidence that the challenged restraint harms competition.'" *Epic Games*, 67 F.4th at 983 (quoting *Amex*, 138 S. Ct. at 2284). To prove market power, the plaintiff must, "at the threshold, define the relevant market." *Rebel Oil*, 51 F.3d at 1434. Then, "[m]arket power is generally inferred from the defendant's possession of a high market share and the existence of 'significant barriers to entry.'" *Epic Games*, 67 F.4th at 983 (quoting *Rebel Oil*, 51 F.3d at 1434).

### a. The Relevant Market Consists of Suppliers Located Within a 500-Mile Radius from the High Desert Area Near Los Angeles.

"The relevant market for antitrust purposes is 'the area of effective competition'—*i.e.*, 'the arena within which significant substitution in consumption or production occurs.'" *Id.* at 975 (quoting *Amex*, 128 S. Ct. at 2285). The relevant market "contains both a geographic

---

[120] *See* Ex. 105 at 7; Ex. 6 ¶¶ 15-22.
[121] *See* Ex. 2 ¶ 299.

component and a product or service component." *Id.* at 975. Generally, "[a] market comprises 'any grouping of sales whose sellers, if unified by a monopolist or a hypothetical cartel' could profitably raise prices above a competitive level. *Id.* (quoting *Rebel Oil*, 51 F.3d at 1434). The "SSNIP" test checks "whether a hypothetical monopolist could profitably impose a <u>S</u>mall, <u>S</u>ignificant, <u>N</u>on-<u>T</u>ransitory <u>I</u>ncrease in <u>P</u>rice above a competitive level" by taking a proposed market and then asking if a hypothetical monopolist could impose a SSNIP without losing enough customers to suppliers outside of the market to make the SSNIP unprofitable. *Epic Games*, 67 F.4th at 975. If the SSNIP would be unprofitable, then the proposed market is too narrow. *Id.*

Pacific Steel's proposed relevant geographic market ("RGM") consists of suppliers of steel rebar located within 500 miles of Mojave, California (or Rancho Cucamonga, California). Each of the four analytical steps that establish this RGM is grounded in undisputed facts.

**First**, the product market is steel rebar. Rebar is a commodity product with no reasonable substitutes.[122] CMC's Dr. Shehadeh concedes that steel rebar is the correct product market.[123]

**Second**, the RGM should be defined by supplier location, rather than customer location.[124] Dr. Shehadeh agrees that a supplier-based RGM is appropriate in this case.[125]

**Third**, the RGM is centered on the locus of the anticompetitive effects alleged in the complaint, meaning either Mojave, California (the site of Pacific Steel's foreclosed MiDa mill), or Rancho Cucamonga, California (the center of the 500-mile exclusion zone).[126] Because those locations are relatively close together, the choice between them does not materially affect the analysis.[127] Dr. Shehadeh agrees with this centering of the RMG.[128]

**Fourth**, the **outer** bound of the RGM is defined by a circle, centered on Mojave or Rancho Cucamonga, with a 500-mile radius. While Dr. Shehadeh disputes this final step, the

---

[122] *See* Ex. 3 ¶ 111; Ex. 36 at 2-3 (███████████████████████ █████████████).
[123] *See* Ex. 2 ¶ 69; Ex. 11 ¶ 9.
[124] *See generally* Horizontal Merger Guidelines (2010) § 4.2.1 at 13.
[125] *See* Ex. 22 at 46:14-47:2.
[126] *See* Ex. 3 ¶ 123; Ex. 11 ¶ 13.
[127] *See* Ex. 3 ¶ 124; Ex. 11 ¶ 13.
[128] *See* Ex. 2 ¶ 70; Ex. 12 ¶ 14.

1  500-mile radius is established by both (i) CMC's contemporaneous documents and executives'

2  admissions and (ii) CMC's own sales and profit margins data.

3  　　　When discussing micro mills at an investor conference, CMC's then-CEO Barbara Smith

4  explained that ████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████████████████

6  ████████████████████████████████████████[29] Accordingly, ███████████████████

7  ████████████████████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████████[130]

9  Multiple contemporaneous business documents relating to mill site considerations for CMC's

10  new West Virginia MiDa mill likewise show ████████████████████████████████████

11  ████████████████████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████████████████

14  ████████████████████████████████[133]

15  　　　Professor Elhauge's "SSNIP" analysis confirms that the radius of the RGM in this case is

16  no larger than 500 miles. As Professor Elhauge explains, as of 2017, there were three suppliers

17  in the proposed RGM: the Rancho mill, then owned by Gerdau, with a ████ market share,

18  CMC's AZ-1 mill with a ████ share, and Nucor's Kingman, Arizona, mill with a ████ share.[134]

19  On January 2, 2018, CMC announced that it would acquire the Rancho mill, increasing its

20  market share to ████ from 2019-2020.[135] This acquisition set up a natural experiment of

21  whether CMC (an actual rather than hypothetical monopolist) could profitably impose a SSNIP

22  in the RGM.[136] That is exactly what happened: From 2017 to 2019, CMC increased AZ-1's rebar

23

24  _____

25  [129] Ex. 106 at 6.
   [130] Ex. 107 at 10, 13 (emphasis in original).

