1

**UNITED STATES DISTRICT COURT**

2

**NORTHERN DISTRICT OF CALIFORNIA**

3

**OAKLAND DIVISION**

4

5 | PACIFIC STEEL GROUP,

6 |         Plaintiff,

7 |      vs.

8 | COMMERCIAL METALS COMPANY, et al.,

9 |         Defendants.

10

11

Case No. 4:20-cv-07683-HSG

**JOINT PRETRIAL STATEMENT AND [PROPOSED] ORDER**

The Hon. Haywood S. Gilliam, Jr.

| | |
|---|---|
| Date: | June 25, 2024 |
| Time: | 3:00 p.m. |
| Courtroom: | 2 |
| | |
| Action Filed: | October 30, 2020 |
| Trial Date: | July 29, 2024 |

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Joint Pretrial Statement and Proposed Order**

Pursuant to the Honorable Haywood S. Gilliam, Jr.'s Civil Pretrial and Trial Standing Order, Plaintiff Pacific Steel Group ("Pacific Steel" or "Plaintiff") and Defendants Commercial Metals Company, C M C Steel Fabricators, Inc. d/b/a CMC Rebar, and CMC Steel US, LLC (collectively, "CMC" or "Defendants") submit the following Joint Pretrial Conference Statement.

## I.      SUBSTANCE OF THE ACTION

### A.  The parties

Plaintiff Pacific Steel Group is a California limited liability company with its principal place of business in San Diego, California.

Defendant Commercial Metals Company is a Delaware corporation with its principal place of business in Irving, Texas. Defendant C M C Steel Fabricators, Inc. d/b/a CMC Rebar is a Texas corporation with its principal place of business in Seguin, Texas, and is a wholly owned subsidiary of Defendant Commercial Metals Company. Defendant CMC Steel US, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Irving, Texas, and is a wholly owned subsidiary of Defendant Commercial Metals Company.

### B.  Substance of the claims and defenses that remain to be decided

Pacific Steel claims that, during spring and summer 2020, Pacific Steel was engaged in negotiations with Danieli Corporation ("Danieli") to purchase a rebar manufacturing mill known as a "MiDa micro mill," which only Danieli can sell and which is the only kind of rebar manufacturing mill built in the United States since 1996, and build it in Southern California. Pacific Steel also claims that CMC and Danieli entered into an agreement on July 23, 2020, that prohibited Danieli from selling a MiDa micromill to Pacific Steel within 500 miles of Rancho Cucamonga, California. Pacific Steel asserts that, by entering into that agreement, CMC prevented Pacific Steel from building a rebar manufacturing mill; foreclosed Pacific Steel from entering the market for rebar supplied from within 500 miles of Southern California; restrained trade in, monopolized, and/or attempted to monopolize the market for rebar supplied from within 500 miles of Southern California; and interfered with Pacific Steel's prospective economic benefit through its business relationship with Danieli, all in violation of U.S. and California antitrust and unfair

1 business practices laws.

2     CMC denies all of Pacific Steel's claims and contends that it has acted lawfully.  CMC

3 contends that its agreement with Danieli did not unlawfully prevent Pacific Steel from

4 manufacturing and selling rebar because the agreement was limited in scope and duration, addressed

5 only one of many available options for producing rebar, and therefore did not foreclose competition.

6 CMC further contends that Pacific Steel's alleged geographic market for rebar is far too narrow;

7 commercial realities establish that the relevant geographic area where customers can and do turn to

8 buy rebar is much larger and reflect a high degree of competition among several rebar suppliers, all

9 of whom regularly sell rebar into Southern California. CMC contends that, as a result, CMC does

10 not have the power to control prices or exclude competition. CMC also contends that its agreement

11 with Danieli did not cause any customers to pay higher prices for rebar or otherwise harm

12 competition. CMC also contends that it did not harm Pacific Steel, since Pacific Steel had other

13 viable options for a rebar mill and any delays it experienced in building its MiDa mill were not

14 caused by CMC's agreement with Danieli.

15     **C. Operative pleadings**

16     The operative pleadings that raise these issues are Pacific Steel's First Amended

17 Complaint for Damages and Injunctive Relief [Dkt. 76] and CMC's Answer to First Amended

18 Complaint for Damages and Injunctive Relief [Dkt. 97].

19 **II.    RELIEF REQUESTED**

20     **A. Plaintiff's requested relief**

21       i.    A verdict from the jury determining that CMC entered into a conspiracy in

22     unreasonable restraint of trade in the relevant market for rebar in violation of

23     Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Cartwright Act, California

24     Business & Professions Code § 16720

25       ii.    A verdict from the jury determining that CMC monopolized or, in the

26     alternative, attempted to monopolize the relevant market for rebar in violation

27     of Section 2 of the Sherman Act, 15 U.S.C. § 2

iii.   A verdict from the jury determining that CMC conspired with Danieli such that CMC could unlawfully maintain its monopoly in the relevant market for rebar in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and the Cartwright Act, California Business & Professions Code § 16700 *et seq.*

iv.   A verdict from the jury determining that CMC unlawfully interfered with Pacific Steel's prospective business advantage in violation of California common law

v.   The total summation of damages caused to Pacific Steel (including any amounts subject to automatic trebling[1])

vi.   Pre-judgment and post-judgment interest at the maximum legal rate[2]

vii.   Reasonable attorneys' fees and costs[3]

viii.   Such other relief as the Court deems just and proper

**B. Defendants' requested relief**

i.   Judgment entered in favor of CMC

ii.   Reasonable attorneys' fees and costs

iii.   Such other relief as the Court deems just and proper

**III.   UNDISPUTED FACTS**

The parties stipulate to the following facts:

1.   Steel reinforcing bar or "rebar" is a steel bar used to reinforce concrete or masonry structures and add tensile strength.

