UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC STEEL GROUP,<br><br>    Plaintiff,<br><br>    v.<br><br>COMMERCIAL METALS COMPANY, et al.,<br><br>    Defendants. | Case No. 20-cv-07683-HSG<br><br>**ORDER DENYING DEFENDANTS' MOTIONS TO EXCLUDE EXPERT WITNESSES AND PLAINTIFF'S MOTION TO STRIKE**<br><br>Re: Dkt. Nos. 153, 156, 160, 205 |

Before the Court are Defendants Commercial Metals Company and its subsidiaries' (collectively, "CMC") motions to exclude expert witnesses and Plaintiff Pacific Steel Group's ("Pacific Steel") motion to strike expert sur-reply report. Dkt. Nos. 153, 156, 160, 205. For the reasons below, the Court **DENIES** the motions.

## I. LEGAL STANDARD

Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion or otherwise" where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Expert testimony is admissible under Rule 702 if it is both relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). "[R]elevance means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes primarily to relevance.") (quotation omitted). Under the reliability requirement, the expert

1  testimony must "ha[ve] a reliable basis in the knowledge and experience of the relevant
2  discipline." *Primiano*, 598 F.3d at 565.  To ensure reliability, the Court "assess[es] the [expert's]
3  reasoning or methodology, using as appropriate such criteria as testability, publication in peer
4  reviewed literature, and general acceptance." *Id.* at 564.

## II.   CMC'S MOTIONS

### A.   Theodore Griswold

CMC first contends that Theodore Griswold is unqualified to offer an opinion as to the regulatory requirements for constructing a steel mill in California or anywhere else.  Dkt. No. 153 ("Mot.") at 2.  According to CMC, Mr. Griswold has never worked on obtaining permits for a minimill or any other type of rebar mill in California or elsewhere.  *See id*. (citing Ex. 3 Griswold Tr. at 84:2–6).  Next, CMC argues that Mr. Griswold's opinions should be excluded because his extensive relationship with Pacific Steel makes him biased.  *See id*. at 4.

Mr. Griswold is a partner at the Procopio Law Firm in San Diego and has over 30 years of experience representing clients as an environmental attorney in California.  Griswold Report at ¶ 6.  His work has entailed assisting clients with obtaining project approvals and permits, and in opposing permit applications in connection with infrastructure, economic development, industry and renewable energy projects.  *Id*.  Additionally, he assists clients in gaining project approvals from federal, state, and local governments, and contests projects (mining, land fill, industrial, and shipping) on behalf of clients seeking to address environmental concerns.  *See id*. at ¶ 7–8.  He has won awards as a top-rated lawyer in energy law, environmental law, land use, and zoning.  *See id*. at Ex. 1 ("CV") at 6.

Based on the proffered information, the Court finds that Mr. Griswold is qualified to offer an opinion regarding the process for obtaining regulatory clearance for a large industry project (in this case, a minimill).  Mr. Griswold has extensive practical and legal experience in handling complex matters for clients seeking regulatory clearance for industrial-scale projects.  While CMC is correct that none of Mr. Griswold's representations explicitly involved "minimills," the Court finds his lack of prior experience with this particular type of project goes to the weight of his testimony rather than its admissibility.  *See United States v. Garcia*, 7 F.3d 885, 890 (9th Cir.

1993) ("Ms. Clashin's lack of particularized expertise goes to the weight accorded her testimony, not to the admissibility of her opinion as an expert.").

