UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PACIFIC STEEL GROUP,

              Plaintiff,

     v.

COMMERCIAL METALS COMPANY, et al.,

             Defendants.

Case No. 20-cv-07683-HSG

**PUBLIC VERSION OF ORDER FILED ON JUNE 10, 2024 DENYING PLAINTIFF'S AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT[1]**

Re: Dkt. Nos. 155, 235

Before the Court are Plaintiff Pacific Steel Group's ("Pacific Steel") and Defendants Commercial Metals Company and its subsidiaries' (collectively, "CMC") cross-motions for summary judgment. Dkt. Nos. 155, 235. The Court held a hearing on the cross-motions. Dkt. No. 245. For the reasons below, the Court **DENIES** the cross-motions for summary judgment.

## I.    BACKGROUND

### A.    The Rebar Industry

Steel reinforcing bar or "rebar" is a steel bar used to reinforce concrete in construction projects. Dkt. 155-3, Ex. 3 ("Elhauge Report") at ¶ 14. Without reinforcement, concrete could not be widely used in construction projects. *See id.* at ¶ 15. Today, rebar is often produced at a type of steel mill called a "mini mill." Dkt. 161-3, Ex. 1 ("Lawrence Tr.") at 53:20-54:5. Mini mills contain

---

[1] The Court filed an order under seal denying Plaintiff's and Defendants' motions for summary judgment on June 10, 2024. In that order, the Court highlighted in yellow any material that might have been subject to the parties' pending administrative motions to seal. That same day, the Court issued an order directing the parties to file a joint proposed set of redactions as to any information in the summary judgment order they believed to be sealable. *See* Dkt. No. 319. The parties did not submit any proposed redactions. Instead, the parties submitted a joint statement confirming that neither party believes that the summary judgment order requires any redactions. *See* Dkt. No. 351. This public order thus is identical to the Court's June 10, 2024 summary judgment order in every respect except that the Court has removed the yellow highlighting.

United States District Court
Northern District of California

United States District Court
Northern District of California

an electric furnace, which melts scrap metal down to molten steel. *Id.* The molten steel is then cast into billets, and a rolling mill takes the billets and rolls them into final form. *Id.* The final component is the finishing end, which stacks or bundles the materials. *Id.* In a traditional mini mill, after billets are heated, they are cut, cooled, stored, and then reheated and rolled into rebar. Dkt. No. 161-5, Ex. 3 ("Cottrell Tr.") at 125:13-19.

A "micro mill" is a specialized type of mini mill. Elhauge Report at ¶ 56. Micro mills use an electric arc furnace, but instead of outputting pure steel billets (which must be stored and later re-heated and rolled into rebar), a micro mill outputs directly into rebar. Cottrell Tr. at 125:13-20. By rolling the billets in real time, continuous-continuous micro mills replace the reheat furnace found in traditional mini mills with a more flexible induction furnace. *Id.* In Pacific Steel's view, this advanced technology translates into significant cost advantages for rebar manufacturers: it estimates that each ton of rebar produced by a micro mill costs at least approximately $53 less to manufacture than a ton produced by a mini mill. Elhauge Report at ¶ 182. According to Pacific Steel, the micro mill is not only the most cost-effective and profit-maximizing means of entering a rebar manufacturing market, but also the only means used to build any new rebar manufacturing facility in the United States in the last quarter-century. *See* Dkt. No. 154-4, Ex. 2 ("Olson Decl.") at ¶¶ 12–13.

### B.   Alleged Anticompetitive Conduct

Defendant Commercial Metals Company manufactures rebar and other steel products at facilities located across the United States and in Poland. Dkt. No.155-3, Ex. 6 ("Leitzinger Report") at ¶ 6. In 2006, CMC commissioned the Danieli Corporation ("Danieli") – a leading firm in the production of steel plants – to build the world's first micro mill in Mesa, Arizona ("AZ1") using Danieli's "MiDa" continuous-continuous process. *See* Dkt. No. 161-13, Ex. 11, ("Smith Tr.") at 114:22–115:22. Following the agreement and in that same year, CMC and Danieli entered into a territorial exclusivity agreement in which Danieli gave CMC a five-year exclusive right to build a MiDa mill within 350 miles of CMC's mill site in Mesa, Arizona or within 250 miles of CMC's other mills. *See* Dkt. No. 161-17, Ex. 16 at CMC_0000481600. In exchange, CMC agreed to help Danieli sell its micro mills by allowing Danieli to tour AZ1 with

United States District Court
Northern District of California

1   its potential customers, among other benefits.  *See id*. at 601.  AZ1 first opened in 2009.  Dkt. 155-

2   3, Ex. 2 at ¶ 35.

3          Plaintiff Pacific Steel Group is a San Diego-based rebar fabrication and installation

4   company founded in 2014.  Leitzinger Report at ¶ 6.  In 2019, Pacific Steel wanted to build its

5   own micro mill for manufacturing rebar.  Dkt. No. 214-1, Ex. 53 at PSG-00043776–7.  Pacific

6   Steel believed that such vertical integration would have given it access to increased quantities of

7   rebar at lower prices in a more efficient integrated process.  *Id*.  In November 2019, Pacific Steel

8   met with Danieli and began negotiations to build a micro mill in the high desert area near the

9   greater Los Angeles basin.  *See* Dkt. 155-3, Ex. 23.  In January 2020, Danieli offered to sell

10  Pacific Steel a micro mill utilizing MiDa technology.  *See* Dkt. No. 161-1, Ex. 30 at

11  Danieli_0021703–04.  From November 2019 to August 2020, Pacific Steel attempted to gain

12  regulatory approval and purchase property for its proposed mill.  Dkt. No. 187-12, Ex. 10 at 27–

13  28.

14         In August 2020, prior to Pacific Steel and Danieli fully executing an agreement, Danieli

15  informed Pacific Steel it could no longer sell Pacific Steel a MiDa mill because CMC and Danieli

16  had entered into another exclusivity agreement.  *See* Dkt. No. 161-43, Ex. 41, at PSG-00043166.  In

17  August 2020, CMC contracted for Danieli to build a micro mill capable of producing both rebar and

18  merchant bar using continuous-continuous technology that Danieli termed "MiDa-S" in Mesa,

19  Arizona ("AZ2").  *See* Dkt. No. 161-21, Ex. 19, at CMC_0000417063.  In connection with this

20  arrangement, CMC and Danieli entered into an exclusivity agreement ("CMC-Danieli Exclusivity

21  Provision") under which CMC had the exclusive right to build MiDa-S mills within a 500-mile

22  radius of any of its existing United States mills for the next three years.  *See id*. at 63–64.  The CMC-

23  Danieli Exclusivity Provision also gave CMC the exclusive right to build a MiDa mill within a 500-

24  mile radius of its traditional mini mill in Rancho Cucamonga, California (the "Rancho mill"), which

25  CMC purchased in 2020.  *See id*.  Pacific Steel's proposed MiDa mill in the greater Los Angeles

26  basin was within the 500-mile radius of the Rancho mill, and accordingly was precluded by the

27  CMC-Danieli Exclusivity Provision. This exclusivity agreement was initially set to last three years,

28  but in November 2021, CMC and Danieli amended the agreement to remove the Rancho MiDa

3

exclusivity provision.  *See* Dkt. Nos. 155-4, Ex. 35 at CMC_0000008798; 161-50, Ex. 48 at Danieli_0017088.  Soon after, Danieli notified Pacific Steel that it once again could sell Pacific Steel a MiDa mill in Southern California, and in December 2021, Danieli provided Pacific Steel an updated MiDa mill commercial offer.  Dkt. No. 155-6, Ex. 103, at PSG-0024776.

Accordingly, the claimed violations occurred between August 2020 and December 2021. Pacific Steel's antitrust claims largely center around CMC's exclusivity agreement with Danieli. Pacific Steel alleges that CMC's geographic exclusivity provision with Danieli during the operative time period unlawfully excluded it and all other potential entrants from the relevant geographic market for rebar manufacturing by blocking the uniquely efficient, effective, and profit-maximizing means of entry.  *See* Dkt. No. 76, ("FAC") ¶ 1.

### C.    Procedural History

Pacific Steel filed an eight-count suit in October 2020 alleging claims against CMC and Danieli under Sections 1 and 2 of the Sherman Act, California antitrust law, California unfair competition law, and California common law.  *See* Dkt. No. 1.  In May 2021, the Court granted Defendants' motions to dismiss with leave to amend.  Dkt. No. 74 ("Dismissal Order").  Pacific Steel then filed the operative FAC, removing Danieli as a defendant, realleging its original eight causes of action, and addressing some of the deficiencies identified in the Dismissal Order.  *See* Dkt. No. 76.  CMC again moved to dismiss.  Dkt. No. 79.  In April 2022, the Court granted in part and denied in part the second motion to dismiss.  Dkt. No. 92.  The April 2022 order granted CMC's motion to dismiss Pacific Steel's predatory pricing claims with leave to amend, but otherwise denied CMC's motion.  *See id.*  At the motion to dismiss stage, the parties disputed the scope of Pacific Steel's relevant geographic market.  Pacific Steel's FAC limits the relevant geographic market to "suppliers located within a 500-mile radius from the high desert area near the greater Los Angeles basin, the planned location of the Danieli micro mill that Pacific Steel intended to build before it was blocked from doing so."  FAC ¶ 120.  CMC argued that this geographic market was too narrow in that it excluded suppliers to which customers reasonably turn.

Now that discovery has concluded, each side moves for summary judgment.  *See* Dkt. Nos.

United States District Court
Northern District of California

155 ("PSG Mot."), 186 ("CMC Opp."), 202 ("PSG Reply"); 235 ("CMC Mot."), 187 ("PSG Opp."), 199 ("CMC Reply").

## II.  LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.* But in deciding if a dispute is genuine, the court must view the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008). If a court finds that there is no genuine dispute of material fact as to only a single claim or defense or as to part of a claim or defense, it may enter partial summary judgment. Fed. R. Civ. P. 56(a).

## III.  SHERMAN ACT LIABILITY

Pacific Steel's Sherman Act claims challenge the CMC-Danieli Exclusivity Provision. That provision prohibited Danieli from selling one of its proprietary micro mills to any company other than CMC within a 500-mile radius of Rancho Cucamonga, California for three years. The Amended Complaint's first cause of action alleges that the CMC-Danieli Exclusivity Provision violates Section 1 of the Sherman Act (15 U.S.C. § 1), and its second through fourth causes of action allege that CMC violated Section 2 (15 U.S.C. § 2) by using the CMC-Danieli Exclusivity Provision to maintain its monopoly power in the rebar manufacturing market.

The Sherman Act contains two principal prohibitions. Section 1 targets *concerted* action, rendering unlawful "every contract, combination. . . , or conspiracy, in restraint of trade." 15 U.S.C. § 1; *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 973–74 (9th Cir. 2023). To establish liability under Section 1, a plaintiff must ultimately prove (1) the existence of an agreement, and (2)

that the agreement was an "unreasonable" restraint of trade.[2] *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016). Section 2 targets *independent* action, making it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 1; *Epic Games*, 67 F.4th at 974. To establish liability under Section 2, a plaintiff must show (1) the possession of monopoly power in the relevant market; (2) the willful acquisition or maintenance of that power; and (3) causal antitrust injury. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020).

There are two general categories of liability standards for Sherman Act claims. *Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680, 685 (9th Cir. 2022). A small category of restraints are unreasonable *per se* because they always or almost always tend to restrict competition and decrease output. *Epic Games*, 67 F.4th at 974. Most restraints, however, are subject to the Rule of Reason, a three step, burden-shifting framework that "requires courts to conduct a fact-specific assessment" to determine a restraint's "actual effect" on competition. *Id.* "The goal is to distinguish between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Ohio v. American Express Co.*, 138 S.Ct. 2274, 2284 (2018) (cleaned up).

The parties agree that the Rule of Reason framework applies to this case. At step one, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect." *Nat'l. Coll. Athletic Assoc. v. Alston*, 141 S. Ct. 2141, 2160 (2021). A plaintiff may meet this initial burden through direct or indirect evidence. *Qualcomm Inc.*, 969 at 989. Direct evidence includes "proof of actual detrimental effects on competition," such as "reduced output, increased prices, or decreased quality in the relevant market." *Id.* (cleaned up). The "more common" indirect evidence approach involves "proof of market power plus some evidence that the challenged restraint harms competition." *Rebel Oil Co., Inc. v. Atlantic Richfield*

---

[2] The parties do not dispute that a contract exists between CMC and Danieli, and Plaintiff has put forward sufficient evidence to establish an agreement. So as to Pacific Steel's Section 1 claim, the only question is whether the challenged agreement is an "unreasonable" restraint of trade.

United States District Court
Northern District of California

*Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).  Should the plaintiff carry this burden, the burden then "shifts to the defendant to show a procompetitive rationale for the restraint."  *Alston*, 141 S. Ct. at 2160.  If the defendant can make that showing, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means.  *Id*.  The Rule of Reason applies "essentially the same" whether the alleged antitrust violation involves concerted anticompetitive conduct under Section 1 or independent anticompetitive conduct under Section 2.  *Epic Games*, 67 F.4th at 974; *see also Flaa*, 55 F.4th at 685 ("Because the legal tests for sections 1 and 2 of the Sherman Act similar, we can review claims under each section simultaneously.").

CMC moves for summary judgment on Pacific Steel's Section 1 and Section 2 claims.  CMC contends that Pacific Steel has not adduced sufficient direct or indirect evidence that the challenged restraint had a substantial anticompetitive effect so as to create a genuine issue of fact for trial.  CMC argues that (1) Pacific Steel's proposed geographic market is fatally flawed; (2) Pacific Steel cannot demonstrate that CMC has market or monopoly power; and (3) Pacific Steel cannot prove any harm to competition.  CMC Mot. at 12–20.  In addition to opposing CMC's motion, Pacific Steel cross-moves for summary judgment on its Section 1 conspiracy in restraint of trade claim.  PSG Mot. at 16–25.  First, Pacific Steel argues that it is entitled to summary judgment because there is direct evidence of detrimental effects on competition.  In the alternative, Pacific Steel contends that indirect evidence of anticompetitive effects (including CMC's high market share, significant barriers to entry, and supracompetitive prices) shows that it is entitled to summary judgment.

On each motion, viewing the factual record in the light most favorable to the nonmoving party, the Court finds at least one genuine dispute of material fact.  Accordingly, the Court denies summary judgment to both parties.

### A.    Section 1 Liability

#### i.    Direct Evidence

Pacific Steel argues that it is entitled to summary judgment on its Section 1 claim because there is direct evidence that CMC's restraint has had a substantial anticompetitive effect that harms consumers.  PSG Mot. at 17.  According to Pacific Steel, "the undisputed evidence shows

that CMC intentionally suppressed rebar output by excluding Pacific Steel from the market."  *Id*. Additionally, Pacific Steel argues that because it has put on sufficient direct evidence of CMC's injurious exercise of market power, it is entitled to summary judgment without first defining a relevant geographic market.  Pacific Steel argues that in *Epic Games*, the Ninth Circuit made clear that "direct evidence of market power can obviate the need to define the relevant market."  *Id*. (citing *Epic Games*, 67 F.4th at 974 & n.6).  Relying on this footnote, Pacific Steel contends that the undisputed evidence shows that CMC intentionally suppressed rebar output, and submits that in light of this direct evidence of harm to competition, the Court need not define the relevant geographic market.

In response, CMC argues that Pacific Steel's argument is wrong because (1) even under a direct evidence theory, it must still adequately define a relevant geographic market; and (2) even if it does not need to do so, there has been no showing of harm to competition.  On the first point, CMC contends that Pacific Steel's citation to a footnote in *Epic Games* is not applicable to this case because that footnote was referencing "quick look" cases, which this case is not.  CMC Opp. at 14.  On the second point, CMC argues that Pacific Steel speculates that rebar output decreased and prices increased but has no direct proof of this or any other harm to competition beyond its own speculation.  *See id*.

The Court agrees that Pacific Steel has not shown that it is entitled to summary judgment based on its direct evidence theory.  In most, though not all, antitrust cases, the first step is to accurately define the relevant market in which the defendant competes.  *Epic Games*, 67 F.4th at 974; *see also American Express*, 138 S.Ct. at 2285.  ("[C]ourts usually cannot properly apply the rule of reason without an accurate definition of the relevant market.").  As CMC points out, the *Epic Games* footnote on which Pacific Steel relies clarifies that defining the relevant market is not an absolute requirement, and that the Supreme Court has skipped this threshold step "in its so-called 'quick look' cases."  *Epic Games*, 67 F.4th at 974 & n.6.  The "quick look" analysis is appropriate where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1134 (9th Cir. 2011).  But if

United States District Court
Northern District of California

an arrangement "might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition," then the "quick look" analysis is inappropriate.  *Id.*  In this case, the Court cannot say that CMC's arrangement with Danieli is so obviously anticompetitive that it could not possibly have a "net procompetitive effect," or have "no effect at all," on competition.  In *American Express*, the Court considered the argument that there was no need to define the relevant market because plaintiff had offered actual evidence of adverse effects on competition.  *See* 138 S. Ct. at 2286 & n.7.  The Court disagreed, noting that while plaintiff cited cases that evaluated whether horizontal restraints had an adverse effect on competition, those cases were different than cases like *American Express* involving vertical restraints.  *Id.*  The Court explained that "[v]ertical restraints often pose no risk to competition unless the entity imposing them has market power, which cannot be evaluated unless the Court first defines the relevant market."  *Id.*  Relevantly, this case involves a vertical agreement between a supplier (Danieli) and a customer (CMC), rather than a horizontal agreement between competitors.  Pacific Steel's citation to a single footnote in *Epic Games* without further explanation thus does not warrant a deviation from the Supreme Court's usual approach requiring a threshold definition of the relevant market.

And even if Pacific Steel did not need to define the relevant market, its bid for summary judgment on a direct evidence theory nonetheless fails because there is a genuine dispute of material fact as to whether CMC's territorial exclusion provision had an anticompetitive effect. Pacific Steel's expert Dr. Leitzinger submits that the Mojave mill would have contributed about 173,000 new tons of rebar to the market each year, in addition to the approximately 206,000 tons that the mill would produce for Pacific Steel's existing furnish-and-install business.  Leitzinger Report at ¶¶ 15–22.  According to Pacific Steel, this directly demonstrates the actual anticompetitive effects of the territorial exclusion: as a result of Pacific Steel being barred from producing this large amount of rebar, CMC was able to raise prices and keep out competition.  *See* PSG Mot. at 18.  But CMC responds with facts suggesting that Pacific Steel's proposed mill would not meaningfully affect the overall supply of new rebar in the market.  According to deposition testimony of Pacific Steel's founder and CEO, the company's business plan was to "us[e] the products internally in [its] downstream business," and the company contemplated that

United States District Court
Northern District of California

while it would "have the capability of selling excess rebar to independent fabricators," it "did not anticipate this in the business plan."  *See* Dkt. No. 186-83, Ex. 81 ("Benson Tr.") at 291:2-20; 293:1-6.  CMC also cites Leitzinger's reply report which represents that "Pacific Steel does not plan to sell the rebar it manufactures."  Dkt. No. 186-87, Ex. 85 ("Leitzinger Reply Report") at ¶32.  CMC thus plausibly suggests that Pacific Steel's manufacture and internal use of the rebar produced would not have any effect on rebar market prices.  The Court finds that there is a dispute of material fact as to whether CMC's alleged restraint has had actual detrimental effects on competition.  Although Pacific Steel has provided some evidence to suggest this may be the case, CMC has proffered enough counterevidence to submit the issue to a jury.  The Court finds that Pacific Steel is not entitled to summary judgment on this basis.

### ii.    Indirect Evidence

Both parties contend that they are entitled to summary judgment as to Plaintiff's Section 1 claim based on indirect evidence.  In order for a plaintiff to meet its burden with indirect evidence, it must (1) define the relevant market;[3] (2) show that the defendant has market power; and (3) present some evidence that the defendant uses that market power to "harm competition."  *See Epic Games*, 67 F.4th at 983.   CMC argues that (1) Pacific Steel improperly defines the relevant geographic market; (2) CMC does not have market power; and (3) Pacific Steel fails to demonstrate harm to competition.  For its part, Pacific Steel argues that (1) it has properly defined the relevant market; (2) CMC does have market power; and (3) CMC has harmed competition.

### a.   Relevant Geographic Market

The relevant market for antitrust purposes is "the area of effective competition," which means "the arena within which significant substitution in consumption or production occurs."  *Epic Games*, 67 F.4th at 975.  A relevant market includes both a geographic market and a product market.  *Id*.  Generally, "[t]he process of defining the relevant [geographic] market is a

---

[3] Though the relevant market includes both geographic and product dimensions, *see Qualcomm*, 969 F.3d at 992, CMC only challenges the propriety of Pacific Steel's proposed geographic market, *see* CMC Mot. at 13. Accordingly, this order only addresses that aspect of the market definition.

factual inquiry for the jury." *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993). But summary judgment is appropriate on this basis if the "moving party shows that there is an absence of evidence to support the plaintiff's case," and the non-moving party's "evidence cannot sustain a jury verdict on the issue of market definition." *Rebel Oil*, 51 F.3d a 1435.

The 2010 Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("2010 Merger Guidelines") explain the two ways that agencies and courts define a geographic market.[4] One is based on the location of the relevant suppliers and the other is based on the location of the relevant customers. *See* 2010 Merger Guidelines §§ 4.2.1, 4.2.2. A geographic market based on the location of the suppliers must include all the firms with relevant production, sales, or service facilities in the specified region. *Id.* § 4.2.1. A supplier-based market accordingly must be broad enough to "encompass the region from which sales are made." *Id.* On the other hand, when the market is based on the location of the relevant customers, some suppliers that sell into the relevant geographic market may be located outside the boundaries of that market. *Id.* § 4.2.2. The Guidelines account for this on the back end, however, by including in the market share calculation all the firms that sell to customers in the geographic region, regardless of the location of the supplier making those sales. *Id.* Under either approach the geographic market and market share, when taken together, must account for the relevant firms who supply the market. A common method of confirming the proper scope of the relevant geographic market is to determine whether a hypothetical monopolist could impose a "small but significant non-transitory increase in price" (SSNIP) in the proposed market. *Id.* § 4. If enough consumers would respond to a SSNIP by purchasing the product from outside the proposed geographic market, making the SSNIP unprofitable, the proposed market definition is too narrow. *See Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys.*, 778 F.3d 775, 784 (9th Cir.

---

[4] In December 2023, the Federal Trade Commission and Department of Justice issued revised Merger Guidelines. The 2023 Merger Guidelines do not appear to differ from the 2010 Merger Guidelines in any way relevant to this case. The parties cite the 2010 Merger Guidelines, and have not suggested that the revised guidelines would change the analysis. Accordingly, the Court follows the parties' lead and relies on the 2010 Merger Guidelines.

United States District Court
Northern District of California

2015); *see also Teradata Corp. v. SAP SE*, 570 F.Supp.3d 810, 838 (N.D. Cal. 2021) ("This test asks whether a hypothetical monopolist over a group of products could profitably impose a . . . 'SSNIP' of 5%.").

Pacific Steel proposes that the relevant geographic market for rebar manufacturing in this case "consists of suppliers located within a 500-mile radius from the high desert area near the greater Los Angeles basin, the planned location of the Danieli micro mill that Pacific Steel intended to build before it was blocked from doing so." FAC ¶ 120. This is consistent with the relevant geographic market that Pacific Steel's expert Professor Elhauge defines: "suppliers located within 500 miles of Southern California." Elhauge Report at ¶ 122–24. Elhauge proposes that the market should be "centered around Rancho Cucamonga, CA (because the challenged restraint foreclosed rival steel rebar mills within 500 miles of Rancho Cucamonga, CA) or should be centered around Mojave, (because that is the location from which Pacific Steel was foreclosed from building its planned steel rebar mill)." *Id*. Elhauge claims that qualitative and quantitative evidence supports the appropriateness of this geographic market. Qualitatively, Elhauge argues that (1) CMC's internal documents indicate that rebar mills "serve a small market" and "are located . . . close to customers"; (2) CMC's own CEO stated that "a 500-mile shipping range" for steel rebar is "the most efficient, cost-effective way to serve the market"; (3) Bank of America's Global Investment Banking division observed that rebar mills are "designed to service an area of 400-500 miles"; (4) Danieli concluded that the feasibility of a rebar mill depends on having an identified market for rebar with a radius of 350 to 500 miles; and (5) CMC's own contracts set "exclusivity zones of no more than a 500 mile radius." *Id*. at ¶¶ 126–31. Quantitatively, Elhauge asserts that the hypothetical monopolist test is met because CMC raised its prices (relative to its costs) well beyond the 5% threshold typically used define a SSNIP. *See id*. at ¶ 199.

The Court begins with CMC's motion. CMC argues that it is entitled to summary judgment because Pacific Steel's proposed supplier-based geographic market is "legally defective" given that it "seeks to exclude the rebar sales of all manufactures – regardless of how much rebar those manufacturers ship into the market." CMC Mot. at 13. According to CMC, buyers within Pacific Steel's proposed geographic market regularly rely on suppliers not included in that proposed market

to source rebar. *Id*. at 14. CMC argues that Elhauge's report "ignores the basic commercial realities of the market." *Id*. at 15. CMC contends that after its 2018 Rancho acquisition, rebar prices and margins increased throughout the entire country, not just in Pacific Steel's proposed geographic market. It contends that prices in this market moved in lockstep with prices throughout the country, which undermines Elhauge's conclusion and makes Pacific Steel's proposed market deficient. *Id*. at 16. CMC's rebuttal expert, Dr. Ramsey Shehadeh, provides a report in support of this position. He claims that customers in Elhauge's proposed geographic market "have historically turned to mills outside the [proposed market] for an economically significant portion of their rebar purchases." Dkt. No. 161-10, Ex. 8 ("Shehadeh Report") at ¶ 79. According to Shehadeh, this means Pacific Steel's proposed geographic market is defective. *See id*. Shehadeh contends that distant mills in Washington, Texas, Utah, and Colorado effectively constrain prices at mills within Pacific Steel's proposed market. Shehadeh Report at Exs. 23–30. CMC also argues that though Elhauge's SSNIP analysis concludes that CMC increased its prices beyond the 5% threshold, that analysis does not show that this price increase outpaced the market. *See* CMC Mot. at 16. According to CMC, since Pacific Steel argues that prices increased beyond 5% at AZ1, it would also need to demonstrate that the price of rebar in the overall market did not rise at the same level between 2017 and 2019. According to Shehadeh, rebar prices steadily rose during this time period, and national prices did not far outpace prices in Pacific Steel's proposed geographic market. *See* Shehadeh Report at Exs. 13–15.

Pacific Steel claims that CMC's methodology broadly includes relatively distant geographic substitutes whose competitive significance is unlikely to be commensurate with their share in a properly-defined market. PSG Opp. at 14 (citing 2010 Merger Guidelines § 4). Pacific Steel argues the that the 500-mile radius from the high desert area near the greater Los Angeles basin defines an appropriate market because it is corroborated by CMC's own contemporaneous documents and executives' admissions, as well as by its sales and profit margin data. PSG Mot. at 20. Pacific Steel cites a statement by CMC's then-CEO that the "most efficient, cost-effective way to serve the market" is to "limit your shipping radius to . . . a 500-mile shipping range" because "steel is very heavy . . . and it's very expensive logistically to get it to the end market." Dkt. No. 155-6, Ex. 106

1    at 6.  Further, Pacific Steel argues that Elhauge's SSNIP analysis demonstrates that from 2017 to

2    2019, CMC increased AZ1's rebar prices relative to its costs by 13%, well in excess of the 5% that

3    is considered sufficient for the SSNIP test.  *Id.* at 20–21; Elhauge Report Ex. 11 ¶¶ 21, 104.

4           CMC is not entitled to summary judgment regarding the viability of Pacific Steel's proposed

5    geographic market.  CMC's principal arguments are that (1) distant suppliers effectively compete

6    in the proposed geographic market and (2) Elhauge's SSNIP analysis is unreliable because it does

7    not account for general price increase trends outside the proposed geographic market.  Pacific Steel

8    has raised a genuine dispute of fact as to both arguments. Pacific Steel has identified internal

9    documents that indicate CMC's own understanding that placing mill sites within 500 miles of

10   intended customers is optimal.  Dkt. No. 155-6, Ex. 106 at 6.  Plaintiff also points out that CMC's

11   own expert has confirmed that he does not know of any CMC documents reflecting a radius greater

12   than 500 miles around a proposed rebar mill site.  Dkt. No. 155-4, Ex. 22 ("Shehadeh Tr.") at 265:3–

13   6 ("I have not seen a document from CMC that has an anticipated mill site and draws a radius greater

14   than 500 miles for rebar.").  While this evidence does not conclusively establish the validity of

15   Pacific Steel's proposed market, it does tend to support it.  And Pacific Steel also has proffered

16   evidence suggesting that distant mills may not be an effective check on CMC's pricing because of

17   its freight cost advantages.  *See* Dkt. No. 155-3, Ex. 11 ("Elhauge Reply Report") at ¶¶ 129

18   ("Because a competitive market prices at the efficient competitive level, a supplier located at a

19   distance where it incurs inefficient costs cannot price at the competitive level. Further, because a

20   supplier located more than 500 miles from the relevant customers incurs such inefficient costs, it

21   cannot constrain a rival from charging an above-competitive price to those customers.  Accordingly,

22   the evidence that it would be inefficient to supply customers located more than 500-miles away

23   means that a hypothetical monopolist in that area could raise prices over the competitive level, thus

24   satisfying the hypothetical monopolist test."); 137 (positing that after CMC shuttered the Rancho

25   mill, it was able to raise prices over 5%, even with distant suppliers attempting to serve as a

26   competitive check).  Viewing these facts in the light most favorable to Pacific Steel, a reasonable

27   jury could find its geographic market to be appropriately defined.

28          Despite CMC's insistence that Elhauge's SSNIP analysis ignores commercial realities,

United States District Court
Northern District of California

14

United States District Court
Northern District of California

Pacific Steel raises a genuine dispute of fact as to this issue as well.  CMC argues that prices in Pacific Steel's proposed market increased, but did so in "lockstep" with prices charged by mills throughout the country.  But as Elhauge's reply report points out, "correlated price movements might reflect the similar responses of different markets to similar changes." Elhauge Reply Report ¶ 72.  This correlation could be attributed to similar responses to similar market dynamics or any of a number of other factors.  *See id.* at ¶¶ 72–73.  Stated differently, proof that prices outside the relevant geographic market also increased does not necessarily foreclose the possibility that a hypothetical monopolist would be able to impose a SSNIP.  Moreover, Pacific Steel has proffered evidence supporting Elhauge's SSNIP analysis.  Elhauge analyzed how CMC's 2018 acquisition of four Gerdau mills impacted CMC's pricing power at its other mills.  In that analysis, he found (contrary to CMC's assertion that rebar prices outside the proposed market increased in "lockstep" with prices for AZ1 rebar) that CMC mills with different market dynamics experienced much less significant price increases.  *See* PSG Opp. at 10; Dkt. 155-3, Ex. 6.  This tends to undermine CMC's position that Elhauge's SSNIP analysis was deficient for not taking outside price trends into account.

At this stage, Pacific Steel does not need to definitively prove its proposed geographic market.  Instead, it only needs to present enough evidence to reasonably raise a dispute of material fact regarding the viability of that market.  *See Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762 (9th Cir. 2001) (reversing order granting summary judgment because there was a genuine issue of material fact regarding market definition); *Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905-RMW, 2008 WL 73689 at *10 (N.D. Cal. January 5, 2008) ("However, questions of fact exist, and, accordingly, the court cannot enter summary judgment on the geographic scope of the relevant technology markets.").  Though Pacific Steel bears the burden of proving the relevant geographic market at trial, at the summary judgment stage CMC must show the absence of any genuine issue of material fact.  *Id.* at 8.  Pacific Steel has presented sufficient evidence to raise at least one such issue as to the viability of its proposed geographic market. Accordingly, CMC is not entitled to summary judgment on this basis.

The Court's explanation as to why CMC is not entitled to summary judgment also establishes that Pacific Steel is not either, because there are genuine disputes of material fact bearing on the

United States District Court
Northern District of California

1    validity of its proposed geographic market.  While Pacific Steel has presented enough evidence to

2    defeat CMC's motion for summary judgment, it has not definitively established that its own

3    proposed geographic market is appropriately defined.  CMC has raised issues of fact that preclude

4    summary judgment in Pacific Steel's favor.  As discussed above, CMC presents evidence supporting

5    the position that customers in Pacific Steel's proposed geographic market have historically turned

6    to mills outside that market, in places such as Texas, Washington, Utah, and beyond.  *See* Shehadeh

7    Report at ¶ 79, Exs. 23–30.  CMC has also proffered evidence that though prices at AZ1 increased,

8    prices increased at a similar rate throughout the entire country.  *See id*. at Exs. 8–16.  Viewed in the

9    light most favorable to CMC, these facts provide a basis on which a reasonable jury could reject

10   Pacific Steel's position, so the Court denies its motion for summary judgment as well.

### b.  Market Power

12        Next, the Court addresses the second factor in the anticompetitive conduct analysis: market

13   power.  To prevail on its unreasonable restraint of trade claim based on indirect evidence of

14   substantial anticompetitive effects, Pacific Steel must show that CMC has market power.  *See Epic*

15   *Games*, 67 F.4th at 982–83.  Market power is the ability for a defendant to profitably raise prices by

16   restricting output.  *Id.* at 983.  "In other words, a firm with market power is a price-*maker*, not the

17   price-*takers* that economic theory expects in a competitive market.  Pursuant to this indirect-

18   evidence route, the existence of market power is a significant finding that casts an anticompetitive

19   shadow over a party's practices in a rule-of-reason case."  *Id*.  Market power is generally inferred

20   from the defendant's possession of a high market share and the existence of "significant barriers to

21   entry."  *Rebel Oil*, 51 F.3d at 1434.  Courts generally require a 65% market share to establish a

22   prima facie case of market power.  *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195,

23   1206 (9th Cir. 1997).  Whether a defendant possesses market power is a factual question.  *Epic*

24   *Games*, 67 F.4th at 983.

25        CMC argues that Pacific Steel's 32.9% market share is presumptively insufficient to

26   establish market power.  CMC Mot. at 18.  CMC also argues that Pacific Steel has no other direct

27   evidence of market power.  *See id*. at 19.  In opposition to CMC's motion and in support of its own

28   motion, Pacific Steel argues that CMC's market share is approximately 87%, which is more than

sufficient to establish market power.  PSG Opp. at 17; PSG Mot. at 22.

The Court finds that there are genuine disputes of material fact as to whether CMC has market power, precluding the entry of summary judgment for either party.  CMC argues that Shehadeh's report confirms its presumptively low market share.  In that report, Shehadeh claims that 1,670,827 tons of rebar were sold to customers in Elhauge's alleged relevant geographic market.  Shehadeh Report, Ex. 29.  According to Shehadeh, CMC sold 549,545 tons, accounting for 32.9% of the market.  *Id*.  Shehadeh's analysis includes suppliers from beyond Southern California, including Utah, Washington, Texas, Arizona, Oklahoma, Tennessee, and Oregon.  *Id*.  Pacific Steel argues that CMC's market share challenge (based on Shehadeh's analysis) relies on its geographic market arguments, which should fail because they include distant suppliers who do not constrain CMC's ability to increase prices.  PSG Reply at 9–10.  Pacific Steel submits analysis by Elhauge showing that CMC accounts for at least 86% of overall rebar sales when the geographic market is properly defined.  Elhauge Report at ¶ 151; Elhauge Reply Report at ¶¶ 138, 142.[5]  Given the Court's earlier conclusion that there are disputes of fact regarding the proper scope of the geographic market, there are also related disputes of fact on this issue.  The Court cannot resolve the parties' market share arguments at this stage because unresolved issues of fact based on the expert analyses directly bear on the appropriate scope of the geographic market.  "This is a classic example of dueling expert testimony that precludes summary judgment." *Tevra Brands LLC v. Bayer HealthCare LLC*, NO. 19-cv-04312-BLF, 2024 WL 1909156, at *10 (N.D. Cal. May 1, 2024).  Triable issues of fact thus preclude summary judgment for either party on Pacific Steel's Section 1 claim.

### c.  Harm to Competition

Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury.  *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034–36 (9th Cir.2001).  Accordingly, to succeed on a Section 1 or 2 claim under an indirect evidence theory, a plaintiff must also present "'some evidence' that the defendant uses [its] market power to harm

---

[5] Elhauge concludes that CMC's market share is between 91 and 95%, but submits that even considering foreign steel importers, its share would be between 86 and 90%.  *See id*.

United States District Court
Northern District of California

competition." *Epic Games*, 67 F.4th at 983.  This inquiry need not always be extensive or highly technical.  "It is sufficient that the plaintiff prove the defendant's conduct, as matter of economic theory, harms competition—for example that it increases barriers to entry or reduces consumer choice by excluding would-be competitors that would offer differentiated products." *Id*. at 983–84.

In the Court's order granting CMC's initial motion to dismiss, the Court found exclusive dealing precedent to be the closest analogue to Pacific Steel's claims.  Dismissal Order at 14.  The Court recognized that technically the CMC-Danieli Exclusivity Provision is not "an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor." *See Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 996 (9th Cir. 2010).  But as in exclusive dealing cases, the fundamental harm alleged here is market foreclosure due to an exclusive relationship between a supplier (Danieli) and its customer (CMC). The Court found this contractual relationship similar enough to a traditional exclusive-dealing relationship to make that precedent helpful, and accordingly asked whether the CMC-Danieli Exclusivity Provision "forecloses competition" in a "substantial share" of the rebar manufacturing market. *See* Dismissal Order at 14–15 (citing *Allied Orthopedic*, 592 F.3d at 996 ("Under the antitrust rule of reason, an exclusive dealing arrangement violates Section 1 only if its effect is to 'foreclose competition in a substantial share of the line of commerce affected.'")).

The parties' summary judgment briefing has not undermined these premises, so the Court will continue to apply them.  The Ninth Circuit has indicated that when analyzing whether an agreement forecloses competition, courts should consider the "the full range" of opportunities that the agreement leaves open to the defendant's competitors. *See id.* at 15 (citing *Omega Env't., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162–63 (9th Cir. 1997) (citations omitted)).

CMC argues that is entitled to summary judgment because Pacific Steel has not made a sufficient showing to create a genuine issue of fact as to whether its conduct harmed competition. CMC Mot. at 20.  CMC argues that there is no evidence that the CMC-Danieli Exclusivity Provision foreclosed Pacific Steel from manufacturing rebar.  According to CMC, the evidence shows that Pacific Steel could have built a commercially viable mill wherever it chose.  CMC Mot. at 22.  CMC

United States District Court
Northern District of California

1    contends that Pacific Steel could have contracted with Danieli to build another kind of mini mill

2    that did not use MiDa technology.  It asserts that this alternative mill could have been more profitable

3    than Pacific Steel's existing business and enjoyed margins comparable to a MiDa mill.  *Id.*  Further,

4    CMC claims that Pacific Steel's "entire theory impermissibly conflates harm to PSG with harm to

5    competition."  CMC Reply at 12.

6         The Court finds that there is at least one genuine dispute of material fact bearing on whether

7    CMC's conduct substantially foreclosed competition.  Viewing the evidence in the light most

8    favorable to Pacific Steel, a reasonable jury could find that CMC's conduct substantially foreclosed

9    the range of opportunities available to its competitors.  Pacific Steel argues that because of the

10   territorial exclusivity provision, there were no alternative mills that competitors (including itself)

11   could have built in the proposed geographic market that "could have constrained CMC's pricing of

12   rebar."  PSG Opp. at 23.  Pacific Steel cites at least three types of evidence to support this position.

13        First, Pacific Steel cites an email exchange between various Danieli executives, in which

14   one executive relayed a statement by CMC's then-COO contending that Pacific Steel moving to a

15   MiDa mill in California would "crush the dynamics of the market" and that MiDa is the "winning

16   technology."  Dkt. No. 187-32, Ex. 30 at 11–12.  In Pacific Steel's view, this document confirms

17   that CMC believed that the MiDa technology was not only superior to any alternatives, but that

18   competitors having access to this technology would disrupt CMC's current advantages in the

19   market.  Viewed in this light, the evidence supports a reasonable inference that CMC was interested

20   in foreclosing others' access to MiDa technology to perpetuate its own advantage.

21        Second, Pacific Steel submits a declaration from its Vice President of Mill Operations Mark

22   Olson.  Discussing the unviability of alternative mills, Olson avers that "SMS could not offer Pacific

23   Steel a technologically advanced finishing end comparable to Danieli's DRB system," and says this

24   alternative "would have been less efficient and precise" making it "unsuitable for Pacific Steel's

25   business needs."  Olson Decl. at ¶ 25.  In discussing another alternative mill from Primetals, Olson

26   points out that that proposed mill would not have included continuous casting and rolling process

27   comparable to MiDa mill, and notes that "the last rebar min mill constructed in the United States

28   similar to what Primetals proposed was the North Star Steel (now Nucor) mini mill in Kingman,

United States District Court
Northern District of California

Arizona, which came online in 1996." *Id.* at ¶ 28.  Olson also contends that Danieli's proposed workaround mill design was "materially inferior to the MiDa mill" because it "would have used a traditional finishing end, used in conventional mini mills," which is far less efficient than the MiDa micro mill's direct rolling and bundling system.  *Id.* at ¶¶ 32, 35.

And third, Pacific Steel points to Elhauge's report, which provides a complementary analysis.  According to Elhauge, "Pacific Steel and other rivals were 100% foreclosed from access to micro-mills in the relevant geographic market."  Elhauge Report at ¶ 173.  Elhauge concludes that the Danieli MiDa mill was the only feasible means for competitors to compete economically in the proposed geographic market.  *See id.* at ¶¶ 173, 180.  He opines that the total operational cost savings for using a Danieli micro mill rather than a mini mill were estimated to be $53 per ton.  *See id.* at ¶ 182.  He also explains that a non-MiDa Danieli mill was not economically viable because it would have increased operating costs by at least $9.50 per ton.  *Id.* at ¶ 210 & n. 495; Elhauge Reply Report at ¶ 168.  Finally, Elhauge opines that no other company could offer a "reasonable economic substitute" because those companies had less experience than Danieli, and Danieli offered the "lowest capital and operational costs."  Elhauge Reply Report at ¶¶ 170–77.  Elhauge's report accordingly concludes that neither Pacific Steel nor "rivals" more broadly could effectively compete in the proposed geographic market while the exclusivity provision was in place.  According to him, whether for Pacific Steel or other competitors, alternative mills could not offer the environmental-permitting prospects, financing possibilities, or efficiencies needed to justify the risk of investing hundreds of millions of dollars.  *See* Elhauge Report at ¶ 170–78.

Together, this evidence suffices to create a genuine issue of fact as to whether CMC's territorial exclusion might have had the effect of substantially foreclosing competition in the rebar market in Southern California.  Whether Pacific Steel ultimately will be able to prove its case is not the issue at this stage.  Instead, the Court decides only whether there is a genuine dispute of material fact as to whether CMC's actions have "foreclosed existing competitors or new entrants from competition in the . . . relevant market."  *Gilbarco*, 127 F.3d at 1162.  Pacific Steel has proffered facts supporting an inference that CMC substantially foreclosed competition by leaving rivals no alternative mill that would be an economically viable means to effectively compete in the proposed

United States District Court
Northern District of California

20

United States District Court
Northern District of California

geographic market.  So the Court cannot grant summary judgment.  *See Complete Entertainment Resources LLC v. Live Nation Entertainment*, No. CV 15-9814 DSF, 2017 WL 6512223 at *3 (C.D. Cal. Oct. 16, 2017) ("Despite Defendants' adamant statements to the contrary, [Plaintiff's] argument is not absurd on its face. The Court is unaware of any legal rule that says that an antitrust defendant prevails in a rule-of-reason case if a plaintiff's legal theory of anticompetitive harm cannot neatly fit in a preexisting legal 'box.' Defendants are free to attack Plaintiff's expert, put on their own expert, and let the finder of fact decide who is right and who is wrong."); *Id* & n. 8 ("This is not a case where there is, for example, no restraint as a matter of law or the restraint has no plausible effect on competition. There is clearly a restraint of trade and it is admittedly exclusionary to rivals. Plaintiff has presented evidence that the restraint is anticompetitive; Defendants have presented evidence of procompetitive justifications. So, under the rule-of-reason, the finder of fact evaluates the arguments and weighs the effects.").

## B.   Section 2 Liability

CMC also moves for summary judgment on Plaintiff's Section 2 claim.  CMC largely repeats its Section 1 arguments in its motion for summary judgment as to the Section 2 claims. *See* CMC Mot. at 12-24.  Accordingly, its geographic market[6] and harm to competition arguments fail as to Section 2 for the reasons explained above.  CMC's only Section 2 specific argument is that it is entitled to summary judgment on Pacific Steel's attempted monopolization claim.

CMC moves for summary judgment on the attempted monopolization claim on the basis that Pacific Steel cannot establish that CMC "had a dangerous probability of achieving monopoly power."  Mot. at 20.  To establish a Sherman Act Section 2 violation for attempted monopolization, a plaintiff must demonstrate four elements: (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving "monopoly power"; and (4) causal antitrust injury.  *Rebel Oil*,

---

[6] Monopoly power under Section 2 requires "something greater than market power" under Section 1, meaning that the Section 2 standard is more "stringent."  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 112 S. Ct. 2072, 2090 (1992).  As explained above, there is a genuine issue of fact as to CMC's properly-defined market share.  This factual dispute thus also precludes summary judgment for CMC as to Pacific Steel's Section 2 claim.

1    51 F.3d at 1432–33.  Elhauge reports that CMC's market share increased to nearly 100% when it

2    acquired the Rancho mill in 2018.  Elhauge Reply Report ¶ 136.  Elhauge's data spans 2017 to 2021,

3    and shows that after CMC acquired then shut down the Rancho mill, it was able to significantly

4    reduce steel output in the market (worsening a steel rebar shortage) and charge higher profits.  *See*

5    *id.* at ¶ 164.  Together, these facts raise a question appropriately decided by a jury as to whether

6    CMC possesses a dangerous probability of achieving monopoly power.  Accordingly, CMC's

7    motion on this basis fails.

8    **IV.    STATE CLAIMS**

9         Finally, CMC moves for summary judgment on Pacific Steel's Cartwright Act, UCL, and

10   interference with prospective economic advantage claims, all of which sound in California law.

11   Pacific Steel cross-moves for summary judgment on its interference with prospective economic

12   advantage claims.  The Court denies the parties' motions.

13        **A.    Cartwright Act and UCL**

14        Like Section 1 of the Sherman Act, California's Cartwright Act bans agreements that

15   "prevent competition in . . . [the] sale or purchase of . . . any commodity."  Cal. Bus. & Prof. Code

16   § 16720(c).  Because it was modeled after the Sherman Act, "[t]he analysis under California's

17   antitrust law mirrors the analysis under federal law."  *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*,

18   236 F.3d 1148, 1160 (9th Cir. 2001).  California's Unfair Competition Law (UCL) prohibits "any

19   unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "[C]laims

20   raised under the UCL's unlawful prong rise or fall with the Court's determination of liability with

21   respect to the underlying violation."  *GreenCycle Paint, Inc. v. PaintCare, Inc.*, 250 F. Supp. 3d

22   438, 451 (N.D. Cal. 2017).  CMC argues that these claims rise and fall with the Sherman Act claims.

23   *See* CMC Mot. at 24 ("PSG has staked those claims on the same conduct as its antitrust claims, so

24   summary judgment is proper for the same reasons detailed above.").  Since the Court found that

25   Pacific Steel's Sherman Act claims survive summary judgment, it reaches the same conclusion as

26   to the Cartwright Act and UCL claims.

27        **B.    Interference with Prospective Economic Advantage**

28        A claim for intentional interference requires Pacific Steel to demonstrate the following five

United States District Court
Northern District of California

22

elements: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003). To succeed on this claim, Pacific Steel must ultimately prove that CMC's conduct was "wrongful by some legal measure other than the fact of interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995). An act is independently "wrongful" if it is unlawful, i.e., "if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea Supply*, 29 Cal. 4th at 1159.

CMC argues that (1) Pacific Steel's economic relationship with Danieli was too speculative to be actionable; and (2) CMC's actions were not independently wrongful because it did not violate any laws. CMC Mot. at 25. In its opposition, Pacific Steel argues that it "was engaged in a real and ongoing relationship with Danieli to build a rebar mill before CMC intentionally blocked that effort." PSG Opp. at 25.

CMC is not entitled to summary judgment on this claim because Pacific Steel has put forward sufficient evidence to reasonably support the conclusion that Pacific Steel had more than a prospective relationship with Danieli. Pacific Steel proffers documents exchanged between its senior officers and Danieli's discussing terms for a MiDa mill. Dkt. No. 187-51, Ex. 49. Top executives at Danieli eventually shared multiple rounds of proposals with Pacific Steel discussing what the "investment level would be," and after considering possible "new opportunities and new projects and new customers," were "prepared to sell Pacific Steel a MiDa mill in Southern California." Dkt. No. 155-4, Ex. 23 ("Losso Tr.") at 48:20-49:21. Moreover, Pacific Steel has submitted agreements between it and other companies regarding the inspection of the proposed mill site. Exs. 49–53. Viewing this evidence in the light most favorable to the non-moving party, a reasonable jury could find that Pacific Steel had a relationship with Danieli, with the probability of future economic benefit. Accordingly, the Court denies CMC's motion for summary judgment.

Nor is summary judgment warranted in Pacific Steel's favor. Pacific Steel argues that "the

United States District Court
Northern District of California

same undisputed facts that establish [its] restraint of trade claim also prove all six elements of its intentional interference . . . claim.  PSG Mot. at 25.  But since the Court denied Pacific Steel summary judgment on its restraint of trade claim, it does so again on this basis.

//

//

## V.     CONCLUSION

The Court **DENIES** both parties' motions for summary judgment.  *See* Dkt. Nos. 155, 235.

The clerk is directed to serve via email Christopher Wheeler (cwheeler@fbm.com),

Benjamin Brown (bbrown@cohenmilstein.com), Steven Bizar (steven.bizar@dechert.com), and

Bonnie Lau (blau@mofo.com).

**IT IS SO ORDERED.**

Dated:   6/28/2024

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge