UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PACIFIC STEEL GROUP,

Plaintiff,

v.

COMMERCIAL METALS COMPANY, et al.,

Defendants.

Case No. 20-cv-07683-HSG

**ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL, GRANTING PLAINTIFF'S MOTION FOR ATTORNEYS' FEES, AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO SEAL**

Re: Dkt. Nos. 535, 536, 542, 548

Before the Court is Defendants Commercial Metals Company, CMC Rebar West, and CMC Steel US, LLC's (collectively, "Defendants" or "CMC") motion for judgment as a matter of law and for new trial, Dkt. No. 536, and Plaintiff Pacific Steel Group's ("PSG") motion for attorneys' fees, Dkt. No. 548. The Court held a hearing on the motions on February 27, 2025. Dkt. No. 549. The Court DENIES the motion for judgment as a matter of law and for new trial and GRANTS the motion for attorneys' fees. The Court also GRANTS IN PART and DENIES IN PART CMC's related administrative motion to seal parts of the opening brief, Dkt. No. 535, and GRANTS its motion to seal parts of the reply brief, Dkt. No. 542.

I.    BACKGROUND

Plaintiff PSG alleged that CMC's geographic exclusivity provision with Danieli Corporation ("Danieli") in the 16 months between August 2020 and December 2021 unlawfully excluded PSG and all other potential entrants from the relevant geographic market for rebar manufacturing by blocking access to Danieli's uniquely efficient, effective, and profit-maximizing MiDa mills. *See* Dkt. No. 76 (operative FAC) ¶ 1; Tr. 478:6–11. The Court held a 12-day jury

United States District Court
Northern District of California

trial beginning on October 21, 2024.  At trial, Plaintiff sought relief under Sections 1 and 2 of the Sherman Act and under California's Cartwright Act.  The jury found that PSG had proven, by a preponderance of evidence, (1) that a relevant antitrust market for steel rebar supplied from within 500 miles of Rancho Cucamonga, California existed; (2) that the challenged exclusivity agreement between CMC and Danieli was an unreasonable restraint of trade in the relevant market, in support of PSG's Section 1 and California state law claims; (3) that CMC attempted to monopolize the relevant market, in support of PSG's Section 2 claims; and (4) that the challenged restraint was a material cause of injury to PSG.  *See* Dkt. No. 496.  The jury awarded the full damages proposed by PSG's expert, Dr. Leitzinger, which were trebled under the statute for total damages of $330,110,409.  *See* Dkt. No. 525.

CMC originally moved for judgment as a matter of law at the close of PSG's case, and the Court took the motion under submission.  *See* Tr. 1590:11–14.  Following the verdict, CMC renewed its motion for judgment as a matter of law and moved for a new trial.  Dkt. No. 536.

## II.     MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.     Legal Standard

"[A] party must make a Rule 50(a) motion for judgment as a matter of law before a case is submitted to the jury.  If the judge denies or defers ruling on the motion, and if the jury then returns a verdict against the moving party, the party may renew its motion under Rule 50(b)." *Equal Emp. Opportunity Comm'n v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). In considering a Rule 50(b) motion that reasserts arguments presented in a Rule 50(a) motion, a court must uphold the jury's verdict if "substantial evidence" supports the jury's conclusion. *Castro v. Cnty of L.A.*, 833 F.3d 1060, 1066 (9th Cir. 2016).  Substantial evidence means "evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion" from the same evidence.  *Id.* (quotation omitted).  A court should only grant a Rule 50(b) motion if, after construing all evidence in the light most favorable to the nonmoving party, the record "permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Id.* (quotation omitted); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) ("[A]lthough the court should review the record as a whole, it must disregard all

United States District Court
Northern District of California

1  evidence favorable to the moving party that the jury is not required to believe.").[1]

2  **B.   Discussion**[2]

3  CMC advances six primary arguments in support of its motion.  First, CMC argues that

4  PSG "did not prove its narrow relevant geographic market." Mot. at 7.  Second, CMC argues that

5  PSG failed to prove foreclosure—"that temporarily blocking [PSG] from building a Danieli MiDa

6  mill was tantamount to preventing all competitors from accessing the only economically viable

7  way to make rebar." *Id.*  Third, CMC argues that PSG did not prove that CMC possessed the

8  market power necessary to show substantial harm to competition (or a dangerous probability of

9  achieving monopoly power). *Id.*  Fourth, CMC argues that—the foreclosure requirement

10 notwithstanding—PSG otherwise "fail[ed] to proffer any evidence beyond speculation" of

11 substantial harm to competition. *Id.*  Fifth, CMC argues that PSG did not prove that the

12 exclusivity agreement caused PSG any material harm. *Id.*  Finally, CMC argues that there was

13 insufficient evidence to support the damages calculated by PSG's expert. *Id.* at 29.

14 **i.   Relevant Geographic Market**

15 PSG was required to prove its relevant geographic market to succeed on both of its

16 Sherman Act claims.  The relevant market "comprises 'any grouping of sales whose sellers, if

17 unified by a monopolist or a hypothetical cartel' could profitably raise prices above a competitive

18 level." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 (9th Cir. 2023) (quoting *Rebel Oil Co.,*

19 *Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995)).  "If the sales of other producers

20 could substantially constrain the price-increasing ability of the monopolist or hypothetical cartel,

21 these other producers must be included in the market." *Epic Games*, 67 F.4th at 975 (quotation

22

23 [1] While the Court has reviewed the record as a whole, it has not tried to catalogue every piece of
   relevant evidence in this order, instead citing to the record as appropriate to show "substantial
24 evidence" to support the jury's conclusion.
   [2] PSG argues that CMC waived its Rule 50(b) arguments for judgment as a matter of law by
25 failing to "specify the judgment sought and the law and facts that entitle[d] [it] to the judgment."
   Opp. at 33 (quoting Fed. R. Civ. P. 50(a)(2)).  Not so.  CMC properly moved for judgment as a
26 matter of law at the close of PSG's case.  Tr. 1590:11–12.  It complied with this Court's
   instruction that no further argument would be needed at that time.  Tr. 1528:1–1529:3.  This was
27 enough to preserve these issues for a Rule 50(b) motion. *Cf. Reeves v. Teuscher*, 881 F.2d 1495,
   1498 (9th Cir. 1989) (finding that a Rule 50(b) motion was not waived where the court interrupted
28 the parties and prevented them from arguing for a directed verdict, instructing them to renew their
   motion after the verdict).

1    omitted).  In this case, PSG argued, and the jury ultimately found, that the relevant geographic

2    market was the market for steel rebar supplied from within 500 miles of Rancho Cucamonga,

3    California.  *See* Dkt. No. 491 at 21; Dkt. No. 496 at 3.

4        CMC argues that no reasonable jury could find PSG's relevant geographic market because

5    for many years the majority of rebar consumed in the market has come from more than 500 miles

6    away.  Mot. at 21.  According to CMC, this fact alone "demonstrates that outside suppliers can

7    and do constrain local mills' pricing."  *Id.* at 22.  Further, CMC argues that PSG's only evidence

8    to support its proposed market, the analysis of its antitrust expert, Einer Elhauge, ignored this fact,

9    and was based on a test that suffers from "fundamental defect[s]."  *Id.* at 24.  Specifically, CMC

10   argues that Elhauge's application of the generally accepted test to define a geographic market, the

11   hypothetical monopolist or "small but significant non-transitory increase in price" ("SSNIP") test,

12   was flawed for two reasons.  First, it argues Elhauge excluded a year of data covering the period

13   when CMC and Gerdau were negotiating CMC's acquisition of the Rancho mill, "without any

14   evidentiary justification."  *See* Mot. at 24; Reply at 15.  Second, it argues that Elhauge ignored the

15   Horizontal Merger Guidelines instruction that an SSNIP analysis should compare prices inside the

16   market with prices in surrounding geographic areas.  *See* Mot. at 24–25.

17       PSG responds that CMC cannot raise these arguments about Elhauge's analysis at this

18   stage because it failed to challenge his analysis in a *Daubert* motion before or at trial.  Opp. at 10.

19   It also argues that documentary and economic evidence supports Elhauge's conclusions.  *Id.* at 11.

20       The Court finds that CMC has not shown that the jury's conclusion that PSG proved its

21   relevant market was unreasonable as a matter of law.  First, the Court agrees that CMC's

22   arguments about Elhauge's analysis go to its admissibility and reliability, rather than the

23   sufficiency of the evidence, and were therefore waived.  "Questions of evidentiary admissibility

24   and credibility are properly challenged either before or during trial.  Failure to raise a *Daubert*

25   challenge at trial causes a party to waive the right to raise objections to the substance of expert

26   testimony post-trial."  *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012)

27   (quotation omitted); *see Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1067 (9th Cir. 1996), *as*

28   *amended on denial of reh'g* (June 26, 1996) (parties may not "challenge on appeal the reliability

of . . . scientific evidence under *Daubert*, in the guise of an insufficiency-of-the-evidence argument"). While "couch[ed] . . . in terms of insufficiency of the evidence," CMC's objections to Elhauge's analysis are clearly admissibility and reliability challenges that CMC waived by failing to raise them before or at trial. *Marbled*, 83 F.3d at 1066. Both of CMC's criticisms—that when conducting his SSNIP test, Elhauge should not have excluded a year of data and failed to follow the Merger Guidelines—directly attack his methodology, rather than his conclusions based on undisputed record evidence. *See* Mot. at 7 (arguing that test was "improperly conducted"); Reply at 15 (arguing that test was "invalid" due to his methodology). These are plainly *Daubert* arguments, meaning that CMC has waived them. *See Skydive*, 673 F.3d at 1114 (holding that arguments that an expert made "erroneous calculations" by failing to "properly deduct" certain costs and "appl[ying] an improper interest rate" should have been raised as *Daubert* challenges because they "turn[ed] upon on the substance and credibility of [the expert's] testimony"). Accordingly, the jury was allowed to rely on Elhauge's SSNIP analysis, which found that when CMC acquired the Rancho mill, it obtained a 90% market share of rebar production in PSG's proposed relevant market and was able to raise prices relative to costs at its Mesa mill by 13%. Tr. 1323:2–24. This amount exceeds the "5% threshold typically used [to] define a SSNIP" for the purpose of proving a relevant geographic market. *See Pac. Steel Grp. v. Com. Metals Co.*, No. 20-CV-07683-HSG, 2024 WL 3236705, at *7 (N.D. Cal. June 28, 2024).

CMC argues that, notwithstanding its failure to bring a *Daubert* challenge, Elhauge's market analysis cannot support the jury's verdict because certain "indisputable record facts contradict or otherwise render [that opinion] unreasonable." Reply at 15 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)). It is true that "[i]n the context of antitrust law, if there are undisputed facts about the structure of the market that render the inference economically unreasonable, the expert opinion is insufficient to support a jury verdict." *Rebel Oil*, 51 F.3d at 1435–36. But here, the Court finds that CMC has not identified undisputed record facts about the rebar market that render Elhauge's conclusions unreasonable as a matter of law.

As mentioned above, CMC's core argument is that the fact that the majority of rebar

United States District Court
Northern District of California

1  consumed within PSG's relevant market comes from more than 500 miles away makes that market

2  definition "legally defective." *See* Mot. at 21.  However, CMC's only supporting authority comes

3  from non-binding cases that addressed different products, markets, and evidence.  For example, in

4  *United States v. United States Sugar Corp.*, No. CV 21-1644 (MN), 2022 WL 4544025 (D. Del.

5  Sept. 28, 2022), *aff'd*, 73 F.4th 197 (3d Cir. 2023), the Delaware District Court found that the

6  proposed geographic market for refined sugar was too narrow given that customers within it were

7  readily able to turn to outside suppliers, specifically because undisputed facts showed that "sugar

8  flows easily across the country from areas of surplus to deficit in response to prices and demand."

9  *See id.* at *24.  But here, PSG offered evidence from which the jury reasonably could conclude

10 that rebar customers turn to distant suppliers for a different reason, and that economic realities

11 instead support a narrower definition of the relevant geographic market for rebar.

12      Significantly, PSG submitted evidence showing that rebar does not "flow easily" across

13 distances longer than 500 miles due to transportation costs.  *See* Tr. 1290:19–1291:7 (statement by

14 former CMC CEO Barbara Smith that rebar is "expensive logistically to get [] to the end market");

15 TX93-12 (document in which CMC identified the areas to which its mills primarily sell as 500-

16 mile radiuses around each mill); TX 507-7 (showing that CMC charged 10% higher prices for

17 rebar in California than in Tennessee, Texas, and Oklahoma).  CMC does not dispute the general

18 principle that rebar is expensive to ship, *see* Mot. at 22–23, but instead argues that these higher

19 transportation costs are irrelevant because outside suppliers can still effectively compete in the

20 relevant market, in part due to California's higher production costs as compared to outside

21 markets.  *See* Mot. at 23 (citing evidence that Nucor believed that it could ship rebar over 500

22 miles at competitive prices); TX 507-7 (showing that CMC could make rebar in Texas and ship it

23 to California more cheaply than making it in California); TX 1064 (showing highest production

24 cost at CMC's Rancho mill, excluding scrap cost).  However, Elhauge rebutted this evidence with

25 his own analysis showing that CMC's production costs to supply the relevant market from distant

26 mills (which, based on his opinion, should include scrap cost) were actually higher, demonstrating

27 that "inducing supply [of rebar] from distant mills" outside a 500-mile radius is inefficient.  *See*

28 Tr. 1338:21–1339:23.  Viewing the competing evidence and expert analysis in the light most

1    favorable to PSG, it was reasonable for the jury to conclude that evidence of higher transportation

2    costs for rebar supported PSG's more narrow proposed relevant market.  *Cf. United States Sugar*

3    *Corp.*, 2022 WL 4544025, at *7 (finding that in the sugar industry, "[t]ransportation costs are

4    relatively low and usually not determinative of whether a particular sugar supplier will supply a

5    location").[3]

6         In addition, Elhauge concluded that outside suppliers could only profitably supply the

7    relevant market because it was insufficiently supplied and subject to supracompetitive pricing.  Tr.

8    1332:24–1334:24.  CMC argues that this theory relies on the *Cellophane* fallacy, which is

9    inapplicable to the undifferentiated product market here.  Reply at 15.  But antitrust authorities

10   have acknowledged the legitimacy of PSG's theory outside the context of the *Cellophane* fallacy.

11   *See, e.g.*, DOJ and FTC, *Horizontal Merger Guidelines* § 4.2.1 (2010) (explaining that

12   "competition from more distant plants would not defeat [a monopolist's] price increase because

13   supplies coming from more distant plants require expensive transportation"); Areeda &

14   Hovenkamp, *Antitrust Law* ¶ 552 (5th ed. 2024) (noting that "actual imports may occur [into a

15   geographical area] only because local prices are already monopolistic and thus unconstrained by

16   the remote suppliers").  And here, it was reasonable for the jury to rely on Elhauge's SSNIP

17   analysis to find evidence of supracompetitive pricing in the relevant market.

18        In sum, CMC fails to show that PSG's relevant market was unreasonable as a matter of

19   law.  It cannot attack Elhauge's SSNIP methodology after trial.  And the jury reasonably could

20   find that his hypothetical monopolist analysis adequately established PSG's relevant market.

21   CMC also fails to show that undisputed record evidence about the rebar market contradicted

22

23   _____

24   [3] CMC's other two cases similarly do not support their arguments for judgment as a matter of law.
     In *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715 (3d Cir. 1991), the Third Circuit rejected a

25   narrow, "oddly configured" 100-square-mile market for tractors.  *Id.* at 726.  Unlike PSG, the
     plaintiffs in that case offered almost no evidence to justify their choice, and the court observed that

26   "[t]he mere delineation of a geographical area, without reference to a market as perceived by
     consumers and suppliers, fails to meet the legal standard for the relevant geographic market."  *Id.*

27   at 727.  And in *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045 (8th Cir. 1999), the court rejected
     a proposed market that would exclude suppliers that many customers would be closer to and who

28   might offer higher quality goods.  *Id.* at 1053–55.  For these reasons, the out-of-market suppliers
     would have been able to control the price-increasing capability of the hypothetical monopolist.
     The facts adduced at trial here were clearly distinguishable under the relevant standard.

United States District Court
Northern District of California

1    Elhauge's conclusions.  Accordingly, CMC's motion is **DENIED** on this ground.

2        ii.    **Foreclosure**

3        CMC next argues that PSG was required to prove that building a Danieli MiDa mill was

4    the "only viable way for CMC's actual and potential competitors to make rebar."  Mot. at 9.  Put

5    another way, CMC argues that PSG was required to prove "'foreclosure'—i.e., the lack of

6    alternatives to compete."  *Id.* at 10.  CMC notes that the "concept of foreclosure based on a lack of

7    alternatives often arises in the context of exclusive dealing claims."  *Id.*  Accordingly, CMC

8    attempted to import language about foreclosure from the ABA's model instruction for exclusive

9    dealing cases into the final instructions in this case.  *See* Dkt. No. 344 at 62–64; *id.* at 63 n.45

10   (citing ABA Model Jury Instructions in Civil Antitrust Cases ("ABA Model Instruction") 2.D.6,

11   "Exclusive Dealing – Additional Considerations").  Specifically, CMC sought to include, as a

12   factor for evaluating proof of competitive harm, "whether alternative options to compete for rebar

13   sales existed, even if those alternatives were not available on the same terms."  *See* Dkt. No. 344 at

14   63.  The Court disagreed with this approach, concluding that "it would be a mistake to try to

15   engraft exclusive dealing instructions" into the proof of competitive harm instruction in a case not

16   involving an exclusive dealing claim.  *See* Tr. 2090:16–19.  CMC now argues that the final

17   instructions misstated the law because they "do not mention foreclosure or PSG's burden of

18   proving that it lacked alternatives at all."  *See* Mot. at 36.

19        The Court acknowledges that early in the case, it observed that the restraint at issue here is

20   "similar enough to a traditional exclusive-dealing relationship to make [exclusive dealing]

21   precedent helpful."  *See, e.g.*, Dkt. No. 352 at 18.  But at bottom, the actual record developed

22   made clear that CMC's agreement with Danieli, which indisputably precluded Danieli from *selling*

23   its MiDa mill to any buyer in the relevant market other than CMC, is meaningfully different from

24   an exclusive dealing contract.  *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 1003 (9th Cir. 2020)

25   ("Exclusive dealing involves an agreement between a vendor and a buyer that prevents the buyer

26   from purchasing a given good from any other vendor." (quotation omitted)); *see also* ABA Model

27   Instruction 2.D.5, "Elements of Exclusive Dealing" (requiring a plaintiff to prove an agreement

28   "forecloses the buyer(s) from purchasing the product . . . from competing suppliers").  And the

United States District Court
Northern District of California

8

United States District Court
Northern District of California

1  concepts of "lack of alternatives" or "foreclosure" as defined in the exclusive dealing context are

2  not explicit elements of the proof of competitive harm standard that generally applies under the

3  rule of reason test.  *Compare Epic Games*, 67 F.4th at 983 (summarizing elements of direct proof

4  and indirect proof of competitive harm), *with Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157,

5  1162 (9th Cir. 1997) ("The main antitrust objection *to exclusive dealing* is its tendency to

6  'foreclose' existing competitors or new entrants from competition . . . .") (emphasis added).  *See*

7  *also* ABA Model Instruction 1.C.2, "Rule of Reason—Proof of Competitive Harm."

8         CMC cites the Ninth Circuit's opinion in *Epic Games* to argue that "[i]t has always been

9  PSG's burden to prove that the exclusivity agreement had a 'substantial anticompetitive effect' by

10  foreclosing competition."  *See* Reply at 7 (citing *Epic Games*, 67 F.4th at 983).  However, the *Epic*

11  *Games* court did not discuss the concept of foreclosure in the context of competitive harm.

12  Instead, the court held that evidence regarding "barriers to entry" or the exclusion of competitors

13  may show harm to competition.  *See id.* at 983–84 ("It is sufficient that the plaintiff prove the

14  defendant's conduct, as matter of economic theory, harms competition—for example that it

15  increases barriers to entry or reduces consumer choice by excluding would-be competitors that

16  would offer differentiated products.").

17         The other cases CMC cites also do not establish that PSG was required to prove

18  foreclosure as it is narrowly defined in the exclusive dealing context.  For one, several of the cited

19  cases address traditional or de facto vendor exclusivity agreements, unlike the agreement at issue

20  here that imposed restrictions on the seller, not the buyer.  *See Omega*, 127 F.3d at 1162

21  (addressing exclusive dealing relationship that restricted distributors' ability to purchase from

22  other manufacturers); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1054 (8th Cir.

23  2000) (addressing claim that "amounted to de facto exclusive dealing").  One of CMC's cases

24  seemingly requiring foreclosure in the context of an exclusivity agreement imposed on a seller is a

25  decades-old out-of-circuit case.  *See Elder-Beerman Stores Corp. v. Federated Dep't Stores, Inc.*,

26  459 F.2d 138, 146 (6th Cir. 1972) ("We interpret the 'rule of reason' as meaning that the granting

27  of exclusive selling rights or acceptance of such exclusive selling rights, acts which are not

28  prohibited by law unless there is a resulting foreclosure of market alternatives cannot, without

proof of such foreclosure, form the basis for a jury verdict that the defendants had entered into a conspiracy to restrain trade.").  And *General Business Systems v. North American Philips Corp.*, 699 F.2d 965 (9th Cir. 1983), involved an exclusive distributorship arrangement and a refusal to deal theory that PSG has never asserted against CMC here.  *See id.* at 978–79 (analyzing refusal to deal claim involving alleged "use of pressure [by manufacturer] against [suppliers] to maintain the exclusive distributorship [with affiliated distributors]," and considering the availability of alternative sources of supply in that context).  The Court finds that none of CMC's cases warrant the creation of a novel element not required by directly on point recent Ninth Circuit authority.

Aside from these cases, CMC argues that *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422 (9th Cir. 1993), is instructive because it addressed a "supply monopoly theory," which CMC claims that PSG alleges here.  *See* Mot. at 10.  In *L.A. Land*, the plaintiff, a company that operated bowling alleys, brought a Section 2 claim (but not a Section 1 claim) against the defendant, a company that both owned a bowling alley in the relevant market and manufactured and sold bowling equipment.  *See L.A. Land*, 6 F.3d at 1424.  The plaintiff alleged that the defendant monopolized the market for retail bowling services by delaying the transmittal of the plaintiff's application to purchase bowling equipment from the defendant.  *See id.* at 1424–25.  The jury found for the plaintiff, and the Ninth Circuit ultimately reversed the district court's denial of the defendant's motion for judgment notwithstanding the verdict.  *Id.*

In reversing the district court's decision, the court held that plaintiff failed to prove that defendant possessed monopoly power because plaintiff provided no evidence that anticompetitive acts were aimed at any competitor other than plaintiff, that defendant charged monopoly prices, or that there were substantial barriers to entry in the relevant market.  *See L.A. Land*, 6 F.3d at 1426–28.  In addition, the court noted that plaintiff might have been more successful if it had pursued a supply monopoly theory, given that, based on the evidence, "a rational jury could not conclude that [defendant] possessed the power to exclude competition from the relevant market without hearing evidence that [it] had monopoly control of the equipment market."  *Id.* at 1429.  However, because it did not pursue a monopoly supply theory, plaintiff failed to show that the defendant "had power to exclude from the market a potential competitor that chose to purchase equipment

10

from a company other than [defendant], nor did it prove that other suppliers did not exist." *Id.*[4]

The Court finds that *L.A. Land*, while addressing a theory of harm arguably adjacent to PSG's theory, does not provide a sufficient basis for requiring PSG to prove foreclosure. *L.A. Land* is substantially distinguishable on several grounds. First, plaintiff's theory in *L.A. Land* alleged that defendant delayed only plaintiff's application to purchase bowling equipment, while CMC's agreement with Danieli expressly prohibited it from selling a MiDa mill to any other company in the relevant market. *See, e.g.*, TX0002-2; Tr. 1374:13–1375:4 (Elhauge testifying that "the challenged restraint barred all rival use of the MiDa technology throughout the geographic market"). Second, unlike the plaintiff in *L.A. Land*, PSG introduced evidence supporting a showing of CMC's monopoly power, including supracompetitive prices and barriers to entry. *See* Tr. 1359:18–1374:2. And importantly, the court's discussion of the power to exclude competitors in *L.A. Land* was squarely in the context of that plaintiff's monopolization claim, *see L.A. Land*, 6 F.3d at 1425–29, but CMC does not make any distinction between PSG's Section 1 and Section 2 claims in arguing that foreclosure is required. *See* Mot. at 11 (arguing that "[t]o win *at trial*, PSG was required to prove that buying a Danieli MiDa mill was the only way to compete") (emphasis added). Given these distinctions, including CMC's failure to explain why *L.A. Land*'s Section 2 analysis should apply to the proof of competitive harm required for both of PSG's claims, the Court finds that *L.A. Land* does not support CMC's position that the jury instructions misstated the law.[5]

_____

[4] CMC overreads *Paladin Associates, Inc., v. Montana Power Co.*, 328 F.3d 1145 (9th Cir. 2003), as supporting a similar proposition. That case turned on the defendant's evidence of countervailing procompetitive benefits of the alleged anticompetitive acts. *Id.* at 1157–58. Here, the jury was properly instructed regarding the significance of procompetitive benefits, and thus presumably rejected CMC's position. *See* Dkt. No. 491 at 24; *cf. Results ByIQ LLC v. Netcapital.com LLC*, No. C 11-0550 SC, 2013 WL 4835838, at *4 (N.D. Cal. Sept. 11, 2013) (finding a sufficient evidentiary basis where "Defendants presented their facts at trial, Plaintiff presented theirs, and the jury made its decision based on what all agree was a proper jury instruction"). And as in *Epic Games*, the court in *Paladin* discussed barriers to entry and the power to exclude competition. 328 F.3d at 1157–58. But it never required CMC's strict foreclosure element.

[5] CMC also cites *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995), in which the Ninth Circuit held that a plaintiff bringing a Section 2 claim "must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the predator's high price." *See* Mot. at 9. But in outlining these requirements, the court was explicitly addressing the "barriers to entry" element of the market

United States District Court
Northern District of California

According to CMC, because PSG "never explain[ed] how its theory of harm to competition is distinct from exclusive dealing cases," PSG was required to show proof of foreclosure as it is defined in the exclusive dealing context, i.e. that "a Danieli MiDa mill was the only way to compete." Reply at 6 n.1; Mot. at 11. But as explained above, CMC does not identify any controlling authority that directly applies the exclusive dealing elements to a theory like PSG's. As such, CMC fails to show that PSG was required to fit its theory into the "preexisting legal box" of exclusive dealing. *See Pac. Steel Grp. v. Com. Metals Co.*, No. 20-CV-07683-HSG, 2024 WL 3236705, at *21 (N.D. Cal. June 28, 2024) (quotation omitted). Moreover, based on the jury instructions the Court gave that were rooted in controlling law, the jury was free to consider the availability of alternative mill technology as a factor in the competitive harm analysis. *See* Dkt. No. 491 at 22–23 (instructing the jury that it could consider "the number of competitors in the relevant market" and "whether there are barriers to entering the market").

The Court thus finds that the jury was properly instructed, and rejects CMC's argument that "PSG was required to prove that buying a Danieli MiDa mill was the only way to compete." Mot. at 11. Accordingly, CMC's motion is **DENIED** on this ground.

### iii.    Substantial Anticompetitive Harm

Under the rule of reason, PSG had "the initial burden to prove [directly or indirectly] that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Epic Games*, 67 F.4th at 983 (citation omitted). "The rule of reason applies essentially the same regardless of whether the alleged antitrust violation involves concerted anticompetitive conduct under Section 1 or independent anticompetitive conduct under Section 2. *Id.* at 974 (quotation omitted); *see also Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680, 685 (9th Cir. 2022) ("Because the legal tests for sections 1 and 2 of the Sherman Act are similar, we can review claims under each section simultaneously." (quotation omitted)). "To prove a

power analysis. *See Rebel Oil*, 51 F.3d at 1439. And in turn, the court defined "barriers to entry" more broadly as "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns," including the "control of an essential *or superior* resource." *See id.* at 1439 (emphasis added) (citation omitted). Based on this context, the Court does not find that the "barriers to entry" element requires the kind of total foreclosure CMC argues should be imported from the exclusive dealing context.

1    substantial anticompetitive effect directly, the plaintiff must provide proof of actual detrimental

2    effects on competition, such as reduced output, increased prices, or decreased quality in the

3    relevant market." *Epic Games*, 67 F.4th at 983 (quotation omitted). "To prove substantial

4    anticompetitive effects indirectly, the plaintiff must prove that the defendant has market power and

5    present some evidence that the challenged restraint harms competition." *Id.* (quotation omitted).

6    CMC argues that the jury could not reasonably have found that PSG proved anticompetitive harm

7    directly or indirectly. *See* Reply at 11–12. The Court disagrees, and finds that, at a minimum,

8    PSG introduced indirect evidence of anticompetitive harm that is adequate to support the jury's

9    finding.

10                              **a.  Market Power**

11        "Market power is the ability for a defendant to profitably raise prices by restricting

12    output." *Epic Games*, 67 F.4th at 983. "Market power is generally inferred from the defendant's

13    possession of a high market share and the existence of 'significant barriers to entry.'" *Id.* (quoting

14    *Rebel Oil*, 51 F.3d at 1434). PSG's evidence of CMC's high market share, the existence of

15    significant barriers to entry in the relevant market, and CMC's ability to restrict output and raise

16    prices was sufficient for the jury to find that CMC had market power.

17        First, PSG introduced testimony that CMC had more than a 90% share of the relevant

18    market between 2019 and 2021. Tr. 1359:11–1372:6 (Elhauge); TX0231A-C; TX0235A. PSG

19    also introduced testimony refuting CMC's calculation of a 30% market share. Tr. 1362:25–

20    1366:24 (arguing that CMC's calculation used an incorrect market definition and selected a year

21    that minimized the market share). CMC argues that Elhauge's testimony flows from his flawed

22    market definition, and that the real market share was between 25% and 35%. Mot. at 25–26

23    (citing TX1058 and TX508-8). CMC also argues that PSG's business documents assumed there

24    was no competitor with a high market share. *Id.* (citing TX644-28, in which the lead of PSG's

25    efforts to construct the Danieli mill, Mark Olson, stated there was no "single mill with a large

26    position"). Having already concluded that the jury reasonably could have agreed with PSG's

27    relevant market definition, the Court also finds that the jury could have reasonably credited PSG's

28    competing evidence that partially relied on this definition to determine that CMC had a high

United States District Court
Northern District of California

United States District Court
Northern District of California

1   market share.[6]

2       Second, PSG introduced evidence that competitors faced substantial barriers to entry in the

3   steel rebar market.  Elhauge testified that building a new mill costs between 300 and 450 million

4   dollars, takes years to complete, and requires land in an area with a sufficient supply of scrap

5   metal.  Tr. 1368:1–1369:19.  He also testified that the exclusivity agreement constituted a

6   significant barrier to entry, as every competitor in the market was prohibited from using Danieli's

7   MiDa technology, not just PSG.  *Id.*  Elhauge also noted that there have been no new entrants to

8   the market since 1996, despite a shortage in local supply.  Tr. 1369:5–19.  The jury reasonably

9   could have inferred from this testimony that there were "factors in the market that deter entry,"

10  including "control of an essential or superior resource" by way of the exclusivity agreement.

11  *Rebel Oil*, 51 F.3d at 1439.  And the jury reasonably could have credited the significance of these

12  barriers and the absence of any recent entrants to determine that these barriers are so substantial as

13  to be "capable of constraining the normal operation of the market to the extent that the problem is

14  unlikely to be self-correcting."  *Id.*

15      Third, PSG introduced testimony that CMC had the market power to reduce output and

16  raise prices to supracompetitive levels.  Elhauge testified that CMC was able to increase its prices

17  by 39% overall and 13% relative to costs after acquiring the Rancho Cucamonga mill—price

18  increases that exceeded those in other areas.  Tr. 1369:23–1370:6.  He also testified that CMC

19  subsequently reduced production at the Rancho Cucamonga mill despite unmet demand in order to

20  sell at higher margins.  Tr. 1369:23–1372:6; TX0235A.  CMC responds that it introduced trial

21  testimony from its former director of marketing and its vice president of commercial and supply

22  chain that other players set the market price, CMC's market share decreased after acquiring the

23  Rancho mill, and prices around the country increased at the same time it acquired and later shut

24  down the Rancho mill.  Mot. at 25–26; Reply at 16.  But the jury reasonably could have concluded

25  that PSG's testimony was stronger, including by choosing not to credit the potentially self-serving

26

27  ───────────────
    [6] Likewise, the jury could have credited Elhauge's argument that business documents should be
28  given reduced weight here, where their use of terms may not align with the legal definition of "the
    relevant market."  Tr 1404:2–19.  That Olson articulated his understanding of the market does not
    conclusively determine the market definition for antitrust purposes.

United States District Court
Northern District of California

1    testimony of CMC's witnesses regarding who set market price.  The jury also reasonably could

2    have concluded that CMC's data about decreasing market share and nationwide price increases

3    aligned with Elhauge's testimony that CMC decreased output to achieve higher margins, but that

4    its price increases were comparatively higher than those in the rest of the market.

5         CMC also argues that Nucor—a competitor in PSG's relevant market—was able to expand

6    its mill without the use of Danieli's MiDa technology, suggesting that PSG could have expanded

7    production even without that technology during the exclusivity period.  Mot. at 17–18.  If true, this

8    would tend to suggest that CMC did not have the market power to lower output and raise market

9    prices, since existing competitors could "expand their output to challenge the predator's high

10   price." *Rebel Oil Co*, 51 F.3d at 1439.  CMC argues that this "torpedoes" PSG's theory of harm.

11   Mot. at 17–18.  But CMC's characterization overreads this precedent.  In *Rebel Oil*, the evidence

12   showed that two other gas retailers had expanded output during the period in question by acquiring

13   existing gas stations and then delivering a higher volume of gasoline at those stations.  51 F.3d at

14   1441–42.  On that basis, the Ninth Circuit held that the evidence showed that the gasoline supply

15   market in Vegas was "highly elastic," and therefore "did not support an inference" that the

16   defendant, ARCO, controlled retail gas supply and prices.  *Id.* at 1442.  The court held that "[i]f

17   there is undisputed evidence indicating that competitors have expanded output in the recent past,

18   or have the ability to expand output in the future, summary disposition may be appropriate."  *Id.* at

19   1441.  But this ruling was highly fact-specific, relying on evidence that competitors could "easily

20   offset" price increases "in a very short time."  *See id.* at 1442.  Here, by contrast, CMC introduced

21   testimony that Nucor began expanding its melt shop in August 2022, but the expansion apparently

22   was not complete at the time of trial.  *See* Mot. at 17–18; Reply at 10–11.  And Elhauge testified in

23   detail about how long it takes to build a new mill.  *See, e.g.*, Tr. 1368:1–1369:19, 1478:9–12.  On

24   this basis, the jury reasonably could have concluded that the time and resources required for mill

25   construction in the steel rebar market posed significant barriers to expanding output.

26        The Court finds there was sufficient evidence for the jury to determine that CMC had

27

28

15

market power.[7]

### b.  Additional Harm to Competition

Evidence of additional harm to competition "need not always be extensive or highly technical." *Epic Games*, 67 F.4th at 983–84.  "It is sufficient that the plaintiff prove the defendant's conduct, as [a] matter of economic theory, harms competition—for example that it increases barriers to entry or reduces consumer choice by excluding would-be competitors that would offer differentiated products." *Id.*

PSG introduced adequate evidence to show that the exclusionary agreement harmed competition.  PSG introduced evidence showing that, under basic economic principles of supply and demand, PSG's entrance into the market would have increased output and correspondingly reduced prices, and that prices for consumers will be higher for a period of time because of PSG's delayed construction of the Danieli mill.  Tr. 1381:2–21 (Elhauge); Tr. 488:3–16, 643:4–21 (PSG's CEO, Eric Benson).  Elhauge also provided examples where gross markup was lower in regions where rival mills had recently opened within 500 miles of CMC's mills than in other regions.  Tr. 1382:19–1384:24; TX0238; *cf. Epic Games*, 67 F.4th at 985 (upholding district court's finding of indirect proof of harm based on "basic economic presumptions" about the market, including evidence that when Epic entered the PC-gaming market, another gaming platform lowered its commission).  And PSG introduced evidence that CMC intentionally and maliciously blocked PSG's entry.  *See, e.g.*, TX0001-12 (noting CMC's desire to add the exclusivity agreement because PSG's entry would "crush the dynamics of [the] market"); TX0109-2 (discussing the "significant risk" and "concern" regarding "a 'non-mill' fabrication company [that] has announced plans to enter steel manufacturing with a micro-mill in

---

[7] CMC recycles these arguments to suggest that no reasonable jury could have concluded that CMC had a dangerous probability of achieving monopoly power.  Mot. at 25–26.  CMC does not make any effort to distinguish its arguments regarding PSG's market power and monopoly power showings.  This is unsurprising, as monopoly power is analyzed in the same way and only "differs in degree from market power, requiring 'something greater.'"  *Epic Games*, 67 F.4th at 998 (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992)).  Because PSG introduced sufficient evidence that CMC had a market share of greater than 90%, the jury reasonably could have found that it also met the higher threshold of demonstrating monopoly power.  *Cf. United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (holding that control of 87% of the market clearly constituted monopoly power).

16

California").  The jury was entitled to credit this evidence, including as an indication of CMC's own belief that PSG's mill would lead to increased output and lower prices, and as support for the conclusion that MiDa exclusivity cut off the ability for PSG—and others—to meaningfully compete.  *See Sidibe v. Sutter Health*, 103 F.4th 675, 688 (9th Cir. 2024).

PSG also introduced evidence that the alternatives available to competitors while the exclusionary agreement was in effect were inadequate.  PSG introduced evidence showing that any alternative options from SMS and Primetals were only theoretical in 2020.  Tr. 470:7–24, 653:12–17 (Benson); Tr. 773:5–20, 775:2–9 (Olson); *see also* Opp at 21–22.  It also introduced evidence that MiDa mills offered significant advantages, including the DRB finishing ends, which allowed "rebar to be efficiently and quickly cut to standard or custom lengths directly off the rolling process, yielding significant cost savings."  Opp. at 20–21 (citing testimony from Olson, Tr. 705:12–706:4, 722:15–21, and Benson, Tr. 489:14–491:1).  And PSG introduced evidence that Danieli's non-MiDa alternative was not feasible, as Olson and Benson testified that the mill used billet welders and older, non-DRB finishing ends in a "crazy" and unreliable design that had never been built anywhere.  Tr. 751:10–758:20 (Olson); Tr. 434:2–8 (Benson); *see also* Opp. at 23–24 (discussing additional testimony).  CMC itself appears to have acknowledged in some instances that Danieli had the "winning technology," and the jury could properly conclude that "CMC paid the money to Danieli to block the only technology that could effectively compete in California."  Opp. at 21 (quoting TX0001-12).

In turn, CMC vigorously argues that PSG failed to show that other alternatives were not viable and cannot show a harm to competition.  It points to the fact that Danieli's CEO believed there were other competitors at the time he agreed to the exclusivity window, the fact that other companies have considered SMS and Primetals to be viable alternatives, internal documents supporting CMC and PSG's belief that there were alternatives, spreadsheets from Mr. Olson purporting to show the profitability of Danieli's non-MiDa alternative, and critiques about the benefits of DRB, all while also attacking Elhauge's credibility.  Mot. at 11–18.  But this evidence was all vigorously disputed, and the jury could have reasonably credited PSG's counterarguments that these "alternatives" were vastly inferior and sometimes entirely hypothetical—explaining why

United States District Court
Northern District of California

1    MiDa was the only technology that had been newly deployed for decades.  *See* Opp. at 21.[8]

2    Because the Court holds that PSG did not have to prove complete foreclosure, PSG was permitted

3    to argue that the exclusionary restraint prevented PSG from pursuing meaningful alternatives to

4    Danieli's MiDa mill, delayed its entry into the market, and reduced the output of rebar in the

5    market for a period of time.

6           CMC argues that PSG had to "present actual evidence of harm to competition."  Mot. at

7    18.  The Court finds that PSG was allowed to prove competitive harm indirectly by showing that

8    the restraint was likely to cause harm to competition.  The ABA's model jury instructions permit

9    the jury to consider likely future harm when considering whether a plaintiff proved competitive

10   harm.  ABA Model Instruction 1.C.2, "Rule of Reason—Proof of Competitive Harm" (stating that

11   "to prove that the challenged restraint is unreasonable, plaintiff first must demonstrate that the

12   restraint has resulted [*or is likely to result*] in a substantial harm to competition") (emphasis in

13   original); *see also* Final Jury Instructions at 37, *In re Google Play Store Antitrust Litig.*, No. 21-

14   MD-2981 (Dec. 6, 2023, N.D. Cal.), Dkt. No. 850 (providing a competitive harm jury instruction

15   using this model language).  Ninth Circuit precedent is in accord.  *See Freeman v. San Diego*

16   *Ass'n of Realtors*, 322 F.3d 1133, 1150 (9th Cir. 2003) ("Under the rule of reason, we look to the

17   particular facts of the case to determine whether a challenged restraint is likely to enhance or harm

18   competition."); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 n.10 (9th Cir. 1991) (discussing a

19   "likely to affect competition" test when considering the rule of reason).  Despite being given an

20   opportunity to brief this issue at trial, CMC did not provide any cases suggesting otherwise, and

21   they do not do so now either.  *See* Dkt. No. 489 at 7–9 (arguing against the optional ABA

22   language); Tr. 2285:19–2286:1.  In fact, the only case CMC cites, *MacDermid Printing Solutions*

23   *LLC v. Cortron Corp.*, 833 F.3d 172 (2d Cir. 2016), supports the conclusion that PSG could show

24   harm to competition from a past action with an adverse effect, "even if consumers have not yet felt

25   that effect."  *Id.* at 182.

26

27   ─────────────────

28   [8] The jury also could have credited Olson's testimony that his spreadsheets analyzing costs, which
     CMC argues showed Danieli's alternative was profitable, were not intended to estimate
     profitability.  *See, e.g.*, Tr. 1003:8–1004:5, 1009:22–1010:11, 1060:6–1061:3.

United States District Court
Northern District of California

Additionally, CMC argues that PSG's "speculative future theory" of harm is insufficient to prove harm to competition. Mot. at 18–19. But consistent with the discussion above, the fact that PSG's alleged harm will occur in the future does not alone mean that PSG's evidence was inadequate. The Court thus rejects CMC's argument that PSG's evidence that more entrants in the market drive down prices was too speculative to permit the jury to reasonably find sufficiently likely future harm. Nor is PSG's theory too speculative as a matter of law because the exclusivity window was only in effect for 16 months. CMC relies on *Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947 (9th Cir. 1998), to argue that the 16-month restriction only caused a "temporary decline in the number of competitors" which "is not a significant restraint of trade." Mot. at 18 (quoting *id.* at 952). But *Adaptive Power* involved a highly fact-sensitive inquiry, finding no anticompetitive effect caused by the "trivial" elimination of a competitor for no more than ten months, and observing that restraints lasting under a year typically do not meet the threshold. 141 F.3d at 952. As PSG correctly points out, the jury reasonably could have found that the steel-starved nature of the market here and the longer duration of the exclusivity window were sufficient to constitute a non-trivial and significant restraint.

Finally, CMC argues that PSG's theory of harm, as outlined by Elhauge, is fatally undermined by PSG's damages expert's testimony. *See* Mot. at 19–20. Elhauge testified that by delaying PSG's entrance into the market, the agreement with Danieli delayed an increase in rebar supply in the market that would lower prices. *Id.* at 19. But CMC argues that this was contradicted by Dr. Leitzinger's damages analysis that PSG's added capacity would have no price effect because PSG primarily wanted to use its increased supply itself. *Id.* at 19–20. Further, CMC contends that Elhauge's explanation that PSG's self-supply will still reduce prices by taking PSG's demand off the market is inconsistent with Leitzinger's testimony that PSG's demand wasn't part of the market, such that the self-supply wouldn't impact the prices in the market. Reply at 12, n.6. PSG responds that this argument is "nothing more than one side of the battle of the experts." Opp. at 15.

While the evidence could have supported different conclusions, it was sufficient for the jury to find that PSG will sell some of its excess rebar on the market so as to reconcile the two

United States District Court
Northern District of California

1    theories.  Tr. 1383:25–1384:24, 1484:17–1485:14 (Elhauge testifying that early plans were to sell

2    between 160,000 and 180,000 tons per year); Tr. 1550:21–1551:14 (Leitzinger describing his

3    assumption that 180,000 tons would be sold as excess).  CMC mischaracterizes this testimony

4    when it argues that "PSG presented no evidence about how much [excess rebar it plans to sell on

5    the open market], whether that amount (as opposed to the full 380,000 ton capacity) would be

6    enough to have any price effect, or even when it would be sold."  Reply at 13.  CMC also contends

7    that PSG's eventual goal was to use all 380,000 tons, and that the excess rebar would eventually

8    no longer be sold.  Mot. at 20.  Even if this is true, the jury reasonably could have found that for

9    the initial 16-month window that was the basis for damages in this case, PSG would still be selling

10   its excess rebar.

     The Court finds that PSG at least introduced sufficient indirect evidence of anticompetitive

12   harm, and that this evidence was not unduly speculative.  Accordingly, CMC's motion is

13   **DENIED** on this ground.

14              **iv.     Injury and Causation**

15              CMC argues that PSG failed to prove that the exclusivity agreement caused any antitrust

16   injury.  It first argues that evidence at trial established that PSG was not ready to sign a contract

17   with Danieli in the summer of 2020.  Mot. at 26–27.  CMC points primarily to testimony from

18   Danieli's CEO, Mr. Losso, that the contract between Danieli and PSG was still in its infancy, and

19   to the fact that Mr. Olson had only just been hired to help lead the project in July 2020 and only

20   first drew up a business plan in September 2020.  *Id.*  CMC also contends that PSG made

21   "significant progress on its mill" during the exclusivity period.  *Id.* at 27.  It discusses examples of

22   how PSG proceeded with its mill construction plans between the summer of 2020 and late 2021,

23   including hiring an engineering firm, hiring a consultant who could help with its Environmental

24   Impact Report (EIR) for Kern County, submitting a CEQA application to Kern County, engaging

25   in discussions with various utilities, beginning the necessary research studies, and otherwise

26   signaling to partners and investors that the project was progressing.  *Id.* at 27–29.

27              PSG responds that it had prepared for this project for years, including by hiring an

28   executive with decades of experience and securing land rights and a commercial proposal.  Opp. at

United States District Court
Northern District of California

20

26.  It notes that Losso agreed that PSG was committed to the MiDa mill and that PSG was "ready, willing, and able to purchase a MiDa mill," right up until CMC intervened and prevented Danieli from sending the commercial proposal in mid-July, as Danieli originally intended.  *Id.* (discussing Olson's testimony that PSG was waiting for Losso to send the commercial proposal).  PSG argues that Kern County, not PSG, controlled the timing of the EIR process, and that it would not start the process until PSG could purchase a MiDa mill.  *Id.* at 27–28 (discussing Olson's testimony).  PSG further notes that many of the studies needed for the EIR had a limited shelf life and thus could not be conducted until the project could move forward.  *Id.* at 27 (citing Tr. 800:15–25).  PSG argues that Olson performed ministerial tasks, but those tasks didn't offset any delay because "the primary roadblock was the EIR."  Opp. at 29, n.10.  Olson testified that he had joined the company to work on the MiDa project, and he couldn't stand by and do nothing in his new role just because the project had been blocked by the exclusivity agreement.  Tr. 775:10–778:10.

The Court finds that the jury reasonably could have credited PSG's evidence, including Olson's testimony, and found that the exclusivity agreement caused antitrust injury to PSG.  CMC's evidence is not the smoking gun it asserts.  There is no doubt that CMC introduced testimony that PSG continued performing tasks while the exclusivity agreement was in place.  But the central dispute here is whether the core of the EIR process—which PSG argued was a prerequisite for meaningful progress on the CEQA application—could start in earnest without a contract for a mill.  The jury reasonably could have credited Olson's testimony, and the supporting documents PSG identifies in its opposition, to conclude that Olson completed only ministerial tasks for CEQA and the EIR, and that the EIR process could not start until PSG had a signed contract.  That PSG completed some parts of this process during the exclusivity window goes to the weight of the evidence and Olson's credibility: it does not mean no reasonable jury could agree with his central thesis.  CMC argues that these statements are inadmissible hearsay that the jury could not rely upon.  Mot. at 29; Reply at 16–17.  This is true as to Olson's testimony about Lorelei Oviatt's statement that Kern County would not start the process without the MiDa mill, which was introduced for its effect on Mr. Olson as the listener with a limiting instruction that it

United States District Court
Northern District of California

1       could not be used by the jury for its truth.  Tr. 791:17–792:15.  But PSG had testified previously

2       that Kern County would not begin the process while Danieli could not supply a MiDa mill.  Tr.

3       775:2–779:9 (Olson testifying that it "was made clear that without a project, without the ability to

4       buy [the] steel mill, [PSG] could not get the county to start" the EIR process); Opp at 27 n. 9.

5       CMC did not object to this testimony, and so waived any admissibility argument.  Moreover, the

6       jury reasonably could have credited Olson's testimony that some of the necessary environmental

7       studies were time sensitive and could only begin once PSG signed a contract.  *See* Tr. 800:15–25.

8            PSG also submitted sufficient evidence showing that it planned to continue negotiations

9       with Danieli in the summer of 2020, and that it was Danieli that refused to send an updated

10      proposal as planned due to CMC's intervention.  *See* Tr. 737:21–740:6.  The fact that Mr. Olson

11      was just beginning his job and some due diligence remained does not mean that PSG would not

12      have moved forward with the contracting process upon receiving this proposal but for the

13      exclusivity agreement, and the jury reasonably could have found as much.  Accordingly, CMC's

14      motion is **DENIED** on this ground.

15              **v.    Damages**

16           Dr. Leitzinger testified that the exclusivity agreement led to four categories of damages:

17      (1) lost profits from a 16-month delay in construction of the mill; (2) lost transportation cost

18      savings because PSG was forced to "continue buying rebar from suppliers located at a long

19      distance away"; (3) lost fabrication cost savings from being unable to use the cost-efficient DRB

20      finishing end; and (4) a higher eventual purchase price for the MiDa mill.  Mot. at 29, 31.  The

21      jury adopted Dr. Leitzinger's calculations wholesale.  *Compare* Tr. 1547:3–5, *with* Dkt. No. 496 at

22      7 (verdict form).  CMC argues that each of these measures of damages is speculative and

23      unsupported by evidence.  Mot. at 29.

24           "An antitrust plaintiff must simply provide evidence to support a just and reasonable

25      estimate of the damage."  *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1297 (9th Cir. 1984)

26      (quotation omitted).  "The jury is allowed to act on probable and inferential proof in determining

27      the amount of damages even though such an award may be an approximation."  *Dolphin Tours,*

28      *Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1511 (9th Cir. 1985).  "A jury's finding of the

1    amount of damages must be upheld unless the amount is grossly excessive or monstrous, clearly

2    not supported by the evidence, or only based on speculation or guesswork." *Handards*, 743 F.2d

3    at 1297 (quotation omitted).  The Court concludes that PSG put forth sufficient non-speculative

4    evidence for each category of damages, and CMC has not met its burden to overturn the jury's

5    verdict.

6        First, CMC argues that Dr. Leitzinger incorrectly assumed when calculating lost profits

7    that PSG's mill would have been operational by December 2024 (as Mr. Olson indicated) but for

8    the exclusivity agreement, without any independent analysis to support this assumption.  Mot. at

9    30–31.  CMC contends that PSG could not take title to the land until at least January 2021, which

10   meant—given later 2024 estimates on how long the project would take to complete after PSG and

11   Danieli signed a contract after the exclusivity agreement ended—the mill could not have been

12   operational until October 2025, at the earliest.  *Id.*  Additionally, CMC criticizes Dr. Leitzinger's

13   assumption that PSG's mill will actually be running by April 2026, despite Mr. Olson's testimony

14   that it would take until at least December 2026.  *Id.* at 31.  Finally, CMC argues that Dr.

15   Leitzinger's testimony relies on the unsupported assumption that PSG could ramp up its mill and

16   operate as profitably as CMC's mills.  *Id.*[9]

17       Once more, CMC relies in part on waived challenges to expert admissibility masquerading

18   as challenges to the sufficiency of the evidence.  To the extent CMC had concerns about Dr.

19   Leitzinger relying on Mr. Olson's estimate for when the mill would have been operational absent

20   the exclusivity agreement without conducting his own analysis, it should have raised them in

21   *Daubert* motions.  *See Marbled*, 83 F.3d at 1066.  So too for challenges to the assumptions on

22   which Mr. Leitzinger relied in his methodology.  And as before, CMC has not identified

23   undisputed facts that render Dr. Leitzinger's assumptions unreasonable.  *See* Opp at 30 (citing

24   extensive record evidence supporting damages).  Contrary to CMC's claims, PSG introduced

25   competing evidence that its predictions about how long the contract would take to close matched

26

27   [9] CMC also repeats its argument that the exclusivity agreement did not delay PSG's construction
     of the mill, let alone for 16 months.  Mot. at 30.  Because the Court has concluded that the jury
28   reasonably could have credited PSG's evidence regarding causation, this argument fails again
     here.

United States District Court
Northern District of California

what took place after the exclusivity agreement lifted, supporting the accuracy of Mr. Olson's December 2024 estimate. Tr. 658:25–660:16. Mr. Olson also testified that the 2024 estimate CMC relied on to argue that the plant could not open until October 2025 at the earliest had overestimated the time needed by a factor of two. *See* Tr. 1048:8–1049:15. Finally, as PSG correctly points out, ample record evidence suggested that assuming PSG would take the same amount of time to ramp up production as CMC was actually a conservative estimate. Opp. at 30–31 (citing Losso's testimony, Olson's experience in steel-making, and the benefit of additional knowledge of how to implement MiDa technology). CMC had an opportunity to cross-examine these witnesses and challenge PSG's theory. That these points were disputed does not mean the jury's verdict rested on "speculation or guesswork."

Second, CMC claims there is no basis for lost transportation cost savings because PSG chose to buy from outside mills, instead of from CMC. Mot. at 31. The Court is not persuaded by this argument. First, CMC did not seriously present it to the jury during trial, and cites no evidence it ever did. *See* Mot. at 31 (citing Tr. 1585:15–24, which only briefly notes that PSG chose to buy more rebar from Nucor's Utah and Seattle facilities in 2020). Second, the jury reasonably could have inferred that PSG could not feasibly purchase its steel from the same rival company that imposed an exclusivity window in order to block PSG from constructing its competing steel mill. CMC also argues that PSG had "industry leading margins" and thus did not suffer any harm. Mot. at 31. This argument is plainly without merit. The fact that PSG made money does not mean it did not make less money because of CMC's anticompetitive behavior. *See* Tr. 1557:2–1558:18 (comparing costs of moving rebar from out of state to cost structure after construction of the Mojave mill). PSG was not required to collapse to show a legally cognizable harm.

Third, CMC argues that the lost fabrication cost savings are based purely on Mr. Benson's speculative and incorrect testimony about the DRB finishing end. Mot. at 31. CMC makes much of Mr. Losso's testimony that "the major benefit of the DRB is the quality of the rebar bundle, not the alleged benefits in cutting to custom size that Mr. Benson's hypothesized fabrication cost savings is based on." *Id.* (summarizing Losso's testimony). But PSG introduced sufficient

1    testimony from Mr. Benson explaining why he anticipated cost savings from DRB.  *See* Tr.

2    490:6–495:11.  Benson testified that the DRB finishing end allowed Danieli's mills to more

3    efficiently cut custom lengths, and he explained that he sampled PSG's existing jobs to see which

4    would benefit from this precision.  *Id.*  The jury was entitled to credit Benson's testimony over

5    Losso's.

6          Finally, CMC argues that the damages awarded for the increased cost of the Danieli

7    contract were based on wholly speculative guesswork from Olson.  Mot. at 32.  It argues that

8    Olson's base price—calculated from Danieli's January 2020 offer—is not what PSG would have

9    paid, as the price was only valid for two months, at a time when PSG was not in a position to

10   negotiate a final contract.  *Id.*  CMC points to a September 2020 email where Losso told Olson

11   that the alternative non-MiDa mill would "stay within the previous price and hopefully just take

12   into consideration the [exchange rate] that is about 7.5% higher compared to the beginning of the

13   year."  *Id.* (citing TX649-1).  CMC also argues that the 2022 contract price Olson used to calculate

14   the increased cost was "irrelevant" because it needed to be renegotiated in 2023 and was not what

15   PSG actually paid for the mill.  *Id.*

16         That Olson relied on the best proxies he had does not make his testimony "guesswork."

17   Losso's comment that the *alternative mill* should "take into consideration" the exchange rate does

18   not necessarily mean that the 2020 price would have differed for the MiDa mill.  And Olson

19   testified that the 2023 contract had changed in scope from the original agreement.  *See* Tr. 838:22–

20   839:2.  Based on the totality of the record, the jury reasonably could have concluded that the 2022

21   contract was a better comparison point for the contract price directly following the end of the

22   exclusionary window than the eventual price paid.  The jury was not required to be highly precise

23   and certain in its verdict, especially given the complex inquiry entailed in determining antitrust

24   damages.  *See Dolphin Tours*, 773 F.2d at 1511.

25         The Court concludes that sufficient evidence supported the jury's damages verdict, and

26   CMC cannot now bring *Daubert* challenges it failed to timely raise.  Accordingly, CMC's motion

27   is **DENIED** on this ground.

28

1

2

United States District Court
Northern District of California

### III.     MOTION FOR NEW TRIAL

#### A.     Legal Standard

A court may grant a new trial under Rule 59 "if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999) (citation omitted).  Unlike on a motion for a judgment as a matter of law, when considering a motion for a new trial, the Court "can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1371 (9th Cir. 1987).  However, a motion for new trial should not be granted "simply because the court would have arrived at a different verdict."  *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

#### B.     Discussion

CMC first argues that a new trial is warranted because the jury's verdict is against the clear weight of the evidence.  Mot. at 32–33.  Specifically, CMC urges the Court to "disregard misleading testimony from PSG's witnesses about PSG's preparedness to sign a contract with Danieli in August 2020, PSG's commitment to a MiDa mill and nothing else, and PSG's ability to progress its mill project despite the exclusivity."  *Id.* at 33.  The Court rejects these arguments.  Given the evidence cited above, the Court finds that PSG introduced sufficient evidence to show that (1) PSG was prepared to move forward with the contract and was waiting for Danieli to send a commercial proposal at the time Danieli and CMC signed the exclusivity agreement, *see* Opp. at 26–27; (2) alternatives to Danieli's MiDa mill were inadequate, and PSG's efforts to explore other options during the exclusivity window did not invalidate that fact, *see* Opp. at 20–26; and (3) even if PSG could pursue some additional actions during the exclusivity window, it could not begin the EIR process in earnest until it signed a contract with Danieli, *see* Opp. at 27–29.

CMC also argues a new trial should be granted because the Court made several errors.  First, CMC argues that the Court improperly excluded impeachment testimony from two witnesses regarding the viability of SMS and Primetals mills.  Mot. at 33–35.  Second, it argues that the Court improperly allowed PSG to repudiate a stipulated fact about the length of the exclusivity

agreement. *Id.* at 35–36.  Third, CMC claims that the Court failed to properly instruct the jury

regarding foreclosure. *Id.* at 36–37.  Fourth, CMC argues that the Court improperly excluded

impeachment evidence showing that Kern County started the EIR process during the exclusivity

window. *Id.* at 37.  Fifth, CMC argues that the Court erred by modifying a jury instruction after

CMC's closing argument. *Id.*  Finally, CMC claims that attorney misconduct permeated the

proceedings. *Id.* at 37–38.  The Court rejects each of these arguments and finds that CMC has not

met its burden of showing entitlement to a new trial.  Accordingly, the Court **DENIES** the motion.

### i.    Exclusion of Late-Disclosed Witnesses

CMC first challenges the Court's decision to exclude the video deposition testimony of

SMS sales manager Mario Fabro and Primetals representative Ed Woodrow because they were not

included on CMC's witness list submitted before trial as required by the Court's Standing Order.

Mot. at 33.  CMC argues that Mr. Fabro would have testified that "SMS understood that PSG was

looking to buy a micromill similar to a Danieli MiDa mill [in August 2020], that SMS could

provide that technology to PSG in 2020, and that it was PSG—not SMS—who decided to call off

any discussions between PSG and SMS." *Id.* at 34.  CMC likewise argues that Mr. Woodrow

would have testified that Primetals was "ready and willing" to offer its technology to PSG in 2020.

*Id.*

"A district court is vested with broad discretion to make . . . evidentiary rulings conducive

to the conduct of a fair and orderly trial." *S.M. v. J.K.*, 262 F.3d 914, 919 (9th Cir. 2001), *as

amended*, 315 F.3d 1058 (9th Cir. 2003) (citation omitted).  Where a party seeks a new trial based

on unfavorable evidentiary rulings, it must establish that the court's rulings were both erroneous

and substantially prejudicial. *See Ruvalcaba v. City of L.A.*, 64 F.3d 1323, 1328 (9th Cir. 1995).

The challenged ruling does not provide any basis for a new trial.  First, the Court's ruling

was not erroneous.  CMC announced its intention to introduce deposition testimony of the late-

disclosed witnesses for the first time the night before trial, claiming that it provided prior notice to

PSG by including deposition designations of Woodrow and Fabro's testimony in the parties' joint

pretrial statement. *See* Dkt. No. 443 at 2–3.  But as the Court found, the deposition designations

were "not an adequate substitute for the clear and direct witness disclosures required by the

United States District Court
Northern District of California

1  Standing Order." *See* Dkt. No. 475 at 2; Civil Pretrial and Trial Standing Order for Cases Before

2  District Judge Haywood S. Gilliam, Jr. ("Standing Order") ¶ 7(g) (requiring the joint pretrial

3  statement witness list to include "all witnesses likely to be called at trial," without distinguishing

4  between live and deposition testimony).  In addition, the Court found that allowing the witnesses

5  to testify would prejudice PSG because it had reasonably prepared its case with the understanding

6  that the witnesses would not be called, and would have had only the weekend before trial to adjust

7  its plans. *See* Dkt. No. 475 at 3.  This ruling plainly comports with Federal Rule of Civil

8  Procedure 37(c)(1) (stating that a party that "fails to . . . identify a witness as required by Rule

9  26(a) . . . is not allowed to use that . . . witness . . . at a trial, unless the failure was substantially

10  justified or is harmless).[10]

11      Further, CMC has not shown that it was substantially prejudiced by the Court's ruling.

12  CMC argues that the exclusion of Woodrow and Fabro's testimony prejudiced CMC's ability to

13  refute PSG's arguments regarding the alternative mills SMS and Primetals could offer to PSG.

14  Reply at 21.  However, CMC presented extensive evidence about these alternatives, and the jury

15  necessarily rejected its position. *See* Mot. at 12–14 (discussing evidence that Benson and PSG

16  considered SMS to be a viable alternative, that other companies subsequently used the technology

17  from Primetals and SMS, and that it was PSG, not SMS, that ended negotiations over an

18  alternative mill).  And the Court's ruling only applied to CMC's attempt to call the witnesses as

19  part of its case in chief. *See* Dkt. No. 475 at 3–4 (rejecting defense counsel's contention at oral

20  argument that CMC intended to call the witnesses solely for impeachment purposes, a claim belied

21  by CMC's prior arguments and their testimony); *see also* Standing Order ¶ 7(g) (stating that "[n]o

22  party shall be permitted to call any witness in its case in chief who is not disclosed in its pretrial

23  statement").

24      ii.    **Stipulated Facts**

25      CMC next argues that the Court improperly allowed PSG to repudiate stipulated facts.

26  Mot. at 35–36.  Before trial, the parties had agreed to a lengthy set of undisputed facts. *See* Dkt.

27

28  _____

[10] CMC erroneously cites Federal Rule of Civil Procedure 37(b) for this rule. *See* Mot. at 33.

No. 343 at 4–9 (joint pretrial statement); Dkt. No. 416 at 35–39 (joint proposed jury instructions). This included the fact that "Commercial Metals and Danieli agreed that Danieli would not sell to any company other than Commercial Metals . . . a regular MiDa mill within 500 miles of the GPS coordinates of Commercial Metals's traditional minimill in Rancho Cucamonga, California, for three years." *See* Dkt. No. 416 at 37. CMC introduced this fact at trial, stating that, "it is undisputed in this case that the exclusivity period was three years." Tr. 635:19–20. Over PSG counsel's objection, the Court instructed the jury to treat the stipulated fact as proven. Tr. 636:13–17. Later in the trial, PSG introduced evidence that the length of the exclusivity period actually was up to six years, rather than three years. *See e.g.*, TX 202-2 (contract language). PSG re-raised its concern that the stipulated fact conflicted with the evidence, and the Court instructed the parties to try and work out the issue. Tr. 1349:11–20, 1351:7–9.

The parties then agreed that the stipulated facts "need not to be read to the jury." Tr. 1523:5–9. CMC's initial position was that "[PSG] can make whatever arguments they'll make and we'll make whatever arguments we'll make. But we're not going to refer to stipulated facts as part of that argument." Tr. 1526:7–10. The Court shared that its initial inclination was to strike the one fact that the jury was instructed to take as proven, but allowed the parties to come back with a proposal on how to deal with the prior instruction to the jury regarding stipulated facts. Tr. 1524:5–8, 1526:17–22. CMC subsequently took the position that no curative instruction was necessary because CMC had "every right to use" the fact at the time, and "a curative instruction could potentially prejudice CMC" by suggesting counsel "invoked the fact improperly." *See* Tr. 1962:13–19; 1963:6–16. Having heard the parties' positions, the Court instructed the jury that "there are no stipulated facts to which the parties have agreed, and so you should disregard any prior instruction that a fact was agreed and must be treated as proven. I think there was probably only one over the course of the trial. But that instruction no longer applies in your assessment of the evidence." Tr. 2036:22–2037:2.

CMC claims now that PSG "convinced the Court to jettison the stipulated facts entirely." Mot. at 36. CMC argues that it prepared its case with the understanding that the length of the exclusivity agreement was undisputed, and the Court's ruling allowed PSG to suggest that CMC's

1    witnesses and attorneys were lying when they referenced a previously stipulated fact. *Id.* Besides

2    mischaracterizing the parties' agreement that the remaining stipulated facts need not be read to the

3    jury, Tr. 1523:5–9, as a decision by the Court to "jettison" the facts, CMC fails to show that the

4    instruction regarding the single stipulated fact was either erroneous or substantially prejudicial.

5        First, the Court's setting aside of the stipulated fact was proper. "Relief from [stipulated

6    facts in a] pretrial order is committed to the district court's discretion." *See Seymour v. Summa*

7    *Vista Cinema, Inc.*, 809 F.2d 1385, 1388 (9th Cir.), *amended*, 817 F.2d 609 (9th Cir. 1987). Such

8    facts may be modified to "prevent manifest injustice." *See Angle v. Sky Chef, Inc.*, 535 F.2d 492,

9    495 (9th Cir. 1976); *Jeffries v. United States*, 477 F.2d 52, 55 (9th Cir. 1973) ("A stipulation of

10    counsel originally designed to expedite a trial should not be rigidly adhered to when it becomes

11    apparent that it may inflict manifest injustice upon one of the subscribers thereto."). PSG

12    introduced evidence that contradicted one interpretation of an otherwise ambiguous stipulated fact.

13    PSG promptly objected to this ambiguity when this stipulated fact was introduced. The Court

14    acknowledges that it would have been preferable if the parties had agreed only to unambiguous

15    and unobjectionable stipulated facts ahead of trial. But directing the jury to conclude that the

16    parties both agreed that the exclusivity window extended only three years from signing despite

17    substantial evidence to the contrary would have been error.

18        Moreover, CMC has not shown that the Court's decision or its curative instruction

19    substantially prejudiced CMC. Contrary to CMC's assertions that the Court unilaterally

20    "jettisoned" the remaining stipulated facts, both sides agreed that only one stipulated fact had been

21    entered into the record and that the Court need not admit any more. *See* Tr. 1523:5–9, 1964:5–11.

22    The Court heard both parties' positions on how to address the remaining misconception about the

23    stipulated facts.[11] The Court then provided a curative instruction that did not draw attention to the

24    particular fact or place blame on either party. CMC argues that PSG "weaponized CMC's

25    justified reliance" on the previously stipulated fact to "convince the jury that CMC's witnesses

26

27    ───────────────

28    [11] Despite having the opportunity to argue its position to the Court at trial, CMC did not cite a single one of the cases it now cites in its brief—or any case—in support of its argument that PSG should not be allowed to withdraw the stipulated fact.

United States District Court
Northern District of California

1    and counsel were lying to them, greatly prejudicing CMC." Mot. at 36. The Court disagrees that

2    PSG's references to the disputed exclusion period were fairly characterized as "weaponizing" the

3    previously stipulated fact, but in any event CMC did not object to PSG's closing argument and

4    thus waived any challenge.[12] Even if it had, the Court finds that nothing about this sequence of

5    events rose to the high level of prejudice warranting a new trial.

6         ###    iii.    Jury Instructions

7         CMC argues that a new trial is warranted because the Court failed to instruct the jury about

8    foreclosure of competition, having rejected CMC's request to include such language. *See* Mot. at

9    36. CMC claims it was prejudiced because the Court's ruling allowed PSG to misstate the law

10   and claim that PSG does not have to show a MiDa mill was the only possible way to compete. *Id.*

11   at 37. As the Court discussed extensively above, "foreclosure" is not an explicit element of the

12   proof of competitive harm standard under the rule of reason test, and the Court was not required to

13   import such language from the exclusive dealing context. The Court properly instructed the jury

14   that it could consider the availability of alternative mill technology as a factor in the competitive

15   harm analysis. *See* Dkt. No. 491 at 22–23 (instructing the jury that it could consider "the number

16   of competitors in the relevant market" and "whether there are barriers to entering the market").

17   This was not an error and is not grounds for a new trial.

18        ###    iv.    Exclusion of Kern County Evidence

19        CMC argues it was substantially prejudiced when the Court erroneously excluded an email

20   from Mr. Olson to PSG's engineers. Mot. at 37. CMC contends that this email would have

21   impeached Mr. Olson's statements that PSG could only work on "ministerial-type activities" for

22   CEQA and could not proceed with the necessary EIR process while the exclusivity agreement was

23   in effect. *Id.*

24        The Court did not err by excluding this exhibit. The Court's standing order requires that

25   the parties' pretrial exhibit lists contain "citations to all evidence that a party might introduce at

26   trial, other than that to be used solely for impeachment or rebuttal." *See* Standing Order ¶¶ 4, 7(h);

27   _____

28   [12] CMC's objection to the curative instruction and the repudiation, Tr. 1962:13–14, 1963:3–10, is
     not the same as an objection to an allegedly prejudicial line of argument in closing.

United States District Court
Northern District of California

1    *see also* Fed. R. Civ. P. 26(a)(3)(A)(iii).  The Court determined that the document was "not fairly

2    characterized as being solely for impeachment given that the substance of it is really the same

3    matter we've been going over for a long time, including a number of documents that were

4    disclosed as exhibits."  Tr. 1029:11–23.  The Court has discretion to exclude evidence for failure

5    to timely disclose, and CMC makes no argument that its failure to include this exhibit was

6    "substantially justified or [was] harmless."  *See R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240,

7    1246 (9th Cir. 2012).  Nor does CMC dispute the Court's original finding that this evidence was

8    not solely for impeachment.

9        Even had this been an error, this ruling did not substantially prejudice CMC.  CMC had

10    ample opportunity to challenge Mr. Olson's testimony, and it introduced testimony and exhibits in

11    support of its position that PSG was able to proceed with the CEQA process in meaningful ways.

12    *See* Mot. at 28–29 (discussing this evidence extensively in the context of injury/causation).

13              **v.    Amended Jury Instruction**

14        CMC next argues that the Court's amendment to one jury instruction after CMC's closing

15    argument was "wildly prejudicial" and erroneous.  Mot. at 37.  Neither is true.  First, the Court did

16    not err in amending the jury instruction to accurately reflect antitrust principles.  PSG originally

17    argued at the charging conference that the Court should include optional language from the ABA

18    model instructions alluding to future harm in the jury instruction for harm to competition.  *See* Tr.

19    2066:11–2069:1; ABA Model Instruction 1.C.2, "Rule of Reason—Proof of Competitive Harm"

20    (stating that "to prove that the challenged restraint is unreasonable, plaintiff first must demonstrate

21    that the restraint has resulted [*or is likely to result*] in a substantial harm to competition")

22    (emphasis in original).  While recognizing that PSG's theory relied upon "future consequences

23    being claimed from the effect of the restraint in the past," the Court rejected PSG's request,

24    reasoning that the standard instruction already permitted PSG's theory.  Tr. 2066:24–2068:16.

25    But at closing, CMC argued that "PSG doesn't have any real world evidence that the exclusivity

26    agreement resulted in substantial harm" and "PSG can't point to a single customer that paid higher

27    prices during the 16-month period that the exclusivity was in effect, up through and including

28    today."  Tr. 2220:5–10, 2238:1–8 ("Nobody has paid higher prices because of the exclusivity.

United States District Court
Northern District of California

1    They can't point to a single customer that did.").  PSG promptly objected, arguing that CMC's

2    statement that consumers must have already felt the price effects misstated the law.  Tr. 2269:11–

3    2270:1.  In additional briefing, PSG argued that the Court should amend the jury instruction to

4    include the optional language.  *See* Dkt. No. 489 at 5; Tr. 2297:19–2298:11 (PSG counsel

5    clarifying that it was only seeking to amend the instruction to use the ABA's optional language).

6    The Court concluded that the optional language was legally correct and, given CMC's statements

7    during closing argument, should be included.  Tr. 2285:10–2288:9 (discussing reasoning and

8    supporting Ninth Circuit precedent), 2298:22–2299:5 (ruling on the issue).

9            This ruling was legally sound.  CMC argued that the inclusion of the future harm language

10    would misstate the law.  *See* Tr. 2288:12–14.  But CMC did not cite any on-point authority

11    explaining why the ABA-sanctioned language could not apply as a matter of law in this case.  *See*

12    Tr. 2295:1–8; Dkt. No. 489 at 7–9 (citing no supporting authority).  As the Court has discussed

13    above with respect to the element of competitive harm, the optional language in the instruction is

14    supported by precedent and did not misstate the law.  While the optional language may not need to

15    be given in every case, the facts developed at trial supported a theory of harm that is likely to be

16    felt in the future.  *See* Tr. 2289:15–2291:4.  And as PSG correctly observed, mills can take years

17    to construct, and CMC's closing argument suggested that PSG had to show higher prices "during a

18    time when the mill could not possibly have been operational, even absent CMC's misconduct."

19    Dkt. No. 489 at 5.  Allowing the jury to believe that PSG could not show competitive harm

20    through evidence of a likely future increase in prices would have been wrong as a matter of law.

21    *See Deck v. Jenkins*, 814 F.3d 954, 981 (9th Cir. 2016) ("Arguments of counsel which misstate the

22    law are subject to objection and correction by the court . . . ." (citation omitted)).

23            Additionally, the change did not result in substantial prejudice to CMC.  The Court denied

24    PSG's request for a curative instruction implying that the Court amended the jury instructions

25    because CMC had mischaracterized the law.  *See* Tr. 2300:13–15.  Instead, the Court told the jury

26    directly that it was responsible for making the change, not the parties, and gave CMC counsel the

27    opportunity to supplement its closing argument in light of the change.  *See* Tr. 2303:21–2304:5.

28

33

1

### vi.    Attorney Misconduct

2    Finally, CMC argues that attorney misconduct "permeated the proceeding" because PSG

3  counsel (1) introduced false testimony that PSG could not start the CEQA process without the

4  signed Danieli contract; (2) referenced improper hearsay evidence in closing; (3) accused CMC

5  witnesses and counsel of lying about the exclusivity window; and (4) accused CMC's witness of

6  presenting a false narrative, despite evidence to the contrary.  Mot. at 37–38.  The Court finds that

7  CMC has not come close to meeting the high threshold for disturbing the jury's verdict on these

8  grounds.

9    "A new trial is warranted on the ground of attorney misconduct during the trial where the

10 flavor of misconduct sufficiently permeates an entire proceeding [such] that the jury was

11 influenced by passion and prejudice in reaching its verdict."  *Anheuser-Busch, Inc. v. Nat.*

12 *Beverage Distribs.*, 69 F.3d 337, 346 (9th Cir. 1995) (quotation omitted).  "[W]here offending

13 remarks occurred principally during opening statement and closing argument, rather than

14 throughout the course of the trial, we are less inclined to find the statements pervaded the trial and

15 thus prejudiced the jury."  *Settlegoode v. Portland Pub. Schs.*, 371 F.3d 503, 518 (9th Cir. 2004)

16 (quotation omitted).  There is a high threshold for this showing where a party does not object to

17 the alleged misconduct during trial.  *See Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th

18 Cir. 2002).

19    First, CMC argues that PSG's counsel encouraged and introduced false testimony about

20 Kern County and the CEQA process.  This is a repackaged critique of PSG's evidence regarding

21 the CEQA process, which the Court has already rejected.  CMC offers no explanation as to how

22 PSG's line of questioning was improper.  PSG was entitled to try to show that, while it may have

23 started the CEQA process during the exclusivity window, it could not meaningfully begin the EIR

24 process until it had a signed contract.  Whether PSG successfully did so and whether Olson's

25 testimony was credible were questions for the jury.  The Court does not find given the trial record

26 that this testimony was false or that counsel otherwise acted improperly.  And CMC was not

27 prejudiced by this line of questioning, as it had ample opportunity to cross-examine PSG's

28 witnesses and to offer witnesses of its own.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Relatedly, CMC objects to PSG's reference in closing to Mr. Olson's statement regarding

2  Kern County's unwillingness to move forward without a signed contract with Danieli.  But the

3  Court promptly reminded the jury of its substantive limiting instruction when CMC objected.  Tr.

4  2343:12–2344:1.  This complaint is not a basis for overturning the jury's verdict.

5    Next, CMC argues that PSG's counsel improperly repudiated a stipulated fact and implied

6  that CMC's counsel and witnesses were lying.  Once more, CMC is repeating its earlier

7  arguments.  As discussed previously, PSG was within its rights to discuss the ambiguity in the

8  exclusivity window language, and its attack on CMC's credibility (which was grounded in what

9  the key document actually said on its face) does not rise to the level of misconduct.  Even if it did,

10  CMC has fallen well short of demonstrating that it was prejudiced by this isolated comment or that

11  such prejudice permeated the proceedings so thoroughly as to warrant retrial.

12    Finally, CMC argues that PSG's characterization of Mr. Henderson's testimony as a "false

13  narrative" went against the evidence and was misconduct.  "Using some degree of emotionally

14  charged language during closing argument in a civil case is a well-accepted tactic in American

15  courtrooms."  *See Settlegoode*, 371 F.3d at 518.  Casting CMC's witness as advancing a lawyer-

16  driven but untrue narrative was within the realm of commentary on what the evidence showed and

17  does not amount to misconduct.  CMC also did not object to this statement during the trial, and it

18  does not explain how it was prejudiced by it.  In short, these few incidents over the course of a

19  two-week trial fall well short of showing that attorney misconduct "permeated the proceedings."

20    For all these reasons, the Court **DENIES** CMC's motion for new trial.

21  **IV.    MOTION FOR ATTORNEYS' FEES**

22    Also before the Court is PSG's unopposed motion for attorneys' fees, Dkt. No. 548.  The

23  Court **GRANTS** the motion.

24    **A.    Legal Standard**

25    The Sherman Act authorizes an injured plaintiff to recover "a reasonable attorney's fee."

26  15 U.S.C. § 15(a); Dkt 525 at 2 (entering judgment).  "An award of attorney's fees as part of the

27  cost of a successful antitrust suit is mandatory . . . ."  *Twin City Sportservice, Inc. v. Charles O.*

28  *Finley & Co.*, 676 F.2d 1291, 1312 (9th Cir. 1982).

The Ninth Circuit uses the "lodestar" method to determine reasonable attorney fees. *See Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008). The court calculates the lodestar "by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate." *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 945 (9th Cir. 2007). Courts assessing reasonableness consider factors such "(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases." *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975). "The fee applicant has the burden of producing satisfactory evidence, in addition to the affidavits of its counsel, that the requested rates are in line with those prevailing in the community for similar services of lawyers of reasonably comparable skill and reputation." *Jordan v. Multnomah Cnty.*, 815 F.2d 1258, 1263 (9th Cir. 1987).

### B.    Discussion

PSG's counsel seeks attorneys' fees of $19,016,423.96 for 23,153.65 total hours worked across three law firms. Dkt. No. 548 at 2; Dkt. No. 548-1 at 28 (Cohen Milstein, seeking $9,786,551.26 for 13,861.25 hours); Dkt. No. 548-2 at 20 (Farella Braun, seeking $2,691,397.90 for 3943 hours); Dkt. 548-3 at 12 (Quinn Emanuel, seeking $6,538,474.80, for 5349.4 hours). The rates in question range from $735 to $2,169 for partners and of counsel, $325 to $1,278 for associates, discovery counsel, and contract attorneys, and $285 to $710 for support staff. Dkt. No. 548 at 15. PSG submits a declaration from each firm, explaining what each attorney worked on, how many hours they billed, and what their hourly rates were. *See* Dkt. No. 548-1; 548-2; 548-3. PSG seeks only 90% of fees incurred before April 26, 2022, to account for work on dismissed claims. *See* Dkt. No. 548 at 10. It has also removed any entries from timekeepers working fewer than five hours and does not seek compensation for the time value of money. *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

PSG argues that these fees reasonably compensate more than four years of complex work that resulted in a 12-day trial and recovered the full requested damages. *Id.* at 10–11. It further notes that (1) there was no prior or concurrent litigation from the DOJ or FTC to support its efforts; (2) the case involved challenging factual and legal issues; and (3) the case was skillfully litigated by both sides. *Id.* at 11. PSG argues that the rates are reasonable "in light of counsels' exceptional experience litigating complicated antitrust cases like this one, the quality of their work, and the prevailing rates of similarly qualified counsel in this district." *Id.* at 12. It cites ample evidence that Cohen Milstein, Farella Braun, and Quinn Emanuel's similar hourly rates have been found reasonable by other courts, including some in the Northern District. *Id.* at 13–15. Finally, PSG submits an expert declaration agreeing that the hourly rates were reasonable and "well in line with the hourly rates charged by and awarded to comparably qualified San Francisco Bay Area attorneys for comparable work and results." *Id.* at 16 (quoting expert declaration). Its expert notes that, while Quinn Emanuel charged high rates (sometimes above $2,000), this reflected its leading role at trial and "unrivaled expertise and experience." *Id.* CMC filed a statement of non-opposition to this motion. Dkt. No. 552.[13]

Having reviewed PSG's counsels' filings, the Court finds that the requested hourly rates are reasonable and generally in line with "prevailing hourly rate[s] in the Northern District for work that is similar to that performed in this case, by attorneys with the skill, experience and reputation comparable" to those involved in this case. *See Camacho*, 523 F.3d at 980–81. PSG cites ample evidence that the hourly rates requested were actually billed and are in line with counsels' customary rates. Dkt. No. 548 at 16; Dkt. No. 548-4 at 14–15. PSG and its expert also point to extensive evidence of comparable rates in the Bay Area, including by citing recent cases affirming the reasonableness of similar fees from these same law firms. Dkt. No. 548 at 13–15; Dkt. No. 548-4 at 16–29. The Court also agrees that counsels' experience and the achieved result support the reasonableness of these rates. Dkt. No. 548-4 at 15–16. Notably, CMC does not

---

[13] Despite filing a statement of non-opposition, CMC states that it "does not concede the reasonableness of the total amount of fees requested" and draws attention to the fact that 58 timekeepers billed to this matter. Dkt. No. 552 at 2.

oppose this motion or dispute any of these findings.

Additionally, the Court finds that the number of hours worked on this case was reasonable. While more than $20,000,000 in fees across more than 23,000 hours is a large amount, PSG rightfully points out that this case involved complicated legal questions and more than four years of highly contested litigation involving multiple rounds of motions to dismiss and extensive summary judgment litigation, ultimately culminating in a 12-day jury trial.  CMC observes in its non-opposition that 58 timekeepers is high, but the Court agrees with PSG that this reasonably reflects the extensive demands of a major half-decade-long antitrust case that goes to trial.

Because this case involved a substantial, multi-year effort culminating in a complex and costly trial, and recognizing that CMC does not oppose this motion, the Court finds that the requested attorneys' fees are reasonable.  Accordingly, the Court **GRANTS** this motion.

## V.    ADMINISTRATIVE MOTIONS TO SEAL

Before the Court are CMC's two motions to consider whether another party's materials should be sealed, Dkt. Nos. 535 and 542.  The Court GRANTS IN PART and DENIES IN PART the motions.

### A.    Legal Standard

Courts generally apply a "compelling reasons" standard when considering motions to seal documents.  *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010) (quoting *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)).  "This standard derives from the common law right 'to inspect and copy public records and documents, including judicial records and documents.'"  *Id.* (quoting *Kamakana*, 447 F.3d at 1178).  "[A] strong presumption in favor of access is the starting point."  *Kamakana*, 447 F.3d at 1178 (quotations omitted).  To overcome this strong presumption, the moving party must "articulate compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure, such as the public interest in understanding the judicial process."  *Id.* at 1178–79 (citations, internal quotation marks, and alterations omitted).  For example, a court may order sealing under the "compelling reasons" standard of confidential and proprietary business information when public disclosure of such information "could result in improper use by

1    business competitors." *See Hyams v. CVS Health Corp.*, No. 18-CV-06278-HSG, 2023 WL

2    2960009, at *2 (N.D. Cal. Mar. 15, 2023).

3        When a party seeks to seal a document that has been designated as confidential by another

4    party or non-party, the party filing the sealing motion need not satisfy the showing described

5    above. *See* Civ. L-R 79-5(f)(1). Instead, within seven days of the motion's filing, the designating

6    party must file a statement or declaration justifying the reasons for keeping the document or

7    information under seal. *Id.* 79-5(f)(3). A failure to file a statement or declaration may result in the

8    unsealing of the provisionally sealed material without further notice to the designating party. *Id.*

9        **B.    Discussion**

10       Dkt. Nos. 535 and 542 pertain to materials filed in connection with CMC's motion for

11   judgment as a matter of law and a new trial. Dkt. No. 535 seeks to file under seal excerpts of

12   CMC's opening brief designated confidential by non-parties Nucor and Primetals. *See* Dkt. No.

13   535 at 2. Dkt. No. 542 similarly seeks to file under seal excerpts of CMC's reply brief designated

14   confidential by non-party Nucor. *See* Dkt. No. 542 at 2.

15       Nucor timely filed responses to CMC's motions. *See* Dkt. Nos. 538 and 544. Nucor

16   requests that the Court redact two excerpts of CMC's motion and one excerpt of CMC's reply

17   brief because they contain Nucor's nonpublic, commercially sensitive information, including

18   confidential business strategies. *See* Dkt. No. 538 at 2; Dkt. No. 544 at 2. PSG did not respond to

19   CMC's motions. Primetals also did not respond to CMC's motions.

20       The Court finds that the documents and information Nucor seeks to seal contain the

21   company's commercially sensitive and confidential business information, and that this fact

22   satisfies the compelling reasons standard and outweighs the public's interest in viewing the

23   documents. *See Baird v. BlackRock Institutional Tr. Co., N.A.*, 403 F.Supp.3d 765, 792 (N.D. Cal.

24   2019) ("[C]onfidential business information in the form of license agreements, financial terms,

25   details of confidential licensing negotiations, and business strategies satisfies the compelling

26   reasons standard." (quotation omitted)). The disclosure of this non-public business information

27   could reasonably place Nucor at a competitive disadvantage. *See In re Qualcomm Litig.*, No.

28   3:17-CV-0108-GPC-MDD, 2017 WL 5176922, at *2 (S.D. Cal. Nov. 8, 2017) (observing that

United States District Court
Northern District of California

1  sealing confidential business information "prevent[ed] competitors from gaining insight into the

2  parties' business model and strategy"); *see also Finisar Corp. v. Nistica, Inc.*, No. 13-CV-03345-

3  BLF (JSC), 2015 WL 3988132, at *4 (N.D. Cal. June 30, 2015) (sealing "confidential product and

4  business information which is not intended for public disclosure"). Further, Nucor did not

5  voluntarily put this information at issue in this litigation. *See United States v. Bazaarvoice, Inc.*,

6  No. 13-CV-00133-WHO, 2014 WL 11297188, at *1 (N.D. Cal. Jan. 21, 2014).

7      Accordingly, the Court **GRANTS** Dkt. Nos. 535 and 542 as to the materials identified by

8  Nucor. The Court **DENIES** the remainder of Dkt No. 535, as Primetals did not file a declaration

9  or response presenting a basis for sealing any other documents or information. *See* Civ. L.R. 79-

10  5(f)(3) ("A failure to file a statement or declaration may result in the unsealing of the provisionally

11  sealed document without further notice to the Designating Party."). The Court **DIRECTS** the

12  parties to file unredacted versions of the opening brief on the public docket within 7 days of this

13  order.

## VI.  CONCLUSION

15      The standard for granting a motion for judgment as a matter of law is high, and the Court

16  must draw all reasonable inferences in favor of upholding the jury's verdict. The standard is

17  similarly high for a motion for new trial. CMC has not shown a sufficient basis to disturb the

18  verdict. Accordingly, CMC's motion for judgment as a matter of law and for a new trial, Dkt. No.

19  536, is **DENIED**. PSG's motion for attorneys' fees, Dkt. No. 548, is **GRANTED**. CMC's

20  administrative motion to seal, Dkt. No. 542, is **GRANTED**. CMC's remaining motion to seal,

21  Dkt. No. 535, is **GRANTED IN PART** and **DENIED IN PART**.

23      **IT IS SO ORDERED.**

24  Dated:    9/29/2025

25  _____

26  HAYWOOD S. GILLIAM, JR.
    United States District Judge

*United States District Court*
*Northern District of California*