UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC STEEL GROUP,<br><br>        Plaintiff,<br><br>    v.<br><br>COMMERCIAL METALS COMPANY, et al.,<br><br>        Defendants. | Case No. 20-cv-07683-HSG<br><br>**ORDER GRANTING MOTION TO STAY EXECUTION OF JUDGMENT WITHOUT A BOND**<br><br>Re: Dkt. No. 563 |

United States District Court
Northern District of California

Pending before the Court is Defendants' motion to stay execution of judgment without a bond.  Dkt. No. 563 ("Mot."); Dkt. No. 567 ("Opp."); Dkt. No. 568 ("Reply"); Dkt. No. 573 ("Sur-Reply").[1]  The Court held a hearing on the motion, Dkt. No. 579 ("Tr."), and the Court now **GRANTS** it.[2]

## I.    DISCUSSION

On November 5, 2024, a jury returned a verdict in favor of Plaintiff Pacific Steel Group ("PSG") and against Defendants Commercial Metals Company, CMC Rebar West, and CMC Steel US, LLC (collectively, "CMC").  *See* Dkt. No. 496.  Final judgment was subsequently entered in favor of Plaintiff against Defendants in the amount of $330,110,409.  *See* Dkt. No. 525. On September 29, 2025, the Court denied CMC's motion for judgment as a matter of law and for new trial.  *See* Dkt. No. 562.  CMC has appealed this order to the Ninth Circuit, Case No. 25-6912, *see* Dkt. No. 574, and it now asks the Court to stay execution of the judgment pending resolution of the appeal without requiring a supersedeas bond, *see generally* Mot.

---

[1] The Court granted Plaintiff leave to file a sur-reply.  Dkt. No. 572.

[2] Plaintiff's counsel did not appear at the hearing.

Under Federal Rule of Civil Procedure 62(b), "[a]t any time after judgment is entered, a party may obtain a stay by providing a bond or other security." Fed. R. Civ. Proc. 62(b). The Ninth Circuit has held, however, that the Court has "inherent discretionary authority in setting supersedeas bonds," *Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1505 n.1 (9th Cir. 1987), and may "waive the bond requirement if it sees fit," *Townsend v. Holman Consulting Corp.*, 881 F.2d 788, 796–97 (9th Cir. 1989), *vacated on reh'g on other grounds*, 929 F.2d 1358 (9th Cir. 1990) (en banc). The bond is intended to "ensure[] that the appellee will be able to collect the judgment plus interest should the court of appeals affirm the judgment." *Opticurrent, LLC v. Power Integrations, Inc.*, No. 17-CV-03597-EMC, 2019 WL 2389150, at *25 (N.D. Cal. June 5, 2019). As such, courts typically consider five factors to determine whether waiver is appropriate:

> (1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and (5) whether the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in an insecure position.

*See Dillon v. City of Chicago*, 866 F.2d 902, 904–05 (7th Cir. 1988) (quotations and internal citations omitted); *accord Kranson v. Fed. Express Corp.*, No. 11-CV-05826-YGR, 2013 WL 6872495, at *1 (N.D. Cal. Dec. 31, 2013) (noting that "[c]ourts in the Ninth Circuit regularly use the *Dillon* factors in determining whether to waive the bond requirement"). The movant "has the burden to objectively demonstrate the reasons for departing from the usual requirement of a full supersedeas bond." *See Cotton ex rel. McClure v. City of Eureka, Cal.*, 860 F. Supp. 2d 999, 1028 (N.D. Cal. 2012) (quotation omitted).

The first four *Dillon* factors support waiver here, as the Court is confident that CMC is willing and able to quickly pay judgment if it loses its appeal.[3] CMC is "a financially stable

---

[3] The parties agree that the fifth *Dillon* factor is not implicated here. Mot. at 4 n.1 (citing *Dillon v. W. Publ'g Corp.*, No. 3:03-CV-0203-ECR-RAM, 2007 WL 9728805, at *2 (D. Nev. Oct. 5, 2007)); Opp. at 3 n.1.

Fortune 500 company" with a "book value" (assets minus liabilities) of over $4 billion, Mot. at 5; Dkt. No. 563-1 ¶ 5, and total liquidity exceeding $1 billion, Dkt. No. 580 ("Dec. Lawrence Decl.") ¶¶ 7–8 (December 2025 CFO declaration); *see also* Dkt. No. 568-1 ¶ 7 (October 2025 CFO declaration noting liquidity of $1.8 billion).[4]  This includes $300 million in cash on hand, which is expected to increase to $500 million once the pending acquisition of Foley Products Company ("Foley") closes.  Dec. Lawrence Decl. ¶¶ 7–8.[5]  CMC's CFO has represented that Defendants "will promptly pay the full amount" if the verdict is affirmed.  Dkt. No. 563-1 ¶ 3.[6]  In recognition of its expected liability, CMC has already "accrued a $350 million liability on its balance sheet in its publicly released statements."  Mot. at 4; *see* Dkt. No. 563-2 at 18 (November 2024 10-Q describing this litigation liability); *cf. Viavi Sols. Inc. v. Platinum Optics Tech. Inc.*, No. 20-CV-05501-EJD, 2025 WL 673637, at *2 (N.D. Cal. Mar. 3, 2025) (crediting fact that accounting department had "already accrued for the possibility that the full judgment" may be due).  While the judgment against CMC is large, this evidence convinces the Court that CMC will be able to quickly pay the judgment if necessary.

Even if the Court were concerned that CMC's ability to pay could change in the future, CMC has also committed to provide the Court with regular financial reports.  Mot. at 5; *see also* Tr. 10:5–12 (offering to provide "copies of . . . quarterly financials").  CMC also rightfully notes that it "is a public company and reports its financial statements regularly [such that] PSG and the Court will be able to readily track its financial condition and can address any concerns if

---

[4] As discussed below, the parties dispute the relevant amount of liquidity in light of two acquisitions that began shortly before and during the briefing for this motion.  Following the December motions hearing, the Court asked CMC's CFO to prepare a declaration showing the then-current state of CMC's finances.  Tr. 5:4–8, 11:3–5.  The Court relies primarily on that December declaration, which has the most complete picture of how CMC is impacted by these acquisitions.

[5] The total liquidity figures also include cash equivalents and amounts available under "revolving credit facilities."  Dec. Lawrence Decl. ¶¶ 7–8.

[6] PSG argues that CMC's assurance does "not detail how or how quickly CMC would" pay and is distinguishable from assurances credited in other cases where a party committed to pay the judgment within 30 days of affirmance.  *See* Opp. at 4–5.  CMC disagrees that this is a requirement, but it nevertheless commits to pay the judgment within 30 days of any unfavorable resolution of its appeal.  Reply at 4; Dkt. No. 568-1 ¶ 10 (CFO commitment).  This supports waiver of the bond requirement.

United States District Court
Northern District of California

necessary." Mot. at 5. Given CMC's financial stability, its commitment to pay within 30 days, and the Court's future visibility into any financial changes, the Court agrees that requiring CMC to post a supersedeas bond at this stage "would be a waste of money." *Dillon*, 866 F.2d at 904–05 (quotation omitted).

PSG primarily argues that CMC has not met its burden because CMC's liquid assets are substantially less than it represented given its two recent acquisitions. *See* Opp. at 2; Sur-Reply at 2. First, CMC announced on September 18, 2025, that it had purchased Concrete Pipe & Precast, LLC ("CP&P") for "a cash purchase price of $675 million," Dkt No. 567-1 at 7 (CMC Form 8-K), which constitutes a substantial portion of the "$850 million in cash and cash equivalents" that CMC originally claimed to have when it filed its motion on September 30, 2025, *see* Opp. at 3 (quoting Mot. at 3). CMC did not mention this in its opening motion. When addressing the CP&P acquisition in its reply, CMC also alerted the Court of its October 16, 2025 acquisition of Foley. Reply at 4 n.1. The Foley acquisition apparently has "a cash purchase price of $1.84 billion." Dkt. No. 573-2 (CMC Form 8-K). PSG argues that these "recent developments undermine CMC's conclusory assertions that the balance sheet attached to its motion alone demonstrates it could pay in full on time." Opp. at 5; *see also* Sur-Reply at 2 ("All that is certain at this time is that CMC has rapidly taken on significant additional debt well in excess of its 'available liquidity' . . . ."). As mentioned, the Court asked CMC in December to submit an updated declaration outlining CMC's current financial positions in light of these concerns. Tr. 5:4–8, 11:3–5; *see generally* Dec. Lawrence Decl.

Having reviewed the declarations, the Court is persuaded that these acquisitions do not currently pose any risk to CMC's ability to pay the judgment. CMC explained in October that it "has more than $1.8 billion in cash, cash equivalents, and lines of credit on which it can draw," which is "more than enough to pay $675 million to acquire CP&P and pay the $350 million Judgment, if required." Reply at 5–6. That statement is consistent with CMC's December financials, which estimated CMC's liquidity at $1.2 billion following closing of the CP&P acquisition. Dec. Lawrence Decl.¶¶ 3, 7. PSG argues that this amount is still insufficient given the $1.84 billion Foley acquisition. Sur-Reply at 2. While the parties disputed whether the

4

original financial mechanism for the Foley acquisition could impact CMC's cash positions, *compare* Reply at 4 n.1, *with* Sur-Reply at 2 (arguing that financing terms only lasted for 364 days), that mechanism has been supplanted by the issuance of "two tranches of senior notes" totaling $2 billion, which mature "on an eight year term and a ten year term." *See* Tr. 7:3–7, 8:12–21; *see also* Dkt. No. 580-2 (reporting on the senior notes). CMC represents that this financing will not impact its available liquidity or ability to pay. Dec. Lawrence Decl. ¶ 6.[7]

PSG also argues that CMC has previously raised $900 million through public debt financing, and the three major credit rating agencies have rated CMC's notes as "non-investment" or "junk" grade. Opp. at 6.[8] But CMC introduces evidence that the credit rating agencies specifically stated that CMC has "very good liquidity," "has capacity to add this additional debt [relating to its acquisitions] to its balance sheet," and has projected cash positions sufficient to pay the judgment. Reply at 7 (quoting Dkt. No. 568-5 at 2, 6; and Dkt. No. 568-6 at 2). CMC also introduces evidence that none of the three agencies changed their ratings following announcement of the acquisition for CP&P and Foley or the senior note financing, and two of them "explicitly accounted for the possibility that CMC might pay the Judgment in their ratings." Reply at 6; Dec. Lawrence Decl. ¶ 9; Dkt. No. 568-1 ¶¶ 12–14.

PSG's cited cases requiring a supersedeas bond are distinguishable. For example, PSG relies heavily on *Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*, No. 09-CV-05235-MMC, 2017 WL 2311249 (N.D. Cal. May 26, 2017). That case notably involved evidence that the appellant had an "Altman Z-Score" that "implie[d] bankruptcy possibility in the next two years." *Id.* at *2 (quotation omitted). There is no comparable evidence of financial distress in this case. And in *Opticurrent, LLC v. Power Integrations, Inc.*, No. 17-CV-03597-EMC, 2019 WL 2389150 (N.D. Cal. June 5, 2019), the court declined a motion to stay execution

---

[7] While the Court does not think the CP&P acquisition is evidence of inability to pay, the Court notes that CMC should have mentioned the CP&P acquisition in its original briefing, as this was clearly relevant to the representations about liquidity.

[8] PSG presumably would make the same arguments about the newest $2 billion in senior notes, as they received the same BB+ and Ba2 ratings. Dec. Lawrence Decl. ¶ 9. This does not meaningfully change the Court's analysis.

*United States District Court*
*Northern District of California*

of judgment largely because the party's "ability to pay the judgment [was] not beyond question given the risks attendant to" ongoing litigation in another case. *Id.* at *26.[9]

As a result, the Court determines that waiving the requirement to post a supersedeas bond is warranted. "[I]n the event that [CMC's] financial stability deteriorates materially, [PSG] may return to this Court and seek a modification of this order." *Celador Int'l Ltd. v. Walt Disney Co.*, No. 04-CV-03541-VAP (RNBx), 2011 WL 13187262, at *3 (C.D. Cal. Aug. 5, 2011).

## II.    CONCLUSION

Accordingly, the Court **GRANTS** the motion. Dkt No. 563. Execution of the November 2024 judgment is hereby stayed pending CMC's appeal. CMC is not required to post a supersedeas bond. The Court also **ORDERS** CMC to provide a short declaration outlining its updated financial position every 90 days (beginning 90 days after the date of this order). This declaration should identify CMC's total liquidity and update the Court on the status of the Foley acquisition and any other notable financial events.

**IT IS SO ORDERED.**

Dated:    3/31/2026

HAYWOOD S. GILLIAM, JR.
United States District Judge

---

[9] More generally, the Court is only aware of a handful of cases where a large and stable Fortune 500 company was required to post a supersedeas bond, and the movants in those cases put forward significantly less evidence. *See, e.g.*, *Sorrano v. New York Life Ins. Co.*, No. 96 C 7882, 2006 WL 1005902, at *1–*2 (N.D. Ill. Apr. 13, 2006) (noting that "even Fortune 500 companies can engage in questionable accounting practices, be forced to restate their financials and declare bankruptcy," and finding that a copy of financial statements without discussion of liquidity and "a promise that [the party] is good for any judgment is not enough" (quotation omitted)); *Thomas & Marker Const., Co. v. Wal-Mart Stores, Inc.*, No. 3:06-CV-406, 2009 WL 1119582, at *28 (S.D. Ohio Apr. 27, 2009) (rejecting stay of execution for Wal-Mart because "financial statements are merely a look back and not a look forward").