26  [131] *See* Ex. 45 at 9-10, 14, 18; Ex. 47 at 5, 12, 15; Ex. 48 at 2, 6, 14.
   [132] *See* Ex. 22 at 264:23-265:6; Ex. 48 at 14.

27  [133] *See* Ex. 22 at 265:23-265:6.
   [134] *See* Ex. 3 ¶ 136; Ex. 11 ¶¶ 21, 104.

28  [135] *See* Ex. 11 ¶¶ 21, 104.
   [136] *See id.*

1  prices relative to its costs by ███[137] well in excess of the ███ that is considered sufficient to

2  pass the SSNIP test.[138] Dr. Shehadeh does not seriously dispute these figures.[139]

3      Dr. Shehadeh nonetheless objects to this final step of the RGM analysis, arguing that the

4  RGM should include not only suppliers physically located in the RGM but also suppliers who

5  make sales *into* the RGM, regardless of their physical location.[140] He would expand the RGM

6  "at least [to] mills as far east as . . . Tennessee" and also would include all international mills.[141]

7      Dr. Shehadeh's proposed expansion of the RGM is not based on evidence or analysis that

8  should go to the jury. Instead, it is based on a clear misapplication of the Horizontal Merger

9  Guidelines' basic rules for analyzing supplier-based markets. In such markets, only "sales made

10 by suppliers located *in* the geographic market are counted, regardless of the location of the

11 customer making the purchase."[142] But Dr. Shehadeh's RGM would count sales by suppliers

12 located *outside* the proposed geographic market merely because those suppliers have made sales

13 into it.[143] That economics malpractice need not be credited, and given the documentary evidence

14 lining up uniformly in favor of a radius of 500 miles or tighter, this issue is appropriate for

15 summary resolution. *See United Food & Com. Workers Loc. 1776 & Participating Emps. Health*

16 *& Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1166-76 (N.D. Cal. 2017)

17 (granting summary judgment to plaintiffs on market definition where defendants' analysis

18 "ignor[ed]" basic principles, resulting in a "vastly overbroad market").

19          **b.     CMC Has Market Power in the RGM.**

20      CMC's share of rebar manufactured within 500 miles of Mojave is not subject to dispute.

21

22 [137] *See id.* The corresponding price increase was from ███ in FY 2017 to ███ in FY 2019.
   [138] *See id.*
23 [139] *See* Ex. 11 ¶ 29. ████████████████████████████████████████
24 ████████████████ *see* Ex. 2 ¶¶ 82-84. ████████████████████████████
   ██████ *See* Ex. 11 ¶ 58.
25 [140] *See* Ex. 22 at 158:10-21.
26 [141] Ex. 2 ¶ 71.
   [142] Horizontal Merger Guidelines (2010) § 4.2.1 at 14; *see also* Ex. 11 ¶¶ 102-03.
27 [143] *See* Ex. 2 ¶¶ 72-74; Ex. 22 at 160:14-19. At deposition, Dr. Shehadeh further conceded that ██
28 ████████████████████████████████████████████████████████ Ex. 22
   at 189:24-190:21.

1   Dr. Shehadeh calculates the 2021 "Rebar Production Capacity" of suppliers in the RGM to be

2   ████ tons, composed of ████ tons from CMC's AZ-1 mill and ████ tons from Nucor's

3   Kingman mill.[144] CMC's resulting ██ market share, even before AZ-2 comes online, is well

4   above levels that courts have found indicative of market power. *See, e.g.*, *Epic Games*, 67 F.4th

5   at 987 (affirming finding that ████ market share established market power).

6        That steel rebar manufacturing features significant entry barriers also is beyond dispute.

7   AZ-2 ultimately will cost ████ million,[145] and Pacific Steel's Mojave mill carries an estimated

8   cost of ██ million.[146] *See United States v. Syufy Enters.*, 903 F.2d 659, 667 (9th Cir. 1990)

9   (citing "heavy manufacturing" as an industry with "structural barriers to entry" because it

10  "requires onerous front-end investments that might deter competition from all but the hardiest

11  and most financially secure investors"). Building a rebar mill also requires a costly, lengthy state

12  and federal environmental regulatory approval process.[147] *See Safeway, Inc. v. Abbott Lab'ys*,

13  761 F. Supp. 2d 874, 889 (N.D. Cal. 2011) (obtaining regulatory approval is a barrier to entry).

14                    **c.    CMC's Territorial Exclusion Harms Competition.**

15       The reduced rebar output owing to Pacific Steel's delayed entry and the increased prices

16  in the RGM that Prof. Elhauge demonstrates easily satisfy the final step one showing of "some

17  evidence that the challenged restraint harms competition."[148]

18       **B.    CMC'S INABILITY TO ADDUCE EVIDENCE OF NON-PRETEXTUAL
             PROCOMPETITIVE EFFECTS ESTABLISHES PACIFIC STEEL'S
19           RIGHT TO SUMMARY JUDGMENT AS TO LIABILITY AT STEP TWO
             OF THE NINTH CIRCUIT'S SECTION 1 FRAMEWORK.**

20

21       Having demonstrated that the territorial exclusion "impose[s] substantial anticompetitive

22  effects, . . . the burden shifts back to [CMC] to 'show a procompetitive rationale for the

23

24  ──────────────
    [144] *See* Ex. 2 ¶ 142 & Exhibit 30 thereto.
25  [145] *See* Ex. 20 at 105:2-6.
    [146] *See* Ex. 24 at 261:10-12.
26  [147] *See* Ex. 12 ¶¶ 10-67.
    [148] *See* Ex. 3 ¶¶ 194-98; Ex. 11 ¶¶ 194-99. Moreover, price effects from market entry are likely to
27  be amplified when the new competitor is a "maverick" that "plays a disruptive role in the market
    to the benefit of consumers." Horizontal Merger Guidelines § 2.1.5. Here, the Mojave mill's
28  unusual status as a substantially solar-power mill with associated environmental benefits, as well
    as Pacific Steel's recognized strength in project management, suggest that the Mojave mill would
    have a maverick entrant's outsized effects on rebar prices.

restraint[].'" *Epic Games*, 67 F.4th at 985-86 (quoting *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2160 (2021)). "A procompetitive rationale is 'a [1] nonpretextual claim that [the defendant's] conduct is [2] indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." *Id.* at 986 (quoting *Fed. Trade Comm'n v. Qualcomm, Inc.*, 969 F.3d 974, 991 (9th Cir. 2020)). Restraints "that have significant anticompetitive effects but only minimal procompetitive benefits" are properly found to be "pretextual at step two." *Id.* at 994. Given the exclusionary and output-reducing effects of the challenged restraint, CMC bears "a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 113 (1984).

In this litigation, CMC has identified only two ostensible procompetitive justifications for the territorial exclusion, and neither finds support in the record. First, in moving to dismiss this case, CMC suggested that the restraint protected CMC's own IP bound up in the MiDa mills' design and/or equipment.[149] ████████████████████████████████████ ████████████████████████████████[150]████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████[151] Thus, CMC in no way stood to "profit from its intellectual property rights" in the MiDa technology, *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1219 (9th Cir. 1997), as it has none and never did.

Second, CMC and its expert economist have argued that, ████████████████ ███████████████████████████████████████████████████████ ████████████[152] But CMC's CEO and CFO both testified that ████████████████████

---

[149] *See* Dkt. 79 at 10:18-11:1.
[150] *See* Ex. 27 at 51:18-52:23, 53:20-54:16; *see also* Ex. 11 at 127.
[151] *See* Ex. 35 at 2 ███████████████████████████████████████ ██████████████████████████████████████; Ex. 88 at 2; Ex. 89 at 2. █████████████████████████████████████████████████ █████████████████████████████████████████████ Ex. 32 at 124:5-125:11.
[152] *See* Ex. 16 at 17-18; Ex. 2 ¶¶ 243-63.

1  ███████████████████████.[153] And there is no evidentiary or theoretical basis for the suggestion that

2  CMC would have withheld from Danieli any information that could have improved AZ-2's

3  equipment or layout for fear that it also could improve future competitor MiDa mills,[154] and

4  CMC does not ████████████████████████████████[155] CMC's proffered justifications

5  thus are pretextual and "need not [be] weigh[ed] . . . against the anticompetitive harms" of the

6  restraint. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 658 (2d Cir. 2015).

7       Because Pacific Steel has made its prima facie case and CMC has failed to proffer any

8  non-pretextual procompetitive justifications for its territorial exclusion, the Court need not

9  consider any less restrictive alternatives (such as royalty provisions[156]) or balance pro- and

10  anticompetitive effects, and Pacific Steel is entitled to summary judgment as to liability on its

11  claim for conspiracy in restraint of trade. *See Epic Games*, 67 F.4th at 985-86.

12  ### C.  HIGHER REBAR PRICES IMPOSED ON SOUTHERN CALIFORNIA REBAR CUSTOMERS IS TEXTBOOK ANTITRUST HARM.

14       When "an incumbent monopolist takes steps to maintain its monopoly by foreclosing a

15  would-be rival from entering . . . [b]oth consumers and foreclosed rivals suffer antitrust injury."

16  Areeda & Hovenkamp, Antitrust Law ¶ 391e. Here, CMC's foreclosure injured Pacific Steel and

17  prevented it from competing in the rebar manufacturing market, so "[Pacific Steel's] injury—

18  exclusion from the Relevant Market[]—is inseparable from the alleged harm to competition."

19  *Retrophin, Inc. v. Questcor Pharms., Inc.*, 41 F. Supp. 3d 906, 914 (C.D. Cal. 2014).

---

[153] *See* Ex. 33 at 109:9-110:1; Ex. 21 at 149:23-153:24, 156:10-25; *see also* Ex. 11 ¶¶ 239-46, 252-56. ████████████████████████████████████████████████████ *see* Ex. 17 at 16, fails both for the same reason and because it does not relate to the relevant product market, making it legally non-cognizable. *See In re NCAA Student-Athlete Name & Likeness Litig.*, 37 F. Supp. 3d 1126, 1150 (N.D. Cal. 2014) (noting the antitrust defendant's burden to demonstrate the restraint "actually promotes competition *in a relevant market*" (emphasis added)).

[154] *See* Ex. 22 at 182:23-184:4; *see also* Ex. 32 at 202:11-21.

[155] Ex. 32 at 202:1-10.

[156] *See* Ex. 3 ¶ 235; Ex. 11 ¶ 191.

1   **II.   THE RECORD ESTABLISHES PACIFIC STEEL'S RIGHT TO SUMMARY
        JUDGMENT AS TO LIABILITY ON ITS CLAIM FOR INTENTIONAL
2       INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE.**

3          The same undisputed facts that establish Pacific Steel's restraint of trade claim also

4   prove all six elements of its intentional interference with prospective economic advantage claim:

5   "(1) an economic relationship between the plaintiff and some third party, with the probability of

6   future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship;

7   (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual

8   disruption of the relationship; . . . (5) economic harm to the plaintiff proximately caused by the

9   acts of the defendant," and (6) the interference is "wrongful by some legal measure other than

10  the fact of the interference itself." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th

11  1134, 1153 (2003) (citations omitted). As described above, (1) Pacific Steel was advancing its

12  plan to hire Danieli to build a MiDa mill until (2) CMC learned of the plan and (3) pressured

13  Danieli to agree to a territorial exclusion designed to stop Pacific Steel from building the MiDa

14  mill, which (4) prevented Pacific Steel from building its planned mill, (5) injuring Pacific Steel

15  and (6) violating federal and state antitrust laws.[157]

16         The Court thus should grant summary judgment to Pacific Steel on its intentional

17  interference claim. Alternatively, if the Court finds that Pacific Steel is not entitled to summary

18  judgment as to one or more elements, the Court should grant partial summary judgment in

19  Pacific Steel's favor as to each element that Pacific Steel has established beyond dispute.

20                                  **CONCLUSION**

21         For the foregoing reasons, the Court should hold CMC liable on Pacific Steel's claims

22  for conspiracy in restraint of trade and intentional interference with prospective economic

23  advantage, and this matter should proceed to trial on damages for those claims as well as on

24  liability and damages for Pacific Steel's monopolization claims.

25

26

27

28

---

[157] *See supra* Parts III-V.

1  Dated:  November 2, 2023                    /s/ Christopher C. Wheeler

2                                              Christopher C. Wheeler (SBN 224872)
                                               Cameron J. Gibbs (SBN 346524)
3                                              FARELLA BRAUN + MARTEL LLP
                                               One Bush Street, Suite 900
4                                              San Francisco, CA 94104
                                               Telephone: (415) 954-4400
5                                              Facsimile: (415) 954-4480
                                               cwheeler@fbm.com
6                                              cgibbs@fbm.com

7                                              Benjamin D. Brown (SBN 202545)
                                               Daniel McCuaig (*pro hac vice*)
8                                              Nathaniel D. Regenold (*pro hac vice*)
                                               COHEN MILSTEIN SELLERS & TOLL
9                                                  PLLC
                                               1100 New York Ave. NW, Fifth Floor
10                                             Washington, D.C. 20005
                                               Telephone: (202) 408-4600
11                                             Facsimile: (202) 408-4699
                                               bbrown@cohenmilstein.com
12                                             dmccuaig@cohenmilstein.com
                                               nregenold@cohenmilstein.com

13                                             *Counsel for Plaintiff Pacific Steel Group*

14

15

16  39522\16466148.1

17

18

19

20

21

22

23

24

25

26

27

28