2.   Merchant bar quality products or "merchant bar" is a class of long-steel products that come in a variety of shapes—including rounds, angles, channels, and flats—and are commonly used in structural and construction applications.

3.   Rebar and merchant bar are separate products that are not substitutes for one another.

---

[1] *See* 15 U.S.C. § 15(a).

[2] *See* 15 U.S.C. § 15(a); 28 U.S.C. § 1961(a).

[3] *See* 15 U.S.C. § 15(a).

4.  Rebar is a good that travels in interstate commerce.

5.  Rebar manufacturing equipment is a good that travels in interstate commerce.

6.  In the United States, some rebar is made in "minimills," which use a two-step process to manufacture rebar.

7.  In the "melt shop," recycled scrap metal is melted and cast into billets.

8.  In the "rolling mill," billets are rolled to size and then cut to length by the rolling mill's "finishing end."

9.  In a traditional minimill, the melt shop and rolling mill operate independently; after steel is melted and cast into billets, the billets are cut, cooled, and stored; later, the billets are transferred to the rolling mill where they are reheated in a "reheat furnace" before being rolled into rebar, allowed to cool on a cooling bed, then cut to length by a "static cold shear."

10. In a "micromill," sometimes called a "continuous-continuous minimill," the melt shop casts one long, continuous billet that is fed directly into the rolling mill, where "induction furnaces" maintain the temperature of the billet, eliminating the need for a traditional reheat furnace.

11. Danieli is a steel mill equipment manufacturer.

12. Danieli micromills are known as "MiDa mills."

13. MiDa micromills cut rebar to length while the rebar is still hot before it is transferred to the cooling bed.

14. On December 15, 2006, CMC and Danieli entered into an agreement to build a MiDa micromill in Mesa, Arizona ("CMC Steel AZ1"), and executed the "AZ1 Exclusivity Agreement."

15. In the AZ1 Exclusivity Agreement, CMC and Danieli agreed that Danieli would not sell to any company other than CMC a MiDa mill within 250 miles of CMC's existing U.S. mills or within 350 miles of CMC's new MiDa mill, CMC Steel AZ1, for five years.

16. On July 2, 2015, CMC and Danieli entered into an agreement to build a second MiDa mill in Durant, Oklahoma ("CMC Steel OK"), and executed the "OK Exclusivity Agreement."

17. In the OK Exclusivity Agreement, CMC and Danieli agreed that Danieli would not sell to any company other than CMC a MiDa mill within 400 miles of CMC's existing U.S. mills and its new MiDa mill, CMC Steel OK, so long as CMC exercised its right of first refusal to build a MiDa mill in the same area within 45 days of receiving notice of Danieli's opportunity to build a MiDa mill for a company other than CMC in an identified area, for five years.

18. On January 2, 2018, CMC announced that it had entered into an agreement to acquire four steel mills and 33 rebar fabrication facilities across the United States, including a traditional minimill in Rancho Cucamonga, California (the "Rancho mill" or "CMC Steel CA"), from Gerdau S.A. and its subsidiaries (collectively, "Gerdau").

19. On November 5, 2018, CMC completed the acquisition of assets from Gerdau.

20. On October 11, 2019, CMC announced the closure of the melt shop of the Rancho mill.

21. On October 11, 2019, CMC announced the reduction in the number of shifts in the rolling mill of the Rancho mill.

22. On August 7, 2020, CMC and Danieli entered into an agreement to build a MiDa-S micromill ("CMC Steel AZ2"), which is intended to produce both rebar and merchant bar using a continuous-continuous process, and executed the "AZ2 Memorandum of Understanding."

23. In the AZ2 Memorandum of Understanding, CMC and Danieli agreed that Danieli would not sell to any company other than CMC: (1) a MiDa-S mill within 500 miles of the GPS coordinates of its nine existing U.S. mills for three years; (2) a regular MiDa mill within 500 miles of the GPS coordinates of CMC's traditional minimill in Rancho Cucamonga, California, for three years; and (3) a regular MiDa mill within 500 miles

of the GPS coordinates of CMC's traditional minimill in Sayreville, New Jersey, for five years.

24. On June 19, 2020, Pacific Steel executed a vacant land purchase agreement to acquire the land in Mojave, California, on which it planned to build a rebar mill.

25. On August 13, 2020, CMC publicly announced it was building CMC Steel AZ2 in Mesa, Arizona; at the same time, CMC publicly announced the closure of the rolling mill of the Rancho mill.

26. In September 2020, Danieli offered to sell Pacific Steel a non-MiDa mill to be built in Mojave, California.

27. On October 30, 2020, Pacific Steel filed this civil action.

28. In December 2020, CMC closed the Rancho mill; there is currently no rebar mill operating in California.

29. On April 29, 2021, Pacific Steel submitted application materials for its Mojave MiDa mill project to the Kern County Planning and Natural Resources Department.

30. On May 28, 2021, the Kern County Planning and Natural Resources Department notified Pacific Steel that its application materials were incomplete and that, based on a review of Pacific Steel's proposed project, an Environmental Impact Report ("EIR") would be required per the California Environmental Quality Act ("CEQA").

31. On June 11, 2021, Pacific Steel amended its complaint.

32. On June 15, 2021, Pacific Steel took title to the land on which it expects to build its MiDa mill.

33. On August 5, 2021, Pacific Steel submitted revised application materials for its Mojave MiDa mill project to the Kern County Planning and Natural Resources Department.

34. On August 27, 2021, the Kern County Planning and Natural Resources Department formally accepted Pacific Steel's application materials for its Mojave MiDa mill project and notified Pacific Steel that its application was complete.

35. On October 29, 2021, the Court heard oral argument on CMC's motion to dismiss Pacific Steel's amended complaint.

36. On November 11, 2021, CMC and Danieli executed the First Amendment to the AZ2 Memorandum of Understanding, removing the agreement that Danieli would not sell to any company other than CMC a regular MiDa mill within 500 miles of the GPS coordinates of CMC's traditional minimill in Rancho Cucamonga, California.

37. CMC does not own any patents or patents pending relating to the design or operation of the MiDa technology.

38. CMC does not own any patents or patents pending relating to the design or operation of the MiDa-S technology.

39. On March 31, 2022, Pacific Steel executed an agreement with Danieli for the supply of a MiDa mill in Mojave, California.

40. On October 28, 2022, the Kern County Planning and Natural Resources Department issued a Notice of Preparation of a draft EIR for Pacific Steel's Mojave MiDa mill project.

41. On December 30, 2022, Pacific Steel executed Amendment No. 1 to its contract with Danieli for the supply of a MiDa mill in Mojave, California.

42. On March 17, 2023, Pacific Steel executed Amendment No. 2 to its contract with Danieli for the supply of a MiDa mill in Mojave, California.

43. On May 31, 2023, Pacific Steel executed Amendment No. 3 to its contract with Danieli for the supply of a MiDa mill in Mojave, California.

44. On September 19, 2023, Pacific Steel executed Amendment No. 4 to its contract with Danieli for the supply of a MiDa mill in Mojave, California.

45. On November 17, 2023, the Kern County Planning and Natural Resources Department issued a draft EIR for Pacific Steel's Mojave MiDa mill project.

46. On January 26, 2024, the Kern County Planning and Natural Resources Department issued a final EIR for Pacific Steel's Mojave MiDa mill project.

47. On February 8, 2024, the Kern County Planning and Natural Resources Department's Planning Commission issued a staff report recommending that the Kern County Board

of Supervisors certify the final EIR for Pacific Steel's Mojave MiDa mill project and approve the project's development plan.

48. On March 5, 2024, Pacific Steel executed Amendment No. 5 to its contract with Danieli for the supply of a MiDa mill in Mojave, California.

49. On March 19, 2024, the Kern County Board of Supervisors issued a staff report certifying the final EIR for Pacific Steel's Mojave MiDa mill project and approving the project's development plan.

50. On March 21, 2024, the Board of Supervisors of the County of Kern issued a Notice of Determination detailing the decision of the Kern County Board of Supervisors to certify the final EIR for Pacific Steel's Mojave MiDa mill project and to approve the project's development plan.

51. On May 14, 2024, Pacific Steel submitted application materials to the Eastern Kern Air Pollution Control District for an air permit for its Mojave MiDa mill project.

## IV.   DISPUTED FACTUAL ISSUES (ASSUMING THE PARTIES' PENDING SUMMARY JUDGMENT AND *DAUBERT* MOTIONS ARE DENIED)

1. When Pacific Steel and Danieli would have executed an agreement for the supply of a MiDa mill in Mojave, California, absent the challenged agreement.

2. Whether building a Danieli MiDa mill was the only way for Pacific Steel to enter the alleged relevant market.

3. When, if ever, Pacific Steel will obtain the last regulatory approval necessary to build a MiDa mill in Mojave, California.

4. When, if ever, Pacific Steel will complete construction of its MiDa mill in Mojave, California.

5. When, if ever, Pacific Steel will operate a MiDa mill in Mojave, California, that produces usable rebar.

6. When, if ever, Pacific Steel will operate a MiDa mill in Mojave, California, at full capacity.

7.  How long, if at all, was Pacific Steel delayed in building a MiDa mill in Mojave, California, by the challenged agreement.

8.  Whether the challenged agreement caused any harm to Pacific Steel.

9.  Whether rebar suppliers located farther than 500 miles from Rancho Cucamonga, California, are capable of constraining CMC Steel AZ1's ability to price rebar above the competitive level for a sustained period of time.

10. Whether the challenged agreement caused a reduction of output of rebar supplied in a relevant antitrust market, caused customers to pay higher prices for rebar supplied in a relevant antitrust market, or otherwise harmed competition.

## V.      AGREED STATEMENT

The parties do not believe that all or part of the action may be presented upon an agreed statement of facts.

## VI.      STIPULATIONS

In addition to the stipulation on third party documents previously entered by this Court, [Dkt. 144], the parties, having met and conferred, propose the following stipulations:

1.  Documents that were produced to a party to this action by another party as required under the Federal Rules of Civil Procedure shall be deemed authentic for purposes of this lawsuit only, absent good cause. Good cause includes circumstances indicating a lack of trustworthiness of the document and any condition in the actual document or the manner in which it was produced that brings into question whether the document was actually generated by the relevant party.

2.  Documents that were produced to a party to this action by another party as required under the Federal Rules of Civil Procedure and that were generated by the party that produced such documents shall be presumed admissible for the purposes of this lawsuit only, absent good cause. Good cause includes circumstances under which the source of information featured in the document and/or the circumstances of its preparation indicate a lack of trustworthiness (as noted in Federal Rule of Evidence 803(6)). Notwithstanding this presumption, both sides shall retain the right to argue that

portions of the document contain inadmissible hearsay within hearsay (under Federal Rule of Evidence 805), and retain the right to other objections, such as irrelevance or that the probative value is outweighed by the potential for prejudice (under Federal Rules of Evidence 402 and 403).

3. The parties shall be permitted to supplement their lists of all documents or other items to be offered as exhibits at trial, pursuant to Paragraph 7(h) of the Court's Civil Pretrial and Trial Standing Order, only for good cause. The parties agree that good cause includes the supplemental production of documents by a party to another party after February 1, 2024 (regardless of whether the producing party or the receiving party seeks to supplement its exhibit list with such evidence), and the availability after February 1, 2024, of previously unavailable public records.

4. Having initially identified all evidence that either party might introduce at trial that was obtained from deposition testimony, and all objections thereto, and met and conferred regarding the same, pursuant to Paragraph 7(l) of the Court's Civil Pretrial and Trial Standing Order, the offering party shall not be required to state its position in response to any objections to the use of such materials before the pretrial conference. To establish a process for narrowing and resolving disputes regarding the use of these materials at trial:

   a.   A party intending to offer evidence that was obtained from deposition testimony shall provide to the other party the designations intended to be used by 9 am PT at least two days before the date on which they will be offered. For example, if a party planned to offer designated testimony on Friday, it would identify its intended designations by 9 am PT on Wednesday.

   b.   The opposing party shall identify its operative objections and counter-designations (and, where permissible, its affirmative designations), by 9 pm PT at least two days before their intended use. Continuing the example

above, the opposing party must identify its objections and counter-designations (and its affirmative designations) by 9 pm PT on Wednesday.

c.   The offering party shall identify its operative objections and reply designations thereto (and its operative objections and counter-designations to the opposing party's affirmative designations) by 9am PT at least one day before their intended use. Continuing the example above, the offering party must identify its objections and reply designations (and its operative objections and counter-designations to the opposing party's affirmative designations) by 9 am PT on Thursday.

d.   The parties shall meet and confer (and the opposing party shall identify its operative objections and reply designations to the offering party's counter-designations) by 5 pm PT at least one day before the deposition designations' intended use and attempt to resolve the remaining disputes. Continuing the example above, the parties must meet and confer (and the opposing party must identify its operative objections and reply designations to the offering party's counter-designations) by 5 pm PT on Thursday.

e.   Should the parties be unable to resolve their disputes, the parties shall follow the procedure set forth in Paragraph 31 of the Court's Civil Pretrial and Trial Standing Order by including their respective positions in their statements on outstanding discovery disputes of five pages or less, which will be submitted to the Court by midnight PT the day before the testimony is set to be played at trial. Continuing the example above, the parties would submit their briefs by midnight on Thursday.

f.   A party shall be permitted to drop any designations, counter-designations, or reply designations at any time; in such a case, all associated counter-designations or reply designations (that are not also associated with any other designation intended to be used) also shall be dropped.

5. Having identified the "voluminous writings, recordings, or photographs that cannot be conveniently examined in court" underlying their Federal Rule of Evidence 1006 exhibits, the parties shall not exchange any Rule 1006 exhibits until one week before trial. The parties shall not be required to state their objections or responses to any objections to the use of any Rule 1006 exhibits before the pretrial conference, and by not doing so neither party waives its right to object to any Rule 1006 exhibits or to respond to any objections. The parties shall exchange objections to Rule 1006 exhibits five days before trial, and they shall exchange responses to objections three days before trial. During trial, the parties shall use the procedures set forth in Paragraph 31 of the Court's Civil Pretrial and Trial Standing Order to resolve any disputes regarding the use of such Rule 1006 exhibits.

The parties also stipulate not to elicit testimony, proffer evidence, or make argument regarding the following at trial:

6. The purported political, ideological, or partisan affiliation or activities of either party or any of its respective directors, officers, or employees. Should a witness open the door by raising any of these issues, responsive questioning within the scope of that door-opening testimony shall be permitted, as shall re-direct questioning within the scope of cross-examination.

7. Any allegation that CMC sets prices below its costs in "downstream" furnish-and-install markets, as alleged in *Pacific Steel Group v. CMC Steel Fabricators, Inc.*, No. 22-892 (S.D. Cal.). Testimony regarding the existence, scope, and capabilities of CMC's furnish-and-install business, as it relates to Pacific Steel's motivation to build its own rebar mill and/or to use MiDa technology, may be elicited.

8. Any information or testimony purportedly obtained from, or the conduct of, former CMC employee Steven Davis, including but not limited to the conduct alleged in *CMC v. Steven Davis*, No. 5:23-cv-1404 (C.D. Cal.). This stipulation shall neither expand nor limit CMC's ability to examine Mr. Griswold, if he testifies at trial, about the nature and extent of his law firm's representation of Pacific Steel in other matters, including

its representation of Mr. Davis in the C.D. Cal. case, at Pacific Steel's expense, to the extent it goes to Mr. Griswold's credibility and potential bias; in that event, Pacific Steel shall retain all associated privileges and rights, including to re-direct Mr. Griswold within the scope of CMC's cross-examination.

9.  Any competitive benefits supposedly produced by the challenged restraint that CMC did not disclose or identify during fact or expert discovery.

10. Eric Benson's personal expenditures or lifestyle, including mentions of his yacht, private jet, vacations, and marital and/or relationship status. Should Mr. Benson open the door on such topics, by raising, e.g., his personal wealth, ability to personally finance PSG's Mojave mill, personal environmental practices, or lifestyle (as opposed to the finances and environmental or regulatory goals of Pacific Steel or the Mojave mill), cross-examination within the scope of the door-opening testimony shall be permitted, as shall re-direct questioning within the scope of cross-examination.

11. That exclusivity agreements are standard contractual provisions in the steel mill industry and/or that the fact that CMC's prior exclusivity agreements with Danieli were not subject to lawsuits supports the inference that they were lawful. This is a narrow stipulation.  Testimony or evidence regarding the existence, scope, or operation of, or CMC's reasons for insisting on, the exclusivity protections in CMC's prior agreements with Danieli does not fall within this stipulation.

12. Whether Mark Olson violated any employment agreement with, or any legal, contractual, or ethical obligation owed to, Gerdau when he began to consult with Pacific Steel regarding the Mojave mill project in late 2019. Testimony regarding the fact that Mr. Olson consulted with Pacific Steel during the late 2019/early-to-mid 2020 time period while he was employed by Gerdau does not fall within this stipulation.

13. The automatic trebling of damages or the recovery of attorneys' fees under the Sherman Act, 15 U.S.C. § 15(a), or California's Cartwright Act, Cal. Bus. & Prof. Code § 16750(a).

14. Pacific Steel's furnish-and-installation business (or the market therefore), including the proposed testimony of Ms. Kamoss regarding the finances of that business, except as directly related and relevant to the claims and defenses in the case. This is a narrow stipulation. Testimony and evidence regarding the financial aspects of Pacific Steel's furnish-and-installation business that will be impacted by the Mojave mill or Pacific Steel's plans for financing the mill, or that is otherwise related and relevant to the claims and defenses in the case, does not fall within this stipulation.

15. Whether the fact that Danieli is not a defendant in this litigation has any bearing on the question of liability.

16. Testimony from any CMC current or former employees regarding the California and Kern County, California, regulatory requirements for building a greenfield rebar mill in Kern County, California. This is a narrow stipulation. Testimony or evidence regarding CMC employees' experience operating a rebar mill in California or California's statewide regulations that impacted operating a rebar mill in 2018-2020 does not fall within this stipulation.

## VII.     WITNESSES TO BE CALLED

Please see attached **Exhibit 1**, listing all witnesses likely to be called at trial, other than solely for impeachment or rebuttal, together with a brief statement following each name describing the substance of the testimony expected.

## VIII.     EXHIBITS, SCHEDULES, AND SUMMARIES

Please see attached **Exhibit 2**, listing all documents or other items to be offered as exhibits at trial, other than solely for impeachment or rebuttal, and a brief statement following each that describes: (1) its substance or purpose; (2) the identity of the sponsoring witness; and (3) whether the parties have stipulated to its admissibility and, if they have not, the objection to its admission, the grounds for the objection, and the position of the offering party.

IX.     **DISPUTED LEGAL ISSUES**

   **A.** **Whether CMC violated Section 1 of the Sherman Act and violated California's Cartwright Act by entering into an agreement with Danieli that unreasonably restrained trade in the alleged market for steel rebar supplied from within 500 miles of Rancho Cucamonga, California.** *See* **15 U.S.C. § 1; Cal. Bus. Code & Prof. Code § 16720.**

   **Plaintiff's Contention** – Pacific Steel prevails on this claim because the facts establish that (1) CMC knowingly entered into an agreement with Danieli; (2) the agreement unreasonably restrained trade; and (3) Pacific Steel was injured in its business or property because of CMC's agreement that unreasonably restrained trade. *See Epic Games, Inc v. Apple, Inc.*, 67 F.4th 946, 983 (9th Cir. 2023); *In re Nat'l Collegiate Athletic Assoc. Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1256-63 (9th Cir. 2020); *see also Cnty. of Tuolumne v. Sonora Community Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) ("The analysis under California's antitrust laws mirrors the analysis under federal law because the Cartwright Act . . . was modeled after the Sherman Act." (internal citation omitted)).

   **Defendants' Contention** – Pacific Steel has failed to carry its burden on this claim for multiple reasons. To start, Pacific Steel cannot prove a relevant antitrust market; its alleged geographic market is far too narrow. CMC does not have market power in any properly defined market. Nor can Pacific Steel prove that CMC's agreement with Danieli resulted in substantial anticompetitive harm in any market. *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020). The exclusivity agreement did not harm competition or consumers by reducing output or raising prices. There are many ways to effectively compete for sales of rebar, and current competitors have proven that they can expand production to efficiently supply Southern California and effectively constrain CMC's pricing. And, Pacific Steel (or any other potential competitor) could have built an alternative rebar mill offered by Danieli, could have purchased mill equipment from another supplier, or could have built the specific mill it wanted from Danieli outside of a 500-mile radius of Rancho Cucamonga. *See Omega Environmental, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997); *Determined Prods., Inc. v. R. Dakin & Co.*, 514 F. Supp. 645, 648 (N.D. Cal. 1979). In any event, Pacific Steel intends to use the rebar it manufactures itself as it expands its business, rather than sell it to third parties. Furthermore, even if Pacific Steel could

1    establish, contrary to the evidence, that its entry would lower the effective market price for rebar,

2    it admits that, even without the exclusivity, it would not have manufactured any rebar at least until

3    December 2025, making any theorized effect on competition future-based and entirely speculative

4    contrary to the legal requirements to establish actual substantial anticompetitive effects. Finally,

5    Pacific Steel was not harmed because CMC's agreement with Danieli did not cause any delay in

6    its planned mill project, and any injury it may have experienced was not of the type the antitrust

7    laws were intended to prevent. *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466,

8    489 (9th Cir. 2021).

9    **B.  Whether CMC violated Section 2 of the Sherman Act by willfully acquiring and/or maintaining a monopoly in the alleged market for steel rebar supplied**

10    **from within 500 miles of Rancho Cucamonga, California. *See* 15 U.S.C. § 2.**

11    **Plaintiff's Contention** – Pacific Steel prevails on this claim because the facts establish

12    that (1) CMC possesses monopoly power in a relevant antitrust market for steel rebar supplied

13    from within 500 miles of Rancho Cucamonga, California; (2) CMC willfully acquired or

14    maintained its monopoly power in that market by engaging in anticompetitive conduct; and (3)

15    Pacific Steel was injured in its business or property because of CMC's anticompetitive conduct.

16    *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481-83 (1992); *Greyhound*

17    *Computer Corp. v. Int'l Bus. Machines Corp.*, 559 F.2d 488, 492-503 (9th Cir. 1977).

18    **Defendants' Contention** – Pacific Steel's monopolization claim fails for largely the same

19    reasons as its Section 1 claim. Pacific Steel cannot prove that (1) CMC has monopoly power in

20    any properly defined antitrust market because its alleged relevant market is far too narrow; (2) that

21    CMC's actions were willful, anticompetitive, or actually resulted in CMC's acquisition of

22    monopoly power; or (3) that the exclusivity provision harmed Pacific Steel (or competition more

23    broadly) and was the type of injury the antitrust laws were intended to prevent. *See Epic Games,*

24    *Inc. v. Apple, Inc.*, 67 F.4th 946, 982-83 (9th Cir. 2023); *Qualcomm,* 969 F.3d at 989-90; *Paladin*

25    *Assocs.,* 328 F.3d at 1158 (9th Cir. 2003); *Optronic Techs.*, 20 F.4th at 489.

26

27

28

**C. Whether CMC violated Section 2 of the Sherman act by attempting to monopolize the alleged market for steel rebar supplied from within 500 miles of Rancho Cucamonga, California.** *See* **15 U.S.C. § 2.**

**Plaintiff's Contention** – Pacific Steel prevails on this claim because the facts establish that (1) CMC engaged in anticompetitive conduct; (2) CMC had a specific intent to achieve monopoly power in a relevant antitrust market for steel rebar supplied from within 500 miles of Rancho Cucamonga, California; (3) there was a dangerous probability that CMC would achieve its goal of monopoly power in that market; and (4) Pacific Steel was injured in its business or property because of CMC's anticompetitive conduct. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 481-85 (9th Cir. 2021).

**Defendants' Contention** –Pacific Steel's attempted monopolization claim fails for largely the same reasons as its Section 1 claim. It cannot prove that: (1) CMC's exclusivity agreement with Danieli was anticompetitive; (2) any relevant antitrust market in which CMC acted with a specific intent to achieve monopoly power; (3) there was a dangerous probability that CMC would achieve monopoly power in any relevant antitrust market; or (4) any injury to Pacific Steel or competition caused by the exclusivity provision and of the type the antitrust laws were intended to prevent. *See Rebel Oil*, 51 F.3d 1421, 1435 (9th Cir. 1995); *Sidibe v. Sutter Health*, No. 12-04854, 2021 WL 879875, at *9 (N.D. Cal. Mar. 9, 2021).

**D. Whether CMC violated Section 2 of the Sherman Act and violated California's Cartwright Act by conspiring to monopolize the alleged market for steel rebar supplied from within 500 miles of Rancho Cucamonga, California.** *See* **15 U.S.C. § 2; Cal. Bus. Code & Prof. Code § 16720.**

**Plaintiff's Contention** – Pacific Steel prevails on this claim because the facts establish that (1) CMC knowingly entered into an agreement with Danieli to obtain or maintain monopoly power in a relevant antitrust market for steel rebar supplied from within 500 miles of Rancho Cucamonga, California; (2) CMC specifically intended that it would obtain or maintain monopoly power in that market; (3) CMC committed an overt act in furtherance of the agreement; and (4) Pacific Steel was injured in its business or property because of the agreement. *See Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003); *Optronic Techs., Inc. v.*

1   *Ningbo Sunny Elec. Co.*, 20 F.4th 466, 481-85 (9th Cir. 2021); *see also Cnty. of Tuolumne v.*

2   *Sonora Community Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) ("The analysis under California's

3   antitrust laws mirrors the analysis under federal law because the Cartwright Act . . . was modeled

4   after the Sherman Act." (internal citation omitted)).

5       **Defendants' Contention** – Pacific Steel's conspiracy to monopolize claim fails for largely

6   the same reasons as its Section 1 claim. Pacific Steel cannot prevail on this claim because it cannot

7   establish (1) that CMC knowingly entered an agreement with Danieli to obtain or maintain

8   monopoly power in any relevant antitrust market; (2) that CMC acted with a specific intent to

9   monopolize any relevant antitrust market; (3) that CMC committed an overt act in furtherance of

10  an agreement to monopolize any relevant antitrust market; or (4) any injury to Pacific Steel or

11  competition caused by the exclusivity provision and of the type the antitrust laws were intended to

12  prevent. *Optronic Techs.*, 20 F.4th at 489; *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d

13  1145, 1158 (9th Cir. 2003).

14      **E. Whether CMC violated California common law by disrupting Pacific Steel's**
        **prospective economic advantage stemming from its economic relationship with**

15      **Danieli.** *See Korea Supply Co. v. Lockheed Martin Corp.*, **29 Cal. 4th 1134 (2003).**

16      **Plaintiff's Contention** – Pacific Steel prevails on this claim because the facts establish

17  that (1) Pacific Steel and Danieli were in an economic relationship that probably would have

18  resulted in an economic benefit to Pacific Steel; (2) CMC learned of that relationship; (3) CMC

19  knowingly entered into an agreement with Danieli that CMC knew was certain or substantially

20  certain to disrupt the relationship between Pacific Steel and Danieli; (4) the relationship between

21  Pacific Steel and Danieli was disrupted; (5) CMC's conduct was a substantial factor in causing

22  Pacific Steel harm; and (6) CMC's conduct was "wrongful by some legal measure other than the

23  fact of the interference itself." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134,

24  1153 (2003); *G&C Auto Body Inc. v. Geico General Ins. Co.*, 552 F. Supp. 2d 1015, 1021-22

25  (N.D. Cal. 2008).

26      **Defendants' Contention** – Pacific Steel cannot prevail on its intentional interference

27  claim because it cannot establish (1) that, as of August 2020, it had an actual economic

28  relationship with Danieli that probably would have resulted in an economic benefit to Pacific

Steel; (2) that CMC somehow learned of this non-existent economic relationship; (3) that CMC knowingly entered into an agreement with Danieli to disrupt the non-existent relationship between Pacific Steel and Danieli; (4) that Pacific Steel's non-existent relationship with Danieli was actually disrupted by CMC's agreement with Danieli; (5) that CMC's agreement with Danieli, and not other reasons—like Pacific Steel's failure to secure land, regulatory approval, financing, or electricity for its planned mill site—was a substantial factor in causing harm to Pacific Steel; or (6) that CMC's agreement with Danieli was independently wrongful. *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 950, 953 (2003).

## X.   PENDING MOTIONS OR MATTERS

The following motions that must be resolved prior to trial are pending:

1. Pacific Steel's Motion to Exclude Opinions of Gilbert Hutton [Dkt. 157, 158]

2. CMC's Motion to Exclude Expert Testimony of Theodore Griswold [Dkt. 153, 162]

3. CMC's Motion to Exclude Expert Testimony of Eric Benson and Mark Olson [Dkt. 154, 163]

4. CMC's Motion to Exclude Expert Testimony of Dominick DeSalvo and John Stanich [Dkt. 156, 164]

5. CMC's Motion to Exclude Certain Testimony of Patrick F. Kennedy [Dkt. 160, 165]

6. Pacific Steel's Motion to Strike Sur-Reply Report of Ramsey Shehadeh, Ph.D., Filed with CMC's Reply Memorandum in Support of Its Motion to Exclude Certain Testimony of Patrick F. Kennedy [Dkt. 205]

7. CMC's Motion to Strike Expert Reply Report of Theodore Griswold [Dkt. 271]

8. Pacific Steel's Motion in Limine No. 1 Seeking An Advance Ruling That Statements By Danieli In Furtherance Of The Conspiracy Are Admissible [Dkt. 302]

9. Pacific Steel's Motion in Limine No. 2 Seeking To Preclude References To Hybar, LLC's Mill Project In Osceola, Arkansas [Dkt. 303]

10. Pacific Steel's Motion in Limine No. 3 To Preclude CMC From Offering Rationales For Entering Into The Exclusivity Agreement With Danieli Related To CMCs AZ-1 MiDa Mill [Dkt. 304]

11. Pacific Steel's Motion in Limine No. 4 To Preclude CMC From Proffering Any
    Explanation For The November 2021 Removal Of The Challenged Restraint That Was
    Not Disclosed By Its Corporate Designee [Dkt. 305]

12. CMC's Motion in Limine No. 1 re: Alleged Anticompetitive Effects of the Acquisition
    and Closure of Defendants' Rancho Mill [Dkt. 309]

13. CMC's Motion in Limine No. 2 re: Excluding Evidence Regarding Section 232 of the
    Trade Expansion Act of 1962 [Dkt. 310]

14. CMC's Motion in Limine No. 3 re: Excluding Evidence Regarding the Italian Lawsuit
    Between SMS and Danieli [Dkt. 311]

15. CMC's Motion in Limine No. 4 re: Referring to a Conspiracy Between CMC and
    Danieli [Dkt. 312]

## XI.   BIFURCATION OR SEPARATE TRIAL OF ISSUES

The parties do not request bifurcation or a separate trial of specific issues.

## XII.   USE OF DISCOVERY RESPONSES

Please see attached **Exhibit 3**, listing citations to all evidence that the parties might introduce at trial, other than to be used solely for impeachment or rebuttal, that was obtained from deposition testimony, interrogatory responses, or responses to requests for admission, and a brief statement following each that describes any objections to the use of the materials, the grounds for the objections, the position of the offering party, and a certification that the parties have conferred regarding such objections.

## XIII.   ESTIMATE OF TRIAL TIME

Pacific Steel estimates that it will need five-to-six court days to present its case, and CMC estimates that it will need five-to-six court days to present its case.

## XIV.   SETTLEMENT DICUSSIONS

The parties met and conferred on May 24 and May 30, 2024, regarding settlement prospects and consider settlement discussions to be stalled. They are not optimistic about the prospect of continued settlement discussions.

**XV.      MISCELLANEOUS**

The parties have not identified any miscellaneous matters that would facilitate the just, speedy, and efficient resolution of this action.

*The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues of fact and law remaining to be litigated, this order shall supplement the pleadings and govern the course of trial of this case, unless modified by the Court to prevent manifest injustice.*

1    Dated:    June 13, 2024                          Dated:    June 13, 2024

2

3    By:   /s/ Christopher C. Wheeler                 By:   /s/ Steven Bizar
     Christopher C. Wheeler (SBN 224872)              Steven Bizar (*pro hac vice*)
4    Cameron J. Gibbs (SBN 346524)                    Agnese Nadalini (*pro hac vice*)
     FARELLA BRAUN + MARTEL LLP                       David Costigan (*pro hac vice*)
5    One Bush Street, Suite 900                       DECHERT LLP
     San Francisco, CA 94104                          2929 Arch St.
6    Telephone: (415) 954-4400                        Philadelphia, PA 19104
     Facsimile: (415) 954-4480                        Telephone: 215.994.4000
7    cwheeler@fbm.com                                 Facsimile: 215.994.2222
     cgibbs@fbm.com                                   Email: steven.bizar@dechert.com
8                                                     Email: agnese.nadalini@dechert.com
                                                      Email: david.costigan@dechert.com
9    Benjamin D. Brown (SBN 202545)
     Daniel McCuaig (*pro hac vice*)
10   Nathaniel D. Regenold (*pro hac vice*)           Shari Ross Lahlou (*pro hac vice*)
     COHEN MILSTEIN SELLERS                           Nathan Richardson (*pro hac vice*)
11   & TOLL PLLC                                      DECHERT LLP
     1100 New York Ave., NW, Fifth Floor             1900 K Street, NW
12   Washington, DC 20005                             Washington, DC 20006
     Telephone: (202) 408-4600                        Telephone: 202.261.3300
13   Facsimile: (202) 408-4699                        Facsimile: 202.261.3333
     bbrown@cohenmilstein.com                         Email: shari.lahlou@dechert.com
14   dmccuaig@cohenmilstein.com                       Email: nathan.richardson@dechert.com
     nregenold@cohenmilstein.com
15                                                    Joseph Trujillo (SBN 305170)
     William C. Price (SBN 108542)                    DECHERT LLP
16   Rachael L. McCracken (SBN 252660)                45 Fremont St., 26th Floor
     QUINN EMANUEL URQUHART &                         San Francisco, California 94105
17   SULLIVAN, LLP                                    Telephone: 415.262.4500
     865 S. Figueroa Street, 10th Floor               Facsimile: 415.262.4555
18   Los Angeles, CA 90017                            Email: joseph trujillo@dechert.com
     Telephone: (213) 443-3000
19   Facsimile: (213) 443-3100                        By:   /s/ Bonnie Lau
     williamprice@quinnemanuel.com                    Bonnie Lau (SBN 246188)
20   rachaelmccracken@quinnemanuel.com                Lena Gankin (SBN 333047)
                                                      MORRISON & FOERSTER LLP
21   Steig D. Olson (*pro hac vice*)                  425 Market Street
     Nic Siebert (*pro hac vice*)                     San Francisco, California 94105-2482
22   QUINN EMANUEL URQUHART &                         Telephone: 415.268.7000
     SULLIVAN, LLP                                    Facsimile: 415.268.7522
23   51 Madison Avenue, 22nd Floor                    Email: blau@mofo.com
     New York, NY 10010
24   Telephone: (212) 849-7000                        *Attorneys for Defendants*
     Facsimile: (212) 849-7100                        *Commercial Metals Company;*
25   steigolson@quinnemanuel.com                      *CMC Rebar West;*
     nicolassiebert@quinnemanuel.com                  *CMC Steel US, LLC*
26
     *Attorneys for Plaintiff Pacific Steel Group*
27

28

1

**ECF ATTESTATION**

2       I, Christopher C. Wheeler, am the ECF User whose ID and password are being used to file

3  this JOINT PRETRIAL STATEMENT AND [PROPOSED ORDER].  In accordance with Civil Local

4  Rule 5-1, concurrence in the filing of this document has been obtained from each of the other

5  signatories, and I shall maintain records to support this concurrence for subsequent production for the

6  Court if so ordered or for inspection upon request by a party.

7

Dated:     June 13, 2024                          FARELLA BRAUN + MARTEL LLP

8

9
                                        By:     /s/ Christopher C. Wheeler
10                                                 Christopher C. Wheeler

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**[PROPOSED] JOINT PRETRIAL ORDER**

The above JOINT PRETRIAL STATEMENT AND [PROPOSED ORDER] is approved as the Pretrial Order for this case and all parties shall comply with its provisions.

**IT IS SO ORDERED.**

Dated:

_____

The Honorable Haywood S. Gilliam, Jr.
UNITED STATES DISTRICT JUDGE