The Court finds that any purported bias also clearly goes to weight rather than admissibility. "[E]vidence of bias goes toward the credibility of a witness, not his competency to testify, and credibility is an issue for the jury." *United States v. Abonce-Barrera*, 257 F.3d 959, 965 (9th Cir. 2001); *see Hingson v. Pac. Sw. Airlines*, 743 F.2d 1408, 1413 (9th Cir. 1984) ("If the testimony is otherwise admissible under Rule 702, the fact that Waters worked for PSA does not preclude his appearance as an expert witness for Hingson."). Accordingly, the Court finds that Mr. Griswold is qualified to offer testimony regarding the regulatory steps that Pacific Steel would need to take to secure a mill in the greater Los Angeles Basin.[1]

### B. Dominick DeSalvo and John Stanich

Next, CMC argues that the Court should exclude the expert opinions of Dominick DeSalvo and John Stanich. *See* Dkt. No. 156 ("Mot."). DeSalvo and Stanich submitted a joint expert report opining that CMC blocked Pacific Steel from entering a binding contract with Danieli for a MiDa micro mill for 487 days. According to DeSalvo and Stanich this delayed Pacific Steel from constructing its mill project and caused damages (in the form of increased costs of labor, material, equipment, and services necessary for the construction of the mill) totaling at least $17,985,961. *See* Dkt. No. 156-5, Ex. 3 ("DeSalvo and Stanich Report") at ¶ 6. They also opine that to the extent Pacific Steel theoretically could have turned to alternative contractors rather than working with Danieli, such "experienced, highly specialized contractors" were unavailable due to the large

---

[1] CMC contends that if Mr. Griswold is permitted to testify, the Court should grant supplemental discovery given his refusal to answer questions at his deposition on certain topics, specifically the advice he personally provided to Pacific Steel with respect to its regulatory prospects of constructing different kinds of steel mills. *See id.* at 6–7. To the extent Mr. Griswold refused to answer questions during his deposition, he will be precluded from testifying as to those topics. *Oracle America, Inc. v. Google Inc.*, Case No. C 10-03561-WHA, 2012 WL 1189898, at *4 (N.D. Cal. Jan. 4, 2012) ("In the interest of fairness, Mr. Lindholm cannot testify on matters he refused to address during his deposition."). The Court also finds that CMC has not shown that Mr. Griswold "selectively disclos[ed]" attorney opinion or waived the attorney-client privilege generally by testifying as he did. *See Genentech, Inc. v. Insmed, Inc.*, 236 F.R.D. 466, 469 (N.D. Cal. 2006) ("Waiver is not likely to be found when the statements alleged to constitute waiver do not disclose the contents of a specific communication between client and attorney.").

3

number of mill projects under construction across the United States. According to DeSalvo and Stanich, this means that Pacific Steel's only alternative would be to work with "inexperienced contractors," and doing so would result in great financial loss. *See id*. at ¶¶ 17–25. CMC challenges both conclusions, arguing that the 487-day delay conclusion is disconnected from the facts and is unreliable, and that the "inexperienced contractors" argument is speculative and rests on a suspect methodology. *See generally* Mot. The Court denies the motion as to both grounds.

As to the first opinion, CMC contends that DeSalvo and Stanich's conclusion that CMC delayed Pacific Steel's mill construction by at least 487 days "follows from a single implausible and counter-factual premise" that Pacific Steel could not make "even a single day's worth of progress towards constructing its anticipated mill during those 487 days." Mot. at 4. CMC says this opinion is fatally flawed because Pacific Steel actually undertook several necessary pre-construction projects during the 487-day delay period. But the report focuses on the delay impacting the "critical path of Pacific Steel's mill project," meaning that while Pacific Steel could conduct certain preconstruction activity, there were certain critical tasks that could not be completed prior a fully executed agreement. DeSalvo and Stanich Report at ¶ 6; *see also* Dkt. 180-3, Ex. 1 ("DeSalvo Tr.") at 33:14-34:5 ("So it's things that are progressing the project, but they're not progressing the important part of the project."). The Court agrees with Pacific Steel that CMC's challenge is "an attempt to repackage its anticipated cross-examination" of DeSalvo and Stanich as a *Daubert* motion. *JH Kelly, LLC v. AECOM Tech. Servs. Inc.*, 605 F.Supp.3d 1295, 1318 (N.D. Cal. 2022). The inquiry into the admissibility of expert testimony is "a flexible one" where "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

CMC also argues that DeSalvo and Stanich's damages calculation (based on the purported 487-day delay) is independently defective and "heaps additional unreliability onto an already collapsed foundation." Mot. at 8. DeSalvo and Stanich predicate their damages opinion on their estimate, compiled by Stanich, of the increased construction costs Pacific Steel would incur in building a minimill no earlier than June 2024, as compared to if the project had proceeded as

4

1   planned in February 2023.  DeSalvo and Stanich Report at ¶¶ 7, 44-45.  CMC argues that their

2   estimate is "based on an exercise lacking anything approaching an appropriate methodology."  *Id*.

3   Specifically, CMC contends that the damages calculation relies on a uniform wage labor rate of

4   $100 per hour for seven different construction specialties.  According to CMC, this is a

5   "contrived" and "shoddy" methodological approach that does not take into consideration the

6   varying prices rates for different specialties.  *Id*. at 8–9.  But this again goes to weight, not

7   admissibility.  *See United States for Use & Benefit of BergelCorp. v. Sauer, Inc.*, No. 5:18-CV-

8   00612-EJD, 2020 WL 470273, at *2 (N.D. Cal. Jan. 29, 2020) ("[E]xperts' decisions about what

9   data to use in their analysis bear on the weight, not the admissibility of expert testimony.").

10  　　　　CMC also seeks to exclude DeSalvo and Stanich's expert testimony regarding the

11  unavailability of qualified contractors and the increased costs Pacific Steel would incur based on

12  having to wait for them to become available.  Mot. at 12.  CMC argues that this opinion is "sheer

13  speculation" and based on unreliable methodology.  *See id*. at 12–19.  Specifically, CMC contends

14  that DeSalvo and Stanich "rely in part on press releases disclosing various current and anticipated

15  steel mill construction projects around the country to infer that steel mill contractors must be

16  busy."  Mot. at 13.  CMC contends that this is a conclusory and arbitrary assumption.  According

17  to CMC, "those press releases do not specify the contractors working on the projects, the resources

18  or personnel committed by the contractors, or when they were retained, much less show that

19  particular contractors who are purportedly unavailable now would have been available had

20  [Pacific Steel] contacted them sooner."  *Id*.  But DeSalvo and Stanich represent that they "(1)

21  researched all steel mill projects projected to start in 2023 and 2024, . . . (2) researched the

22  availability of steel mill contractors, . . . (3) obtained the costs of materials that would be used on

23  the project, . . .  (4) obtained union labor rates, . . .  [and] (5) reviewed contractor quotations

24  received by Pacific Steel."  DeSalvo and Stanich Report at ¶ 22.  This is an adequate basis for the

25  opinion, and CMC will be able to test the validity of the assumptions through cross-examination.

26  　　　　Finally, CMC argues that the method DeSalvo and Stanich used to quantify the delta in

27  cost between using "inexperienced" versus "experienced" contractors is "novel, untested, and

28  unreliable."  Mot. at 15 (citing *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998)).

United States District Court
Northern District of California

1   DeSalvo and Stanich opine that if Pacific Steel had to hire inexperienced contractors, it would
2   result in at least 11% higher costs than it would incur working with experienced ones. DeSalvo
3   and Stanich Report at ¶ 25. They rely on their "own industry experience and the learning curve
4   theory." *Id*. at ¶ 26. The learning curve theory explains "that with each repetition of a task, the
5   time taken to complete that same task again will decrease at a certain, observable rate." *Id*. at ¶
6   27. "This decrease in time is due to the learning and experience gained by the individual or
7   organization performing the repeated task." *Id*. The quantitative analysis takes the form of a
8   percentage that increases with the difficulty of improving efficiency. For example, in an "80%
9   Learning Curve," each doubling of repetitions results in a 20% efficiency gain, whereas in a "90%
10  Learning Curve," each doubling results in just a 10% efficiency gain. *See id*. at ¶ 27–30. CMC
11  argues that DeSalvo and Stanich's opinion that a 90% Learning Curve applies to this case is
12  unsupported by any scholarly sources or publications. In response, Pacific Steel argues that CMC
13  ignores DeSalvo and Stanich's "citation to several additional scholarly papers (one as recent as
14  2018) that apply the Learning Curve in a variety of industries, including the construction
15  industry." Opp. at 15. This is an adequate basis to support the reliability of the opinion. "At the
16  end of the day, the appropriate way to discredit [this] theory [is] through competing evidence and
17  incisive cross-examination." *Murray v. S. Route Mar. SA*, 870 F.3d 915, 925 (9th Cir. 2017).

### C. Patrick Kennedy

Pacific Steel claims that the only viable way to compete in the proposed market is to have a MiDa mill. It argues that the Danieli non-MiDa mills were inferior alternatives to the MiDa technology. Patrick Kennedy, an economist hired by Pacific Steel, supports this conclusion. His expert report opines that had Pacific Steel opted for a non-MiDa mill, it would have been "at a material disadvantage when compared to technology that was available to [its] competitors." Dkt. 160-7, Ex. 5 ("Kennedy Report") at ¶ 117. According to Dr. Kennedy, an alternative mill would have committed Pacific Steel to a technology with an earnings capacity that "was approximately $19 million less per year than with the MiDa Mill at full capacity." *Id*. CMC argues that the Court should "exclude Dr. Kennedy's opinion that it would have been irrational for [Pacific Steel] to invest in Danieli's alternative mill." Dkt. 160-1 ("Mot.") at 5. CMC makes two arguments: (1)

Dr. Kennedy does not adequately explain how he reached his conclusions such that the Court cannot assess whether his methods are reliable; and (2) Dr. Kennedy' conclusions rest solely on a profitability metric – Return on Capital Employed ("ROCE") – that is not generally accepted in the relevant community. *Id*. at 7–15.

"As a prerequisite to making the Rule 702 determination that an expert's methods are reliable, the court must assure that the methods are adequately explained." *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002) (collecting cases). The district court has a duty to "act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards." *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 982 (9th Cir. 2011).

CMC argues that "Dr. Kennedy made no attempt to explain how he used some combination of Pacific Steel's WACC [(weighted average cost of capital)] and the ROCE tables he calculated" to conclude that building a MiDa mill was viable but building Danieli's alternative mill was not. Mot. at 7. CMC also contends that Dr. Kennedy never articulates *how* he concluded that building a MiDa mill is economically rational. *Id*. at 8. But Dr. Kennedy's report explains operating costs differences between the MiDa mill and the alternative mill. *See* Kennedy Report at Figure 15. Dr. Kennedy explains how he arrived at various costs differences in personnel, maintenance, supplies, gas, electrodes, rolling, and melt shop between the MiDa and alternative mill. *See id*. And his analysis considered that over a range of historical average metal spreads, the financial performance of the alternative mill would have dropped below Pacific Steel's cost of capital and comparable market-based required returns. *See* Kennedy Report at ¶¶ 48, 87–88, 103, Figure 16. Unlike in *Hermanek*, where the "district court relied solely on [the expert's] general qualifications without requiring the [plaintiff] to explain the method [the expert] used to arrive at his [conclusions]," Dr. Kennedy has adequately explained his methodologies here. *Hermanek*, 289 F.3d at 1094.

CMC also argues that ROCE is not an accepted economic basis for evaluating project investment, making Dr. Kennedy's opinion "contrived and unreliable." Mot. at 10–15. But Dr. Kennedy's report details that ROCE is a methodology applied routinely in the steel industry. Dr. Kennedy avers that "[o]ther companies in the steel industry also consider ROCE when making

7

investment decisions." Kennedy Report at ¶ 67. He notes that Geradu (a leading global steel producer) has represented that ROCE is a "critical consideration" in evaluating the profitability of its business lines. *Id*. Several steel companies and other "capital-intensive companies" use ROCE as well. *See* Dkt. No. 160-8, Ex. 6 ("Kennedy Reply Report") at ¶¶ 26–35 (citing statements on companies' websites characterizing ROCE as (1) "the central performance measure" for allocating capital expenditures; (2) "the key management indicator used to assess [] profitability"; and (3) "the one and only ratio to measure value creation"). Based on these representations, the Court finds that there is sufficient evidence that this method is "generally accepted in the relevant community," *see Kumho Tire Co., Ltd. v. Carmichael*, 526 119 S.Ct. 1167, 1176 (1999), and is not the type of "unreliable nonsense" warranting exclusion, *see Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). Again, any purported defects in the application of the methodology can be attacked on cross examination. *See Pelican Int'l., Inc. v. Hobie Cat Co.*, 2023 WL 2130379, at *2 (S.D. Cal. Feb. 10, 2023) ("[W]here the methodology is reasonable . . . the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder.").

### III. PACIFIC STEEL'S MOTION

#### A. Ramsey Shehadeh

In compliance with the Court's Scheduling Order, Pacific Steel filed Dr. Kennedy's opening expert report, CMC filed Ramsey Shehadeh's ("Dr. Shehadeh") rebuttal expert report, and Pacific Steel filed Dr. Kennedy's reply expert report. Though the Court's Scheduling Order did not contemplate additional expert filings, CMC filed a "Declaration" of Dr. Shehadeh because Dr. Kennedy's expert reply "presented updated and wholly new calculations and methods." Dkt. 190-14, Ex. 12 ("Shehadeh Decl.") at ¶ 1. Pacific Steel moves to strike Dr. Shehadeh's declaration arguing that his "misleadingly styled" declaration is an expert sur-reply report that is impermissible because the Court's Scheduling Order did not allow sur-replies and the declaration was filed after the close of expert discovery. Dkt. 205 ("Mot.") at 3.

Federal Rule of Civil Procedure 26 governs the disclosure of expert reports. *See* Fed. R.

Civ. P. 26(a)(2)(D). Expert rebuttal reports are "intended solely to contradict or rebut evidence on the same subject matter identified by another party" in that other party's expert disclosures." Fed. R. Civ. P. 26(a)(2)(D)(ii). Accordingly, under Rule 26, parties are not allowed to use a rebuttal report as a "backdoor to introduce analysis that could have been included in the opening report." *City & Cnty. of S.F. v. Purdue Pharma L.P.*, No. 18-CV-07591, 2022 WL 1203075, at *2 (N.D. Cal. Apr. 22, 2022). Under Rule 26(e), a party may supplement expert reports "in a timely manner if the party learns that in some material respect, the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e). Rule 37 provides that if a party fails to provide the information required by Rule 26(a), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1). When considering whether an untimely expert report is substantially harmless or justified, the Court may consider various factors, including: (1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence. *See Lanard Toys Ltd. v. Novelty, Inc.*, 375 F. App'x 705, 713 (9th Cir. 2010).

The Court denies Pacific Steel's motion to strike. Dr. Kennedy's reply report plainly included significant new NPV and IRR analyses. Pacific Steel argues that these additional analyses were advanced solely to explain that Dr. Shehadeh's critique was immaterial because NPV and IRR calculations lead to the same conclusions as Dr. Kennedy's initial ROCE analyses. *See* Dkt. 222 ("Reply") at 4. But this "immateriality" argument is based on entirely new, previously undisclosed analyses and calculations that were not included in the opening report. This meant that Dr. Shehadeh was not able to respond to them in his rebuttal report. Courts in this district have found that reply reports cannot raise new theories or analyses, because this practice makes a fair response impossible. *See e.g., Purdue Pharma L.P.*, 2022 WL 1203075, at *1–2 ("Dr. Keyes is responding to an identified omission in her report by performing a new analysis in an attempt to fill the hole that Defendants' experts identified. This is not proper rebuttal testimony—Dr. Keyes is not attempting to 'explain, repel, counteract or disprove evidence of the

9

adverse party.' She is offering a new model based on a new methodology in response to a criticism of her opening report."); *Oracle America, Inc. v. Google*, No. C-10-03561-WHA, 2011 WL 5572835, at *3 (N.D. Cal. Nov. 15, 2021) ("A party with the burden of proof on an issue should not be allowed to secretly prepare an army of "rebuttal" experts to attack the opposition reports. . . If they were allowed to do so, their work would not be subject to a direct response from any opposing expert. This immunity, combined with the element of surprise, would be unfair.").

Dr. Kennedy's reply report offered "a new model based on a new methodology in response to a criticism of [his] opening report." *Purdue Pharma L.P.*, 2022 WL 1203075, at *1–2. In response, CMC submitted Dr. Shehadeh's declaration, which principally addresses the NPV analysis in Dr. Kennedy's expert reply. In that declaration he claims that "Dr. Kennedy's NPV calculations yield results that contradict his ROCE-based analysis." Shehadeh at ¶ 18. This filing was "substantially justified" as a matter of basic fairness.[2] Accordingly, the Court DENIES Pacific Steel's motion to strike.[3]

\\

\\

---

[2] Courts have cited this element of simple fairness in allowing similar supplemental expert filings. *See, e.g., United States ex rel. Brown v. Celgene Corp.*, No. CV 10-3165 GHK (SS), 2016 WL 6542730, at *9 (C.D. Cal. June 29, 2016) (permitting sur-reply "to address any possible prejudice" caused by plaintiff's late disclosed report); *Cellspin Soft, Inc. v. Garmin Int'l., Inc.*, No. 17-cv-05934-YGR, 2021 WL 12171867, at *2–4 (N.D. Cal. Dec. 21, 2021) (permitting two supplemental rebuttal reports under Rule 26(e) based on incomplete information); *Nat'l. Fire Prot. Ass'n., Inc. v. UpCodes, Inc.*, No. 2:21-CV-05262-SPG-E, 2023 WL 5505888, at *7 (C.D. Cal. Aug. 8, 2023) (permitting sur-rebuttal to remedy plaintiff's late expert discovery disclosure).

[3] Ordinarily, instead of filing what amounts to a sur-declaration, a party confronted with an expert rebuttal report that it believes offers new analysis or theory not previously disclosed would simply move to strike the new opinions. *See e.g.*, *Purdue Pharma L.P.*, 2022 WL 1203075, at *1 ("Defendants move to strike sections of the rebuttal reports of Plaintiff's experts Dr. Keyes and Dr. Waldman. Defendants argue that the relevant sections of the reports offer new analyses and new opinions that are improper for rebuttal reports."). For whatever reason, CMC did not do so here, and in the current posture, Dr. Shehadeh's declaration is a necessary and fair response as explained above. But fundamentally, the Court questions why the newly added analyses in Dr. Kennedy's reply report should not simply be stricken. Accordingly, the Court **ORDERS** the parties to submit simultaneous briefs of no more than five pages explaining why the proper course is not simply to strike both the new analyses in Dr. Kennedy's reply report and Dr. Shehadeh's responsive declaration (which would be unnecessary at that point). The parties shall submit their briefs by July 2, 2024. No further responses are permitted.

## IV. CONCLUSION

CMC's motions to exclude are **DENIED**.  *See* Dkt. Nos. 153, 156, 160.  Pacific Steel's motion to strike is also **DENIED.**  *See* Dkt. No. 205.

**IT IS SO ORDERED.**

Dated:   6/25/2024

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge